No. 23-5275

# In the United States Court of Appeals for the District of Columbia Circuit

———————————————

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,
PLAINTIFF-APPELLANT

*v.*

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
AND ADRIANNE TODMAN, IN HER OFFICIAL CAPACITY
AS ACTING SECRETARY OF HOUSING AND URBAN DEVELOPMENT,
DEFENDANTS-APPELLEES

———————————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (CIV. NO. 13-966)
(THE HONORABLE RICHARD J. LEON, J.)*

———————————————

**PAGE-PROOF BRIEF OF APPELLANT**

———————————————

KANNON K. SHANMUGAM
WILLIAM T. MARKS
YISHAI SCHWARTZ
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I, Kannon K. Shanmugam, counsel for appellant National Association of Mutual Insurance Companies and a member of the Bar of this Court, certify as follows:

**(A)**   **Parties and amici.**  The parties, intervenors, and amici that appeared before the district court or are participating in this appeal are the United States Department of Housing and Urban Development; Adrianne Todman, in her official capacity as Secretary of Housing and Urban Development; Marcia L. Fudge, in her former official capacity as Secretary of Housing and Urban Development; Shaun Donovan, in his former official capacity as Secretary of Housing and Urban Development; Julian Castro, in his former official capacity as Secretary of Housing and Urban Development; Benjamin S. Carson, Sr., in his former official capacity as Secretary of Housing and Urban Development; American Insurance Association; National Association of Mutual Insurance Companies; Judicial Watch, Inc., Allied Educational Foundation; National Fair Housing Alliance; Lawyers' Committee for Civil Rights Under Law; National Low Income Housing Coalition; Poverty & Race Research Action Council; National Housing Law Project; LatinoJustice PRLDEF; NAACP Legal Defense and Education Fund, Inc.; American Civil Liberties Union; National Consumer Law Center; National Community Reinvestment Coalition; Chamber of Commerce of the United States of America;

American Financial Services Association; Consumer Mortgage Coalition; Independent Community Bankers of America; Mortgage Bankers Association; National Association of Home Builders of the United States, Inc.; American Bankers Association; Consumer Bankers Association; Financial Services Roundtable; and American Association of Retired Persons.

(B)    **Rulings under review.**  The ruling under review is the district court's order and memorandum opinion of September 19, 2023, denying summary judgment to plaintiff, granting summary judgment to defendants, and dismissing the case.  D. Ct. Dkt. 155 & 156.  The district court's opinion is not yet reported but is available at 2023 WL 6142257 and is reproduced at pages ___-___ of the joint appendix.

(C)    **Related cases.**  This case has previously been before this Court under the caption *American Insurance Association, et al.* v. *Department of Housing & Urban Development, et al.*, No. 14-5321.  In that appeal, this Court vacated a prior judgment of the district court and remanded the case for further proceedings in light of the Supreme Court's decision in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).  Counsel for appellant is not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

MAY 1, 2024

ii

## CORPORATE DISCLOSURE STATEMENT

Appellant National Association of Mutual Insurance Companies is a trade association representing the commercial, professional, and other interests of homeowner's insurance companies.  It has no parent corporation, and no publicly held company owns 10% or more of it.

# TABLE OF CONTENTS

Page

Introduction.................................................................................1

Statement of jurisdiction................................................................3

Statement of the issue ...................................................................3

Pertinent statutory and regulatory provisions ...................................4

Statement of the case ...................................................................6

    A.    Background..................................................................6

    B.    Facts and procedural history..........................................9

Summary of argument ..................................................................17

Standard of review.......................................................................21

Argument...................................................................................22

    I.    The disparate-impact rule is unlawful as applied to
        the ratemaking and underwriting decisions of
        homeowner's insurers because it will cause the
        pervasive consideration of protected characteristics...................22

        A.    Ratemaking and underwriting are based on
              actuarial principles designed to allow insurers
              to identify, analyze, and group risks....................................23

        B.    The disparate-impact rule will cause the pervasive
              consideration of protected characteristics in
              ratemaking and underwriting ............................................27

        C.    The district court's contrary conclusion was incorrect ......36

    II.    The disparate-impact rule is unlawful as applied to
        the ratemaking and underwriting decisions of
        homeowner's insurers because state law limits
        insurers' discretion over those decisions.......................................40

        A.    State insurance laws severely limits insurers' discretion
              to consider protected charcateristics in ratemaking
              and underwriting ...............................................................41

Page

Table of contents—continued:

    B.    State insurance laws break the causal connection
           between ratemaking and underwriting and any
           disparity in the provision of homeowner's insurance .........46

    C.    The district court's contrary conclusion was incorrect ......49

Conclusion..............................................................................................53

## TABLE OF AUTHORITIES

### CASES

*AFL-CIO* v. *FEC*, 333 F.3d 168 (D.C. Cir. 2003) ...............................36

*Buchanan* v. *Warley*, 245 U.S. 60 (1917) ...........................................31

*Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984).....................................................................21

*Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*,
    508 U.S. 520 (1993).....................................................................31

*City of Cleburne* v. *Cleburne Living Center, Inc.*,
    473 U.S. 432 (1985).....................................................................31

*Davis* v. *District of Columbia*, 925 F.3d 1240 (D.C. Cir. 2019) .......................40

*Doe* v. *Mutual of Omaha*, 179 F.3d 557 (7th Cir. 1999)....................................48

*Genus Medical Technologies LLC* v. *FDA*, 994 F.3d 631 (D.C. Cir. 2021) ....21

*Greater New Orleans Fair Housing Action Center* v. *HUD*,
    639 F.3d 1078 (D.C. Cir. 2011).............................................................7

*Inclusive Communities Project, Inc.* v. *Lincoln Property Co.*,
    920 F.3d 890 (5th Cir. 2019).............................................................40

*Inclusive Communities Project, Inc.* v. *Texas Department of
    Housing & Community Affairs*, 747 F.3d 275 (5th Cir. 2014).....................51

Page

Cases—continued:

*Massachusetts Fair Housing Center* v. *HUD*,
  496 F. Supp. 3d 600 (D. Mass. 2020) .................................................14

*Miller* v. *Johnson*, 515 U.S. 900 (1995).......................................31, 34, 35

*NAACP* v. *American Family Mutual Insurance Co.*,
  978 F.2d 287 (7th Cir. 1992).............................................................25

*National Mining Association* v. *Kempthorne*,
  512 F.3d 702 (D.C. Cir. 2008)...........................................................30

*Ojo* v. *Farmers Group, Inc.*, 356 S.W.3d 421 (Tex. 2011) ..................48

*Ojo* v. *Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010) ..............48

*Oviedo Town Center II, L.L.P.* v. *City of Oviedo*,
  759 Fed. Appx. 828 (11th Cir. 2018)...........................................40, 52

*Raytheon Co.* v. *Hernandez*, 540 U.S. 44 (2003) ..................................7

*Ricci* v. *DeStefano*, 557 U.S. 557 (2009) .....................................7, 31, 34

*SAS Institute Inc.* v. *Iancu*, 138 S. Ct. 1348 (2018) ..........................21

*Saunders* v. *Farmers Insurance Exchange*,
  537 F.3d 961 (8th Cir. 2008)........................................................47, 48

*Students for Fair Admissions, Inc.* v. *President & Fellows of
  Harvard College*, 600 U.S. 181 (2023)..............................................30

*Texas Department of Housing & Community Affairs*
  v. *Inclusive Communities Project, Inc.*,                    2, 3, 9, 11-13, 15-23,
  576 U.S. 519 (2015)...........................................31-32, 34-40, 46-47, 49-52

*United States* v. *Virginia*, 518 U.S. 515 (1996) ...............................31

*University of Great Falls* v. *NLRB*, 278 F.3d 1335 (D.C. Cir. 2002) ..............30

Page

Cases—continued:

*Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ............................................................31

*Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642 (1989)..............................35, 41

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const., Amend. V.............................................................................18

Fair Housing Act,                            1-2, 6-13, 16, 17-20, 22,
42 U.S.C. §§ 3601-3619 ............................. 29, 31, 32, 34, 36, 38-39, 40, 48-49, 52

   42 U.S.C. § 3601 ............................................................................6

   42 U.S.C. § 3604 ............................................................................4

   42 U.S.C. § 3604(a)........................................................................6

   42 U.S.C. § 3604(b)........................................................................6

   42 U.S.C. § 3604(f)........................................................................6

McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015.................................12, 47, 48

   15 U.S.C. § 1012(b) ......................................................................12

26 U.S.C. § 42(m) ............................................................................52

28 U.S.C. § 1291 ..............................................................................3

28 U.S.C. § 1331 ..............................................................................3

24 C.F.R. § 100.500 ......................................................................4, 15

24 C.F.R. § 100.500(a) ......................................................................8

24 C.F.R. § 100.500(b) ......................................................................8

24 C.F.R. § 100.500(c)(1) ..................................................................8

Page

Statutes and regulations—continued:

24 C.F.R. § 100.500(c)(2) ........................................................................8

24 C.F.R. § 100.500(c)(3) ........................................................................8

Ala. Code § 27-13-27 ..............................................................................43

Ala. Code § 27-13-65(3) ..........................................................................43

Alaska Stat. § 21.39.030(a)(1)................................................................43

Alaska Stat. § 21.39.030(a)(2)................................................................43

Alaska Stat. § 21.39.030(a)(4)................................................................45

Ariz. Rev. Stat. Ann. § 20-384(B) ..........................................................43

Ariz. Rev. Stat. Ann. § 20-384(C) ....................................................42, 45

Ark. Code Ann. § 23-67-209(a)...............................................................43

Ark. Code Ann. § 23-67-209(b) ..............................................................42

Ark. Code Ann. § 23-67-210 ...................................................................45

Cal. Ins. Code § 679.71 ...........................................................................41

Cal. Ins. Code § 795.5 .......................................................................43, 44

Colo. Rev. Stat. § 10-3-1104.9(1)............................................................41

Colo. Rev. Stat. § 10-4-403(2)(a)(I) .......................................................43

Colo. Rev. Stat. § 10-4-403(4).................................................................45

Conn. Gen. Stat. § 38a-686(b)(3)............................................................45

Conn. Gen. Stat. § 46a-64c(a)(2) ...........................................................41

D.C. Code § 31-2231.13(d)......................................................................41

D.C. Code § 31-2703(b) ...........................................................................44

Page

Statutes and regulation—continued:

Del. Code Ann. tit. 18, § 2304(22) ................................................................41

Del. Code Ann. tit. 18, § 2503(a)(3) ..............................................................43

Fla. Stat. § 626.9541(1)(x) .............................................................................42

Fla. Stat. § 627.062(2)(b) ..........................................................................43, 44

Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(I) .........................................................41

Ga. Code Ann. § 33-9-4 ..................................................................................43

Haw. Rev. Stat. § 431:14-103(a)(2) ................................................................43

Haw. Rev. Stat. § 431:14-103(a)(5) ..........................................................42, 45

Idaho Code § 41-1405(1) ................................................................................43

Idaho Code § 41-1437(1) ................................................................................44

215 Ill. Comp. Stat. 5/424(3)......................................................................41, 42

Ind. Code § 27-1-22-3(a)(1).............................................................................44

Ind. Code § 27-7-12-7(1) ................................................................................42

Iowa Code § 515F.4(3).................................................................................42, 45

Kan. Stat. Ann. § 40-954(a) ............................................................................44

Kan. Stat. Ann. § 40-954(c) ......................................................................42, 45

Ky. Rev. Stat. Ann. § 304.12-085....................................................................42

Ky. Rev. Stat. Ann. § 304.13-031(1)(c)(7) .....................................................44

Ky. Rev. Stat. Ann. § 304.13-031(1)(e)...........................................................45

La. Stat. Ann. § 22:1454(A) ............................................................................42

La. Stat. Ann. § 22:1454(B)(1) .......................................................................44

ix

Page

Statutes and regulation—continued:

Mass. Gen. Laws Ann. ch. 175, § 4C .................................................................42

Mass. Gen. Laws Ann. ch. 175A, § 5(a)(1) .......................................................44

Md. Code Ann., Ins. § 11-205(c) .......................................................................44

Md. Code Ann., Ins. § 27-501(a)(1) ..................................................................42

Me. Rev. Stat. tit. 24-A, § 2303(1)(C) ...............................................................44

Me. Rev. Stat. tit. 24-A, § 2303(1)(G) ..........................................................42, 45

Mich. Comp. Laws § 500.2027(a)(i) ..................................................................42

Mich. Comp. Laws § 500.2110(1) ......................................................................44

Minn. Stat. Ann. § 70A.05(1) .............................................................................44

Minn. Stat. Ann. § 70A.05(2) .........................................................................42, 45

Miss. Code Ann. § 83-2-3(2)(a) .........................................................................44

Miss. Code Ann. § 83-2-3(2)(b) .....................................................................42, 45

Mo. Rev. Stat. § 375.936(11)(g) .........................................................................43

Mo. Rev. Stat. § 379.318(1) ...............................................................................44

Mont. Code Ann. § 33-16-201(2)(a) ..................................................................44

Mont. Code Ann. § 33-18-210(5) .......................................................................42

N.C. Gen. Stat. Ann. § 58-3-25(c) .....................................................................42

N.C. Gen. Stat. Ann. § 58-40-25 ........................................................................44

N.D. Cent. Code § 26.1-25-03(1)(a) ..................................................................44

N.D. Cent. Code § 26.1-25-03(1)(c) ..............................................................42, 45

N.H. Rev. Stat. Ann. § 412:15(II)(a) ..................................................................44

Page

Statutes and regulation—continued:

N.H. Rev. Stat. Ann. § 412:15(II)(b)..................................................42, 45

N.J. Stat. Ann. § 17:29AA-9 ...............................................................44

N.J. Stat. Ann. § 17:29B-4(7)(c) .........................................................42

N.J. Stat. Ann. § 17:29B-4(7)(d) .........................................................42

N.M. Stat. Ann. § 59A-17-7(A) ...........................................................44

N.M. Stat. Ann. § 59A-17-7(B) ...........................................................42

N.Y. Ins. Law § 2304(a) .......................................................................44

N.Y. Ins. Law § 2606 ...........................................................................42

Neb. Rev. Stat. § 44-7510(1) ...............................................................44

Neb. Rev. Stat. § 44-7510(3)(g) ...........................................................42

Nev. Rev. Stat. § 686B.060(1) ..............................................................44

Nev. Rev. Stat. § 686B.060(2) .......................................................42, 45

Ohio Rev. Code Ann. § 3935.03(B) ......................................................43

Ohio Rev. Code Ann. § 3935.03(C) ......................................................44

Ohio Rev. Code Ann. § 4112.02(H)(4) .................................................43

Okla. Stat. Ann. tit. 36, § 985(C) ........................................................42

Or. Rev. Stat § 737.310(1) ...................................................................43

Or. Rev. Stat § 737.310(4) ...................................................................44

Or. Admin. R. 836-081-0010 ...............................................................43

Pa. Cons. Stat. Ann. tit. 40, § 1171.5(a)(7)(iii) ...................................42

Pa. Cons. Stat. Ann. tit. 40, § 1183(a) .................................................44

Page

Statutes—continued:

R.I. Gen. Laws § 27-44-5(e)(1)...................................................44

R.I. Gen. Laws § 27-44-5(e)(2)...................................................42

S.C. Code Ann. § 38-75-970......................................................44

S.C. Code Ann. § 38-75-1210(B)(1).............................................42

S.D. Codified Laws § 58-11-55...................................................43

S.D. Codified Laws § 58-25-6....................................................44

Tenn. Code Ann. § 56-5-104(1)..................................................44

Tenn. Code Ann. § 56-8-104(7)(F)...........................................42, 43

Tex. Ins. Code Ann. art. 5.78.....................................................44

Tex. Ins. Code Ann. § 544.002...................................................42

Utah Code Ann. § 31A-19a-202(2)..............................................44

Utah Code Ann. § 31A-19a-202(3)...........................................42, 45

Va. Code Ann. § 36-96.3...........................................................42

Va. Code Ann. § 38.2-1904(B)(1) ...............................................44

Va. Code Ann. § 38.2-1904(C)....................................................45

Vt. Stat. Ann. tit. 8, § 4685(d) ..................................................43

Vt. Stat. Ann. tit. 8, § 4686 ......................................................44

W. Va. Code § 33-17A-6(a) .......................................................43

W. Va. Code § 33-20-3(a) .........................................................44

W. Va. Code § 33-20-3(c)(2)......................................................45

Wash. Rev. Code § 48.19.020 ....................................................43

Page

Statutes—continued:

Wash. Rev. Code § 48.19.030(3)(g) ........................................................44

Wis. Stat. § 626.12(2) ..........................................................................45

Wis. Stat. § 625.12(1) ..........................................................................44

Wis. Stat. § 625.12(2) ..........................................................................42

Wyo. Stat. Ann. § 26-14-105(b) .............................................................42

Wyo. Stat. Ann. § 26-14-105(b)(ii) .........................................................45

## MISCELLANEOUS

Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403 (1985) ................................... 23-26

Kenneth S. Abraham, *Insurance Law and Regulation* (5th ed. 2010) ..........25

Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29 (2012) ......................................................... 23-26

Tom Baker, *Containing the Promise of Insurance: Adverse Selection and Risk Classification*, 9 Conn. Ins. L.J. 371 (2003) ...................................24

Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* (May 1988) <tinyurl.com/CAS-Statement> .............................................25, 26

2021 Daily Comp. Pres. Doc. 90 (Jan. 26, 2021) ...............................14

78 Fed. Reg. 11,460 ...........................................................4, 7, 8, 10

83 Fed. Reg. 28,560 ...........................................................................12

85 Fed. Reg. 60,288 ...........................................................................13

86 Fed. Reg. 33,590 ...........................................................................14

88 Fed. Reg. 19,450 ...........................................4, 15, 35, 38, 47

Page

Miscellaneous—continued:

Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276 (Winter 2009) <tinyurl.com/bdfe53eh> ........................................28

National Association of Insurance Commissioners, Property & Casualty Model Rating Law (Jan. 2010) <tinyurl.com/NAIC1775> ................................................26

Jordan R. Plitt et al., *Couch on Insurance* (3d rev. ed. 2023) .........................25

Lars Powell, *Risk-Based Pricing of Property and Liability Insurance*, 39 J. Ins. Reg., no. 4, 2020 ...................................28

## GLOSSARY OF ABBREVIATIONS

**FHA**:   Fair Housing Act

**HUD**:   United States Department of Housing and Urban Development

# INTRODUCTION

To protect against the possibility of property damage and liabilities arising from home ownership, homeowners purchase insurance to pool, manage, and distribute risks to their homes. The economics underlying those transactions are straightforward: an insurer accepts the risk of large but uncertain future losses, and in exchange, the insured pays a small but certain premium. The system works because insurers use data to identify factors relevant to risk and then establish rates that fairly and economically distribute the cost of that risk.

Among the factors that homeowner's insurers do not consider in the ratemaking and underwriting process is membership in protected classes such as race. That information is not actuarially relevant, and the laws of every State prohibit insurers from setting rates and making underwriting decisions based on those factors. By design, ratemaking and underwriting are blind toward race and membership in other protected classes.

In 2013, the Department of Housing and Urban Development (HUD) promulgated a regulation commonly known as the disparate-impact rule. The rule interpreted the ban on discrimination under the Fair Housing Act of 1968 (FHA) to prohibit not only intentional discrimination but also any housing practice that produces a disparate impact on a protected class and lacks adequate justification. The rule established a burden-shifting framework for adjudicating disparate-impact claims, and HUD expressly indicated that the rule

(1)

applied to the actuarially based ratemaking and underwriting practices of homeowner's insurers.

In 2015, the Supreme Court confirmed the availability of disparate-impact claims under the FHA in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015). In so doing, however, the Court emphasized that disparate-impact liability must be limited in several respects in order to avoid constitutional concerns. In particular, disparate-impact liability cannot be applied in a way that causes the explicit and pervasive consideration of race. Disparate-impact claims must also be subject to a "robust causality requirement" in order to avoid holding defendants liable for disparities they did not create.

As applied to the ratemaking and underwriting practices of homeowner's insurers, HUD's disparate-impact rule violates those limitations. Application of the rule to ratemaking and underwriting will cause the explicit and pervasive consideration of race and other protected characteristics in decisionmaking processes that are based solely on actuarial principles and are designed not to consider those characteristics at all. Insurers that do not consider protected characteristics will effectively be compelled to collect and analyze data on such characteristics and adjust their risk-based rates and underwriting formulas to avoid creating a disparity. In addition, the rule threatens to bring about an avalanche of expensive and burdensome lawsuits seeking to impose

liability for insurer practices that are substantially constrained—and sometimes even dictated—by state law.

The district court did not dispute that the disparate-impact rule could be inconsistent with *Inclusive Communities* as applied to ratemaking and underwriting for homeowner's insurance. The court upheld the rule, however, on the ground that those inconsistences might not arise in every case. The court was mistaken. The disparate-impact rule is unlawful as applied to ratemaking and underwriting practices of homeowner's insurers in all of its applications. The judgment of the district court should be reversed.

## STATEMENT OF JURISDICTION

On September 19, 2023, the district court entered an order denying plaintiff's motion for summary judgment and granting the defendants' cross-motion for summary judgment. D. Ct. Dkt. 156. Plaintiff filed a timely notice of appeal on November 17, 2023. D. Ct. Dkt. 157. This Court has jurisdiction under 28 U.S.C. § 1291. The district court had subject-matter jurisidiction under 28 U.S.C. § 1331.

## STATEMENT OF THE ISSUE

Whether HUD's disparate-impact rule, as applied to the ratemaking and underwriting practices of homeowner's insurers, violates the necessary safeguards on disparate-impact liability articulated in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S.

519 (2015).  *See* 78 Fed. Reg. 11,460, *as reinstated*, 88 Fed. Reg. 19,450, *codified at* 24 C.F.R. § 100.500.

## PERTINENT STATUTORY AND REGULATORY PROVISIONS

Section 3604 of Title 42 of the United States Code provides in relevant part:

> As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—
>
> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
>
> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

Section 100.500 of Title 24 of the Code of Federal Regulations provides:

> Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.
>
> (a) *Discriminatory effect.*  A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

4

(b)   *Legally sufficient justification.*

   (1)   A legally sufficient justification exists where the challenged practice:

      (i)   Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

      (ii)   Those interests could not be served by another practice that has a less discriminatory effect.

   (2)   A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (3) of this section.

(c)   *Burdens of proof in discriminatory effects cases.*

   (1)   The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

   (2)   Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

   (3)   If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting

the challenged practice could be served by another practice that has a less discriminatory effect.

(d)    *Relationship to discriminatory intent.*  A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

## STATEMENT OF THE CASE

## A.   Background

1.    Congress enacted the Fair Housing Act in 1968 to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. As amended, the FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer," or to "refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person," "because of race, color, religion, sex, familial status or national origin." 42 U.S.C. § 3604(a). The FHA also makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith because of" the same characteristics. 42 U.S.C. § 3604(b). The FHA contains separate but similar prohibitions on discrimination on the basis of handicap. *See* 42 U.S.C. § 3604(f).

In interpreting federal statutes that prohibit discrimination on the basis of protected characteristics, the Supreme Court has drawn a distinction between those that prohibit only "disparate treatment" and those that prohibit

6

practices that create a "disparate impact." *Raytheon Co.* v. *Hernandez*, 540 U.S. 44, 52 (2003). A claim for "disparate treatment" involves intentional discrimination: it arises when the defendant "has treated [a] particular person less favorably than others because of a protected trait." *Ricci* v. *DeStefano*, 557 U.S. 557, 577 (2009) (internal quotation marks and citation omitted). In order to show disparate treatment, the plaintiff must prove that the defendant acted with "discriminatory intent or motive." *Id.* (citation omitted). By contrast, a claim for "disparate impact" concerns "practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon*, 540 U.S. at 52 (citation omitted). As the name suggests, a disparate-impact claim may succeed "without evidence of the [regulated party's] subjective intent to discriminate." *Id.* at 52-53 (citation omitted).

2.    On February 8, 2013, HUD promulgated a rule titled "Implementation of the Fair Housing Act's Discriminatory Effects Standard," also known as the disparate-impact rule. 78 Fed. Reg. 11,460. Before the promulgation of that rule, this Court declined to resolve the question whether the FHA permitted disparate-impact claims. *See Greater New Orleans Fair Housing Action Center* v. *HUD*, 639 F.3d 1078, 1085 (2011). At the same time, several other courts of appeals divided over the appropriate test to apply when adjudicating disparate-impact claims. *Id.* (citing cases). The rule sought to resolve

those ambiguities by administratively interpreting the FHA to encompass disparate-impact liability and by establishing "uniform standards" for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. 78 Fed. Reg. 11,463. The preamble to the rule also expressly extended disparate-impact liability to the provision and pricing of homeowner's insurance. *See id.* at 11,475.

The uniform standard created by the rule was a three-part burden-shifting framework. Under the first step of the framework, a plaintiff has the burden of proving that a challenged practice "caused or predictably will cause a discriminatory effect"—in other words, that the practice "actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a), (c)(1). At the second step, the defendant bears the burden of proving that the practice was "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2); *see id.* § 100.500(b). Finally, at the third step, the plaintiff bears the burden of proving that "the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3).

3.    In *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), the Supreme Court addressed the question whether claims based on a theory of disparate-impact liability are cognizable under the FHA.  The Court held that some such claims are cognizable but emphasized that disparate-impact liability under the FHA must be "limited in key respects" in order to "avoid the serious constitutional questions" that would otherwise arise from the imposition of disparate-impact liability.  *Id.* at 540.  The Court explained that the FHA must incorporate a "robust causality" requirement at the prima facie stage and cannot be interpreted or applied in a manner that "might cause race to be used and considered in a pervasive way."  *Id.* at 542.  In addition, the Court explained, disparate-impact liability cannot be "based solely on a showing of a statistical disparity" or imposed in a manner that would compel defendants to reorder their priorities and preclude them from considering legitimate market factors.  *Id.* at 540-543.

### B.    Facts And Procedural History

1.    Plaintiff National Association of Mutual Insurance Companies is one of the nation's largest trade associations representing homeowner's insurers.  In 2012, in response to HUD's initial notice of proposed rulemaking concerning the disparate-impact rule, the Association filed a comment opposing HUD's proposal on several grounds.  *See* A.R. 372-383 (D. Ct. Dkt. 40).  In

promulgating the final disparate-impact rule in February 2013, HUD rejected each of the Association's arguments. *See* 78 Fed. Reg. 11,460, 11,474-11,475.

2.    On December 20, 2013, the Association and another trade association filed a complaint under the Administrative Procedure Act challenging the rule. D. Ct. Dkt. 1; *see also* D. Ct. Dkt. 106 (voluntary dismissal of second plaintiff). In its initial complaint and motion for summary judgment, the Association argued that the FHA prohibited only intentional discrimination, not practices that produce a disparate impact. D. Ct. Dkt. 1, at 2; D. Ct. Dkt. 16-1, at 1. HUD moved to dismiss the complaint, arguing first that the Association lacked standing because the rule merely codified burden-shifting standards previously recognized by some courts and thus did not require homeowner's insurers to change their existing underwriting and ratemaking practices. D. Ct. Dkt. 20, at 7-15. On the merits, HUD urged the district court to uphold the rule as consistent with the FHA. *Id.* at 18-45.

The district court granted the Association's motion for summary judgment and vacated the rule in its entirety. D. Ct. Dkt. 45, 46. The court explained that the Association's standing was "self-evident" because the rule directly regulated the Association's members and purported to resolve contested legal questions regarding the availability of disparate-impact liability under the FHA. D. Ct. Dkt. 45, at 14-15 & n.14. The court then held that the

FHA prohibits only disparate treatment and does not permit disparate-impact claims. *Id.* at 2.

HUD appealed. D. Ct. Dkt. 48. While the appeal was pending, the Supreme Court issued its decision in *Inclusive Communities*. In response, this Court vacated the district court's decision and remanded the case to the district court for reconsideration in light of *Inclusive Communities*. D. Ct. Dkt. 51.

3. On remand, the Association amended its complaint, alleging that the disparate-impact rule, as applied to the ratemaking and underwriting practices of homeowner's insurers, violates the limitations on disparate-impact liability recognized in *Inclusive Communities*. D. Ct. Dkt. 57. The Association explained that the fundamental economics of insurance, universal industry standards, and binding state law all dictate that insurers base their ratemaking and underwriting decisions exclusively on legitimate risk factors, such as the proximity of a property to flood zones and the construction materials used to build the dwelling. As a result, the complaint explained, insurers generally do not consider—or even collect—information concerning race or other characteristics protected under the FHA. *See id.* at 5-8.

In light of those industry realities, the Association alleged, *inter alia*, that application of the disparate-impact rule to ratemaking and underwriting

decisions would improperly cause race to be used and considered in a pervasive way, in violation of *Inclusive Communities*.  D. Ct. Dkt. 57, at 18.  The Association further alleged that extensive state regulation of ratemaking and underwriting practices "substantially limits insurers' discretion and breaks the causal connection between underwriting and rating decisions and any disparate impact."  *Id.* (internal quotation marks and citation omitted).[1]

4.     The parties filed cross-motions for summary judgment in 2016.  D. Ct. Dkt. 60, 64.  Before the district court could hear oral argument on those motions, however, President Trump succeeded President Obama.  At HUD's request, the district court postponed argument in order to permit HUD's new leadership to become familiar with the issues in the case.  D. Ct. Dkt. 72, at 1; D. Ct. Dkt., Minute Order (Feb. 8, 2017).

In June 2018, HUD announced that it was reconsidering the disparate-impact rule and sought public comment on possible amendments.  83 Fed. Reg. 28,560.  The district court then stayed the case in light of the rulemaking.  D.

---

[1] As the Association explained, state insurance law would not be preempted by the FHA because of the operation of the McCarran-Ferguson Act, which states in relevant part that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance  .   .   .  unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b); *see* D. Ct. Dkt. 57, at 7-8.  HUD has not contested that state insurance law retains its force in this context.

Ct. Dkt., Minute Order (Feb. 15, 2017).  The Association filed a comment, arguing that the 2013 rule contravened *Inclusive Communities* by requiring insurers pervasively to consider protected characteristics in their ratemaking and underwriting decisions, and that state law limited insurers' discretion to such an extent that any disparate impact claim would fail.  *See* Comment Letter from Kannon K. Shanmugam, Counsel for National Association of Mutual Insurance Companies (Aug. 20, 2018) <regulations.gov/comment/HUD-2018-0047-0384>.

In September 2020, HUD replaced the disparate-impact rule with a new rule.  *See* 85 Fed. Reg. 60,288.  The 2020 rule reaffirmed the viability of some disparate-impact claims under the FHA, but it incorporated into its burden-shifting framework several of the safeguards required in *Inclusive Communities*.  For example, the 2020 rule required a plaintiff sufficiently to plead, and later prove, that the challenged policy had a "robust causal link" to the disparate impact; that it was "arbitrary, artificial, and unnecessary to achieve a valid interest"; and that the disparate impact was "significant."  *Id.* at 60,332 (§ 100. 500(b) & (c)).  The 2020 rule also allowed a defendant to establish as a dispositive defense at the pleading stage that its practice was "reasonably necessary" to comply with controlling federal, state, or local law.  *Id.* at 60,333 (§ 100. 500(d)(2)).  And the 2020 rule included specific language making clear that nothing in the rule was "intended to invalidate, impair, or supersede any law

13

enacted by any state for the purpose of regulating the business of insurance." *Id.* (§ 100.500(e)).

The 2020 Rule was never implemented.  Disagreeing with some of the changes that the rule would have instituted, two non-profit organizations challenged the rule and obtained a preliminary injunction in October 2020, before the rule became effective.  *Massachusetts Fair Housing Center* v. *HUD*, 496 F. Supp. 3d 600, 607, 611-612 (D. Mass. 2020).

In January 2021, President Biden succeeded President Trump.  Five days after the inauguration, the Biden Administration announced its opposition to the 2020 rule.  *See* Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies, 2021 Daily Comp. Pres. Doc. 90 (Jan. 26, 2021).  At the parties' request, litigation in the district court below remained stayed in order to allow the new administration to take action on the 2020 rule.  D. Ct. Dkt., Minute Order (Apr. 19, 2021); *see also* D. Ct. Dkt. 121.

In June 2021, HUD issued a notice of proposed rulemaking announcing plans to "recodify" the 2013 version of the disparate-impact rule.  86 Fed. Reg. 33,590.  The Association again submitted a comment opposing the rule.  D. Ct. Dkt. 153-1, at 10-19.  In March 2023, HUD formally reinstated the 2013 rule,

including repromulgating the same burden-shifting framework as in the original rule from 2013.  88 Fed. Reg. 19,450, 19,454-19,455; *see* 24 C.F.R. § 100. 500.

4.    In response to HUD's reinstatement of the 2013 rule, the Association filed a second amended complaint, challenging both the rule and its reinstatement as inconsistent with *Inclusive Communities*.  D. Ct. Dkt. 146.  The parties relied primarily on their earlier summary-judgment briefing but also filed supplementary briefs addressing recent legal developments and HUD's renewed arguments concerning the Association's standing and the ripeness of the Association's claims.  D. Ct. Dkt. 150-151.

After oral argument, the district court granted HUD's motion for summary judgment and denied the Association's cross-motion for summary judgment.  D. Ct. Dkt. 155.  The district court once again concluded that the Association had standing to challenge the disparate-impact rule.  *Id*. at 13-17.  In so holding, the court rejected HUD's arguments that the rule simply "duplicates pre-existing legal duties and therefore does not cause any injury" to the Association's members.  *Id*. at 14 (internal quotation marks and citation omitted).  The court explained that, while the rule "confirmed preexisting legal standards in some circuits," it established new law in other circuits, including this one.  *Id*. at 14-15 (internal quotation marks and citation omitted).

15

The district court proceeded to reject the Association's claims on the merits.  D. Ct. Dkt. 155, at 20-30.  The district court acknowledged that, in *Inclusive Communities*, the Supreme Court "sought to establish 'adequate safeguards at the prima facie stage' so as not to allow disparate-impact liability to 'cause race to be used and considered in a pervasive way.'" *Id.* at 22 (quoting *Inclusive Communities*, 576 U.S. at 542).  But the district court reasoned that the disparate-impact rule does not "cause[] the pervasive consideration of protected characteristics," because it does not "induce" insurers to collect or use data about customers' and applicants' protected characteristics "beyond what the FHA, as interpreted by *Inclusive Communities*, already induces."  *Id.* at 22-23.  The Association's argument, the court concluded, "is a complaint about any sort of disparate impact liability that might apply to insurance practices." *Id.* at 23.

The district court also rejected the Association's argument that the extensive body of state law restricting the discretion of homeowner's insurers in the setting of rates and making of underwriting decisions cuts off the chain of causation necessary to establish an actionable disparate impact under the FHA.  D. Ct. Dkt. 155, at 23-25.  The court accepted that *Inclusive Communities* requires a plaintiff to demonstrate a heighted causal connection between a defendant's policies and any demonstrated disparate impact.  *Id.* at 25.  And

16

it acknowledged that state law might well always "sever[] the causal connection" between ratemaking and underwriting practices and any disparate impact. *Id.* The court nevertheless concluded that insurers were required to raise those state laws as a defense in individual cases, reasoning that "[i]t is one thing for a law to have a standard that is difficult (or perhaps even impossible) for a plaintiff to meet, and quite another for the law to be invalid." *Id.*

## SUMMARY OF ARGUMENT

HUD's disparate-impact rule is unlawful as applied to the ratemaking and underwriting practices of homeowner's insurers. It would cause the pervasive consideration of race and other characteristics protected by the FHA in an otherwise actuarial process. And because state law substantially limits the discretion of insurers to consider protected characteristics in ratemaking and underwriting, the imposition of liability under the rule based on those aspects of the provision of homeowner's insurance would not satisfy a robust causality standard. The rule thus exceeds the safeguards on disparate-impact liability set forth in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), and should be vacated in relevant part.

I.    The disparate-impact rule cannot be lawfully applied to the ratemaking and underwriting practices of homeowner's insurers because doing so

would cause the pervasive consideration of race and other protected characteristics.

A.     The business of insurance seeks to pool and allocate risk economically.  Insurers take on responsibility for low-probability but high-cost events, and in exchange, insured parties pay smaller but certain premiums.  To allocate the costs of those premiums viably and fairly, insurers must identify risk characteristics, determine whether a particular insured shares those characteristics, and set premiums accordingly.  Because ratemaking and underwriting decisions are based on actuarially relevant risk factors, insurers do not collect or consider data concerning race and other protected characteristics in making those decisions.

B.  The disparate-impact rule would unlawfully transform ratemaking and underwriting, injecting pervasive consideration of protected characteristics into those processes.  The equal-protection component of the Fifth Amendment's Due Process Clause prohibits the federal government from discriminating (or compelling private entities to discriminate) on the basis of race and other protected characteristics.  In *Inclusive Communities*, the Supreme Court explained that disparate-impact liability under the FHA must therefore be limited to avoid the "serious constitutional questions that might arise" if such liability were to cause race and other protected characteristics "to be used and considered in a pervasive way."  576 U.S. at 540, 542.  But because

18

demographic groups are rarely distributed evenly among actuarial risk categories, application of the disparate-impact rule to ratemaking and underwriting decisions would inevitably result in the pervasive consideration of protected characteristics. To avoid creating disparate impacts, insurers would have no choice but to begin collecting, analyzing, and adjusting their policies based on racial and similar client data.

C. The district court's contrary conclusion was based on two errors. *First*, the district court incorrectly assumed that the disparate-impact rule was permissible because it does not formally mandate that insurers collect and consider data concerning protected characteristics. But in *Inclusive Communities*, the Supreme Court explained that disparate-impact liability raises serious constitutional concerns when it *causes* regulated entities explicitly and pervasively to consider protected characteristics. *Second*, the district court reasoned that, to the extent an insurer feels pressure to collect and analyze such data, the rule does not impose any pressure beyond what the FHA already imposes. But unlike the FHA, the rule expressly applies to the ratemaking and underwriting practices of homeowner's insurers. And evidence in the record overwhelmingly indicates that homeowner's insurers did not collect or use race-based or similar data in the absence of the rule.

II.     The disparate-impact rule is also unlawful as applied to ratemaking and underwriting decisions because state law uniformly limits insurer discretion to consider protected characteristics.  Those limitations sever the causal relationship between insurer ratemaking and underwriting practices and any alleged disparity.

A.     The laws of every State substantially dictate and constrain the risk factors homeowner's insurers can consider when setting rates and making underwriting decisions.  All States prohibit the provision of insurance or setting rates based on an applicant's protected characteristics.  And the vast majority of States require that insurers give consideration to all relevant factors when setting rates, thereby limiting insurers' discretion to ignore actuarially relevant factors that cause a disparity in the provision of insurance.

B.     In *Inclusive Communities*, the Supreme Court held that disparate-impact liability under the FHA must incorporate a "robust causality" standard, under which laws that "substantially limit[]" a regulated entity's discretion with respect to the challenged practice would break the causal chain and preclude the imposition of liability.  576 U.S. at 542-543.  In light of ubiquitous state law constraining insurer discretion in ratemaking and underwriting, it is the *States'* conduct, rather than the decisions of insurers, that is responsible for any disparate impacts created by insurers' actuarial practices.

20

C.     In holding otherwise, the district court acknowledged that state law might well make it impossible to impose disparate-impact liability on insurers under the standards articulated in *Inclusive Communities*.  The district court nevertheless concluded that vacatur was not required because an insurer could invoke the heighted causation standard as a defense in a particular case under the disparate-impact rule.  That reasoning erroneously inserts the robust causality standard from *Inclusive Communities* into the disparate-impact rule.  By its plain text, however, the rule does not impose a heightened causation standard at the prima facie stage; a plaintiff can state a disparate-impact claim without regard to an insurer's obligations under state law.  For that reason, as well, the rule should be vacated as applied to the ratemaking and underwriting practices of homeowner's insurers.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant or deny a motion for summary judgment de novo.  *See, e.g., Genus Medical Technologies LLC* v. *FDA*, 994 F.3d 631, 636 (2021).  The Court "owe[s] an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,'" it is "unable to discern Congress's meaning."  *SAS Institute Inc.* v. *Iancu*, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).

21

## ARGUMENT

In *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), the Supreme Court recognized that disparate-impact liability under the FHA must be limited in several crucial respects in order to avoid serious equal-protection concerns. *See id.* at 540-544. As applied to the ratemaking and underwriting practices of homeowner's insurers, the disparate-impact rule allows for the imposition of liability that *Inclusive Communities* forbids. The district court's contrary conclusion was erroneous, and its judgment should be reversed.

## I. THE DISPARATE-IMPACT RULE IS UNLAWFUL AS APPLIED TO THE RATEMAKING AND UNDERWRITING DECISIONS OF HOMEOWNER'S INSURERS BECAUSE IT WILL CAUSE THE PERVASIVE CONSIDERATION OF PROTECTED CHARACTERISTICS

The business of insurance is based on the analysis of risk. Homeowner's insurers thus exclusively consider actuarially valid risk factors when setting rates and making underwriting decisions. Homeowner's insurers do not collect data concerning the race or protected characteristics of their customers and applicants, and they do not consider race or other protected characteristics when setting rates or making underwriting decisions. The disparate-impact rule fundamentally alters the structure and practice of insurance ratemaking and underwriting by injecting into the process the pervasive consider-

22

ation of protected characteristics that insurers do not ordinarily take into account. The rule thus raises serious constitutional questions and directly contravenes the Supreme Court's instructions in *Inclusive Communities*.

### A.    Ratemaking And Underwriting Are Based On Actuarial Principles Designed To Allow Insurers To Identify, Analyze, and Group Risks

The business of insurance is based on the economically rational allocation of risk. In exchange for small but certain premiums, insurers assume responsibility for many low-probability but high-cost potential losses. Insurers are able to accept that bargain because of the "law of large numbers," a statistical phenomenon where "the sample mean for a probabilistic set nears the expected mean for an occurrence or process in the population as the sample size increases." Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 37-38 (2012) (Avraham). In non-mathematical terms, a sufficiently large group of individually risky but uncorrelated transactions that share similar characteristics will produce reasonably predictable outcomes. Based on those outcomes, insurers can determine how to distribute the risks they accept among insureds in the form of insurance premiums. "The heart of any insurance system" is thus "its method of classifying risks and setting prices." Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 403 (1985) (*Efficiency and Fairness*).

To take advantage of the law of large numbers, insurers must identify risk characteristics, sort applicants into groups corresponding to differences in expected loss, and then allocate the grouped risks by establishing rates. *See Efficiency and Fairness* 408. That process proceeds in three steps.

The first step of the process is risk classification, which requires an insurer to determine the expected losses associated with specific risk characteristics so that the insurer can group insureds accordingly. *See Efficiency and Fairness* 410; Tom Baker, *Containing the Promise of Insurance: Adverse Selection and Risk Classification*, 9 Conn. Ins. L.J. 371, 376 (2003) (Baker). The goal is to devise groups of insureds with comparable risk profiles. *See Efficiency and Fairness* 410. Put differently, the purpose is to ensure that the insureds in each group are similarly likely to suffer the loss the insurer has agreed to cover. *See id.* An essential prerequisite for effective risk classification is data collection; indeed, "all other functions of the insurer rely on its ability to gather data about the risks it intends to insure." Avraham 39.

The second step of the process is risk grouping. It involves examining the risk characteristics of individual applicants and then "sorting insurance applicants into categories believed to correspond to differences in expected risk." Baker 376. That step is necessary because, without accurate grouping, "high-risk insureds would adversely select into [less risky] risk pool[s]," caus-

ing low-risk individuals either to subsidize higher-risk customers or, to the extent they are permitted to do so, to opt out and self-insure instead. Kenneth S. Abraham, *Insurance Law and Regulation* 144 (5th ed. 2010); *see NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 290 (7th Cir. 1992). When low-risk individuals choose to self-insure because the cost of subsidizing riskier customers exceeds the value of having insurance, a vicious cycle results: the insurer bears a higher net risk, which requires the insurer to increase premiums. Avraham 44. That, in turn, causes more customers to opt out. *Id.* And because only the highest-risk customers remain, it becomes effectively impossible for the insurer to continue providing insurance. *See id.*; 1 Jordan R. Plitt et al., *Couch on Insurance* § 1:3, at 1-8 (3d rev. ed. 2023).

The third and final step of the process is the allocation of grouped risks through insurance rates. Several general principles guide the ratemaking process. *First*, the rate charged must be an accurate estimate of the expected value of future costs: that is, "the predicted probability that an insured will suffer a loss multiplied by the predicted severity of the loss." *Efficiency and Fairness* 408; *see* Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* 2 (May 1988) <tinyurl. com/CAS-Statement> (*Statement of Principles*). *Second*, the rate must provide for the insurer's costs of doing business, including the costs associated

with the transfer of risk. *See Statement of Principles* 2; *Efficiency and Fairness* 407; Avraham 38. *Third*, the rate should allow for a reasonable profit, but the rate should not be excessive, inadequate, or unfairly discriminatory. *See Efficiency and Fairness* 407; *Statement of Principles* 2; National Association of Insurance Commissioners, Property & Casualty Model Rating Law § 5 (Jan. 2010) (file and use version) <tinyurl.com/NAIC1775>.

Because ratemaking and underwriting decisions in residential property insurance must be based on actuarially relevant risk factors, insurers making those decisions do not consider, or even collect, data concerning the race and other protected characteristics of their customers and applicants. As several leading insurance executives attested below, their companies do not "collect or use information about membership in protected classes for the purposes of rating or underwriting of residential property insurance." D. Ct. Dkt. 60-6, at 2; *see also* D. Ct. Dkt. 60-3, at 1; D. Ct. Dkt. 60-4, at 1-2; D. Ct. Dkt. 60-10, at 4; D. Ct. Dkt. 60-12, at 2. Instead, insurers identify and analyze actuarially relevant risk factors related to individual properties, such as the age of a home, its location, its replacement or repair cost, and various aspects of its construction. *See* D. Ct. Dkt. 60-7, at 2; D. Ct. Dkt. 60-10, at 2; D. Ct. Dkt. 60-12, at 2; D. Ct. Dkt. 60-15, at 2; D. Ct. Dkt. 60-17, at 3. Membership in a protected class

26

is not a relevant factor in actuarial practice and plays no role in insurers' underwriting and rating decisions. *See* D. Ct. Dkt. 60-7, at 2; D. Ct. Dkt. 60-10, at 4; D. Ct. Dkt. 60-12, at 2; D. Ct. Dkt. 60-15, at 3; D. Ct. Dkt. 60-17, at 3.

### B. The Disparate-Impact Rule Will Cause The Pervasive Consideration Of Protected Characteristics In Ratemaking And Underwriting

The disparate-impact rule would fundamentally alter the system of ratemaking and underwriting, injecting pervasive consideration of race and similar characteristics into the process.

1.    As multiple insurance executives attested in uncontested declarations, the disparate-impact rule would effectively require insurance companies to collect and analyze data concerning the protected characteristics of their insureds and applicants, because doing so would be the only way to determine whether ratemaking and underwriting practices would result in or perpetuate a disparate impact. D. Ct. Dkt. 60-3, at 2; D. Ct. Dkt. 60-4, at 2; D. Ct. Dkt. 60-5, at 2; D. Ct. Dkt. 60-6, at 2-3; D. Ct. Dkt. 60-7, at 3; D. Ct. Dkt. 60-8, at 3; D. Ct. Dkt. 60-9, at 2-3; D. Ct. Dkt. 60-10, at 4-5; D. Ct. Dkt. 60-11, at 2; D. Ct. Dkt. 60-12, at 3; D. Ct. Dkt. 60-13, at 1; D. Ct. Dkt. 60-14, at 2; D. Ct. Dkt. 60-16, at 2; D. Ct. Dkt. 60-17, at 4.

That result is logical and foreseeable. "[P]rotected classes, most if not all of the time, will not be evenly distributed throughout the various risk clas-

27

sifications."  Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009) <tinyurl.com/bdfe53eh>; *see* Lars Powell, *Risk-Based Pricing of Property and Liability Insurance*, 39 J. Ins. Reg., no. 4, 2020, at 13.  The only way to try to counteract disparate impacts that naturally follow from consideration of actuarially sound risk factors would thus be for insurers artificially to adjust the factors or the weight assigned to them, with the express purpose of achieving demographically balanced outcomes.  In order to do that, insurers would have to collect and analyze data regarding the personal characteristics of their insureds and applicants.

The foreseeable, indeed almost inexorable, result of applying the disparate-impact rule to homeowner's insurers' ratemaking and underwriting practices would be to effect a sweeping transformation of the insurance process, injecting racial and similar considerations at every stage.  To avoid liability, insurers would first need to analyze to what extent a particular State's laws even allow them to collect data on protected characteristics.  *See* D. Ct. Dkt. 60-10, at 3; D. Ct. Dkt. 60-12, at 3; D. Ct. Dkt. 60-15, at 3.  Insurers next would need to decide how to collect the data from existing and prospective policyholders.  *See* D. Ct. Dkt. 60-4, at 2; D. Ct. Dkt. 60-7, at 3; D. Ct. Dkt. 60-12, at 3.  Insurers would then need to determine how to store and analyze the new

data they have collected. *See* D. Ct. Dkt. 60-12, at 3; D. Ct. Dkt. 60-13, at 2; D. Ct. Dkt. 60-15, at 3.

Finally, insurers would need to determine what, if anything, they can do lawfully and effectively to minimize disparate impacts among protected classes. *See* D. Ct. Dkt. 60-7, at 3; D. Ct. Dkt. 60-11, at 2; D. Ct. Dkt. 60-12, at 4; D. Ct. Dkt. 60-15, at 3. In particular, insurers would need to determine whether federal and state law would permit them to take data about protected characteristics into account in devising new underwriting and rating models, and they would need to determine whether such changes could be achieved consistent with sound actuarial and insurance practices. *See* D. Ct. Dkt. 60-5, at 2; D. Ct. Dkt. 60-7, at 3-4; D. Ct. Dkt. 60-14, at 2; D. Ct. Dkt. 60-17, at 4. Insurers would also need to confront the reality that, in the business of insurance (as in any other business), resources are finite, meaning that changes in ratemaking will often be zero-sum. Reweighing certain risk factors to avoid a disparate impact on one group would inevitably increase the weight attached to other risk factors, negatively affecting those disproportionately affected by those other factors.

2.    The injection of racial and similar considerations into the underwriting and ratemaking process is precisely the sort of constitutionally suspect result that, as construed by the Supreme Court, the FHA does not permit. Courts must "make every effort" to construe statutes in a manner that

"avoid[s] needless constitutional confrontations." *National Mining Association* v. *Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008). Although agencies are sometimes entitled to deference in their interpretations of statutes, courts "will not submit to an agency's interpretation of a statute if it presents serious constitutional difficulties." *Id.* (internal quotation marks and citation omitted). "[T]he constitutional avoidance canon of statutory interpretation trumps *Chevron* deference." *University of Great Falls* v. *NLRB*, 278 F.3d 1335, 1340-1341 (D.C. Cir. 2002).

As the Supreme Court has recently reaffirmed, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Students for Fair Admissions, Inc.* v. *President & Fellows of Harvard College*, 600 U.S. 181, 208 (2023) (internal quotation marks and citation omitted). The "core purpose" of the constitutional principle of equal protection is thus to "do[] away with all governmentally imposed discrimination based on race." *Id.* at 206 (internal quotation marks and citation omitted). That principle is "universal in [its] application," applying "without regard to any differences of race, of color, or of nationality." *Id.* (internal quotation marks and citation omitted).

Laws based on racial classifications are legitimate only if they can pass the most "daunting" constitutional scrutiny. *Students for Fair Admissions*, 600 U.S. at 206. Even a policy that is facially race-neutral is unconstitutional

if it is adopted for a "racially discriminatory intent or purpose." *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-266 (1977). And when an agency's interpretation of a federal statute "compels race-based [decisions], it by definition raises a serious constitutional question." *Miller* v. *Johnson*, 515 U.S. 900, 923 (1995); *see Ricci* v. *DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring); *cf. Buchanan* v. *Warley*, 245 U.S. 60, 78-82 (1917). Classifications based on alienage, national origin, sex, and religion are similarly subject to heightened scrutiny. *See City of Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985); *United States* v. *Virginia*, 518 U.S. 515, 532-533 (1996); *Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 534 (1993).

The constitutional guarantee of equal protection is directly relevant to the interpretation and application of the FHA. As the Supreme Court has observed, the desire to "avoid disparate-impact liability" can sometimes lead a person to engage in "disparate-treatment discrimination," such that "the[] two prohibitions could be in conflict absent a rule to reconcile them." *Ricci*, 557 U.S. at 580 (majority opinion). In *Inclusive Communities*, the Supreme Court attempted to reconcile those prohibitions, explaining that "disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise" if disparate-impact liability were applied too broadly. 576 U.S. at 540.

The Supreme Court proceeded to detail those necessary limitations.  It explained that "[d]ifficult questions might arise if disparate-impact liability under the FHA caused race to be used and considered in a pervasive and explicit manner to justify governmental or private actions that, in fact, tend to perpetuate race-based considerations rather than move beyond them." *Inclusive Communities*, 576 U.S. at 543.  The Court further explained that the "automatic or pervasive injection of race into public and private transactions covered by the FHA has special dangers." *Id.* at 545.  Accordingly, while the FHA does permit some disparate-impact claims, it cannot permit claims that would have the foreseeable effect of causing or injecting pervasive consideration of protected characteristics such as race.

3.     As applied to the ratemaking and underwriting practices of homeowner's insurers, the disparate-impact rule would inevitably "cause race [and similar protected characteristics] to be used and considered in a pervasive way." *Inclusive Communities*, 576 U.S. at 542.  As discussed above, the ratemaking and underwriting decisions of insurers are based solely on consideration of actuarially sound risk factors.  Exclusive reliance on such factors is not only the industry standard; it is economically fundamental to allocating premium costs fairly and ensuring that insurance is viable and available.  A person is no more or less likely to experience a loss because of skin color, race, or

32

membership in any other protected class. An individual's race and membership in other protected classes are thus irrelevant to the calculation of risk. That explains why insurers do not collect or consider data on protected characteristics in their ratemaking and underwriting decisions. In short, the ratemaking and underwriting process is inherently neutral toward protected classes. *See* pp. 23-27, *supra*.

That would change under the disparate-impact rule. Homeowner's insurers would face costly litigation if the application of factors blind to protected status happens to result in a disparate impact. Worse, insurers would face liability whenever an administrative law judge or a jury happens to conclude that a disparity is insufficiently justified by the legitimate actuarial policy. To avoid those results, insurers would have no choice but to request—for the first time—that existing and prospective policyholders self-identify their race, color, religion, sex, familial status, national origin, and handicap status. Insurers would then need to adjust their actuarial models continually in order to avoid the creation of disparate impacts. Indeed, multiple insurance executives attested below to precisely those facts, explaining that the rule would inevitably require them to collect, store, and analyze race-based and similar data to avoid costly litigation and liability. *See* pp. 27-29, *supra*.

By requiring insurers to take race and other protected characteristics into account in their decisionmaking when they otherwise would not, the disparate-impact rule perversely causes insurers to adopt "race-based considerations rather than mov[ing] beyond them." *Inclusive Communities*, 576 U.S. at 543. In so doing, the rule undermines the very purpose of the FHA by increasing, rather than reducing, the salience of race and other protected characteristics in housing decisions.

The disparate-impact rule thus "place[s] a racial thumb on the scales," "requiring [insurers] to evaluate the racial outcomes of their policies, and to make decisions based on . . . those racial outcomes." *Ricci*, 557 U.S. at 594 (Scalia, J., concurring). That type of decisionmaking is indisputably discriminatory, *see id.* at 579-580 (majority opinion), and the Supreme Court has expressly reserved the question whether such discriminatory treatment, even if motivated by a "legitimate fear of disparate impact," could survive constitutional scrutiny, *id.* at 584. More broadly, the disparate-impact rule, as it applies to the ratemaking and underwriting practices of homeowner's insurers, violates the command "[a]t the heart of the Constitution's guarantee of equal protection" that "the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller*, 515 U.S. at 911 (internal quotation marks and citation omitted). Because the rule requires insurers to take race and other protected classes into account when

34

making rating and underwriting decisions, it "demand[s]" the very classifications that equal protection "forbids." *Id.* at 928.

Notably, HUD expressly rejected the Association's attempt to have the rule tailored to avoid those serious constitutional concerns by exempting the ratemaking and underwriting practices of homeowner's insurers from the scope of the rule. *See* 88 Fed. Reg. 19,463.  HUD also declined to incorporate several procedural safeguards based on *Inclusive Communities* that would likely have prevented the injection of pervasive consideration of protected characteristics.  *Id.* at 19,461.  For example, the Association and other commenters requested that HUD include a requirement that plaintiffs adequately plead, and then demonstrate at the prima facie stage, that a challenged policy is "artificial, arbitrary, and unnecessary."  D. Ct. Dkt. 153-1, at 15-16.  Commenters likewise urged HUD to require plaintiffs to bear the ultimate burden of establishing that their proposed alternative policies were "equally effective" and cost-efficient.  88 Fed. Reg. 19,490; *cf. Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 659-660 (1989).  Inclusion of those requirements would likely have adequately protected insurers from improper disparate-impact claims, allowing them to continue underwriting and ratemaking without pervasively considering race and other protected characteristics.  HUD, however, refused to incorporate those requirements.  Because HUD's failure to "undertake this tailoring" creates the "serious constitutional difficulties" just discussed, the

disparate-impact rule is "impermissible" as applied to the ratemaking and underwriting practices of homeowner's insurers. *AFL-CIO* v. *FEC*, 333 F.3d 168, 179 (D.C. Cir. 2003) (internal quotation marks and citation omitted).

## C.    The District Court's Contrary Conclusion Was Incorrect

The district court accepted much of the above analysis. It agreed, for example, that "the Supreme Court in *Inclusive Communities* sought to establish adequate safeguards at the prima facie stage so as not to allow disparate-impact liability to cause race to be used and considered in a pervasive way." D. Ct. Dkt. 155, at 22 (internal quotation marks and citations omitted). And the district court further acknowledged that "the Supreme Court cautioned against interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." *Id.* (internal quotation marks and citation omitted).

The district court nonetheless upheld the disparate-impact rule for two principal reasons. *First*, the court reasoned that the rule does not cause the pervasive consideration of protected characteristics because "[n]owhere does the [rule] require those engaging in housing practices to collect or use data on individuals' protected characteristics." D. Ct. Dkt. 155, at 22. *Second*, the court reasoned that, to the extent an insurer may feel the need to collect and analyze racial and similar data to avoid potential liability, the rule does not "induce that sort of self-examination beyond what the FHA, as interpreted in

36

*Inclusive Communities*, already induces." *Id.* at 22-23 (internal quotation marks omitted).

Neither of those arguments withstands scrutiny. As discussed above, because demographic groups are exceedingly unlikely to be evenly distributed among risk categories, risk-based ratemaking and underwriting decisions will likely affect different groups differently, advantaging some and disadvantaging others. *See* pp. 27-29, *supra*. The only way for insurers to avoid causing disparate impacts, and then to determine whether those impacts might be sufficiently "justified" in the eventual eyes of a jury or administrative law judge, would be systematically to collect and analyze data on race and other protected characteristics. *See* pp. 28-29, *supra*. And the only way for insurers to avoid expensive, risky litigation would be to use that data systematically to adjust ratemaking and underwriting practices in light of racial and similar considerations. *See id.* Application of the disparate-impact rule would thus indisputably drive insurers to pervasive consideration of race and other protected characteristics.

To the extent the district court's reasoning is based on a distinction between formally "requiring" insurers to consider race and merely "causing" them to do so in order to avoid liability, that distinction is irrelevant. After all, the Supreme Court in *Inclusive Communities* was not concerned with formal requirements to consider race; instead, it warned that, "[w]ithout adequate

safeguards," disparate-impact liability "might *cause* race to be used and considered in a pervasive way" and "would *almost inexorably lead* governmental or private entities to use numerical quotas" or similarly constitutionally suspect practices. 576 U.S. at 542 (emphasis added; internal quotation marks and citations omitted).

The district court contended that the disparate-impact rule does not "induce" collection and use of data concerning protected characteristics "beyond what the FHA, as interpreted in *Inclusive Communities*, already induces." D. Ct. Dkt. 155, at 22-23. That contention is invalid. Neither the FHA nor *Inclusive Communities* says anything about the business of insurance in general or ratemaking and underwriting practices in particular. By contrast, HUD has expressly taken the position in the disparate-impact rule that the insurance and ratemaking practices of homeowner's insurers are subject to disparate-impact liability under the FHA. *See* 88 Fed. Reg. 19,463-19,465. The rule thus goes further than the statute in that, through the rule, HUD is attempting conclusively to resolve the question whether, under the statute, disparate-impact liability can apply to ratemaking and underwriting practices. The rule thus pressures insurers to collect and use data concerning protected characteristics in a way the law otherwise does not. That explains why homeowner's insurers felt no need to collect, analyze, or use race-based or similar data before the promulgation of the rule. To the contrary, the overwhelming evidence

38

is that all such collection and use would occur only in response to the rule.  *See* D. Ct. Dkt. 60-3, at 2; D. Ct. Dkt. 60-7, at 3-4, D. Ct. Dkt. 60-9, at 2-3; D. Ct. Dkt. 60-11, at 2; D. Ct. Dkt. 60-12, at 4; D. Ct. Dkt. 60-15, at 3.

In addition, *Inclusive Communities* details several "safeguards" and "limitations" that by their terms preclude applying disparate-impact liability to traditional ratemaking and underwriting decisionmaking.  For example, *Inclusive Communities* holds that policies are not subject to a disparate-impact challenge "unless they are artificial, arbitrary, and unnecessary barriers." 576 U.S. at 543 (internal quotation marks and citations omitted).  Likewise, *Inclusive Communities* explains that liability cannot be "imposed based solely on a showing of a statistical disparity."  *Id.* at 540.  And crucially, *Inclusive Communities* establishes that disparate-impact liability cannot "be so expansive as to inject racial considerations into every housing decision."  *Id.* at 543.  The disparate-impact rule contains none of those safeguards.  In fact, the Association and commenters proposed several adjustments to the disparate-impact rule's burden-shifting framework that may have fully implemented the FHA while avoiding the rule's injection of pervasive consideration of protected characteristics.  *See* pp. 35-36, *supra*.

Application of the disparate-impact rule to ratemaking and underwriting decisions would inevitably result in race and other protected characteristics being "used and considered in a pervasive way."  *Inclusive Communities*,

576 U.S. at 542.  That result raises serious constitutional concerns and contravenes the limits on disparate-impact liability set forth in *Inclusive Communities*.  The district court erred by holding otherwise.

## II. THE DISPARATE-IMPACT RULE IS UNLAWFUL AS APPLIED TO THE RATEMAKING AND UNDERWRITING DECISIONS OF HOMEOWNER'S INSURERS BECAUSE STATE LAW LIMITS INSURERS' DISCRETION OVER THOSE DECISIONS

The Supreme Court further stated in *Inclusive Communities* that disparate-impact liability under the FHA must be subject to a "robust causality requirement" at the prima facie stage to prevent defendants from "being held liable for racial disparities they did not create."  576 U.S. at 542; *see Davis* v. *District of Columbia*, 925 F.3d 1240, 1251 (D.C. Cir. 2019); *Inclusive Communities Project, Inc.* v. *Lincoln Property Co.*, 920 F.3d 890, 902 (5th Cir. 2019).  Those "detailed causation requirements" serve as a "means of cabining disparate-impact liability."  *Oviedo Town Center II, L.L.P.* v. *City of Oviedo*, 759 Fed. Appx. 828, 833-834 (11th Cir. 2018).

Under *Inclusive Communities*, a disparate-impact claim cannot lie when a "law substantially limits the [defendant's] discretion," because the law breaks the "causal connection" between the challenged policy and the allegedly disparate impact.  576 U.S. at 543.  The "robust causality" requirement thus ensures that a defendant cannot be held liable for the "myriad of innocent

causes that may lead to statistical imbalances." *Wards Cove*, 490 U.S. at 657 (citation omitted).

That requirement categorically forecloses disparate-impact claims based on insurers' ratemaking and underwriting practices. The insurance laws of every State severely circumscribe the ability of insurers to consider protected characteristics when making rating and underwriting decisions. As a result, any disparate-impact claim based on underwriting and rating practices necessarily fails. By authorizing disparate-impact lawsuits based on those practices, the disparate-impact rule is contrary to law.

### A.  State Insurance Laws Severely Limit Insurers' Discretion To Consider Protected Characteristics In Ratemaking And Underwriting

State law uniformly restricts the discretion of insurers to consider factors such as race, religion, and national origin in the provision of homeowner's insurance. The insurance laws of 14 States and the District of Columbia include broad prohibitions on discrimination on the basis of protected characteristics in the insurance business. Colorado's insurance law, for example, prohibits an insurer from "[u]nfairly discriminat[ing] based on race, color, national or ethnic origin, religion, sex" and other protected classes "with regard to any insurance practice." Colo. Rev. Stat. § 10-3-1104.9(1); *see* Cal. Ins. Code § 679.71; Conn. Gen. Stat. § 46a-64c(a)(2); Del. Code Ann. tit. 18, § 2304(22); D.C. Code § 31-2231.13(d); Ga. Code Ann. § 33-6-4(b)(8)(A)(iv)(I); 215 Ill.

Comp. Stat. 5/424(3); Mont. Code Ann. § 33-18-210(5); N.J. Stat. Ann. § 17:29B-4(7)(c) & (d); N.Y. Ins. Law § 2606; N.C. Gen. Stat. Ann. § 58-3-25(c); Pa. Cons. Stat. Ann. tit. 40, § 1171.5(a)(7)(iii); S.C. Code Ann. § 38-75-1210(B)(1); Tex. Ins. Code Ann. § 544.002; Va. Code Ann. § 36-96.3.

The insurance laws of 19 States achieve a similar result by specifically prohibiting discrimination in the risk-classification process, specifying, for example, that "[c]lassifications shall not be based on race, color, creed or national origin." Ariz. Rev. Stat. Ann. § 20-384(C); *see* Ark. Code Ann. § 23-67-209(b); Haw. Rev. Stat. § 431:14-103(a)(5); Iowa Code § 515F.4(3); Kan. Stat. Ann. § 40-954(c); La. Stat. Ann. § 22:1454(A); Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Miss. Code Ann. § 83-2-3(2)(b); Neb. Rev. Stat. § 44-7510(3)(g); Nev. Rev. Stat. § 686B.060(2); N.H. Rev. Stat. Ann. § 412:15(II)(b); N.M. Stat. Ann. § 59A-17-7(B); N.D. Cent. Code § 26.1-25-03(1)(c); Okla. Stat. Ann. tit. 36, § 985(C); R.I. Gen. Laws § 27-44-5(e)(2); Utah Code Ann. § 31A-19a-202(3); Wis. Stat. § 625.12(2); Wyo. Stat. Ann. § 26-14-105(b).

The insurance laws of 10 additional States prohibit insurers from providing, renewing, or terminating insurance based on membership in a protected class. *See* Fla. Stat. § 626.9541(1)(x); Ind. Code § 27-7-12-7(1); Ky. Rev. Stat. Ann. § 304.12-085; Md. Code Ann., Ins. § 27-501(a)(1); Mass. Gen. Laws Ann. ch. 175, § 4C; Mich. Comp. Laws § 500.2027(a)(i); Tenn. Code Ann. § 56-8-

104(7)(F); W. Va. Code § 33-17A-6(a); *see also* Mo. Rev. Stat. § 375.936(11)(g) (prohibiting an insurer from canceling, refusing to insure, or refusing to continue to insure "solely because of race, gender, color, creed, national origin, or ancestry or anyone who is or seeks to become insured"); S.D. Codified Laws § 58-11-55 (similar).

The remaining seven States (along with most other States) have adopted insurance laws that prohibit "unfairly discriminatory" rates in general. *See* Ala. Code § 27-13-27; Alaska Stat. § 21.39.030(a)(1); Idaho Code § 41-1405(1); Ohio Rev. Code Ann. § 3935.03(B); Or. Rev. Stat § 737.310(1); Vt. Stat. Ann. tit. 8, § 4685(d); Wash. Rev. Code § 48.19.020. Administrative interpretations and other sources of law in some of those States further specify that insurers may not differentiate among their insureds on the basis of membership in a protected class. *See* Ohio Rev. Code Ann. § 4112.02(H)(4); Or. Admin. R. 836-081-0010.

In addition, at least 45 States and the District of Columbia have overlapping laws that provide that "[d]ue consideration *must be given*" by insurers to an enumerated list of factors, as well as "*all* other relevant factors." Ark. Code Ann. § 23-67-209(a) (emphases added); *see* Ala. Code § 27-13-65(3); Alaska Stat. § 21.39.030(a)(2); Ariz. Rev. Stat. Ann. § 20-384(B); Cal. Ins. Code § 795.5; Colo. Rev. Stat. § 10-4-403(2)(a)(I); Del. Code Ann. tit. 18, § 2503(a)(3); Fla. Stat. § 627.062(2)(b); Ga. Code Ann. § 33-9-4; Haw. Rev. Stat. § 431:14-

103(a)(2); Idaho Code § 41-1437(1); Ind. Code § 27-1-22-3(a)(1); Kan. Stat. Ann. § 40-954(a); Ky. Rev. Stat. Ann. § 304.13-031(1)(c)(7); La. Stat. Ann. § 22:1454 (B)(1); Me. Rev. Stat. tit. 24-A, § 2303(1)(C); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. ch. 175A, § 5(a)(1); Mich. Comp. Laws § 500.2110(1); Minn. Stat. Ann. § 70A.05(1); Miss. Code Ann. § 83-2-3(2)(a); Mo. Rev. Stat. § 379.318(1); Mont. Code Ann. § 33-16-201(2)(a); Neb. Rev. Stat. § 44-7510(1); Nev. Rev. Stat. § 686B.060(1); N.H. Rev. Stat. Ann. § 412:15(II)(a); N.J. Stat. Ann. § 17:29AA-9; N.M. Stat. Ann. § 59A-17-7(A); N.Y. Ins. Law § 2304(a); N.C. Gen. Stat. Ann. § 58-40-25; N.D. Cent. Code § 26.1-25-03(1)(a); Ohio Rev. Code Ann. § 3935.03(C); Or. Rev. Stat § 737.310(4); Pa. Cons. Stat. Ann. tit. 40, § 1183(a); R.I. Gen. Laws § 27-44-5(e)(1); S.C. Code Ann. § 38-75-970; S.D. Codified Laws § 58-25-6; Tenn. Code Ann. § 56-5-104(1); Tex. Ins. Code Ann. art. 5.78; Utah Code Ann. § 31A-19a-202(2); Va. Code Ann. § 38.2-1904(B)(1); Vt. Stat. Ann. tit. 8, § 4686; Wash. Rev. Code § 48.19.030(3)(g); W. Va. Code § 33-20-3(a); Wis. Stat. § 625.12(1); D.C. Code § 31-2703(b).[2]

---

[2] Five of those States require the state insurance commission that reviews and approves the insurance rates to consider "all other relevant factors." Cal. Ins. Code § 795.5; Fla. Stat. § 627.062(2)(b); Minn. Stat. Ann. § 70A.05(1); Tex. Ins. Code Ann. art. 5.78; Utah Code Ann. § 31A-19a-202(2). That necessarily requires insurers to consider the same factors in order to ensure that their rates will obtain regulatory approval.

Those laws also commonly specify that insurers may make distinctions based on "differences among risks that can be demonstrated to have a probable effect upon losses or expenses."  W. Va. Code § 33-20-3(c)(2); *see* Alaska Stat. § 21.39.030(a)(4); Ariz. Rev. Stat. Ann. § 20-384(C); Ark. Code Ann. § 23-67-210; Colo. Rev. Stat. § 10-4-403(4); Conn. Gen. Stat. § 38a-686(b)(3); Haw. Rev. Stat. § 431:14-103(a)(5); Iowa Code § 515F.4(3); Kan. Stat. Ann. § 40-954(c); Ky. Rev. Stat. Ann. § 304.13-031(1)(e); Me. Rev. Stat. tit. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.5(2); Miss. Code Ann. § 83-2-3(2)(b); Nev. Rev. Stat. § 686B.060(2); N.H. Rev. Stat. Ann. § 412:15(II)(b); N.D. Cent. Code § 26.1-25-03(1)(c); Utah Code Ann. § 31A-19a-202(3); Va. Code Ann. § 38.2-1904(C); Wis. Stat. § 626.12(2); Wyo. Stat. Ann. § 26-14-105(b)(ii).

The effect of all of the foregoing state laws is predictable:  homeowner's insurers do not collect or use data on the protected characteristics of its customers.  Indeed, the record is replete with attestations from homeowner's insurers that they do not collect or use data "on the race, color, religion, national origin, sex, familial status, or handicap of its policy holders" for "rating or underwriting of residential property insurance in any State."  D. Ct. Dkt. 60-6, at 2; *see* D. Ct. Dkt. 60-3, at 1; D. Ct. Dkt. 60-4, at 1; D. Ct. Dkt. 60-5, at 1; D. Ct. Dkt. 60-8, at 2-3; D. Ct. Dkt. 60-9, at 2; D. Ct. Dkt. 60-10, at 3-4; D. Ct. Dkt. 60-11, at 2; D. Ct. Dkt. 60-12, at 2; D. Ct. Dkt. 60-13, at 1; D. Ct. Dkt. 60-14, at 2; D. Ct. Dkt. 60-15, at 3; D. Ct. Dkt. 60-16, at 2; D. Ct. Dkt. 60-17, at 3.

**B.      State Insurance Law Breaks The Causal Connection Between Ratemaking and Underwriting Decisions And Any Disparity In The Provision Of Homeowner's Insurance**

The foregoing state laws "substantially limit[]" the discretion of home-owner's insurers with respect to ratemaking and underwriting decisions, severing the causal connection between those decisions and any disparate impact in the provision of insurance. *Inclusive Communities*, 576 U.S. at 543. The disparate-impact rule thus cannot be applied to ratemaking and underwriting practices consistent with the safeguards on disparate-impact liability articulated in *Inclusive Communities*.

1.      As just explained, state law severely restricts insurers' ability to consider race or other protected characteristics in the provision of insurance. For that reason, insurers have limited ability both to assess whether their ratemaking and underwriting practices are creating a disparate impact and to alter those practices in order to eliminate any disparity.

In addition, state law in the overwhelming majority of States requires insurers to take into account all relevant factors in ratemaking and underwriting. If a factor is actuarially relevant to an insurer's ratemaking or underwriting decision, state law thus mandates that the insurer take it into account. To the extent any disparity arises from the consideration of such a factor, it would not be attributable to the insurer's underwriting and ratemaking practices.

Despite the existence of laws in every State that break the causal connection between an insurer's ratemaking and underwriting practices and any alleged disparate impact, HUD's disparate-impact rule expressly applies to homeowner's insurers. *See* 88 Fed. Reg. 19,463-19,465. And in the face of requests that HUD adopt the heightened causation standard required by *Inclusive Communities*, HUD refused, erroneously stating that the Supreme Court "did not announce a heightened causality requirement for disparate impact liability." *Id.* at 19,461. The disparate-impact rule, as applied to the ratemaking and underwriting practices of homeowner's insurers, thus purports to do precisely what *Inclusive Communities* forbids.

2.     Precedent from other circuits supports the conclusion that the application of the disparate-impact rule to the ratemaking and underwriting practices of homeowner's insurers would conflict with state insurance law.

For example, in *Saunders* v. *Farmers Insurance Exchange*, 537 F.3d 961 (2008), the Eighth Circuit considered the viability of a disparate-impact claim challenging the pricing of homeowner's insurance. The court held that the McCarran-Ferguson Act precluded those claims, because the imposition of disparate-impact liability would interfere with Missouri's comprehensive regulatory regime. *See id.* at 967-968. As the court explained, Missouri law required insurers to establish rates based on economic factors essential to in-

47

surer solvency, such as loss experience, and further permitted insurers to classify risks based on standards that "measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses." *Id.* at 967 (citation omitted). Allowing a federal court to "determine that the [i]nsurers' filed rates are unlawful using [the] different federal standard [of] disparate racial impact," the Eighth Circuit concluded, would improperly interfere with state law and, in particular, the ratemaking authority of the state insurance commissioner. *Id.* at 968.

The Ninth Circuit's decision in *Ojo* v. *Farmers Group, Inc.*, 600 F.3d 1205 (2010), is to the same effect. There, the court concluded that disparate-impact claims under the FHA challenging a homeowner's insurer's use of credit scoring might interfere with the administration of Texas insurance law, and it thus certified that question to the Texas Supreme Court. *See id.* at 1207, 1209-1210. The Texas Supreme Court confirmed the existence of a conflict, holding that Texas law allows insurers to consider credit scoring even if doing so results in a disparate impact. *See Ojo* v. *Farmers Group, Inc.*, 356 S.W.3d 421, 435 (Tex. 2011); *cf. Doe* v. *Mutual of Omaha*, 179 F.3d 557, 563 (7th Cir. 1999) (explaining that, even if federal law required an insurer to make its products "equally valuable to the disabled and to the nondisabled," such a law would be unenforceable under the McCarran-Ferguson Act because it "would

48

interfere with a State's administrative regime" (internal quotation marks and citation omitted)).

In light of those decisions, it is clear that state insurance law substantially limits insurer discretion in ratemaking and underwriting, breaking the necessary causal chain between any challenged ratemaking or underwriting practice and an alleged disparate impact. By purporting to permit disparate-impact claims challenging those practices to proceed under the FHA, the disparate-impact rule flouts *Inclusive Communities*.

### C. The District Court's Contrary Conclusion Was Incorrect

The district court did not dispute the foregoing principles. To the contrary, the court concluded that the robust causality requirement from *Inclusive Communities* "works in favor of [the Association's] members" and "protect[s] defendants from being held liable for racial disparities they did not create." D. Ct. Dkt. 155, at 25. The court also expressed the view that, in light of the robust causality requirement, it will be "difficult (or perhaps even impossible) for a plaintiff" to succeed on a disparate-impact claim challenging a homeowner's insurer's ratemaking and underwriting practices. *Id.* The district court concluded, however, that the disparate-impact rule was valid as applied to those practices; it reasoned that "it is one thing for a law to have a standard" that is difficult or impossible to meet, but "quite another for the law to be invalid." *Id.* The district court's analysis is flawed.

49

Most fundamentally, the district court conflated the standards of *Inclusive Communities* with those of the disparate-impact rule. It is the robust causality requirement from *Inclusive Communities* that is "difficult (or perhaps even impossible) for a plaintiff" to meet. D. Ct. Dkt. 155, at 25. But it is the disparate-impact rule—which does not include a heightened causality standard—that the Association argues is invalid. Because any application of the disparate-impact rule to underwriting and ratemaking decisions would necessarily conflict with the robust causality standard from *Inclusive Communities*, the rule is invalid as applied to those decisions.

In any event, not only has the Association shown that it would be difficult for plaintiffs pursuing disparate-impact claims against insurers to succeed; it has shown that it would be impossible. The law of every State strictly regulates the insurance industry and thus substantially limits the discretion of homeowner's insurers both to deviate from actuarially sound practices in ratemaking and underwriting and to revise ratemaking and underwriting practices based on protected characteristics in order to avoid a disparate impact. Ratemaking and underwriting decisions that result from compliance with those laws cannot—as a categorical matter—constitute the predominant cause of any alleged disparity in the provision of homeowner's insurance. Instead, the predominant cause would be the state laws mandating consideration of all

50

actuarially relevant factors and prohibiting consideration of race and other protected characteristics.

To be sure, state insurance law does not directly require homeowner's insurers to set rates in any particular way. But in *Inclusive Communities*, the Supreme Court did not require compulsion of a precise result before a law would break the causal chain between the disparity and the challenged practice or policy. To the contrary, the Supreme Court explained that a law that "*substantially limits* the [defendant's] discretion" is sufficient to eliminate the required causal connection. 576 U.S. at 543 (emphasis added).

In fact, state-law constraints on ratemaking and underwriting decisions constrain discretion to a degree similar to the constraints addressed in *Inclusive Communities*. There, the Supreme Court pointed specifically to federal law governing the award of tax credits for low-income housing, which the Court explained "substantially limit[ed]" the Texas Department of Community Affairs' discretion so as to undermine the causal connection between the Department's decisionmaking and any ultimate housing disparities. 576 U.S. at 543; *see Inclusive Communities Project, Inc.* v. *Texas Department of Housing & Community Affairs*, 747 F.3d 275, 284 (5th Cir. 2014) (Jones, J., specially concurring). The relevant federal law directs "States to develop plans identifying selection criteria for distributing the credits" and mandates consideration of certain criteria and preferences, *Inclusive Communities*, 576

51

U.S. at 525-526, but it does not dictate how those criteria are to be weighed and balanced. *See* 26 U.S.C. § 42(m).

*Inclusive Communities* itself thus makes clear that even substantial (albeit not comprehensive) limitations on discretion are sufficient to prevent liability. Here too, the command under state law for insurers to consider "all relevant factors," especially when combined with a command to refrain from considering race and other protected characteristics, substantially limits the discretion of insurers and thus prevents plaintiffs from stating a disparate-impact claim based on insurers' ratemaking and underwriting practices.

In sum, state insurance law makes it impossible for a plaintiff to meet the "detailed causation requirements" of *Inclusive Communities*, which "cabin[] disparate impact liability" under the FHA. *Oviedo Town Center*, 759 Fed. Appx. at 833-834. By allowing such claims to proceed, HUD's disparate-impact rule conflicts with *Inclusive Communities* and thus is contrary to law. The district court should have vacated the rule as applied to the ratemaking and underwriting decisions of homeowner's insurers, and it erred by doing otherwise.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
WILLIAM T. MARKS
YISHAI SCHWARTZ
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

MAY 1, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellant National Association of Mutual Insurance Companies and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g), that the foregoing Brief of Appellant is proportionately spaced, has a typeface of 14 points or more, and contains 11,695 words.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

MAY 1, 2024