**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,

*Plaintiff-Appellant*

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT

*Defendant-Appellee*

On Appeal from the United States District Court
for the District of Columbia, No. 13-cv-966 (RJL)

***AMICI CURIAE* BRIEF OF THE AMERICAN BANKERS ASSOCIATION
AND INDEPENDENT COMMUNITY BANKERS OF AMERICA® IN
SUPPORT OF PLAINTIFF-APPELLANT**

Paul F. Hancock
K&L GATES LLP
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, FL 33131-2399
(305) 539-3300
paul.hancock@klgates.com

John Longstreth
K&L GATES LLP
1601 K Street NW
Washington, D.C. 20006
(202) 778-9000
john.longstreth@klgates.com

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE ............................................................................ 1

INTRODUCTION ................................................................................................ 3

ARGUMENT ....................................................................................................... 6

I. THE RULE MUST BE VACATED BECAUSE HUD EXCEEDED ITS AUTHORITY AND ACTED CONTRARY TO LAW WHEN IT REJECTED THE DISPARATE-IMPACT STANDARD IMPOSED BY THE SUPREME COURT. ...................................................................... 6

    A.    HUD Is Bound by Supreme Court Precedent Defining the Standard for Disparate-Impact Claims under the Fair Housing Act. ..................................................................................... 6

    B.    HUD Impermissibly Rejected the *Wards Cove* Standard for Disparate Impact Liability under the Fair Housing Act, Wrongly Stating That The Decision Has Been "Superseded" and "Abrogated." ................................................................ 12

    C.    HUD's Decision to Announce the Civil Rights Act of 1991 as the Standard for Disparate Impact under the Fair Housing Act Amounts to an Unauthorized and Unlawful Agency Action. ............. 17

    D.    The Disparate-Impact Rule Adopting the Standard of the Civil Rights Act of 1991 Is a Substantial Departure from *Wards Cove*. ................................................................... 19

    E.    HUD Lacks Authority to Cherry-Pick Portions of the Disparate-Impact Standard Congress Enacted to Supersede *Wards Cove* in Title VII Claims. .................................................................. 23

CONCLUSION .................................................................................................. 25

Certificate Of Compliance ............................................................................... 27

Certificate Of Service ...................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pharm. Ass'n v. Mathews,*
530 F.2d 1054 (D.C. Cir. 1976) ...................................................................7, 19

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ...........................................................................................6

*Chi. & S. Air Lines v. Waterman S.S. Corp.,*
333 U.S. 103 (1948) .........................................................................................18

*de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,*
903 F.3d 415 (4th Cir. 2018) ..................................................................14, 15,16

*Gross v. FBL Fin. Servs., Inc.,*
557 U.S. 167 (2009) .............................................................................11, 12, 17

*Inclusive Cmtys. Project, Inc.* v. *Heartland Cmty. Ass'n,*
824 F. App'x 210 (5th Cir. 2020) ................................................................14, 15

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.,*
920 F.3d 890 (5th Cir. 2019) ....................................................................4, 16, 21

*Lakeland Bus Lines, Inc. v. NLRB,*
347 F.3d 955 (D.C. Cir. 2003) ........................................................................24

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,*
497 U.S. 116 (1990) ...........................................................................................6

*Massachusetts Fair Hous. Ctr. v. HUD,*
496 F. Supp. 3d 600 (D. Mass. 2020) ..............................................................16

*Mhany Mgmt.* v. *City of Nassau,*
819 F.3d 581 (2d Cir. 2016) ......................................................................14, 15

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005) ...........................................................................................7

*Neal v. United States,*
516 U.S. 284 (1996) .....................................................................................6, 13

*Northcross v. Board of Educ. of Memphis City Schs.*,
412 U.S. 427 (1973)............................................................................8

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999)......................................................................10, 18

*Prop. Cas. Insurers Ass'n of Am. v. Donovan*,
66 F. Supp. 3d 1018 (N.D. Ill. 2014).........................................10, 19

*Smith v. City of Jackson, Miss.*,
544 U.S. 228 (2005).........................................................................9, 11

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water*
*Improvement Dist.*,
17 F.4th 950 (9th Cir. 2021) ......................................................11, 13

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015).........................................2-3, 5, 8- 9, 12-16, 20-21, 23, 25

*United States v. Batato*,
833 F.3d 413 (4th Cir. 2016) ..........................................................18

*Univ. of Great Falls v. N.L.R.B.*,
278 F.3d 1335 (D.C. Cir. 2002)........................................................8

*Wards Cove Packing Co., Inc. v. Atonio*,
490 U.S. 642 (1989)..........................................................2, 4-5, 7-23, 25

**Statutes**

5 U.S.C. § 706(2)(A).............................................................................24

29 U.S.C. § 628 .....................................................................................18

42 U.S.C. § 1981a(b)(1)–(2) ................................................................23

42 U.S.C. § 2000e-2(k)(1)(A)–(B) .......................................................9

42 U.S.C. § 3605 ....................................................................................2

42 U.S.C. § 3614a ..................................................................................6

Administrative Procedure Act......................................................3, 24

Age Discrimination in Employment Act .......................................................11, 17, 18

Civil Rights Act of 1964, Title VII....................................…4-5, 8-15, 17-19, 22-24

Fair Housing Act............................................................ 2-6, 8-10, 12, 17, 19, 21-23

**Other Authorities**

137 Cong. Rec. S15219 ............................................................................................24

Implementation of the Fair Housing Act's Discriminatory Effects
    Standard, 76 Fed. Reg. 70921, 70924 (proposed Nov. 16, 2011) ......................17

Implementation of the Fair Housing Act's Discriminatory Effects
    Standard, 78 Fed. Reg. 11460 (Mar. 18, 2013) ........................................9, 12, 17

Implementation of the Fair Housing Act's Discriminatory Effects
    Standard, 78 Fed. Reg. 11460 (Mar. 18, 2013), *as reinstated*, 88
    Fed. Reg. 19450 (May 1, 2023), *codified at* 24 C.F.R. § 100.500 ....3, 13, 14, 19,
    20, 22

**Glossary of Abbreviations**

**HUD:**      United States Department of Housing and Urban Development

# INTEREST OF *AMICI CURIAE*

The American Bankers Association ("ABA") and the Independent Community Bankers of America® ("ICBA") respectfully submit this brief as *amici curiae* in support of Appellant National Association Of Mutual Insurance Companies.[1] *Amici* participated in the district court proceedings with the consent of the parties and have also obtained all parties' consent to the filing of this brief.

The ABA is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $13 trillion banking industry and its million employees. ABA members are located in each of the fifty States and the District of Columbia, and include financial institutions of all sizes and types, both large and small. ABA members hold a substantial majority of domestic assets of the banking industry of the United States and are leaders in all forms of consumer financial services.

ICBA is a national association with one mission: to create and promote an environment where community banks flourish. ICBA powers the potential of the nation's community banks through effective advocacy, education, and innovation.

---

[1] No counsel for any party authored this brief in whole or in part, and no counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. No person or entity other than *amici curiae*, their respective members, and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

ICBA's membership consists of thousands of community banks located throughout the United States – more than half of the total depository institutions in the country. ICBA's members collectively operate nearly 50,000 locations nationwide, employ nearly 700,000 Americans, hold $5.8 trillion in assets, hold $4.8 trillion in deposits, and make $3.8 trillion in loans to consumers, small businesses and the agricultural community.

*Amici*'s members are subject to Section 805 of the Fair Housing Act, which prohibits discrimination in residential real estate-related transactions. 42 U.S.C. § 3605. *Amici* and their members vigorously support the Fair Housing Act and strongly oppose discrimination in any aspect of housing or lending. At the same time, *amici* have serious concerns that in promulgating the Rule at issue, the United States Department of Housing and Urban Development ("HUD" or the "Agency") adopted an incorrect and improper standard for disparate-impact liability under the Fair Housing Act—a standard that is inconsistent with *Wards Cove Packing Co., Inc. v. Atonio ("Wards Cove")*, 490 U.S. 642 (1989), and that ignores the limitations on the application of disparate-impact claims required by *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) ("*Inclusive Communities*"), which followed *Wards Cove*.

*Amici* and their members have an interest in the disposition of this case, as Appellant's challenge to the Disparate-Impact Rule raises issues that *amici*'s

members face in complying with the Fair Housing Act and the Rule. In particular, by misstating the applicable legal standards the Rule substantially increases both the risk and cost of litigation well beyond that which *amici*'s members would face in complying with governing Supreme Court precedent.

## **INTRODUCTION**

Appellant has demonstrated convincingly that HUD violated the Administrative Procedure Act in promulgating the Rule addressing the standard for disparate-impact liability under the Fair Housing Act. *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, ("Disparate-Impact Rule" or "Rule"), 78 Fed. Reg. 11460 (Mar. 18, 2013), *as reinstated*, 88 Fed. Reg. 19450 (May 1, 2023), *codified at* 24 C.F.R. § 100.500. *Amici* support, without repeating, the arguments that Appellant presents and seek to amplify and expand the arguments regarding the fundamental legal flaws of the Rule as applied to all businesses in the United States engaged in the housing industry.

NAMIC squarely presents the issue that HUD's Disparate-Impact Rule as applied to its members' activities violates the necessary safeguards on disparate-impact liability set forth in *Inclusive Communities,* and that the rule wrongly fails to incorporate these safeguards. *See* NAMIC Br. at 35 ("HUD also declined to incorporate several procedural safeguards based on *Inclusive Communities* that would likely have prevented the injection of pervasive consideration of protected

characteristics."). These include requirements that a plaintiff adequately plead, and then demonstrate at the prima facie stage, that a challenged policy has a "robust causal link" to the disparate impact, that a challenged policy be "artificial, arbitrary, and unnecessary," and that a disparate impact plaintiff bears the ultimate burden of establishing that a proposed alternative would be "equally effective" and cost-efficient. *See Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.* (*"Lincoln Properties"*), 920 F.3d 890, 902 (5th Cir. 2019) ("We read the Supreme Court's opinion . . . to undoubtedly announce a more demanding test than that set forth in the HUD regulation.").

Both in initially promulgating the rule and in reinstating it, HUD rejected binding Supreme Court precedent guiding the application of disparate-impact liability in discrimination lawsuits, including, in particular, the standard established by the Court in *Wards Cove*.[2] Although commenters carefully outlined the proper legal standard for disparate-impact claims under the Fair Housing Act, HUD improperly rejected those arguments on the erroneous basis that *Wards Cove* was inapplicable. Rather than following and being informed by the standard the Supreme Court requires, HUD improperly grafted the standard Congress enacted only for

---

[2] *Amici* describe the many areas of divergence between the *Wards Cove* standard announced by the Supreme Court and the standard adopted by HUD in the Rule *infra* at 23-26.

disparate-impact claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII") onto disparate-impact claims brought under the Fair Housing Act. HUD's action is inconsistent with *Wards Cove* as followed in *Inclusive Communities.*

HUD does not have the authority to reject or act inconsistently with the standard that under Supreme Court precedent applies to Fair Housing Act discrimination claims based on a disparate-impact theory. As an executive-branch agency, HUD lacks the authority to legislate and thus cannot adopt a disparate-impact standard that required an act of Congress when implemented for Title VII claims.

Even if HUD somehow had the authority (which it did not) to adopt the standard enacted by Congress to supplant *Wards Cove* in Title VII cases, HUD abused its authority by cherry-picking only those portions of the standard that HUD desired while omitting a crucial limitation imposed by Congress, namely that the new standard would apply only to disparate-impact claims that did not seek monetary relief. Congress required a Title VII plaintiff to show discriminatory *intent* to recover money damages under Title VII, but the Rule does not; it purportedly allows disparate-impact claims under the Fair Housing Act even if they focus solely on money damages.

These errors, individually and in combination, require that the Rule be vacated.

## ARGUMENT

**I.    THE RULE MUST BE VACATED BECAUSE HUD EXCEEDED ITS AUTHORITY AND ACTED CONTRARY TO LAW WHEN IT REJECTED THE DISPARATE-IMPACT STANDARD IMPOSED BY THE SUPREME COURT.**

### A.    HUD Is Bound by Supreme Court Precedent Defining the Standard for Disparate-Impact Claims under the Fair Housing Act.

Section 815 of the Fair Housing Act authorizes HUD to "make rules … to carry out this subchapter" after "giv[ing] public notice and opportunity for comment." 42 U.S.C. § 3614a. As with any rule promulgated by an executive agency, HUD's authority is limited to applying the Fair Housing Act in a manner consistent with judicial precedent. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."). It is beyond question that the Agency has no authority to alter the judicial interpretation of a statute as Congress might choose to do. *See, e.g., Neal v. United States,* 516 U.S. 284, 290, 294–95 (1996) ("Petitioner concedes, as he must, that the Commission does not have the authority to amend the statute we construed in [a prior case];" court gave no deference to an agency rule that "cannot be squared with" with the court's prior interpretation of the statute and overturned it); *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S.

6

116, 131, 134–35 (1990) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning. . . . Although the Commission has both the authority and expertise generally to adopt new policies when faced with new developments in the industry, it does not have the power to adopt a policy that directly conflicts with its governing statute.") (citation omitted).[3]

Nor is it of any moment that HUD may believe its rule to be good policy, given that it lacks authority under the statute to prescribe it, as only Congress can provide that authority. *See Am. Pharm. Ass'n v. Mathews*, 530 F.2d 1054, 1056 (D.C. Cir. 1976) ("the FDA undoubtedly has genuine cause to believe that . . . effective regulation in the public interest necessitates [the asserted] authority on its part . . . Under the present statutory framework, however, I believe that argument

---

[3] This case does not present the situation present in *National Cable & Telecommunications Association v. Brand X Internet Services*, which held that an agency need not follow a statutory construction that a court upheld by deferring to a prior agency construction under "*Chevron*'s step two," and may reach a conclusion that is also within the zone of reasonableness afforded an agency when a statute is ambiguous. 545 U.S. 967, 980–82 (2005). *Wards Cove* was not an agency deference case, and did not suggest in any way that the Supreme Court was interpreting ambiguous language or leaving an agency free to come to an alternative conclusion. That is why Congress addressed the matter legislatively. *See* pp. 12-14, *infra*. Nor would a court in any circumstance defer to an agency's determination as to whether a Supreme Court decision had been "superseded" or "abrogated." *See* pp. 8, 10–11, *infra*.

must be addressed to Congress.") (McGowan, J., concurring). And HUD is likewise owed no deference in its interpretation of Supreme Court precedent, which is a matter for courts, not agencies. *See Univ. of Great Falls v. N.L.R.B.,* 278 F.3d 1335, 1341 (D.C. Cir. 2002) ("We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle." (internal quotation omitted)).

HUD was thus not operating on a clean slate in articulating the application of disparate impact under the Fair Housing Act when it promulgated the Rule. Rather, significant Supreme Court precedent existed to both direct HUD and limit the reach of its rulemaking, precedent arising largely from the Supreme Court's interpretation of Title VII disparate-impact claims in *Wards Cove* and *Inclusive Communities*.

The basic prohibitory language of Title VII, before its amendment by Congress in 1991, is similar to that of the Fair Housing Act. The Supreme Court recognized the "similarity in text and structure" between the two statutes in *Inclusive Communities*. 576 U.S. at 535. The Court also observed that this similarity "is all the more compelling given that Congress passed the FHA in 1968—only four years after passing Title VII" in 1964. *Id.* And the two statutes serve similar purposes, with Title VII designed to eradicate discrimination in employment and the Fair Housing Act designed to eradicate discrimination in housing. *See id.* at 539.

In such circumstances, courts have recognized "a strong indication that [the two laws] should be interpreted pari passu"—i.e., in the same way. *Northcross v. Board of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1973) (per curiam); *see also Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233–34 (2005). *Inclusive Communities* concluded that "cases interpreting Title VII … provide essential background and instruction" for construing the Fair Housing Act. 576 U.S. at 533.

HUD itself recognized this concept in first devising the Disparate-Impact Rule, agreeing that "courts have drawn the analogy between Title VII and the Fair Housing Act in interpreting the Act." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460, 11466 (Mar. 18, 2013). And HUD cited federal circuit court decisions standing for the proposition that "[c]laims under Title VII and the [Fair Housing Act] generally should receive similar treatment." *Id.* at 11,462 n.35.

There is a break-point, however, at which Title VII jurisprudence can no longer guide interpretation of the applicable standard for disparate-impact liability under the Fair Housing Act. The break-point occurred when Congress passed the Civil Rights Act of 1991, which, in pertinent part, displaced the *Wards Cove* disparate-impact standard for future disparate-impact claims brought under Title VII. *See* 42 U.S.C. § 2000e-2(k)(1)(A)–(B). Perceiving the *Wards Cove* disparate-impact standard as too rigorous for Title VII plaintiffs, Congress amended Title VII

in 1991 to create a less rigorous standard for disparate-impact claims brought under that statute. *See Smith*, 544 U.S. at 240 ("One of the purposes of th[e] amendment [to Title VII] was to modify the Court's holding in *Wards Cove* …, a case in which we narrowly construed the employer's exposure to liability on a disparate-impact theory."); *see also Prop. Cas. Insurers Ass'n of Am. v. Donovan,* 66 F. Supp. 3d 1018, 1052 n.12 (N.D. Ill. 2014) ("*PCIAA*") ("In 1991, Congress established a statutory framework for proving disparate impact claims in the Title VII context that was less burdensome on plaintiffs than the *Wards Cove* standard.").

Because Congress chose to amend Title VII in response to *Wards Cove* but did not choose to amend the Fair Housing Act, *Wards Cove* continues to provide the proper application of disparate impact under the Fair Housing Act. The 1991 amendments to Title VII "highlight[] the principle that a departure from the traditional understanding of discrimination requires congressional action." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 618 n.3 (1999) (Thomas, J., dissenting). Congress has never taken action with respect to the Fair Housing Act authorizing "a departure from the traditional understanding of discrimination" as described in *Wards Cove*. Thus, while prior to 1991 it was both appropriate and common to look to interpretations of Title VII to guide the standard of proof for disparate-impact claims under the Fair Housing Act, after Congress's 1991 amendments to Title VII it is error to do so. Title VII is now governed by a

congressionally-enacted disparate-impact standard that is not applicable to other laws prohibiting discrimination.

The Supreme Court has squarely addressed this issue in evaluating the continued application of the *Wards Cove* standard to disparate-impact claims under the Age Discrimination in Employment Act ("ADEA"). In ruling that interpretation of the ADEA is not guided by post-1991 Title VII jurisprudence, the Court stated: "We cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the ADEA. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009). "Congress neglected to add such a provision to the ADEA when it amended Title VII" and "[a]s a result, the Court's interpretation of the ADEA is not governed by Title VII decisions" that post-date the Title VII amendments. *Id.* at 174–75.

The Supreme Court has thus unambiguously concluded that the *Wards Cove* standard continues to apply in disparate-impact cases arising under civil rights statutes other than Title VII, such as the ADEA:

> While the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, *Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA.

*Smith*, 544 U.S. at 240.  The Ninth Circuit has agreed.  *See Sw. Fair Hous. Council, Inc.* v. *Maricopa Domestic Water Improvement Dist.,* 17 F.4th 950, 960 n.5 (9th Cir. 2021) ("The Civil Rights Act of 1991 abrogated *Wards Cove* with respect to claims under Title VII, but the Supreme Court has continued to apply *Wards Cove* burden shifting to other antidiscrimination statutes.")  In the absence of a "congressional action" similar to the 1991 amendments to Title VII, there is no basis to conclude that *Wards Cove* does not continue to supply the disparate-impact standard under the Fair Housing Act.  *See Gross*, 557 U.S. at 174.  And the Supreme Court continued to rely on *Wards Cove* in the Fair Housing Act context in its *Inclusive Communities* decision.  *See* 576 U.S. at 542 (citing *Wards Cove,* 490 U.S. at 653 for its "robust causality requirement").

HUD was thus bound by *Wards Cove* when promulgating the Disparate-Impact Rule, and it constituted error for HUD to apply the 1991 Title VII amendments to disparate-impact claims under the Fair Housing Act.

**B.** **HUD Impermissibly Rejected the *Wards Cove* Standard for Disparate Impact Liability under the Fair Housing Act, Wrongly Stating That The Decision Has Been "Superseded" and "Abrogated."**

When HUD issued the 2013 Disparate Impact Rule that the current rule re-adopts, it explicitly—and wrongly—rejected the concept that *Wards Cove* governs Fair Housing Act disparate-impact claims, stating without explanation that "HUD does not agree … that *Wards Cove* even governs Fair Housing Act claims," and

describing *Wards Cove* as "superseded." 78 Fed. Reg. at 11473. The repromulgated Disparate-Impact Rule repeats this error, stating that *Ward's Cove* has been "superseded" by the 1991 legislation. *See* 2013 Rule at 11473 (stating "HUD does not agree . . . that *Wards Cove* even governs Fair Housing Act claims," and referencing *Wards Cove* as "superseded.").

Discussing the burden shifting framework for Title VII cases in the new 2023 rule, HUD "notes that the *Wards Cove* framework was abrogated by the Civil Rights Act of 1991, which restored the *Albemarle* standard." 88 Fed. Reg. at 19488 n.311. HUD notes that its view is directly contrary to the Ninth Circuit's decision in *Sw. Fair Hous. Council,* discussed above. *Id.* HUD asserts that the Ninth Circuit erred, but HUD is wrong. As set forth above, the 1991 law expressly did not amend the FHA or any statute other than Title VII, and even as to Title VII it applied a new standard only to injunctive claims, not to claims for damages. The Ninth Circuit held exactly that, and that is the only permissible reading of Congress' actions.

Other than to argue erroneously that *Wards Cove* has been "superseded" and "abrogated" in FHA cases, HUD's final rule entirely ignores the case and the limitations it places on disparate impact liability under the FHA. HUD is, of course, not free to simply ignore Supreme Court precedent in purporting to apply a statute. *See Neal,* 516 U.S. at 290 ("the Commission does not have the authority to amend the statute we construed in [a prior case]."). This is particularly true in the

case of HUD's rule, given that *Inclusive Communities* held that the FHA could be read to impose disparate-impact liability only because it "has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based solely on a showing of a statistical disparity." 576 U.S. at 540. *Inclusive Communities* also made clear that "adequate safeguards at the prima facie stage" were required, including the "robust causality requirement" of *Wards Cove. Id*. at 542 (citing *Wards Cove,* 490 U.S. at 653).

HUD discusses none of this statutory background or Supreme Court precedent, but simply asserts that the Ninth Circuit's decision "conflicts with the other circuits." 88 Fed. Reg. at 19488 n.312, (citing *Mhany Mgmt.* v. *City of Nassau,* 819 F.3d 581 (2d Cir. 2016); *Inclusive Cmtys. Project, Inc.* v. *Heartland Cmty. Ass'n ("Inclusive Communities II"),* 824 F. App'x 210 (5th Cir. 2020), and *de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018)). HUD does not discuss any of these cases, much less explain how they "conflict" with the Ninth Circuit's ruling. A review of the cases, two of which ruled in the *defendant*'s favor as to a claim of disparate impact liability under the FHA and the third of which expressly relied on *Wards Cove*, readily demonstrates that each directly undermines HUD's assertion of a "conflict."

*Mhany Mgmt.* does not discuss or even cite *Wards Cove*, and cites the Civil Rights Act of 1991 only in passing. *Mhany Mgmt.*, 819 F.3d at 615 n.8. It thus cannot possibly "conflict" with the Ninth Circuit's recognition of the plain fact that the 1991 legislation repealed *Wards Cove only* as to Title VII and *not* as to the FHA or any other statute. Moreover, the Second Circuit remanded the plaintiff's disparate impact claim to the district court in that case for failure to have properly placed on the *plaintiff* the "burden of proving an available alternative practice that has less disparate impact and serves Defendants' legitimate nondiscriminatory interests." *Id*. at 618–20. This holding in no way conflicts with *Wards Cove*, and to the extent the Second Circuit noted that its conclusion was consistent with HUD's rule it was only as to a matter that did not undermine the continued vitality of *Wards Cove* in any way. *See Wards Cove*, 490 U.S. at 659 (the "ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times*" (quotation omitted)).

*Inclusive Communities II,* on remand from the Supreme Court, affirmed the dismissal of an action claiming disparate-impact race discrimination in violation of the FHA. Like *Mhany Mgmt.,* the case does not discuss or even cite *Wards Cove.* Nor does it make any reference *to* the 1991 legislation. The final case on which the HUD rule relies, *de Reyes v. Waples Mobile Home Park Ltd. P'ship*, cites and relies on *Wards Cove* throughout and states "[t]he Supreme Court's opinion in *Wards*

*Cove* provides a clear example of *Inclusive Communities*' robust causality requirement. In *Wards Cove*, the Supreme Court concluded that the Ninth Circuit erred in holding that plaintiffs had made out a prima facie case of disparate impact under Title VII using evidence that the percentage of salmon cannery workers in 'noncannery jobs' (generally skilled) who were non-white was significantly lower than the number of workers in 'cannery jobs' (unskilled) who were non-white, as this only demonstrated that a racial imbalance existed between the two jobs without demonstrating how a specific policy caused a racial imbalance in either job." 903 F.3d at 426.

All of this demonstrates that, while *Inclusive Communities* is the Supreme Court's most recent word on the disparate impact standard under the FHA, there is no basis for HUD's position that the reasoning of *Wards Cove* is no longer relevant or persuasive in assessing FHA claims. Indeed, as the Fourth Circuit noted in the *de Reyes* case on which HUD purports to rely, "*Inclusive Communities* cited to *Wards Cove* in explaining the robust causality requirement." *See* 903 F.3d at 426 n.6 (citing *Inclusive Communities*, 576 U.S. 542).

HUD's error is particularly significant since the supposed purpose of the Disparate-Impact Rule is to set out the governing legal standards for such claims. The court decision enjoining HUD's 2020 disparate-impact rule issued under the last administration, which the 2023 rule replaces, noted that although

portions of the 2020 rule were consistent with the law, portions were not, and the injunction issued based on those parts that were not. *See Massachusetts Fair Hous. Ctr.r v. HUD*, 496 F. Supp. 3d 600, 607, 611–612 (D. Mass. 2020). *See also Lincoln Properties*, 920 F.3d at 902 (noting that the 2013 HUD rule that the 2023 rule repromulgated was inconsistent with *Inclusive Communities* because it did not impose as demanding a test for liability). The same result is appropriate here.

C. **HUD's Decision to Announce the Civil Rights Act of 1991 as the Standard for Disparate Impact under the Fair Housing Act Amounts to an Unauthorized and Unlawful Agency Action.**

HUD has now twice showed its disdain for the *Wards Cove* standard and its preference for the standard that Congress enacted after the *Wards Cove* decision to govern Title VII claims but not FHA claims. When the 2013 rule was first published for comment, HUD stated that it intended to adopt "the discriminatory effects standard confirmed by Congress in the 1991 amendments to Title VII." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921, 70924 (proposed Nov. 16, 2011). HUD was not swayed by any of the comments describing the legal error of HUD's position, and in the Rule as promulgated, HUD chose the "Title VII discriminatory effects standard codified by Congress in 1991" as the standard to govern disparate-impact claims under the Fair Housing Act. Disparate-Impact Rule, 78 Fed. Reg. at 11474. HUD has now repeated the error in repromulgating the 2013 rule.

As set out above, the authority HUD cites in purported support of its position actually undermines it. *See also Gross*, 557 U.S. at 174 ("We cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the ADEA. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."). HUD observes that the ADEA is somehow more "limited" than the FHA or Title VII, but does not even begin to explain how that observation, even if it were true, would support its ignoring and mischaracterizing the precedent cited above.

HUD of course has no power to emulate Congress and overrule Supreme Court statutory interpretations with which it may disagree. As noted earlier, the Supreme Court has stated that the 1991 amendments to Title VII "highlight[] the principle that a departure from the traditional understanding of discrimination requires congressional action." *Olmstead*, 527 U.S. at 618 n.3 (Thomas, J., dissenting). And yet HUD sought to exercise the powers of Congress in promulgating the Rule. HUD's action here would be comparable to a hypothetical proposal from the Equal Employment Opportunity Commission ("EEOC") to promulgate a rule to supersede the *Wards Cove* decision for future ADEA claims.[4] Federal agencies must promulgate rules that comply with decisions of the Supreme

---

[4] Congress has authorized the EEOC to issue "such rules and regulations as it may consider necessary or appropriate for carrying out" the ADEA. 29 U.S.C. § 628.

Court. *See, e.g.*, *United States v. Batato*, 833 F.3d 413, 437 (4th Cir. 2016) ("Article III courts cannot render decisions subject to revision by another branch of government.") (citing *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)) (Floyd, J., dissenting).

Agencies can seek relief from Congress if they believe that new statutory standards should govern their enforcement of statutes, but they cannot achieve their objective simply through administrative rule making. *See Mathews*, 530 F.2d at 1056 ("Under the present statutory framework, however, I believe that argument must be addressed to Congress.") (McGowan, J., concurring). HUD's preference for the legislative Title VII-specific standard over the governing precedent of the Supreme Court is transparent. Notwithstanding its preference, HUD is bound by the limits of its own authority. And it lacked authority to adopt a standard for the Fair Housing Act that required an act of Congress to achieve in the context of Title VII.

### D. The Disparate-Impact Rule Adopting the Standard of the Civil Rights Act of 1991 Is a Substantial Departure from *Wards Cove.*

Congress designed the 1991 Title VII amendments to alter the *Wards Cove* disparate-impact standard as applied to that statute, so it comes as no surprise that, in improperly adopting the 1991 Title VII amendments, the Disparate-Impact Rule

also diverges widely from *Wards Cove*. The Disparate-Impact Rule departs from *Wards Cove* in at least five significant ways:[5]

- ***First***, *Wards Cove* requires a plaintiff to "demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack," 490 U.S. at 657, but HUD permits a plaintiff "to challenge the decision-making process as a whole," Disparate-Impact Rule, 88 Fed. Reg. at 19485.

- ***Second***, *Wards Cove* requires that "each challenged practice has a significantly disparate impact," 490 U.S. at 657, but HUD made a "decision not to codify a significance requirement," Disparate-Impact Rule, 88 Fed. Reg. at 19486.

- ***Third***, *Wards Cove* requires that the "ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times*," 490 U.S. at 659, but HUD "formalize[s] a burden-shifting test," Disparate-Impact Rule, 88 Fed. Reg. at 19,450, 19459.

- ***Fourth***, *Wards Cove* specifies "there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster," 490 U.S. at 659, but HUD requires the "defendant to prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests," Disparate-Impact Rule, 88 Fed. Reg. at 19484.

- ***Fifth***, *Wards Cove* requires that "any alternative practices … must be equally effective … in achieving [] legitimate [] goals," 490 U.S. at 661, but HUD refused to adopt this standard. Disparate-Impact Rule, 88 Fed. Reg. at 19491.

---

[5] The U.S. District Court for the Northern District of Illinois conducted an extensive analysis comparing the disparate-impact approach of the Disparate-Impact Rule to the disparate-impact approach of *Wards Cove* and described these same five areas of divergence between the two standards. *See PCIAA,* 66 F. Supp. 3d at 1052.

The *Inclusive Communities* decision confirms HUD's errors. The Supreme Court noted that "disparate-impact liability has always been properly limited in key respects" and described the limits in detail. *Inclusive Communities*, 576 U.S. at 540. In particular, the Court described the harmful and unconstitutional consequences flowing from an overbroad application of disparate impact—including the possible invidious consideration of race or national origin in decision-making through racial quotas. *See id.* at 542 (quoting *Wards Cove*, 490 U.S. at 653). Emphasizing the *Wards Cove* standard, *Inclusive Communities* held that a "disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity" and that the application of a "robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact" under the Fair Housing Act. *Id.* (quoting *Wards Cove*, 490 U.S. at 653) (cleaned up). Yet, the Rule describes no meaningful limits on the use of disparate impact and certainly not the type of limits that the Supreme Court has mandated. *See Lincoln Properties*, 920 F.3d at 902 (noting the inconsistencies between the HUD rule and *Inclusive Communities*).

The distinctions between Supreme Court precedent and the Rule have an important and harmful impact on *amici* and their members. For instance, it is well recognized that credit decisions with respect to residential mortgage applications do not align neatly with the realities of racial distribution within the population.

Differences that might be correlated with factors such as age, race, or national origin are to be expected even with the application of fair and prudent underwriting standards, simply because of societal differences in wealth, income, employment, and credit scores. *Wards Cove* and *Inclusive Communities* impose a significantly greater burden on a plaintiff than the HUD rule by requiring the plaintiff to identify the specific and uniformly applied business practice that is challenged and to demonstrate "robust" causality between the challenged practice and the statistical imbalance. Moreover, *Inclusive Communities* limits disparate-impact claims to the "removal of artificial, arbitrary and unnecessary barriers" to housing. 576 U.S. at 540. HUD ignores this important limitation. *Wards Cove* further specifies that there is no requirement of "necessity" in justifying a challenged practice and mandates that the burden of proof remains with the plaintiff at all stages of the lawsuit. 490 U.S. at 659. But the Rule impermissibly places the burden on the "***defendant*** [] prove that the challenged practice is ***necessary*** to achieve one or more substantial, legitimate, nondiscriminatory interests." Disparate-Impact Rule, 88 Fed. Reg. at 19451 (emphasis added).

In sum, the Rule substantially increases both the likelihood and cost of litigation, as well as ensuing risk of reputational injuries, over that which would be present if HUD had followed the Supreme Court precedent.

**E. HUD Lacks Authority to Cherry-Pick Portions of the Disparate-Impact Standard Congress Enacted to Supersede *Wards Cove* in Title VII Claims.**

Even assuming for the sake of argument that HUD had the authority to reject the *Wards Cove* standard and to promulgate in the housing-discrimination realm what it took an act of Congress to achieve in the employment-discrimination realm, the Disparate-Impact Rule exceeds HUD's authority for a separate but interrelated reason. Although HUD purports to adopt the "Title VII discriminatory effects standard codified by Congress in 1991," Disparate-Impact Rule, 88 Fed. Reg. at 19490, HUD did not adopt the entirety of the standard Congress enacted for Title VII. Instead, by adopting the statute's burdens on defendants while ignoring the statute's limitations on disparate impact, HUD formulated a standard for the Fair Housing Act quite different from that which Congress enacted for Title VII.

For instance, under the 1991 Title VII standard, employment-discrimination plaintiffs must establish intent—not merely discriminatory effect—to state a claim for money damages. *See* 42 U.S.C. § 1981a(b)(1)–(2) (prohibiting compensatory and punitive damages in Title VII disparate-impact cases). This is the type of limitation on disparate-impact liability envisioned by *Inclusive Communities* when the Supreme Court observed that "[r]emedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that arbitrarily operates to discriminate on the basis of race." 576 U.S. at 544 (internal quotations

omitted).Congress has never enacted, and the Supreme Court has never recognized, a disparate-impact standard that both *rejects* the limitations of *Wards Cove* and, at the same time, *allows* a claim for money damages.

Yet, in promulgating the Rule, HUD did so. The Agency rejected the provisions of the 1991 standard precluding disparate-impact plaintiffs from obtaining money damages under Title VII (either compensatory or punitive) and set no limits on the use of disparate impact to obtain money damages under the Fair Housing Act. The Rule provides no sound rationale for adopting certain provisions of the 1991 Title VII amendments (those which might be viewed as plaintiff-friendly) while rejecting other provisions of the same statute (those which establish limitations on the use of disparate impact). The 1991 amendments reflect Congress's comprehensive statutory framework for the application of disparate impact under Title VII. Indeed, the legislative history of the 1991 amendments confirms the delicate balance Congress envisioned: "*The bill does not give victims an unlimited entitlement to damages. Compensatory and punitive damages are available only in cases of intentional discrimination*." 137 Cong. Rec. S15219, S15234 (Oct. 25, 1991) (emphasis added).

It is, of course, markedly different to provide a "no requirement of intent" standard for lawsuits that seek to eliminate offending business practices than it is to provide such a standard in lawsuits that seek compensatory and punitive damages.

And HUD has not identified any reasoned basis for adopting only a portion of Congress's 1991 Title VII amendments. Thus, under the Administrative Procedure Act, HUD's cherry-picking is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *cf. Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003) (agency cannot find substantial evidence solely based on evidence that supports the result "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn").

## CONCLUSION

HUD exceeded its authority, and acted arbitrarily and capriciously, by promulgating the Disparate-Impact Rule in a manner that conflicts with (1) the Supreme Court's limitations on disparate impact as articulated in *Wards Cove* and reemphasized in *Inclusive Communities*, and (2) Congress's limitations on disparate impact liability in the 1991 Title VII amendments. *Amici* join Appellant the National Association of Mutual Insurance Companies in requesting that the Court enter an order vacating the HUD Disparate-Impact Rule.

Respectfully submitted,

Paul F. Hancock

/s/ John Longstreth

K&L GATES LLP

John Longstreth

Southeast Financial Center, Suite 3900

K&L GATES LLP

200 South Biscayne Boulevard

1601 K Street NW

Miami, FL 33131-2399

Washington, D.C. 20006

(305) 539-3300

(202) 778-9000

paul.hancock@klgates.com

john.longstreth@klgates.com

*Counsel for Amici Curiae*

May 8, 2024

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6033 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Times New Roman, a proportionally-spaced typeface, in 14-point font.

*/s/John Longstreth*
Counsel for Amici Curiae

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's

ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of

Appellate Procedure, on May 8, 2024, on all registered counsel of record, and has

been transmitted to the Clerk of the Court.


*/s/John Longstreth*