IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,

*Plaintiff-Appellant*

*v.*

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
AND ADRIANNE TODMAN, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF HOUSING AND URBAN DEVELOPMENT,

*Defendants-Appellee*

On Appeal from the United States District Court for the District of
Columbia (Civ. No. 13-966)
(The Honorable Richard J. Leon, J.)

## BRIEF FOR *AMICUS CURIAE* NATIONAL COUNCIL OF INSURANCE LEGISLATORS IN SUPPORT OF PLAINTIFF-APPELLANT URGING REVERSAL

ERIC T. WERLINGER
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave NW –
Suite 800
Washington, DC 20006
(202) 625-3500
eric.werlinger@kattenlaw.com

NAT SHAPO
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
(312) 902-5200
nat.shapo@katten.com

*Counsel for* Amicus Curiae

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I, Nat Shapo, counsel for *Amicus Curiae* National Council of Insurance Legislators and a member of the Bar of this Court, certify as follows:

**(A) Parties and amici.** The parties, intervenors, and amici that appeared before the district court or are participating in this appeal are the United States Department of Housing and Urban Development; Adrianne Todman, in her official capacity as Secretary of Housing and Urban Development; Marcia L. Fudge, in her former official capacity as Secretary of Housing and Urban Development; Shaun Donovan, in his former official capacity as Secretary of Housing and Urban Development; Julian Castro, in his former official capacity as Secretary of Housing and Urban Development; Benjamin S. Carson, Sr., in his former official capacity as Secretary of Housing and Urban Development; American Insurance Association; National Association of Mutual Insurance Companies; Judicial Watch, Inc., Allied Educational Foundation; National Fair Housing Alliance; Lawyers' Committee for Civil Rights Under Law; National Low Income Housing Coalition; Poverty & Race Research Action Council; National Housing Law Project; LatinoJustice

PRLDEF; NAACP Legal Defense and Education Fund, Inc.; American Civil Liberties Union; National Consumer Law Center; National Community Reinvestment Coalition; Chamber of Commerce of the United States of America; American Financial Services Association; Consumer Mortgage Coalition; Independent Community Bankers of America; Mortgage Bankers Association; National Association of Home Builders of the United States, Inc.; American Bankers Association; Consumer Bankers Association; Financial Services Roundtable; American Association of Retired Persons; and National Council of Insurance Legislators.

(B) **Rulings under review.** The ruling under review is the district court's order and memorandum opinion of September 19, 2023, denying summary judgment to plaintiff, granting summary judgment to defendants, and dismissing the case. D. Ct. Dkt. 155 & 156. The district court's opinion is not yet reported but is available at 2023 WL 6142257 and is reproduced at pages ___-___ of the joint appendix.

(C) **Related cases.** This case has previously been before this Court under the caption *American Insurance Association, et al. v. Department of Housing & Urban Development, et al.*, No. 14-5321. In that appeal,

this Court vacated a prior judgment of the district court and remanded the case for further proceedings in light of the Supreme Court's decision in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015). Counsel for *Amicus Curiae* is not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ Nat Shapo_____
NAT SHAPO
COUNSEL FOR AMICUS CURIAE

MAY 8, 2024

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus Curiae* National Council of Insurance Legislators ("NCOIL") makes the following disclosures:

1.    NCOIL is the organization representing the interests of State insurance legislators who author State insurance codes.  These statutes regulate the insurer discrimination practices that are the subject of this appeal, and NCOIL has unique perspective and expertise regarding these laws' basis in Federal law, specifically the McCarran–Ferguson Act.

2.    NCOIL is unincorporated and its members have no ownership interests. No members have issued shares or debt securities to the public.

/s/ Nat Shapo

NAT SHAPO
COUNSEL FOR *AMICUS CURIAE*

MAY 8, 2024

# CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), counsel for *Amicus Curiae* National Council of Insurance Legislators certifies that a separate brief is necessary to provide this *Amicus Curiae's* perspective because other party and amicus briefs do not address this *Amicus Curiae's* perspective as the representative of the State legislators who author the State insurance codes which regulate insurer discrimination practices, nor do they address the history of the McCarran–Ferguson Act as establishing a Federal policy regarding insurer discrimination practices by incentivizing and directing the content of these State insurance codes' unfair discrimination prohibitions' incorporation of Robinson–Patman Anti-Discrimination Act standards. *Amicus Curiae* National Council of Insurance Legislators is particularly well suited to provide this Court important context on these subjects because of its unique historical positioning, perspective, expertise, and knowledge.

/s/ Nat Shapo
NAT SHAPO
COUNSEL FOR *AMICUS CURIAE*

MAY 8, 2024

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................ i

CORPORATE DISCLOSURE STATEMENT ......................................... iv

CERTIFICATE REGARDING SEPARATE BRIEFING ......................... v

TABLE OF AUTHORITIES ............................................................... viii

STATEMENT OF IDENTITY AND INTEREST ................................... 1

SUMMARY OF ARGUMENT ............................................................. 4

ARGUMENT ...................................................................................... 6

I. MCCARRAN–FERGUSON ESTABLISHES THE CONTROLLING NATIONAL REGULATORY STANDARDS FOR INSURER DISCRIMINATION PRACTICES ....................... 6

    A.    Congress Directs the States to Occupy the Field of Competition and Trade Practices Regulation ....................... 6

    B.    The States' Recognition of their Obligation to Legislate in Good Faith ........................................................... 9

    C.    The States' Thoroughly Considered, Well-Developed Response to Congress' Inclusion of Robinson–Patman in McCarran–Ferguson ...................................................... 11

    D.    State Unfair Discrimination Laws Implement a Federal Policy of Cost-Based Pricing ................................... 15

II. THE STATE RATING LAWS IMPLEMENT, AS A MATTER OF CONGRESSIONAL POLICY, ROBINSON–PATMAN'S ECONOMIC, NOT SOCIAL, DISCRIMINATION PRACTICES ................................................................................ 18

III.   THE STATE RATING STATUTES, PURSUANT TO
       CONGRESS'S DELEGATION OF SUCH POLICY
       CHOICES, PROTECT DISCRETE, VULNERABLE
       CLASSES FROM DIRECT DISCRIMINATION. .......................... 22

IV.    MCCARRAN–FERGUSON'S CORE UNFAIR
       DISCRIMINATION STANDARD SPECIFIC TO INSURER
       DISCRIMINATION PRACTICES MUST TRUMP THE
       RULE, WHICH IMPLEMENTS A STATUTE GENERAL TO
       HOUSING THAT DOES NOT SPECIFICALLY
       REFERENCE INSURANCE ......................................................... 26

CONCLUSION ...................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Petroleum Tankers Parent, LLC v. United States,*
  943 F. Supp. 2d 59 (D. D.C. 2013) ...................................................... 28

*Doukas v. Metro. Life Ins. Co.,*
  950 F. Supp. 422 (D.N.H. 1996) ........................................................... 18

*Hardware Mut. Cas. Co. v. Premo,*
  217 A.2d 698 (Conn. 1966) .................................................................. 18

*Ins. Co. of N. Am. v. Comm'r of Ins.,*
  101 N.E.2d 335 (Mass. 1951) ......................................................... 17, 18

*Ins. Comm'r for the State of Md. v. Engelman,*
  692 A.2d 474 (Md. 1997) ...................................................................... 20

*Karlin v. Zalta,*
  201 Cal. Rptr. 379 (Cal. Ct. App. 1984) .............................................. 17

*Life Ins. Ass'n of Mass. v. Comm'r. of Ins.,*
  530 N.E.2d 168 (1988) ......................................................................... 21

*Long Island Care at Home, Ltd. v. Coke,*
  551 U.S. 158 (2007) .............................................................................. 28

*Matter of Polan v. State of N.Y. Ins. Dep't,*
  3 A.D.3d 30 (N.Y. App. Div. 2003) ...................................................... 21

*Nevada v. Dep't of Energy,*
  400 F.3d 9 (D.C. Cir. 2005) ................................................................. 29

*Pac. Fire Rating Bureau v. Ins. Co. of N. Am.,*
  321 P.2d 1030 (Ariz. 1958) .................................................................. 17

*Paul v. Virginia,*
  75 U.S. 168 (1868) ............................................................................. 6, 7

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) ....................................................................... 27, 28

*Telles v. Comm'r of Ins.*,
    574 N.E.2d 359 (Mass. 1991) ................................................................ 21

*Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys.
Project, Inc.*,
    576 U.S. 519 (2015) ........................................................................ 3, 24

*Thompson v. IDS Life Ins. Co.*,
    549 P.2d 510 (Or. 1976) (en banc) .......................................................... 20

*United States v. South-Eastern Underwriters Ass'n*,
    322 U.S. 533 (1944) ..................................................................... 7, 8, 11

## Statutes

15 U.S.C. § 13(a) ......................................................................... 4, 5, 12, 26

15 U.S.C. § 1011 ............................................................................... 7, 8

15 U.S.C. § 1012(a) ............................................................................ 8, 24

15 U.S.C. § 1012(b) ............................................................................. 8, 9

15 U.S.C. § 1013(a) ............................................................................... 9

15 U.S.C. § 1013(c) ............................................................................... 6

24 C.F.R.§ 100.500 ........................................................ 3–6, 22, 25, 26, 27

Del. Code tit. 18, § 2501 ...................................................................... 17

Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.* ......... 3, 5, 6, 21, 25–27

McCarran–Ferguson Act of 1945,
    15 U.S.C. §§ 1011–1015 .............................. 1–11, 13–15, 17, 22, 24–30

Me. Rev. Stat. tit. 24-A, § 2301 ............................................................ 17

Public Accommodations Act, 42 U.S.C. § 2000a ...................................... 20

Robinson–Patman Anti-Price Discrimination Act of 1936,
15 U.S.C. §13.............................................2–5, 9, 12–18, 22, 25, 26, 30

**Other Authorities**

H.R. REP. NO. 79-143 (1945)....................................................... 12

S. REP. 407 (1947) ......................................................................... 15

90 CONG. REC. A4403 (Nov. 16, 1944) ...................................... 12

91 CONG. REC. 1027–28 (Feb. 12, 1945) .............................. 12, 13

91 CONG. REC. 1091 (Feb. 14, 1945) ......................................... 13

91 CONG. REC. 1092 (Feb. 14, 1945) ......................................... 13

91 CONG. REC. 1478 (Feb. 27, 1945) ........................................... 9

91 CONG. REC. 1487 (Feb. 27, 1945) ...................................... 4, 9

1945 NAIC PROC............................................................................ 11

1946 NAIC PROC...................................................................... 10, 16

1947 NAIC PROC.................................................................. 10, 13, 14

1978 NAIC PROC...................................................................... 29, 30

Brief for NAIC as Amicus Curiae Supporting Petitioner,
*Nationwide Mut. Ins. Co. v. Cisneros*, 516 U.S. 1140
(1996) (No. 95-714), 1996 WL 33467770 ........................... 19

Henry Stone & David A. Campbell, *Insurance and the
Robinson–Patman Act*, 319 INS. L.J. 553 (1949).............. 16

JON S. HANSON ET AL., MONITORING COMPETITION: A MEANS
OF REGULATING THE PROPERTY AND LIABILITY INSURANCE
BUSINESS (NAIC 1974)......................................................... 16

NAIC, PRODUCT FILING REVIEW HANDBOOK (2016)................. 19

N.Y. TIMES, June 6, 1944........................................................... 7

Pat McCarran, *Insurance as Commerce—After Four Years*,
    23 NOTRE DAME L. REV. 299 (1948) ........................................ 10, 11, 13

PROPERTY AND CASUALTY MODEL RATING LAW NO. 1775,
    §§ 5A(3), 5A(4)(b) (NAIC 2010) ........................................................ 24

PROPERTY/CASUALTY INSURANCE MODERNIZATION ACT
    §§ 6(A)(3)(A), 6(A)(3)(B), 3(Q) (NAIC 2021) ................................. 22, 23

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **Department**: | United States Department of Housing and Urban Development |
| **FHA**: | Fair Housing Act of 1968 |
| **McCarran–Ferguson**: | McCarran–Ferguson Act of 1945 |
| **NAIC**: | National Association of Insurance Commissioners |
| **NCOIL**: | National Council of Insurance Legislators |
| **Robinson–Patman**: | Robinson–Patman Anti-Price Discrimination Act of 1936 |
| **Rule**: | The Department's disparate impact rule, 24 C.F.R. § 100.500 |

## STATEMENT OF IDENTITY AND INTEREST[1]

The National Council of Insurance Legislators ("NCOIL") is a legislative organization comprised principally of State legislators serving on committees of jurisdiction over insurance regulation. NCOIL serves as an educational forum for policymakers, and develops and promulgates model laws focusing on insurance matters.

NCOIL has particular interest in ensuring the proper administration of the basic rules demarcating Federal and State authority over insurance regulation, as established in the McCarran–Ferguson Act of 1945 ("McCarran–Ferguson")—where Congress delegated to the States the primary responsibility to make and enforce regulatory policy over interstate insurance commerce, while retaining at all times its authority under the Commerce Clause to pass controlling legislation specific to insurance regulation.

Properly implementing both sides of this coin is NCOIL's core mission. It resists Federal encroachment upon the States' primary

---

[1] All parties to the appeal have consented in writing to the filing of this brief. No counsel for a party in this case authored this brief in whole or in part. No person or entity—other than *Amicus Curiae* and its counsel—made a monetary contribution specifically for the preparation or submission of this brief.

regulatory authority if not supported by an Act of Congress. But when Congress does provide specific substantive direction regarding insurance regulation, NCOIL punctiliously implements any such legislation. As discussed herein, this case implicates both of these concerns.

Congress included its first substantive direction to the States regarding insurance regulation in McCarran–Ferguson itself, which aggressively incentivized the States to occupy the fields of several enumerated Federal competition and trade practices statutes. In doing so, Congress specifically intended to force the States to adopt legislation applying Robinson–Patman Anti-Price Discrimination Act of 1936 ("Robinson–Patman") cost-based pricing standards to insurer discrimination practices.

State insurance legislators diligently followed Congress' direction with respect to regulation of insurer discrimination practices by promptly passing statutes in the late 1940s prohibiting "unfairly discriminatory" rates. These laws, like the Robinson–Patman Anti-Price Discrimination Act upon which they are modeled, address economic discrimination, not social class discrimination, and do not recognize disparate impact.

But now the United States Department of Housing and Urban Development ("the Department") is attempting through its disparate impact rule ("the Rule"), 24 C.F.R.§ 100.500, to apply the Fair Housing Act of 1968 ("FHA")—which is completely silent regarding insurer discrimination practices—to impose a radically different standard[2] upon insurer discrimination practices, by rendering Robinson–Patman compliant cost-based pricing illegal when it results in a disparate effect upon protected social classes.

This improperly elevates the Fair Housing Act—a statute general to housing with no language specific to insurance or insurer discrimination practices—above McCarran–Ferguson, an Act of Congress specific to insurance and insurer discrimination practices. Because the States promptly codified and, for nearly eighty years, have enforced McCarran–Ferguson's Congressional policy favoring the Robinson–Patman Anti-Price Discrimination Act cost-based pricing standard for insurance regulation, NCOIL members' interests are substantially affected by the Court's consideration of this matter.

---

[2] Fair Housing Act disparate-impact liability. *See Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015)

# SUMMARY OF ARGUMENT

The McCarran–Ferguson Act of 1945, 15 U.S.C. §§ 1011–1015, is best known for its unique procedural rule under which the States have primary regulatory authority over interstate insurance commerce, but it also directs the basic substantive contours of how the States must regulate. In what one of the law's main drafters labeled an "invitation to the States to legislate in good faith," 91 CONG. REC. 1487 (Feb. 27, 1945) (statement of Sen. O'Mahoney), Congress established a three-year moratorium on the application of the Sherman, Clayton, Federal Trade Commission, and Robinson–Patman Acts to the business of insurance, after which they would apply in full force absent the States occupying their fields with regulatory legislation.

As Congress intended, the States promptly developed, through the National Association of Insurance Commissioners, and passed, through the State legislatures, a series of model laws to displace the Federal antitrust and competition laws. These included statutes which prohibit "unfairly discriminatory" rates, which were explicitly developed to mimic and displace the Robinson–Patman Anti-Price Discrimination Act of

1936, which prohibits "discriminat[ing] in price between different purchasers of commodities of like grade and quality . . . ." 15 U.S.C. § 13(a). Each of these State laws governing insurer discrimination practices under Robinson–Patman standards is the expression of an Act of Congress specific to insurer discrimination practices: McCarran–Ferguson.

The Robinson–Patman's Anti-Price Discrimination Act's standard is economic in nature. As uniformly applied by regulators and the courts, the State prohibitions on unfair discrimination mandate cost-based pricing based on risk of future loss. McCarran–Ferguson thus directs that a single core standard—risk-based pricing—be applied to every risk classification factor.

Robinson–Patman does not recognize protected social class or disparate impact liability, the subject of the Rule. But the Rule requires that a second core standard—protected social class disparate impact liability—be applied to every risk classification factor. This is intended to, and will result in, the invalidation of risk classification methods which meet the McCarran–Ferguson economic cost-based pricing standard, but

which do not meet the Fair Housing Act social protected class disparate impact standard.

This cannot stand. Statutory construction requires that the Rule implementing the Fair Housing Act, a general statute with no references to insurance or insurer discrimination practices may not render illegal practices that precisely meet the directions of McCarran–Ferguson, a statute specific to insurance and insurer discrimination practices.

## ARGUMENT

I. MCCARRAN–FERGUSON ESTABLISHES THE CONTROLLING NATIONAL REGULATORY STANDARDS FOR INSURER DISCRIMINATION PRACTICES

### A. Congress Directs the States to Occupy the Field of Competition and Trade Practices Regulation

In today's era of behemoth multi-thousand page statutes, as the McCarran–Ferguson Act—all 426 words of it, as originally passed[3]— nears its 80th anniversary next year, it stands as a measure of successful lawmaking simplicity. Spawned by the United States Supreme Court's anomalous 1868 ruling that insurance was not interstate commerce subject to Federal oversight, *see Paul v. Virginia*, 75 U.S. 168 (1868), and

---

[3] A 2021 amendment to McCarran–Ferguson at 15 U.S.C. § 1013(c), specific to health insurance, added another 377 words.

the Court's abrupt reversal of this prior holding on the eve of D-Day,[4] *see United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), McCarran–Ferguson's passage just nine months later represented a rapid legislative response to a substantial policymaking challenge: How to regulate an enormous industry—of which the Supreme Court said, "Perhaps no modern commercial enterprise directly affects so many persons in all walks of life as does the insurance business," *id.* at 540— without an established Federal infrastructure, and how to do so while Washington's focus was on an existential world war.

Congress recognized that, in the interim between *Paul* and *South-Eastern Underwriters Ass'n*, the States had crafted the beginnings of a viable regulatory system, and therefore chose to build on this work by "declar[ing] that the continued regulation . . . by the several States of the business of insurance is in the public interest," 15 U.S.C. § 1011, and delegating primary regulation to the States, while reserving its inherent

---

[4] Underneath the monumental stories introduced by the page-wide, eight column, all caps headline, "ALLIED ARMIES LAND IN FRANCE IN THE HAVRE-CHERBOURG AREA; GREAT INVASION IS UNDER WAY," the front page of the New York Times on June 6, 1944 included a less dramatic story under the headline, "Federal Law Held Ruling Insurance; Supreme Court, 4-3, Decides Business is Interstate and Subject to Trust Act." N.Y. TIMES, June 6, 1944.

authority to pass legislation governing the regulation of interstate insurance commerce at any time. *See* 15 U.S.C. § 1011 ("silence on the part of the Congress shall not be construed to impose any barrier to the regulation . . . of such business by the several States"); 15 U.S.C. § 1012(a) ("The business of insurance . . . shall be subject to the laws of the several States which relate to the regulation . . . of such business."); 15 U.S.C. § 1012(b) ("No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .").

McCarran–Ferguson itself became the first Act of Congress establishing substantive standards governing insurance regulation. Having delegated the supervision of an industry which "touches the home, the family, and the occupation or the business of almost every person in the United States," *South-Eastern Underwriters Ass'n*, 322 U.S. at 540, Congress insisted that the States meet this enormous responsibility by thoroughly regulating the basic trade practices of the business of insurance. Congress did so through a thoughtful carrot-and-stick mechanism: A three-year window during which the main Federal

competition and trade practices laws would not apply to the business of insurance, but after which they would be "applicable . . . to the extent that such business is not regulated by State Law." 15 U.S.C. § 1012(b).

This moratorium, during which the Sherman, Clayton, Federal Trade Commission, and Robinson–Patman Acts did not apply,[5] was described by the broker of the final McCarran–Ferguson bill, Senator O'Mahoney, as "an invitation to the States to legislate in good faith," 91 CONG. REC. 1487 (Feb. 27, 1945), by which Congress specifically intended to incentivize the States to occupy the field of the Federal competition laws in the insurance marketplace, *see* 91 CONG. REC. 1478 (Feb. 27, 1945) ("the States are advised and warned that they have a moratorium of 3 years during which they may bring themselves into compliance by way of regulation") (statement of Sen. McCarran).

### B. The States' Recognition of their Obligation to Legislate in Good Faith

---

[5] *See* 15 U.S.C. § 1013(a) ("Until June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act [15 U.S.C. § 41 et seq.], and the Act of June 19, 1936, known as the Robinson–Patman Anti-Discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.").

The States well understood their mandate and immediately set out to collectively draft and then individually adopt model legislation occupying the field of the consumer protection statutes enumerated in McCarran–Ferguson. Hundreds of pages of the Proceedings of the National Association of Insurance Commissioners[6] ("NAIC") document these efforts as the main focus of state regulators and legislators throughout the three-year moratorium granted by Congress. *See, e.g.*, *Joint Report of the Comm. on Federal Legislation and the Comm. on Rates and Rating Organizations of the NAIC*, 1946 NAIC PROC. 95–101; 1947 NAIC PROC. at 141–235, 296–303, 380–413 (extensive reports and proposed model laws responsive to McCarran–Ferguson mandates).

Congress during this time closely monitored the States' compliance with its policy instructions—including Senator McCarran's Judiciary Committee, which "survey[ed] . . . the status of accomplishments and plans of the States" in response to the "feeling in the Congress that the Federal legislature has a positive responsibility to see to it that there is adequate regulation of insurance . . . by the . . . States . . . ." Pat

---

[6] The NAIC was at the time the only State association dedicated to insurance regulation; NCOIL was formed in 1969.

McCarran, *Insurance as Commerce—After Four Years*, 23 NOTRE DAME L. REV. 299, 303, 306 (1948).

### C. The States' Thoroughly Considered, Well-Developed Response to Congress' Inclusion of Robinson–Patman in McCarran–Ferguson

Because the *South-Eastern Underwriters Ass'n* decision upended settled doctrine and threatened the legality of the State system of regulation, *see, e.g.*, *Report of Subcomm. on Federal Legislation to the Executive Comm. of NAIC*, 1945 NAIC PROC. at 26–27 ("This decision completely reversed the fundamental basis underlying state regulation of the business by holding that insurance was commerce. . . . The practical effect of this may be to impair in some respects the well-established regulation by the states and the conduct of the business itself."), the States, primarily through the NAIC, immediately engaged with Congress regarding the legislative branch's response to having a substantial slice of the economy dropped into its lap overnight.[7]

---

[7] Justice Jackson vigorously objected to this extraordinary displacement in his partial dissent, *see South-Eastern Underwriters Ass'n*, 322 U.S. at 594–95 (Jackson, J., dissenting) ("To force the hand of Congress is no more the proper function of the judiciary than to tie the hands of Congress. To use my office, at a time like this, and with so little justification in necessity, to dislocate the functions and revenues of the states and to catapult Congress into immediate and undivided

During this process, NAIC prepared the earliest draft of proposed corrective legislation. *See, e.g.*, 90 CONG. REC. A4403 (Nov. 16, 1944) ("I wish to ask to have printed in the . . . Record . . . the text of the proposed legislation recommended by the [NAIC] . . . .") (statement of Sen. Hatch). This draft exempted insurance from the Robinson–Patman Anti-Price Discrimination Act. *See* H.R. REP. NO. 79-143, at 1 (1945) ("Nothing contained in the . . . Act of June 19, 1936, known as the Robinson–Patman Antidiscrimination Act, shall apply to the business of insurance."). Robinson–Patman requires cost-based pricing by making it unlawful "for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . ." 15 U.S.C. § 13(a).

The proposed exemption from Robinson–Patman was rejected because Members concluded that "[i]t is unfair to legalize the practice of rate discrimination." 91 CONG. REC. 1091 (Feb. 14, 1945) (statement of Rep. Bailey); *see also* 91 CONG. REC. 1027–28 (Feb. 12, 1945) ("If you look

---

responsibility for supervision of the nation's insurance businesses is more than I can reconcile with my view of the function of this Court in our society.").

at section 3 of the bill you will find that it exempts all the business of insurance companies . . . from the . . . Robinson–Patman Act . . . . I will not vote for the bill as . . . reported . . . unless section 3 is stricken[.]") (statement of Rep. Cochran); 91 CONG. REC. 1092 (Feb. 14, 1945) ("I doubt . . . Members . . . should . . . permanently exempt insurance from . . . the . . . Robinson–Patman Act.") (statement of Rep. Kefauver).

Senator McCarran explained that part of the "adequate regulation" Congress sought from McCarran–Ferguson was to "afford the public protection . . . against discrimination . . . ." McCarran, *supra*, at 306, 310. Instead of exempting insurance from Robinson–Patman, McCarran–Ferguson therefore explicitly included Robinson–Patman in the list of Federal statutes which would apply following the moratorium absent State action.

The NAIC extensively studied Congress' action and intent and concluded that, while Robinson–Patman's applicability to insurance before 1945 was unclear, absent State legislative action, McCarran–Ferguson's incorporation by reference of Robinson–Patman "implie[d] that after . . . 1948, the Robinson–Patman Act will apply to the business of insurance . . . ." *Reports of All-Industry Subcomm. on Robinson–*

*Patman Act*, 1947 NAIC PROC. 183–84; *see also id.* ("Our conclusion is that since Section I of Robinson–Patman amends the Clayton Law, it is included within the proviso of Section 2(b) of Public Law 15 [McCarran–Ferguson]. Being within the proviso, the price discrimination . . . subsection[ ] appl[ies] to insurance 'to the extent' that there is no state law regulating the specific activities prohibited by these sections."); *Address of President Robert E. Dineen, Rate Regulation–An Administrative Challenge*, 1947 NAIC PROC. 297 n.1 ("[T]he very fact that the Robinson–Patman Act is specifically mentioned in U.S. Public Law 15 [McCarran–Ferguson] is a clear indication that Congress intended its provisions to apply to the insurance business.").

NAIC understood that Congress expected a specific policy response by the States: The uniform passage of unfair discrimination laws. *See id.* at 187–88 (explaining the "only way by which states may accomplish the ouster" of Robinson–Patman was "through the passage of rate regulatory laws" that "included . . . anti-discrimination sections," and recommending the "enactment in each State—either as an integral part of the rating law or independently—of statutes . . . prohibiting unfair rate discriminations").

The States quickly passed and implemented NAIC's model laws, with their prohibitions on unfair discrimination, following the enactment of McCarran–Ferguson. Congress, closely monitoring the States' progress, and satisfied by their response to the Congressional "invitation . . . to legislate in good faith," extended the moratorium on the applicability of Robinson–Patman and the other Federal statutes enumerated in McCarran–Ferguson from January 1 to June 30, 1948, providing the States more time to pass McCarran–Ferguson compliant legislation. *See* S. REP. 407, at 1359 (1947) ("This bill extends the so-called moratorium provision of Public Law 15 . . . from January 1, 1948, until June 30, 1948. The committee is informed and is satisfied that an effort has been exerted by the insurance industry, the insurance commissioners, and the States in dealing with the matter of State regulation. . . . [I]t would appear most desirable to extend this moratorium period an additional 6 months . . . .").

### D. State Unfair Discrimination Laws Implement a Federal Policy of Cost-Based Pricing Directed by McCarran–Ferguson

As Congress intended, the State unfair discrimination laws implemented as national regulatory policy the same basic anti-discrimination standard as Robinson–Patman: Cost-based pricing and

equal economic treatment of similarly situated consumers. The NAIC President, New York Insurance Superintendent Robert Dineen, explained that "the rationale of" the "Robinson–Patman Act, the All-Industry [NAIC Model] Bills and the New York rating law" is "generally the same, namely, that where varying prices on the same articles are quoted to different buyers . . . the seller should be able to establish that the variations in price are fair and reasonable." Henry Stone & David A. Campbell, *Insurance and the Robinson–Patman Act*, 319 INS. L.J. 553, 564 (1949). His predecessor as NAIC President declared that "no state legislation should prevent the economic non-discriminatory rating of risks. . . . There should be no unfair discriminations . . . ." *Presidential Address to the Seventy Seventh Annual Meeting of NAIC*, 1946 NAIC PROC. 212–13 (NAIC President James McCormack). And NAIC's landmark 1974 rate regulation treatise explained that Robinson–Patman and the state unfair discrimination statutes apply the identical standard: "[I]f the costs are the same, the seller cannot discriminate price." JON S. HANSON ET AL., MONITORING COMPETITION: A MEANS OF REGULATING THE PROPERTY AND LIABILITY INSURANCE BUSINESS 440 (NAIC 1974).

The State rating laws, which include the Robinson–Patman-based unfair discrimination prohibition, explicitly recognize that they implement substantive Federal public policy required by an Act of Congress, McCarran–Ferguson. *See, e.g.*, Me. Rev. Stat. tit. 24-A, § 2301 ("The purpose of this chapter is to promote the public welfare by regulating insurance rates, in accordance with the intent of Congress as expressed in Public Law 15—79th Congress [McCarran–Ferguson], to the end that they shall not be excessive, inadequate or unfairly discriminatory . . . ."); Del. Code tit. 18, § 2501 (same); *Karlin v. Zalta*, 201 Cal. Rptr. 379, 385 (Cal. Ct. App. 1984) ("There ensued precipitate state action to implement the McCarran Act and by 1950 every state had enacted rate regulatory legislation."); *Pac. Fire Rating Bureau v. Ins. Co. of N. Am.*, 321 P.2d 1030, 1032 (Ariz. 1958) ("Because the federal antitrust laws were, by Public Law 15, made inapplicable to insurance only to the extent that the business was regulated by state law, each state proceeded to enact a rate law."); *Ins. Co. of N. Am. v. Comm'r. of Ins.*, 101 N.E.2d 335, 338 (Mass. 1951) ("During the period of delay thus afforded [McCarran–Ferguson moratorium], model laws were prepared by the

[NAIC] . . . . These have now been adopted with few changes in almost every State.").

## II. THE STATE RATING LAWS IMPLEMENT, AS A MATTER OF CONGRESSIONAL POLICY, ROBINSON–PATMAN'S ECONOMIC, NOT SOCIAL, DISCRIMINATION PRACTICES

The State unfair discrimination statutes establish an economic, cost-based pricing standard—which, with respect to insurance, means actuarially justified rates based on risk of future loss—for the regulation of insurer discrimination practices. *See, e.g.*, *Doukas v. Metro. Life Ins. Co.*, 950 F. Supp. 422, 429 (D.N.H. 1996) ("[T]he insurance practice must either be based on actuarial data or on the company's actual or reasonably anticipated experience relating to the risk involved."). This is the same standard as Robinson–Patman—cost-based pricing. *See Hardware Mut. Cas. Co. v. Premo*, 217 A.2d 698, 704 (Conn. 1966) ("The effect of the Act is to permit the filing of a rating plan in which the individual insurer's judgment as to the expense provisions of a particular risk, or the probable hazards of a particular risk, may reflect the expected cost to the insurer of providing the coverage for that risk and, in turn, the amount of premium to be charged the insured.").

Put another way:  Although in the common vernacular, the word "discrimination" generally connotes unacceptable stereotyping, its meaning in insurance—where grouping by characteristic is a necessary component of risk classification—is clinical and not pejorative.  Carriers assign insureds to "classes" determined by expected future costs and risk of loss.  For instance, because insurers cannot efficiently test each insured's driving skills, they must rely on the predictive power of group characteristics (age, moving violations, credit history, etc.) to set and charge an appropriate rate/premium.

Thus, the NAIC explained to the United States Supreme Court:  "In insurance, discrimination is not necessarily a negative term so much as a descriptive one."  Brief for NAIC as Amicus Curiae Supporting Petitioner, *Nationwide Mut. Ins. Co. v. Cisneros*, 516 U.S. 1140 (1996) (No. 95-714), 1996 WL 33467770 at *7; *see also* NAIC, PRODUCT FILING REVIEW HANDBOOK 12 (2016) ("'Unfairly discriminatory' is a concept often based on 'cost based pricing,' with the key word being 'unfairly.' . . . [I]t is only unfairly discriminatory if it cannot be reasonably explained by differences in expected costs.").

High courts understand and apply these unique rules regarding insurer discrimination. *See, e.g.*, *Thompson v. IDS Life Ins. Co.*, 549 P.2d 510, 512 (Or. 1976) (en banc) ("The Insurance Commissioner is instructed to eliminate unfair discrimination, whereas the Public Accommodations Act prohibits *all* discrimination. The reason for the different standards . . . is that insurance . . . always involves discrimination . . . based on statistical differences and actuarial tables. The legislature specifically intended . . . to only prohibit *unfair* discrimination in the sale of insurance policies.") (emphasis in original).

Grouping insureds by the predictive accuracy of shared characteristics is therefore the lodestar of the unfair discrimination statutes. *See, e.g.*, *Ins. Comm'r for the State of Md. v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Matter of Polan v. State of N.Y. Ins. Dep't*, 3 A.D.3d 30, 33 (N.Y. App. Div. 2003) ("'[U]nfair discrimination' is a word of art used in the field of insurance which, '[i]n a broad sense . . . means the offering for sale to

customers in a given market segment identical or similar products at different probable costs' [citations omitted].").

The more accurate the discrimination, the fairer the grouping—and the better the legal footing. *See e.g.*, *Telles v. Comm'r of Ins.*, 574 N.E.2d 359, 361–62 (Mass. 1991) ("The statutory pattern which deals with insurance regulation authorizes insurers to 'discriminate fairly.' . . . '[T]he basic principle underlying statutes governing underwriting practices is that insurers have the right to classify risks and to elect not to insure risks if the discrimination is fair.' . . . '[T]he intended result of the . . . process is that persons of substantially the same risk will be grouped together . . . .'").

This creates a legal standard forbidding the subsidization of more risky insureds by less risky insureds. *See Life Ins. Ass'n of Mass. v. Comm'r. of Ins.*, 530 N.E.2d 168, 171 (1988) ("The intended result of the [risk classification] process is that persons of substantially the same risk will be grouped together, paying the same premiums, **and will not be subsidizing insureds who present a significantly greater hazard.**") (emphasis added).  But such forbidden subsidization is the exact result required by the Department's Rule, which disallows rating factors which

21

meet the cost-based pricing standard if they have a disparate effect on a protected class.

## III. THE STATE RATING STATUTES, PURSUANT TO CONGRESS'S DELEGATION OF SUCH POLICY CHOICES, PROTECT DISCRETE, VULNERABLE CLASSES FROM DIRECT DISCRIMINATION.

McCarran–Ferguson's commands are clear and well-stated. Substantively, the States were directed to occupy the fields of several Federal statutes, including Robinson–Patman's cost-based pricing anti-discrimination standard; while procedurally, they were given primary authority to set any further regulatory policy "in the public interest."

Given these instructions and authority, the States supplemented the unfair discrimination laws by prohibiting the most pernicious grouping of citizens by race, religion, and national origin, even if membership in such a protected class is predictive of future loss. These rules are enshrined in the NCOIL and NAIC model rating laws. *See* PROPERTY/CASUALTY INSURANCE MODERNIZATION ACT §§ 6(A)(3)(A), 6(A)(3)(B) (NCOIL 2021) ("'Unfairly discriminatory' refers either to rates that cannot be actuarially justified, or to rates that can be actuarially justified but are based on proxy discrimination. It does not refer to rates that produce differences in premiums for policyholders with like loss

exposures, so long as the rate reflects such differences with reasonable accuracy. . . . Risks may be classified in any way except that no risk may be classified on the basis of race, color, creed, or national origin."[8]); PROPERTY AND CASUALTY MODEL RATING LAW NO. 1775, §§ 5A(3), 5A(4)(b) (NAIC 2010) ("Unfairly Discriminatory Rates. Unfair discrimination exists if, after allowing for practical limitations, price differentials fail to reflect equitably the differences in expected losses and expenses. . . . Classification. Risks may be grouped by classifications for the establishment of rates and minimum premiums. . . . Such standards may measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses. No risk classification, however, may be based upon race, creed, national origin or the religion of the insured.").

_____

[8] NCOIL added the prohibition on proxy discrimination in order to address concerns raised by stakeholders regarding machine learning artificial intelligence and the possibility that such technology could be used as a way around the prohibition on the use of protected classes. *See* PROPERTY/CASUALTY INSURANCE MODERNIZATION ACT § 3(Q) ("'Proxy Discrimination' means the intentional substitution of a neutral factor for a factor based on race, color, creed, national origin, or sexual orientation for the purpose of discriminating against a consumer to prevent that consumer from obtaining insurance or obtaining a preferred or more advantageous rate due to that consumer's race, color, creed, national origin, or sexual orientation.").

These prohibitions are widely adopted by the States, and universally followed by insurers throughout the country: No insurer uses the core protected classes of race, religion, and national origin as a risk classification factor. These laws, passed by the States under their specific grant, that the "business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business," 15 U.S.C. § 1012(a), on their face regulate treatment, not effect.

Thus, McCarran–Ferguson, the core Federal insurance statute—a Federal statute specific to insurance and specific to insurance discrimination standards—has produced an intelligible, manageable policy regime over insurer discrimination standards consistent with basic insurance principles and with basic notions of social fairness. This regime does not encompass a disparate impact standard, which under controlling law is not to be applied absent a specific statutory basis.[9]

---

[9] *See, e.g., Tex. Dep't of Housing & Cmty. Affairs*, 576 U.S. at 533 ("antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose").

The Rule, however, turns this simple regime on its head. Under McCarran–Ferguson, only one core standard applies to every rating factor: Cost-based pricing under the Robinson–Patman Anti-Price Discrimination Act. The States have supplemented this with a few, additional, discrete requirements, whereby socially pernicious factors may not be directly employed regardless of predictive accuracy. These categorical prohibitions are codified, and therefore represent explicit policy judgments by the primary regulators of the business of insurance under McCarran–Ferguson, elected State legislators.

The Rule, by contrast, would apply a second core standard to every single rating factor used by insurers. The core standard mandated by the Rule (protected class disparate impact) directly conflicts with the core standard required by McCarran–Ferguson (Robinson–Patman cost-based pricing) because the Rule is designed to invalidate facially neutral rating factors compliant with the McCarran–Ferguson regime whereby cost-based pricing trumps unless the classification factor is itself a statutorily protected class.

The Rule invalidates cost-based risk classification methods which result in a disparate effect on protected classes. Preventing the use of

such a predictive factor will require insurers to treat differently those customers who have the same cost profile based on such a risk classification method. This by definition causes the carrier to "indirectly . . . discriminate in price between different purchasers of . . . like grade and quality," 15 U.S.C. § 13(a), in conflict with the plain language of the core standard established by Robinson–Patman.

## IV. MCCARRAN–FERGUSON'S STANDARD, SPECIFIC TO INSURER DISCRIMINATION PRACTICES, MUST TRUMP THE FAIR HOUSING ACT STANDARD, GENERAL TO HOUSING.

The Department's Rule pertains to subject matter (insurer discrimination practices) governed by a Federal statute specific to insurance (McCarran–Ferguson). The FHA, a statute general to housing and not specific to insurance, which indeed never uses the word "insurance," and which is silent with respect to the subject of this submission—insurer discrimination practices—protects social classes and recognizes disparate impact. By comparison, McCarran–Ferguson establishes a discrimination standard based on Robinson–Patman—an anti-discrimination statute which is economic, not social, in nature, and which does not recognize protected class disparate impact liability.

Statutory interpretation requires that the McCarran–Ferguson unfair discrimination regime specific to insurance, which establishes a core standard applicable to every insurer risk classification factor and does not recognize disparate impact against protected classes, must trump the Rule's attempt to apply a second core standard—disparate impact upon protected social classes—to every risk classification factor based on a statute, the Fair Housing Act, which is general to housing and is silent on insurance, a different topic altogether. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. . . . 'The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute . . . treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive provisions . . . .' [Citation omitted.]").

McCarran–Ferguson "deal[s] with [the] narrow, precise, and specific subject" at issue here: Insurer discrimination practices. *Id.* With

respect to housing, the Fair Housing Act "treat[s] the subject in a general manner" with no reference to insurance or insurer discrimination practices, and it does "not expressly contradict[ ] the original act," McCarran–Ferguson. *Id.*; *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007) ("[N]ormally, the specific governs the general."); *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (applying "the 'general principle of statutory construction,' [citation omitted], reiterated repeatedly by the Supreme Court, that 'a more specific statute will be given precedence over a more general one' [citation omitted]"); *Am. Petroleum Tankers Parent, LLC v. United States*, 943 F. Supp. 2d 59, 72 (D. D.C. 2013) ("When both specific  and general provisions cover the same subject, the specific provision will control. *Norwest Bank Minn. Nat'l Ass'n v. Fed. Deposit Ins. Corp.*, 312 F.3d 447, 451 (D.C.Cir.2002).").

In fact, the Department itself has explicitly conceded that the Fair Housing Act is trumped by McCarran–Ferguson with respect to insurer discrimination practices.   In an October 4, 1977 Department memorandum, prepared to develop a "detailed work plan on insurance redlining," and shared with the NAIC,  the Department's Redlining Staff

explained that "[t]he role of the federal government . . . is somewhat limited with this industry given the McCarran–Ferguson Act." *Preliminary Efforts to Develop a Work Plan*, 1978 NAIC PROC. 637, 640.

Recognizing that no Federal law other than McCarran–Ferguson regulated insurer discrimination practices, the Department's Redlining Staff approvingly described "[c]urrent federal legislative initiatives"—including "[p]ending Title VIII amendments [which] might make insurance companies covered by the Fair Housing Act[,] thus prohibiting discriminatory practices." *Id.* at 641.  These proposed bills failed, however, and Title VIII, the Fair Housing Act, still contains no language specifically covering insurers.

The Department thus recognized that the interplay between McCarran–Ferguson and the Fair Housing Act prevented the application of the latter statute to insurer discrimination practices.  Neither statute has changed since the Department's Redlining Staff made this conclusion:  McCarran–Ferguson is still a Federal statute specific to insurer discrimination practices, and the Fair Housing Act is still a Federal statute general to housing with no specific reference to insurance or insurer discrimination practices.  The same legal framework which

controlled the Department's conclusion that its role with respect to insurance was "limited" by McCarran–Ferguson, and that it would require amendments to the law to "make insurance companies covered by the Fair Housing Act," still applies. *Id.*

Under this regime, since the Robinson–Patman Anti-Price Discrimination Act is not a statute that recognizes protected social class disparate impact liability, a Federal disparate impact standard for insurer discrimination practices cannot be created by administrative rulemaking that implements a statute—the Fair Housing Act—that is silent with respect to insurance and insurer discrimination practices.

## CONCLUSION

For the foregoing reasons, NCOIL respectfully submits that this Court should reverse the judgment below.

Respectfully submitted,

/s/ Nat Shapo

ERIC WERLINGER
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave NW –
Suite 800
Washington, DC 20006
(202) 625-3500

NAT SHAPO
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
(312) 902-5200

MAY 8, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that pursuant to Federal Rule of Appellate Procedure 29(a)(5), 32(a)(7), and 32(g) that the foregoing Brief of *Amicus Curiae* has been prepared in a proportionately spaced typeface in 14-point Century and contains 5,322 words.

*/s/ Nat Shapo*
NAT SHAPO
COUNSEL FOR *AMICUS CURIAE*

MAY 8, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing document to be filed on May 8, 2024, with the Clerk of the Court for the District of Columbia Court of Appeals using the Court's electronic filing system, which will send a notice of electronic filing to all attorneys appearing in this matter.

/s/ Nat Shapo
NAT SHAPO
COUNSEL FOR *AMICUS CURIAE*

MAY 8, 2024