No. 23-5275

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,

Plaintiff-Appellant,

v.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Columbia (No. 13-cv-966)
The Honorable Judge Richard J. Leon

## BRIEF OF AMICI CURIAE ILLINOIS, THE DISTRICT OF COLUMBIA, ARIZONA, CALIFORNIA, COLORADO, DELAWARE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

BRIAN L. SCHWALB
Attorney General
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General
ASHWIN P. PHATAK
Principal Deputy
  Solicitor General
RUSSELL C. BOGUE
Assistant Attorney General
400 6th St. NW, Suite 8100
Washington, D.C. 20001

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General
ALEX HEMMER
Deputy Solicitor General
JOHN R. MILLIGAN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

*(Additional counsel on signature page)*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to this Court's Rule 28(a)(1), I hereby certify that:

## A.    Parties and Amici

Except for the following, all parties, intervenors, and amici that appeared before the district court or are appearing before this Court are identified in plaintiff's opening brief:  Amici States Illinois, the District of Columbia, Arizona, California, Colorado, Delaware, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, and Washington.

## B.    Rulings Under Review

References to the rulings at issue appear in plaintiff's opening brief.

## C.    Related Cases

This case has previously been before this Court as *American Insurance Association v. Department of Housing & Urban Development*, No. 14-5321.  Counsel for amici is not aware of any other related cases within the meaning of this Court's Rule 28(a)(1)(C).

/s/ Alex Hemmer
Alex Hemmer

July 10, 2024

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .i

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION AND IDENTITY AND INTEREST OF AMICI STATES ..............................................................................1

SUMMARY OF ARGUMENT ..................................................2

ARGUMENT ................................................................................4

I.    Disparate-Impact Liability Is A Crucial Tool To Fight Ongoing Housing Discrimination. ....................................4

    A.    Housing discrimination persists throughout the country, including in the homeowner's insurance industry. ................4

    B.    Disparate-impact claims help to redress housing discrimination that would otherwise go undetected. ...........13

II.   State Law Does Not Categorically Shield Homeowner's Insurers From Federal Disparate-Impact Liability.....................................19

    A.    States impose a wide range of statutory antidiscrimination regimes governing insurers. .................................20

        1.    Many States permit disparate-impact claims in the housing context. .........................................21

        2.    State insurance codes do not categorically impose a contrary regime.........................................25

    B.    State insurance codes do not categorically shield insurers from federal disparate-impact liability. ................................30

CONCLUSION ...................................................................34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bowman v. City of Des Moines Mun. Hous. Agency,*
805 N.W.2d 790 (Iowa 2011).................................................23

*Burbank Apartments Tenant Ass'n v. Kargman,*
48 N.E.3d 394 (Mass. 2016)..................................................23

*Colo. Civ. Rts. Comm'n v. Travelers Ins. Co.,*
759 P.2d 1358 (Colo. 1988) ..................................................23

*Comm'n on Hum. Rts. & Opportunities v. Sullivan Assocs.,*
739 A.2d 238 (Conn. 1999).....................................................23

*Conn. Comm'n on Hum. Rts. & Opps. ex rel. Hurtado,*
CHRO No. 8230394 .............................................................14

*Douglas v. Dorchester Props., Ltd.,*
2022 WL 4358779 (N.D. Tex. 2022) .....................................23

*Dussault v. RRE Coach Lantern Holdings, LLC,*
86 A.3d 52 (Me. 2014) ...........................................................23

*Ga. Dep't of Hum. Res. v. Montgomery,*
284 S.E.2d 263 (Ga. 1981) .....................................................23

*Gerety v. Atl. City Hilton Casino Resort,*
877 A.2d 1233 (N.J. 2005).....................................................23

*Gonzalez v. N.M. Dep't of Health,*
11 P.3d 550 (N.M. 2000) .......................................................23

*Hac v. Univ. of Hawaii,*
73 P.3d 46 (Haw. 2003)..........................................................23

*Hobson v. Hansen,*
  269 F. Supp. 401 (D.D.C. 1967) ........................................... 13

*Humana Inc. v. Forsyth,*
  525 U.S. 299 (1999) ................................................... 19, 32

*Huskey v. State Farm Fire & Casualty Co.,*
  2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) ...................... 16

*In re Estate of Kerr,*
  949 P.2d 810 (Wash. 1998) ............................................ 27

*Koester v. City of Novi,*
  580 N.W.2d 835 (Mich. 1998) ........................................ 23

*Little Forest Med. Ctr. of Akron v. Oh. Civ. Rts. Comm'n.,*
  575 N.E.2d 1164 (Oh. 1991) .......................................... 23

*Lyman v. Montclair at Partridge Creek, LLC,*
  2023 WL 6096678 (E.D. Mich. 2023) ............................... 23

*Malibu Inv. Co. v. Sparks,*
  996 P.2d 1043 (Utah 2000) ........................................... 23

*McGlawn v. Pa. Hum. Rels. Comm'n,*
  891 A.2d 757 (Pa. Commw. Ct. 2006) ............................. 14

*Miller v. Safeway, Inc.,*
  102 P.3d 282 (Alaska 2004) ........................................... 23

*Mont. Rail Link v. Byard,*
  860 P.2d 121 (Mont. 1993) ............................................ 23

*Nat'l Fair Hous. All. v. Travelers Indem. Co.,*
  261 F. Supp. 3d 20 (D.D.C. 2017) .................................. 17

*Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of America,*
  208 F. Supp. 2d 46 (D.D.C. 2002) ............................... 2, 16

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932) ................................................ 34

*Ojo v. Farmers Grp., Inc.*,
    356 S.W.3d 421 (Tex. 2011) ................................ 29

*Ojo v. Farmers Grp., Inc.*,
    600 F.3d 1205 (9th Cir. 2010) (en banc)............ 33

*People v. N.Y. City Transit Auth.*,
    452 N.E.2d 316 (N.Y. 1983) ................................ 23

*People v. R.L.*,
    634 N.E.2d 733 (Ill. 1994) .................................. 23

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ............................................ 28

*R.I. Comm'n for Hum. Rts. v. Graul*,
    120 F. Supp. 3d 110 (D.R.I. 2015) .................... 14

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ............................................ 27

*Rivera v. DLJ Props.*,
    2022 WL 3048229 (E.D. Tenn. 2022) ................ 23

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ................................................ 34

*Saunders v. Farmers Ins. Exch.*,
    537 F.3d 961 (8th Cir. 2008).......................... 32, 33

*Saville v. Quaker Hill Pl.*,
    531 A.2d 201 (Del. 1987).................................... 23

*Smith v. Town of Clarkton,*
   682 F.2d 1055 (4th Cir. 1982) ............................................. 13

*State of Ind. Civ. Rts. Comm'n v. Cnty. Line Park, Inc.,*
   738 N.E.2d 1044 (Ind. 2000) .............................................. 23

*State v. City of Sunnyside,*
   No. 101205-5, 2024 WL 3058780 (Wash. June 20, 2024) .................. 23

*Support Ministries for Persons with AIDS, Inc. v. Vill. of Waterford,*
   808 F. Supp. 120 (N.D.N.Y. 1992) ....................................... 14

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys.,*
   576 U.S. 519 (2015) ................................. 5, 6, 18, 19, 24, 25, 26, 28

*Toledo Fair Hous. Ctr. v. Nationwide Mutual Ins. Co.,*
   704 N.E.2d 667 (Ohio Ct. Common Pleas 1997) ......................... 16

*United States v. City of Black Jack,*
   508 F.2d 1179 (8th Cir. 1974) ........................................... 13

*Viens v. Am. Empire Surplus Lines Ins. Co.,*
   113 F. Supp. 3d 555 (D. Conn. 2015) .................................... 17

*Watson v. Fort Worth Bank & Trust,*
   487 U.S. 977 (1988) ....................................................... 9

## STATUTES AND REGULATIONS

15 U.S.C. § 1012 .............................................................. 19

29 U.S.C. § 623 ........................................................... 24, 28

42 U.S.C.
   § 2000e-2 ................................................................. 28
   § 3601 ..................................................................... 1, 6
   § 3604 ...................................................................... 24

24 C.F.R. § 100.500 .......................................................... 2, 18, 28

88 Fed. Reg. 19,450 (2023) .......................................... 2, 20, 32, 34

Alaska Stat. § 18.80.240 .......................................................... 21

Ariz. Rev. Stat. Ann. § 41-1491 .......................................... 21, 24

Ark. Code Ann. § 16-123-204 .................................................. 21

Cal. Gov't Code § 12955 .................................................... 21, 22

Colo. Rev. Stat. § 24-34-502 ............................................. 21, 22

Conn. Gen. Stat. § 46a-64b ...................................................... 21

D.C. Code
    § 2-1402.21 ...................................................................... 21
    § 2-1402.68 ...................................................................... 24
    § 31-2231.13 .................................................................... 26

Del. Code Ann.
    tit. 6, § 4603 .................................................................... 21
    tit. 18, § 2304 .................................................................. 26

Ga. Code Ann.
    § 8-3-202 .......................................................................... 21
    § 33-6-4 ............................................................................ 26

Haw. Rev. Stat. § 515-3 ............................................................ 21

Idaho Code § 67-5909 ................................................................ 21

Ind. Code § 22-9.5-5-1 .............................................................. 21

775 Ill. Comp. Stat. 5/3-102 ............................................... 21, 22

Iowa Code § 216.8 .................................................................... 21

Kan. Stat. Ann. § 44-1016 ....................................................... 21, 24

Ky. Rev. Stat. Ann. § 344.360 ................................................. 21, 24

Mass. Gen. Laws ch. 151B, § 4 ...................................................... 21

Md. Code Ann., State Gov't § 20-705 ..................................... 21, 24

Me. Rev. Stat. Ann. tit. 5, § 4581-A ............................................. 21

Mich. Comp. Laws § 37.2502 ......................................................... 21

Minn. Stat. § 363A.09 ..................................................................... 21, 24

Mo. Rev. Stat. § 213.040 ................................................................ 21, 24

Mont. Code Ann. § 49-2-305 .......................................................... 21

N.C. Gen. Stat.
   § 41a-4 ..................................................................................... 21
   § 41a-5 ..................................................................................... 22

N.D. Cent. Code § 14-02.5-02 .................................................. 21, 24

N.H. Rev. Stat. Ann. § 354-A:10 .................................................. 21

N.J. Stat. Ann. § 10:5-12 ................................................................ 21

N.M. Stat. Ann. § 28-1-7 ................................................................ 21

N.Y. Exec. Law
   § 296 ........................................................................................ 21
   § 296-a .................................................................................... 21

Neb. Rev. Stat. § 20-318 ................................................................ 21

Ohio Rev. Code Ann. § 4112.02 .................................................... 21

Or. Rev. Stat. § 659A.421 ...................................................... 21

43 Pa. Stat. § 955 ............................................................... 21

R.I. Gen. Laws § 34-37-4 ...................................................... 21

S.C. Code Ann. § 31-21-40 ................................................ 21, 24

S.D. Codified Laws § 20-13-20 .............................................. 21

Tenn. Code Ann. § 4-21-601 .................................................. 21

Tex. Prop. Code Ann. § 301.021 ............................................. 21

Utah Code Ann. § 57-21-5 .................................................... 21

Va. Code Ann. § 36-96.3 .................................................. 21, 24

Vt. Stat. Ann. tit. 9, § 4503 ............................................. 21, 24

W. Va. Code § 16B-18-5 ................................................... 21, 24

Wash. Rev. Code § 49.60.222 ................................................ 21

Wyo. Stat. Ann. § 40-26-103 .................................................. 24

## OTHER AUTHORITIES

Anderson, Michelle Wilde & Victoria Plaut, *Property Law: Implicit Bias and the Resilience of Spatial Colorlines*, in *Implicit Racial Bias Across the Law* (Justin D. Levinson & Robert J. Smith eds., 2012) .... 9

Bender, Mallika, et al., *Understanding Potential Influences of Racial Bias on P&C Insurance: Four Rating Factors Explored*, Cas. Actuarial Soc'y (2022), https://tinyurl.com/4su9rd52 ........................ 12

Dane, Stephen M., *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Regul. 21, 21 (2006), https://tinyurl.com/mptfccze ............................................. 10, 11, 12, 16

DeLong, Michael, *How Racial Discrimination in Homeowners Insurance Contributes to Systemic Racism and Redlining*, Consumer Fed. of Am. (June 17, 2022), https://tinyurl.com/wxeh346b ........................... 11

Flitter, Emily, *Black Homeowners Struggle to Get Insurers to Pay Claims*, N.Y. Times (Jan 1. 2021), https://tinyurl.com/27cbpjnw ...... 15

Langowski, Jamie, et al., *Qualified Renters Need Not Apply: Race and Housing Voucher Discrimination in the Metropolitan Boston Rental Housing Market*, 28 Geo. J. Poverty L. & Pol'y 35, 42 (2020) .............. 8

Loh, Tracy Hadden, Christopher Coes & Becca Buthe, *The Great Real Estate Reset: Separate and Unequal: Persistent Residential Segregation Is Sustaining Racial and Economic Injustice in the U.S.*, Brookings Inst. (Dec. 16, 2020), https://tinyurl.com/2p8xx3ya ............ 6

Menendian, Stephen, Samir Gambhir & Arthur Gailes, *The Roots of Structural Racism Project: Twenty-First Century Racial Residential Segregation in the United States*, Othering & Belonging Inst., Univ. of Cal., Berkeley (June 30, 2021), https://tinyurl.com/2kbuaamn ....... 6

Mosley, Roosevelt & Radost Wenman, *Methods for Quantifying Discriminatory Effects on Protected Classes in Insurance*, Cas. Actuarial Soc'y (2022), https://tinyurl.com/mr3kp3wf ...................... 15

Nat'l Advisory Comm'n on Civ. Disorders, *Report of the National Advisory Commission on Civil Disorders* (1968), https://tinyurl.com/3bc5k79s .............................................................. 5

Porter, T.J., *Homeowners Insurance for People with Bad Credit*, Bankrate (June. 13, 2024), https://tinyurl.com/mufk63xj .................. 11

Quick, Kimberly & Richard D. Kahlenberg, *Attacking the White-Black Opportunity Gap that Comes from Residential Segregation*, Century Found. (June 25, 2019), https://tinyurl.com/y2kmma26 .................... 11

*Race and Insurance*, Nat'l Ass'n for Race & Ins., https://tinyurl.com/yax3khr8 ............................................................. 10

Rothwell, Jonathan & Andre M. Perry, *How Racial Bias in Appraisals Affects the Devaluation of Homes in Majority-Black Neighborhoods*, Brookings Inst. (Dec. 5, 2022), https://tinyurl.com/ffj84fb7 ................ 8

## INTRODUCTION AND
## IDENTITY AND INTEREST OF AMICI STATES

The amici States of Illinois, the District of Columbia, Arizona, California, Colorado, Delaware, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, and Washington (collectively, "amici States"), submit this brief in support of Defendants-Appellees the U.S. Department of Housing and Urban Development and Adrianne Todman, in her official capacity as Acting Secretary of the Department (collectively, "HUD"), pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Each of the amici States is charged with combating housing discrimination through enforcement of state and federal fair housing laws, including the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq*. Amici States also share an interest in protecting our residents and communities against housing discrimination in all its forms, along with the substantial social and economic harms that can result from such discrimination. The FHA's long-settled prohibition of facially neutral but effectively discriminatory housing practices—including those related to insurance—supports these policy goals.

1

Amici States therefore have a strong interest in preserving HUD's Discriminatory Effects Rule, 88 Fed. Reg. 19,450 (2023) (codified at 24 C.F.R. § 100.500), without the exemption for the homeowner's insurance industry that plaintiff requests. Accessible homeowner's insurance is critical to ending housing discrimination and promoting integration because insurance is "a prerequisite to home ownership for most people in the country." *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of America*, 208 F. Supp. 2d 46, 57 (D.D.C. 2002). Interpreting varied state laws categorically to insulate facially neutral but discriminatory insurance practices from FHA liability nationwide would contravene amici States' commitment to eliminating housing discrimination and would entrench impediments to homeownership for all Americans.

## SUMMARY OF ARGUMENT

The district court correctly granted HUD's motion for summary judgment. Plaintiff argues that, as applied to homeowner's insurers, the Rule exceeds the limitations on disparate-impact liability described in *Inclusive Communities* in two ways: (a) by causing the "pervasive" consideration of protected characteristics and (b) by overlooking the intervening role of state statutes that "substantially limit" insurers'

discretion over underwriting decisions. Those claims are wrong, and accepting them would weaken efforts to fully enforce the FHA.

Disparate-impact liability is a critical tool to fight housing discrimination—a major and ongoing cause of widespread residential segregation. The homeowner's insurance industry has often been the source of this discrimination. From setting rates to processing claims, homeowner's insurers have faced decades of litigation alleging racial discrimination in their practices. Many of these suits have succeeded on a disparate-impact theory of liability. The ongoing availability of disparate-impact claims is thus critical to combatting both intentional and unintended bias in the ratemaking and underwriting capacities of homeowner's insurers. And notwithstanding plaintiff's incorrect suggestion, permitting such claims to proceed will neither require the pervasive consideration of race nor hamstring insurers' abilities to pursue actuarially sound policies.

Plaintiff is also wrong to argue that the Rule contravenes *Inclusive Communities* by overlooking the role of state insurance code provisions purportedly limiting insurer discretion over underwriting decisions (provisions that supposedly break the causal chain between

insurers' conduct and any discriminatory effects).  This argument fails because state law does not uniformly limit insurer discretion by precluding insurers from considering protected characteristics even for the purpose of avoiding discriminatory effects.  To the contrary, dozens of States impose disparate-impact liability on entities in the housing industry already.  The insurance-code provisions plaintiff cites are best read harmoniously with those laws, not to enact separate statutory regimes that prevent insurers from considering the consequences of their actions.  HUD thus correctly rejected plaintiff's request for a categorical rule exempting homeowner's insurers from disparate-impact liability under the FHA.

## ARGUMENT

### I. Disparate-Impact Liability Is A Crucial Tool To Fight Ongoing Housing Discrimination.

#### A. Housing discrimination persists throughout the country, including in the homeowner's insurance industry.

Congress enacted the Fair Housing Act to root out racial discrimination from housing and housing-related services in order to spur greater residential integration throughout the United States.

Despite this ambition, housing discrimination persists in many areas of the country. The homeowner's insurance industry is no exception.

Throughout the course of the twentieth century, various practices designed "to encourage and maintain the separation of races"—such as racially restrictive covenants and redlining—spurred rampant residential segregation. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys.*, 576 U.S. 519, 528-29 (2015). By the end of the 1960s, President Lyndon Johnson's National Advisory Commission on Civil Disorders published a report finding that nearly two-thirds of non-white families lived in blighted neighborhoods but were prevented from finding better housing or moving to more integrated communities because of "both open and covert racial discrimination." *Id.* at 529; *see* Nat'l Advisory Comm'n on Civ. Disorders, *Report of the National Advisory Commission on Civil Disorders* 13 (1968), https://tinyurl.com/3bc5k79s. The Commission recommended enacting "a comprehensive and enforceable open-occupancy law making it an offense to discriminate in the sale or rental of any housing . . . on the basis of race, creed, color, or national origin." *Id.* at 263. Congress responded by passing the FHA, whose

goal was to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

Despite this major legislative achievement, "vestiges" of residential segregation persist in American social life. *Inclusive Communities*, 576 U.S. at 528. According to one study, despite some modest progress, "the neighborhood of an average white resident in the 100 largest metropolitan areas" remained 71% white in 2018. Loh, Coes, & Buthe, *The Great Real Estate Reset: Separate and Unequal: Persistent Residential Segregation Is Sustaining Racial and Economic Injustice in the U.S.*, Brookings Inst. (Dec. 16, 2020), https://tinyurl.com/2p8xx3ya. Other studies fail to find any improvement at all: One group of researchers has found that 81% of major metropolitan areas in the United States were more segregated in 2019 than in 1990. *See* Menendian, Gambhir, & Gailes, *The Roots of Structural Racism Project: Twenty-First Century Racial Residential Segregation in the United States*, Othering & Belonging Inst., Univ. of Cal., Berkeley (June 30, 2021), https://tinyurl.com/2kbuaamn. No matter how it is measured, residential segregation in the United States

remains deeply entrenched over a half a century after the passage of the FHA.

This widespread and entrenched segregation imposes real costs on minority communities. "Black children raised in integrated neighborhoods earn nearly $1,000 more as adults per year, and $4,000 more when raised in white neighborhoods, than those raised in highly segregated communities of color." *Id.* Homeownership rates are 30% higher in white neighborhoods, and 13% higher in integrated neighborhoods, than in highly segregated communities of color. *Id.* As segregation increases, life outcomes for Black Americans deteriorate: Scholars have found that, in "highly segregated" metropolitan areas, Black residents have worse employment levels, earnings, and even mortality rates than in neighborhoods that are less segregated. Quick & Kahlenberg, *Attacking the White-Black Opportunity Gap that Comes from Residential Segregation*, Century Found. (June 25, 2019), https://tinyurl.com/y2kmma26.

Such persistent and corrosive residential segregation is not solely the result of historical practices. It also stems from contemporary forms of housing discrimination. To take just one example, a recent study

found that white individuals in the Boston area seeking to tour apartments were able to arrange a viewing 80% of the time, while "similarly situated Black market-rate testers seeking to view the same apartments were only able to visit the property 48% of the time." Langowski et al., *Qualified Renters Need Not Apply: Race and Housing Voucher Discrimination in the Metropolitan Boston Rental Housing Market*, 28 Geo. J. Poverty L. & Pol'y 35, 42 (2020). "In addition, housing providers showed white market-rate testers twice as many apartment units as Black market-rate testers and provided them with better service as measured by a number of different testing variables." *Id.* Black homeowners seeking to sell their homes or build wealth face similar obstacles. The Brookings Institute has found that homes in Black neighborhoods are consistently valued almost a quarter less than they would be in non-Black neighborhoods. *See* Rothwell & Perry, *How Racial Bias in Appraisals Affects the Devaluation of Homes in Majority-Black Neighborhoods*, Brookings Inst. (Dec. 5, 2022), https://tinyurl.com/ffj84fb7.

Discrimination can also include unconscious bias in discretionary decision-making and purportedly "neutral" policies and practices. Even

well-intentioned actors, who genuinely believe themselves to be fair and unbiased, often draw conclusions and make decisions relying on race-based associations.  Widespread discretionary decision-making can amplify these effects.  In the housing context, these decisions can include landlords and real estate professionals evaluating prospective buyers and tenants; appraisers estimating property values; lenders and mortgage brokers determining creditworthiness; local governments and public agencies determining where to locate amenities and what land uses to approve; and private actors deciding how and where to invest money.  *See* Anderson & Plaut, *Property Law: Implicit Bias and the Resilience of Spatial Colorlines*, *in Implicit Racial Bias Across the Law* 30-31 (Justin D. Levinson & Robert J. Smith eds., 2012).  Such policies or practices that affect a large number of people, and that allow unconscious bias to influence decisions by multiple actors over numerous transactions, can have "precisely the same effects as a system pervaded by impermissible intentional discrimination."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988).  These outcomes are appropriately remedied through the enforcement of anti-discrimination

laws but are likely impossible to address through claims of disparate treatment alone.

The insurance industry is not immune to these broader issues. Indeed, in 2020, the National Association of Insurance Commissioners established a special committee to address issues of race and insurance. *See Race and Insurance*, Nat'l Ass'n for Race & Ins., https://tinyurl.com/yax3khr8. The committee concluded that "there is more to be done" to remedy discrimination in the industry. *Id.* (Background). The available evidence bears this conclusion out. The homeowner's insurance industry has been "battered by claims of race discrimination in the underwriting, marketing, advertising and sale of its products." Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Regul. 21, 21 (2006), https://tinyurl.com/mptfccze. Discrimination in homeowner's insurance can take many forms, such as offering insurance policies with inferior coverage, ignoring interested customers, imposing different terms and conditions based on neighborhood, refusing to underwrite buildings based on age or type of building material, requiring inspection reports in certain areas but not

others, offering fewer or inferior options in one neighborhood versus another, or charging higher premiums to customers with lower credit scores. *See* DeLong, *How Racial Discrimination in Homeowners Insurance Contributes to Systemic Racism and Redlining*, Consumer Fed. of Am. (June 17, 2022), https://tinyurl.com/wxeh346b; Porter, *Homeowners Insurance for People with Bad Credit*, Bankrate (June. 13, 2024), https://tinyurl.com/mufk63xj. All of these practices make it more difficult for members of disadvantaged minority groups to obtain homeowner's insurance.

To be sure, lawsuits brought by fair-housing and civil-rights groups have led to important changes in the homeowner's insurance industry. *See* Dane, *supra*, at 22. But the challenges are ongoing. For instance, one prominent tool in ratemaking is "geographic rating," where insurers use geographic boundaries to charge different prices based on different loss costs. This practice is generally race-neutral, "so long as the selection of the boundary lines is risk-based and does not discriminate on the basis of race." *Id.* at 25. If, however, insurers create geographic ratings on the basis of sub-geographies (e.g., neighborhoods within the same city) with inadequate loss data, racially

discriminatory patterns may arise. That's because, at a municipal level, "fire protection, crime prevention and rebuilding costs are all the same," so "there is no actuarial reason to believe one geographic section of a city would lead to higher or lower losses than another section of the same city." *Id.* at 25-26. But because the majority of ZIP codes are racially segregated, more granular geographic ratings are likely to lead to unjustifiably higher premiums for certain racial groups. *See id.* at 26. And geography is just one of several rating factors with the potential to amplify racial bias. *See generally* Bender et al., *Understanding Potential Influences of Racial Bias on P&C Insurance: Four Rating Factors Explored*, Cas. Actuarial Soc'y (2022), https://tinyurl.com/4su9rd52 (also examining homeownership and creditworthiness). Thus, even facially race-neutral criteria (such as adjusting base rates based on dividing territory by geographic markers like waterways or highways) can have pronounced disparate effects on racial minorities without any corresponding relationship to a loss-cost justification. *See* Dane, *supra*, at 27.

**B. Disparate-impact claims help to redress housing discrimination that would otherwise go undetected.**

Disparate-impact liability is a crucial tool to combat this ongoing housing discrimination, and, contrary to plaintiff's incorrect suggestion, NAMIC Br. 27-40, it does not run afoul of *Inclusive Communities* by requiring pervasive consideration of race. As society has become less accepting of overtly discriminatory behavior, direct proof of intentional discrimination has become less available; actors "seldom, if ever, announce . . . their desire to discriminate." *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064-65 (4th Cir. 1982). But the absence of direct proof does not mean the absence of discrimination. "Effect, and not motivation, is the touchstone of" detecting housing discrimination, both because "clever men may easily conceal their motivations," *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir. 1974), and because "the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme," *Hobson v. Hansen*, 269 F. Supp. 401, 497 (D.D.C. 1967), *aff'd sub nom. Smuck v. Hobson*, 408 F.2d 175 (D.C. Cir. 1969) (en banc). Disparate-impact liability thus serves both as a surrogate for

unearthing concealed, intentional discrimination and as a tool for uncovering real but unintended bias.

States have accordingly used disparate-impact claims to challenge many types of seemingly neutral housing policies that have a discriminatory effect on racial or other minorities. These suits have targeted zoning ordinances, occupancy restrictions, and English-language policies, among other practices. *See, e.g.*, *McGlawn v. Pa. Hum. Rels. Comm'n*, 891 A.2d 757 (Pa. Commw. Ct. 2006) (lending practices of obtaining predatory and unfair sub-prime mortgage loans had disparate impact based on race); *Conn. Comm'n on Hum. Rts. & Opps. ("CHRO") ex rel. Hurtado*, CHRO No. 8230394 (landlord's English-only policy had disparate impact based on national origin and ancestry); *R.I. Comm'n for Hum. Rts. v. Graul*, 120 F. Supp. 3d 110 (D.R.I. 2015) (landlord's policy of limiting occupancy had disparate impact based on familial status); *Support Ministries for Persons with AIDS, Inc. v. Vill. of Waterford*, 808 F. Supp. 120 (N.D.N.Y. 1992) (city's application of a local zoning ordinance had disparate impact based on disability).

The dynamics of the homeowner's insurance industry illustrate the importance of disparate-impact claims in rooting out discrimination. "Allegations of racism are tough to prove" against homeowner's insurers because "insurers have a lot of discretion and don't always provide detailed explanations for why claims are denied." Flitter, *Black Homeowners Struggle to Get Insurers to Pay Claims*, N.Y. Times (Jan 1. 2021), https://tinyurl.com/27cbpjnw. Insurers also "have long argued that the size and timing of payouts, and the neighborhoods where claims are registered and addressed, are proprietary information, and that sharing that data would hurt their ability to compete." *Id.* Absent access to such data or to insurers' decision-making processes, evidence of a racialized effect may be the only way to ferret out discrimination. This avenue has become even more critical in light of the increasing use of machine-learning algorithms in ratemaking and underwriting models. Such algorithms—and the data they are trained on—"can be fraught with inherent bias and discriminatory treatment, whether intentional or not." Mosley & Wenman, *Methods for Quantifying Discriminatory Effects on Protected Classes in Insurance*, Cas. Actuarial Soc'y 10 (2022), https://tinyurl.com/mr3kp3wf. Utilizing biased data in

such algorithms can subsequently "propagate . . . bias into the choices made from the models' predictions." *Id.* Effects-based tests are best suited to capture and rectify this form of algorithmic bias because they don't require a showing of intentional discrimination.

Small wonder, then, that disparate-impact claims have been important in redressing discrimination in the homeowner's insurance market. "Many traditional underwriting practices, like . . . [using] housing age and value . . . , have been successfully challenged under the Act using a disparate impact analysis." Dane, *supra,* at 24; *see, e.g.,* *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 50, 59-61; *Toledo Fair Hous. Ctr. v. Nationwide Mutual Ins. Co.*, 704 N.E.2d 667, 669-71 (Ohio Ct. Common Pleas 1997). Recently, for instance, Black plaintiffs brought a putative class action against State Farm Insurance for "use of algorithmic decision-making tools that allegedly resulted in statistically significant racial disparities in how the insurer processed claims." *Huskey v. State Farm Fire & Casualty Co.*, 2023 WL 5848164, at *1 (N.D. Ill. Sept. 11, 2023). Plaintiffs claimed that the racial disparities stemmed from State Farm's use of algorithms that "scrutinize[d] Black policyholders' claims more than white policyholders' claims." *Id.* at *2.

This additional scrutiny resulted in longer wait times, more paperwork, and more effort for Black claimants to receive payouts than for white claimants. *See id.* at *2-*3. The court found that plaintiffs successfully stated a disparate-impact claim under the FHA. *See id.* at *6. Other courts have likewise upheld the availability of FHA claims against homeowner's insurers whose underwriting criteria had a disparate impact on racial minorities. *See, e.g.*, *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 29-34 (D.D.C. 2017) (denying motion to dismiss disparate-impact claim that insurers unlawfully denied coverage to landlords who rented apartments to tenants receiving Section 8 housing assistance); *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 572-73 (D. Conn. 2015) (similar).

Contrary to plaintiff's assertions, NAMIC Br. 27-40, permitting disparate-impact claims against homeowner's insurers does not require—and has not required—the pervasive consideration of race. Despite decades of disparate-impact litigation against homeowner's insurers, *see supra* pp. 14-17, plaintiff nowhere states that insurance companies *already* pervasively consider race to counteract disparate impacts. There is therefore little reason to accept the assertion that

continuing to allow such claims to go forward will "effect a sweeping transformation of the insurance process." NAMIC Br. 28. Indeed, the Supreme Court rejected essentially the same argument in *Inclusive Communities* itself, explaining that "the existence of disparate-impact liability in the substantial majority of the Courts of Appeals for the last several decades has not given rise to dire consequences." 576 U.S. at 546 (cleaned up). Nor is there any merit to the argument that insurers will be forced "artificially" to adjust "actuarially sound risk factors" in order to achieve "demographically balanced outcomes." NAMIC Br. 28. As plaintiff elsewhere implicitly acknowledges, a "legitimate actuarial policy," *id.* at 33, that happens to have a disparate impact is immune from liability if it is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the insurer that "could not be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(b)(1). In other words, insurers are liable only for unnecessary ratemaking or underwriting policies that erect unjustified barriers for protected groups. HUD's rule thus protects the legitimate actuarial decision-making of insurers while arming plaintiffs with a necessary tool to redress discriminatory ratemaking or underwriting

policies that lack a sound actuarial basis.  The FHA demands no less.

*See Inclusive Cmtys.*, 576 U.S. at 546-47 (acknowledging "the Fair

Housing Act's continuing role in moving the Nation toward a more

integrated society").

## II.   State Law Does Not Categorically Shield Homeowner's Insurers From Federal Disparate-Impact Liability.

Amici States agree with HUD that the Rule does not exceed any

limits on disparate-impact liability described in *Inclusive Communities*,

including, as just discussed, by causing insurers to pervasively consider

protected traits.  *See supra* pp. 17-18; HUD Br. 30-38.  Plaintiff's second

argument—that state law categorically precludes the imposition of

federal disparate-impact liability on insurers, thus breaking any causal

chain between the insurers' decisions and any ensuing discriminatory

effects—is also incorrect.

The federal McCarran-Ferguson Act preserves the States' central

role in regulating the insurance industry by shielding state insurance

laws from federal preemption unless a federal law "specifically relates

to the business of insurance."  15 U.S.C. § 1012(b); *see Humana Inc. v.

Forsyth*, 525 U.S. 299, 307-08 (1999).  As the parties agree, NAMIC Br.

12 n.1; HUD Br. 44, the Fair Housing Act is not such a statute, and so

state insurance law retains its force in this context.  Plaintiff is wrong, however, to read state insurance law categorically to preclude—in all cases—the imposition of federal disparate-impact liability on homeowner's insurers.  To the contrary, States impose a wide range of antidiscrimination regimes on homeowner's insurers.  As HUD explained in promulgating the Rule, *see* 88 Fed. Reg. at 19,463-77, the question whether state law precludes federal disparate-impact liability on insurers must be addressed on a case-by-case basis, not a categorical one.  The district court thus correctly rejected plaintiff's argument and upheld the Rule.

### A.     States impose a wide range of statutory antidiscrimination regimes governing insurers.

The starting premise of plaintiff's second argument is that "[t]he insurance laws of every State" preclude insurers from considering race and other protected characteristics when making rating and underwriting decisions.  NAMIC Br. 41.  That premise is flawed.  States impose a wide range of statutory antidiscrimination regimes on insurers, including regimes that—like the Rule—prohibit insurers not just from engaging in intentional discrimination, but also from acting in a way that produces discriminatory effects.

### 1. Many States permit disparate-impact claims in the housing context.

Essentially all States prohibit discrimination on the basis of race, sex, and other protected characteristics, and at least 43 expressly extend those antidiscrimination prohibitions to the housing context. These laws broadly prohibit those who work in that field—selling and renting housing, making and underwriting housing loans, and more—from discriminating against purchasers, renters, and other individuals.[1] The wording of these statutes vary, but most are broad in scope, prohibiting individuals and entities from (for instance) "discriminat[ing]

---

[1] *See* Alaska Stat. § 18.80.240; Ariz. Rev. Stat. Ann. § 41-1491 *et seq.*; Ark. Code Ann. § 16-123-204; Cal. Gov't Code § 12955; Colo. Rev. Stat. § 24-34-502; Conn. Gen. Stat. § 46a-64b; D.C. Code Ann. § 2-1402.21; Del. Code Ann. tit. 6, § 4603; Ga. Code Ann. § 8-3-202; Haw. Rev. Stat. § 515-3; Idaho Code § 67-5909(8); 775 Ill. Comp. Stat. 5/3-102; Ind. Code § 22-9.5-5-1; Iowa Code § 216.8; Kan. Stat. Ann. § 44-1016; Ky. Rev. Stat. Ann. § 344.360; Me. Rev. Stat. Ann. tit. 5, § 4581-A; Md. Code Ann., State Gov't § 20-705; Mass. Gen. Laws ch. 151B, § 4(3B); Mich. Comp. Laws § 37.2502; Minn. Stat. § 363A.09; Mo. Rev. Stat. § 213.040; Mont. Code Ann. § 49-2-305; Neb. Rev. Stat. § 20-318; N.H. Rev. Stat. Ann. § 354-A:10; N.J. Stat. Ann. § 10:5-12(g)-(h); N.M. Stat. Ann. § 28-1-7(G)-(H); N.Y. Exec. Law §§ 296(2-a), (5), 296-a; N.C. Gen. Stat. § 41a-4; N.D. Cent. Code § 14-02.5-02; Ohio Rev. Code Ann. § 4112.02(H); Or. Rev. Stat. § 659A.421; 43 Pa. Stat. § 955(h); R.I. Gen. Laws § 34-37-4; S.C. Code Ann. § 31-21-40; S.D. Codified Laws § 20-13-20; Tenn. Code Ann. § 4-21-601; Tex. Prop. Code Ann. § 301.021; Utah Code Ann. § 57-21-5; Vt. Stat. Ann. tit. 9, § 4503; Va. Code Ann. § 36-96.3; Wash. Rev. Code § 49.60.222; W. Va. Code § 16B-18-5.

against an individual because of disability, race, creed, color, sex, sexual orientation," and other characteristics "in furnishing facilities or services in connection with housing," Colo. Rev. Stat. § 24-34-502(1)(a)(I); from engaging in "unlawful discrimination" in "the furnishing of facilities or services in connection with" a "real estate transaction," 775 Ill. Comp. Stat. 5/3-102(B); and from similar conduct.

Importantly, many of these statutory regimes prohibit not just *intentional* discrimination based on protected characteristics, but also conduct that has the *effect* of discriminating based on those same characteristics (i.e., disparate-impact discrimination). At least three States—California, North Carolina, and the District of Columbia—expressly provide by statute for disparate-impact claims in the housing context.[2] The supreme courts of at least 19 other States—Alaska, Colorado, Connecticut, Delaware, Georgia, Hawaii, Illinois, Indiana, Iowa, Maine, Massachusetts, Michigan, Montana, New Jersey, New

---

[2] *See* Cal. Gov't Code § 12955.8(b) (defining unlawful housing practice to include conduct that "caus[es] a discriminatory effect"); N.C. Gen. Stat. § 41A-5(a)(2) (prohibiting conduct that "has the effect, regardless of intent, of discriminating" on the basis of a protected trait); D.C. Code § 2-1402.68 (deeming unlawful any "practice which has the effect or consequence" of violating the statute).

Mexico, New York, Ohio, Utah, and Washington—have likewise read their antidiscrimination statutes to encompass disparate-impact claims, either in the housing context or more broadly.[3] Other courts have reached the same conclusion with respect to fair-housing statutes in at least three other States.[4]

---

[3] *See Comm'n on Hum. Rts. & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 255-56 (Conn. 1999) (recognizing disparate-impact liability in the housing context); *Saville v. Quaker Hill Pl.*, 531 A.2d 201, 205-06 (Del. 1987) (same); *State of Ind. Civ. Rts. Comm'n v. Cnty. Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000) (same); *Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790, 798-99 (Iowa 2011) (same); *Dussault v. RRE Coach Lantern Holdings, LLC*, 86 A.3d 52, 61-62 (Me. 2014) (same); *Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 407 (Mass. 2016) (same); *Malibu Inv. Co. v. Sparks*, 996 P.2d 1043, 1050-51 (Utah 2000) (same); *State v. City of Sunnyside*, No. 101205-5, – P.3d –, 2024 WL 3058780, at *15 (Wash. June 20, 2024) (same); *see also Miller v. Safeway, Inc.*, 102 P.3d 282, 290 (Alaska 2004); *Colo. Civ. Rts. Comm'n v. Travelers Ins. Co.*, 759 P.2d 1358, 1370 (Colo. 1988); *Ga. Dep't of Hum. Res. v. Montgomery*, 284 S.E.2d 263, 265 (Ga. 1981); *Hac v. Univ. of Hawaii*, 73 P.3d 46, 55 (Haw. 2003); *People v. R.L.*, 634 N.E.2d 733, 737 (Ill. 1994); *Koester v. City of Novi*, 580 N.W.2d 835, 843 (Mich. 1998); *Mont. Rail Link v. Byard*, 860 P.2d 121, 125 (Mont. 1993); *Gerety v. Atl. City Hilton Casino Resort*, 877 A.2d 1233, 1237 (N.J. 2005); *Gonzalez v. N.M. Dep't of Health*, 11 P.3d 550, 560 (N.M. 2000); *People v. N.Y. City Transit Auth.*, 452 N.E.2d 316, 318 (N.Y. 1983); *Little Forest Med. Ctr. of Akron v. Oh. Civ. Rts. Comm'n.*, 575 N.E.2d 1164, 1168 (Ohio 1991).

[4] *See, e..g., Lyman v. Montclair at Partridge Creek, LLC*, 2023 WL 6096678 (E.D. Mich. 2023); *Rivera v. DLJ Props.*, 2022 WL 3048229, at *2 (E.D. Tenn. 2022); *Douglas v. Dorchester Props., Ltd.*, 2022 WL 4358779, at *2 (N.D. Tex. 2022).

In addition, many of the remaining States likely also permit disparate-impact claims under their fair-housing statutes.  As the Supreme Court explained in *Inclusive Communities*, under federal law, at least, a statute likely encompasses disparate-impact claims when its text "refers to the consequences of actions and not just to the mindset of actors," 576 U.S. at 533—for instance, by prohibiting practices that "would deprive . . . any individual of employment opportunities" because of a protected characteristic, 29 U.S.C. § 623(a)(2) (Age Discrimination in Employment Act), or conduct that would make housing "unavailable" based on such a characteristic, 42 U.S.C. § 3604(a) (FHA).  At 12 additional state fair-housing statutes contain language broadly similar to federal statutes previously held by the Supreme Court to permit disparate-impact liability.[5]  Like these federal statutes, those state laws are arguably best read to permit disparate-impact liability as well.

---

[5] *See, e.g.*, Ariz. Rev. Stat. Ann. § 41-1491.14(A); Kan. Stat. Ann. § 44-1016(a); Ky. Rev. Stat. Ann. § 344.360(1); Md. Code Ann., State Gov't § 20-705(1); Minn. Stat. § 363A.09(1)(1); Mo. Rev. Stat. § 213.040(1)(1); N.D. Cent. Code § 14-02.5-02(1); S.C. Code Ann. § 31-21-40(1); Vt. Stat. Ann. tit. 9, § 4503(a)(1); Va. Code Ann. § 36-96.3(A)(1); W. Va. Code § 16B-18-5(a); Wyo. Stat. Ann. § 40-26-103(A).

All told, then, a wide range of States permit disparate-impact claims arising from the housing context. And, as discussed, *supra* pp. 14-17, private litigants and amici States have enforced those statutes for decades to combat discrimination in this context.

### 2. State insurance codes do not categorically impose a contrary regime.

Plaintiff and its amici offer a different account of state law. NAMIC Br. 41-45; *see also* Br. of Nat'l Council of Insurance Legislators ("NCOIL Br.") 18-22. Plaintiff observes that many States have enacted a provision of its insurance code that specifically bars discrimination *by insurers*, in addition to the fair-housing statutes described above, and it reads those provisions implicitly to preclude imposition of disparate-impact liability. NAMIC Br. 41-45. But plaintiff offers little support for that reading of these provisions, and many States do not interpret their insurance codes' unfair discrimination provisions in that manner.

To start, many of these provisions are themselves best read to *permit* disparate-impact claims rather than to *preclude* them because they "refer[] to the consequences of actions and not just to the mindset of actors." *Inclusive Cmtys.*, 576 U.S. at 533. In Delaware, for instance, it is unlawful for insurers to "discriminate *in any way* because of the

insured's race, color, religion, sexual orientation, gender identity or national origin." Del. Code Ann. tit. 18, § 2304(22) (emphasis added). In the District of Columbia, "no insurer shall make *or permit* an unfair discrimination between insured property having like insuring or risk characteristics." D.C. Code § 31-2231.13(d) (emphasis added). And in Georgia, insurers are prohibited from "making *or permitting* any unfair discrimination between individuals of the same class and of essentially the same hazard." Ga. Code Ann. § 33-6-4(b)(8)(A)(ii) (emphasis added). These provisions focus on "the consequences" of insurers' conduct rather than their "mindset[s]," *Inclusive Cmtys.*, 576 U.S. at 533, and so likely permit (rather than preclude) disparate-impact claims.

And even those unfair-discrimination provisions that do not contain consequences-based language could encompass disparate-impact liability, contrary to plaintiff's suggestion. For one, most of these statutes simply are silent as to whether they permit disparate-impact liability, and so could easily be read by state courts to encompass such antidiscrimination theories. And even if some of these provisions do prohibit only intentional discrimination by insurers, as plaintiff says, it does not follow that insurers are governed only by these

provisions.  To the contrary, most States follow the rule that "statutes relating to the same subject are to be read together as constituting a unified whole."  *In re Estate of Kerr*, 949 P.2d 810, 815 (Wash. 1998) (cleaned up).  Many States—including all 18 amici States—thus read the unfair-discrimination provisions that plaintiff cites to complement, rather than to displace, the general prohibitions on discrimination described above.  *See supra* pp. 20-24.

Plaintiff, for its part, offers little to support its suggestion that state insurance codes uniformly preclude the imposition of federal disparate-impact liability in the homeowner's insurance context. Plaintiff's argument appears to rest on the notion that by prohibiting intentional discrimination based on race and other protected characteristics, these provisions prohibit insurers from taking account of protected characteristics at all in making insurance decisions, which plaintiff asserts the Rule will require insurers to do.  *Cf. Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (arguing that disparate-impact provisions "often requir[e] [regulated entities] to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes").

That argument is flawed for many reasons.  For one, as HUD explains, HUD Br. 30-38, it rests in part on a misreading of the Rule. The Rule does not require insurers pervasively to consider race or other protected characteristics when making insurance decisions nor to collect data on those characteristics or use such data in their decision-making. Instead, as explained, *supra* pp. 17-18, the Rule imposes liability only when a practice lacks a legitimate business justification or there is an available alternative that will have fewer discriminatory effects.  *See* 24 C.F.R. § 100.500(c)(2)-(3).  In any event, as the Supreme Court has explained, it is not the case that the "mere *awareness*" of race or other protected traits would violate a ban on intentional discrimination, *Inclusive Cmtys.*, 576 U.S. at 545 (emphasis added); *see also*, *e.g.*, *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 277-78 (1979).  Were it otherwise, regulated parties would find it difficult if not impossible to comply with the many federal statutory disparate-impact prohibitions, *see, e.g.*, 42 U.S.C. § 2000e-2(a), (k); 29 U.S.C. § 623(a)(2), given that such prohibitions sometimes require parties to consider the way their conduct will affect protected individuals.

More fundamentally, however, plaintiff's claim overstates the degree of uniformity in state law regarding the relationship between intentional-discrimination and disparate-impact liability. To be sure, a State *could* impose the kind of statutory regime that plaintiff describes, under which an insurer must use only market-based methods to make risk classifications and is categorically barred from considering protected characteristics even to avoid causing discriminatory effects. NAMIC Br. 41-46; *accord* NCOIL Br. 22-26. But plaintiff cannot simply cite a list of varied state insurance laws and assert that each State has adopted this particular and narrow approach toward discrimination within the industry.

To be clear, amici States' argument is not that every one of the provisions plaintiff cites in fact permits disparate-impact claims in the context of homeowner's insurance, or that in every State insurers are already subject, as a matter of state law, to disparate-impact liability. At least one state court, as plaintiff observes, NAMIC Br. 48 (citing *Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 435 (Tex. 2011)), has adopted plaintiff's theory, under which insurers must consider only race-neutral factors when pricing insurance even if doing so results in a racially

disparate impact, and the insurance commissioners of several States have asserted elsewhere that their state regimes are best read to preclude disparate-impact claims.[6]  Those States are free to make that choice.  But many States (including many amici States) have made the opposite choice, enacting a regime under which insurers may not act in a manner that yields unjustified and avoidable discriminatory effects.

### B.  State insurance codes do not categorically shield insurers from federal disparate-impact liability.

Because plaintiff's account of state law is flawed, *supra* pp. 20-30, its argument premised on that account, NAMIC Br. 46-52, is likewise wrong, and the district court correctly rejected it.

Plaintiff argues that state insurance codes "in every State" (primarily the unfair-discrimination provisions discussed above, *supra* pp. 24-30) "break the causal connection between an insurer's ratemaking and underwriting practices and any alleged disparate impact."  NAMIC Br. 47.  Plaintiff emphasizes repeatedly that its argument is a "categorical" one, *id.* at 50, applicable in "every State," *id.*

---

[6]  Br. of Oklahoma at 6, *PCIAA v. Todman*, 2024 WL 1283581 (N.D. Ill. Mar. 26, 2024) (Doc. 48); Mot. of Alabama et al. at 2-3, *PCIAA*, 2024 WL 1283581 (Doc. 64) (supporting Oklahoma's brief).

at 47, 50, and that "state law" imposes only one rule on homeowner's insurers, *id.* at 52—namely, that they apply only market-based factors in ratemaking and underwriting decisions and forego considering, in any manner, race and other protected characteristics. That argument is wrong.

Most basically, as discussed *supra* pp. 20-30, state law is not uniform in this area. To the contrary, many States' fair-housing laws impose disparate-impact liability, including on homeowner's insurers, and the unfair-discrimination provisions of state insurance codes that plaintiff cites are in most cases best read harmoniously with those prohibitions. Thus, although *some* States may impose the rule that plaintiff describes, not *all* States do, and the undersigned attorneys general do not read their statutory regimes to do so.

That alone dispels plaintiff's argument. The Supreme Court has emphasized that the question whether state statutes "reverse-preempt" federal law under the McCarran-Ferguson Act is a case-specific one, in which a court must consider whether the application of that federal law to insurers would "directly conflict with state regulation" or "frustrate [a] declared state policy or interfere with a State's administrative

regime." *Humana Inc.*, 525 U.S. at 310.  It cannot be answered using the kind of broad brush plaintiff employs, in which federal law must generally yield to an amorphous and undifferentiated understanding of state interests.  HUD correctly concluded that a case-by-case approach, under which an insurer can assert a "conflict with a specific state insurance law" as a defense to liability in a specific case, *see* 88 Fed. Reg. at 19,465; *accord, e.g.*, *id.* at 19,474 (explaining that McCarran-Ferguson "by its nature[] requires such case-by-case analyses"), is preferable to the categorical exemption plaintiff seeks.  And the district court likewise correctly concluded that insurers can argue in individual cases that "state law prohibits (or requires) certain underwriting or rating decisions," thus "sever[ing] the connection between the insurer's practices and the disparate impact," Op. 25—not that state law serves as a basis for a *categorical* reason to invalidate the Rule in all States.

Plaintiff's arguments against that conclusion, NAMIC Br. 46-52, lack merit.  Plaintiff cites a pair of cases in which courts concluded that disparate-impact claims against homeowner's insurers could not move forward because specific state insurance statutes precluded the imposition of disparate-impact liability.  *Id.* at 47-48 (citing *Saunders v.*

*Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008), and *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1207 (9th Cir. 2010) (en banc)).  But these cases are entirely consistent with HUD's approach:  They turn not on the idea that state law *in every State* precludes disparate-impact claims against insurers, but on the premise that state law in *some* States might do so.  In *Ojo*, for instance, the en banc Ninth Circuit held that whether an insurer could be liable for disparate-impact liability under the FHA turned on an "unsettled" "question of Texas law," namely whether a Texas statute authorizing insurers to use credit scoring in setting insurance rates precluded liability for any discriminatory effects flowing from such a practice.  600 F.3d at 1209-10.  It thus certified that question to the Texas Supreme Court.  *Id.*  By contrast, if plaintiff and its amici were right that *all* state insurance codes categorically precluded the imposition of disparate-impact liability on homeowner's insurers, there would have been no need for certification.  *Accord, e.g.*, *Saunders*, 537 F.3d at 966-69 (conducting lengthy analysis of Missouri law to answer similar question).

In the end, each State is entitled to determine for itself whether insurers within its borders are allowed to engage in conduct that has

unjustifiable discriminatory effects on individuals' equal access to housing. *See San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 50 (1973) ("[O]ne of the peculiar strengths of our form of government" is "each State's freedom to 'serve as a laboratory; and try novel social and economic experiments'") (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 280 (1932) (Brandeis, J., dissenting)). As HUD has explained, plaintiff's proposed nationwide categorical exemption for insurers would "be at odds" with Congress's purpose of "support[ing] the autonomy and sovereignty of each individual state in the field of insurance." 88 Fed. Reg. at 19,475. The district court correctly rejected the argument that such an exemption is required by *Inclusive Communities* or any other authority.

## CONCLUSION

For these reasons, the Court should affirm the judgment below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General
District of Columbia

KWAME RAOUL
Attorney General
State of Illinois

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy
  Solicitor General
RUSSELL BOGUE
Assistant Attorney General
400 6th St. NW, Suite 8100
Washington, D.C. 20001

KRIS MAYES
Attorney General
State of Arizona
2005 N. Central Ave.
Phoenix, AZ 85004

PHILIP J. WEISER
Attorney General
State of Colorado
1300 Broadway, 10th Floor
Denver, CO 80203

ANTHONY G. BROWN
Attorney General
State of Maryland
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 MLK Jr, Blvd.
St. Paul, MN 55155

JANE ELINOR NOTZ
Solicitor General

/s/ Alex Hemmer
ALEX HEMMER
Deputy Solicitor General
JOHN R. MILLIGAN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

ROB BONTA
Attorney General
State of California
1300 I Street
Sacramento, CA 95814

KATHLEEN JENNINGS
Attorney General
State of Delaware
820 N. French St.
Wilmington, DE 19801

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA 02108

AARON D. FORD
Attorney General
State of Nevada
100 North Carson Street
Carson City, NV 8970

MATTHEW J. PLATKIN
Attorney General
State of New Jersey
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
Attorney General
State of Oregon
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

RAÚL TORREZ
Attorney General
State of New Mexico
201 3rd Street NW
Albuquerque, NM 87109

JOSHUA H. STEIN
Attorney General
State of North Carolina
114 W. Edenton Street
Raleigh, NC 27603

MICHELLE A. HENRY
Attorney General
Commonwealth of Pennsylvania
Strawberry Square, 16th Floor
Harrisburg, PA 17120

ROBERT W. FERGUSON
Attorney General
State of Washington
P.O. Box 40100
Olympia, WA 98504

July 10, 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) because it contains 6,497 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ Alex Hemmer
ALEX HEMMER

July 10, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2024, I electronically filed the foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court for the United States Court of Appeals for D.C. Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Alex Hemmer
ALEX HEMMER