**ORAL ARGUMENT NOT YET SCHEDULED**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

### No. 23-5275

———————————

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,
*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT AND
ADRIANNE TODMAN, IN HER OFFICIAL CAPACITY AS ACTING SECRETARY OF
HOUSING AND URBAN DEVELOPMENT,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court for the District of
Columbia,
Case No. 1:13-cv-966,
Before the Honorable Richard J. Leon, J.

———————————

**BRIEF FOR THE NATIONAL FAIR HOUSING ALLIANCE, THE
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,
AARP, THE NATIONAL CONSUMER LAW CENTER, THE
POVERTY & RACE RESEARCH ACTION COUNCIL, THE
NATIONAL LOW INCOME HOUSING COALITION, THE
NATIONAL HOUSING LAW PROJECT, AND THE NAACP
LEGAL DEFENSE AND EDUCATIONAL FUND AS *AMICI
CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

———————————

Thomas Silverstein
Brook Hill
**LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**
1500 K St. NW #900
Washington, DC 20005
Tel: (202) 662-8600
tsilverstein@lawyerscommittee.org
bhill@lawyerscommittee.org

Brian Corman
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Ave., N.W., Suite
500
Washington, DC  20005
Tel: (202) 408-4600
bcorman@cohenmilstein.com

Morgan Williams
**NATIONAL FAIR HOUSING ALLIANCE**
1331 Pennsylvania Ave. NW #650
Washington, DC 20004
Tel: (202) 898-1661
mwilliams@nationalfairhousing.org

*Attorneys for Amici*

July 10, 2024

## Certificate as to Parties, Rulings, and Related Cases

Counsel for *amici curiae* hereby certify as follows:

**A. Parties and *Amici*.** Except for the *amici* filing this brief, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Briefs for Appellant and Appellee.

**B. Ruling Under Review.** An accurate reference to the ruling at issue appears in the Brief for Appellee.

**C. Related Cases.** This case is related to *Nat'l Ass'n of Mut. Ins. Companies v. United States Dep't of Hous. & Urb. Dev.*, 693 F. Supp. 3d 20 (D.D.C. 2023).

/s/ *Brian Corman*
Brian Corman
*Counsel for Amici Curiae*

## Corporate Disclosure Statement

*Amici* are nonprofit corporations. They have no parent corporations, nor does any corporation own 10% or more of their stock.

/s/ *Brian Corman*
Brian Corman
*Counsel for Amici Curiae*

## Certificate of Counsel Regarding Authority to File

All parties have consented to the filing of this *amicus* brief. Pursuant to D.C. Circuit Rule 29(d), *amici* certify that a separate brief is necessary because it reflects a perspective not found in the parties' briefs or in any of the other *amicus* briefs. *Amici* have extensive and substantial expertise in advocating for the elimination of housing segregation from the vestiges of our nation's history and the promotion of equal housing opportunity for all.

Because *amici* are not aware of any other *amicus* brief representing this perspective, they certify pursuant to D.C. Circuit Rule 29(d) that joinder in a single brief with other *amici* would be impracticable.

/s/ *Brian Corman*
Brian Corman
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

Identity and Interest of *Amici Curiae* ........................................................ 1

Introduction and Summary of Argument ..................................................... 5

Argument ..................................................................................................... 9

I.   Appellant Mischaracterizes the Nature of Homeowner's
     Insurance Underwriting and Ratemaking, as well as the
     Application of the FHA to the Insurance Industry .......................... 9
     A.   Insurance Underwriting and Ratemaking are not the
          Products of Purely Objective Risk-Sorting. ......................... 10
     B.   There is No Legal Basis for Insulating the Insurance
          Industry from Disparate Impact Liability under the
          FHA. ...................................................................................... 17

II.  Eliminating Private Business Practices That Cause
     Unjustified Racial Disparities Does Not Raise Constitutional
     Questions or Run Afoul of *Inclusive Communities*. ....................... 22
     A.   Imposing Disparate Impact Liability on the Home
          Insurance Industry Will Not "Inject" Racial and Other
          Considerations "At Every Stage" of the Insurance
          Process. ................................................................................. 23
     B.   The HUD Rule May Cause Insurers to Take Race-
          Neutral Actions Aimed at Reducing Unjustified Racial
          Disparities, but Those Actions Raise No Constitutional
          Issues. ................................................................................... 27

III. The District Court Correctly Held that the HUD Rule Does
     Not "Induce" Greater Consideration of Race Beyond What
     the FHA and *Inclusive Communities* Already Require. ................ 31

Conclusion ................................................................................................. 36

# TABLE OF AUTHORITIES

<u>Page</u>

**CASES**

*Burrell v. State Farm & Cas. Co.,*
226 F.Supp.2d 427 (S.D.N.Y. 2002).......................................... 18

*DeHoyos v. Allstate Corp.,*
345 F.3d 290 (5th Cir. 2003)........................................... 18, 19

*Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.,*
388 F.Supp.3d 145 (E.D.N.Y. 2019) ................................... 24

*Graoch Assocs. #33, L.P. v. Louisville / Jefferson Cty. Metro Hum.*
*Rels. Comm'n,*
508 F.3d 366 (6th Cir. 2007)............................................. 36

*Greater New Orleans Fair Hous. Action v. St. Bernard Parish,*
641 F.Supp.2d 563 (E.D. La. 2009) .................................... 24

*HUD v. Allstate Ins. Co.,*
No. 03-94-0529-8 (Feb. 1997)........................................... 28

*HUD v. State Farm Fire & Cas. Co.,*
Nos. 05-94-1351-8, 05-94-1352-8 (July 1996) .................... 28

*Huskey v. State Farm Fire & Cas. Co.,*
No. 22 C 7014, 2023 WL 5848164 (N.D. Ill. Sept. 11, 2023)
............................................................... 12, 18, 23, 29

*Mhany Mgmt., Inc. v. County of Nassau,*
819 F.3d 581 (2d Cir. 2016) .............................................. 34

*NAACP v. Am. Fam. Mut. Ins. Co.,*
978 F.2d 287 (7th Cir. 1992)........................................... 18, 19

*Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.,*
208 F.Supp.2d 46 (D.D.C. 2002).................................... 18, 19

# TABLE OF AUTHORITIES

<u>Page</u>

*Nat'l Fair Hous. All. v. Travelers Indemn. Co.,*
   261 F.Supp.3d 20 (D.D.C. 2017) ........................................... 32

*Nationwide Mut. Ins. Co. v. Cisneros,*
   52 F.3d 1351 (6th Cir. 1995) ................................................ 18

*Ojo v. Farmers Grp., Inc.,*
   600 F.3d 1205 (9th Cir. 2010) .............................................. 18

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) ............................................................ 30

*Prop. Cas. Insurers Ass'n of Am. v. Todman,*
   No. 13 C 8564, 2024 WL 1283581 (N.D. Ill. Mar. 26, 2024)
   ........................................................... 11, 17, 18, 32

*Reyes v. Waples Mobile Home Park Ltd. P'ship,*
   903 F.3d 415 (4th Cir. 2018) ................................................ 34

*Sullivan v. Liberty Mut. Ins. Co.,*
   606 F.Supp.3d 796 (N.D. Ill. 2022) ....................................... 18

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
   576 U.S. 519 (2015) ...................................................... *passim*

*United Farm Bureau Mut. Ins. Co., Inc. v. Metro. Hum. Rel. Comm'n,*
   24 F.3d 1008 (7th Cir. 1994) ................................................ 18

*United States v. City of Black Jack, Missouri,*
   508 F.2d 1179 (8th Cir. 1974) .............................................. 24

*United States v. Starett City Assocs.,*
   840 F.2d 1096 (2d Cir. 1988) ............................................... 25

iii

# TABLE OF AUTHORITIES

Page

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
 113 F.Supp.3d 555 (D. Conn. 2015) .................................................... 18

*Wai v. Allstate Ins. Co.*,
 75 F.Supp.2d 1 (D.D.C. 1999) ........................................................... 18

*Wards Cove Packing Co. v. Atonio*,
 490 U.S. 642 (1989) ............................................................................ 35


## RULES & REGULATIONS

24 C.F.R § 100.500(c) ............................................................. 5, 26, 33, 35

88 Fed. Reg 19,468 ............................................................................... 11


## OTHER AUTHORITIES

Brian J. Glenn, *The Shifting Rhetoric of Insurance Denial*, 34 Law
 & Soc'y Rev. 779 (2000) ...................................................................... 11

Consent Decree, *United States v. Am. Family Mut. Ins. Co.* and
 *NAACP v. Am. Family Mut. Ins. Co.* (E.D. Wis. July 13, 1995)
............................................................................................................... 29

Consent Decree, *United States v. Nationwide Mut. Ins. Co. et al.*,
 No. C2-97-291 (S.D. Ohio Mar. 10, 1997) .......................................... 29

D.J. Powers, *The Discriminatory Effects of Homeowners Insurance
 Guidelines*, in Insurance Redlining: Disinvestment,
 Reinvestment, and the Evolving Role of Financial Institutions
 119 (Gregory D. Squires ed., 1997) .................................................... 10

iv

# TABLE OF AUTHORITIES

<u>Page</u>

Dana L. Kaersvang, *The Fair Housing Act and Disparate Impact in Homeowners Insurance*, 104 Mich. L. Rev. 1993 (2006) ............... 20

Donald Light, *Transforming Underwriting: From Risk Selection to Portfolio Management* (Celent, March 2004) ..................................... 13

Gail McGiffin, *Are Underwriters Smarter Than Predictive Models?* (Ernst & Young LLP, 2013) ................................................. 11

Meryl Golden & Mike Miller, *Introduction to Price Optimization* 7 (Earnix, 2014) ..................................................................... 15

Rick Swedloff, *The New Regulatory Imperative for Insurance*, 61 B.C.L. Rev. 2031, 2058 (2020) ........................................... 12

Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance Markets* in Insurance Redlining (Gregory D. Squires ed., 1997) ........................................... 17

Statement of Principles Regarding Property and Casualty Insurance Ratemaking 5 (May 2021), ................................................. 14

Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories,* 24 J. Ins. Reg. 21, 24-27 (2006) ....................................... 14

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* are the National Fair Housing Alliance, the Lawyers'
Committee for Civil Rights Under Law, AARP, the National Consumer
Law Center, the Poverty & Race Research Action Council, the National
Low Income Housing Coalition, the National Housing Law Project, and
the NAACP Legal Defense and Educational Fund. Each is a non-profit
organization that has long sought to eliminate housing segregation and
promote equal housing opportunity for all. No party's counsel authored
this brief in any part, and no party, party's counsel, or other person
contributed money that was intended to fund it.

The National Fair Housing Alliance ("NFHA") is a national
organization dedicated to ending discrimination and ensuring equal
opportunity in housing for all people, including through
homeownership, credit access, tech equity, member services,
community development, and enforcement initiatives. NFHA is a
consortium of 167 private, non-profit fair housing organizations, state
and local civil rights agencies, and individuals.

Lawyers' Committee for Civil Rights Under Law ("LCCRUL") is
a non-partisan, nonprofit organization formed in 1963 at the request

of President John F. Kennedy to provide legal services to address racial discrimination and secure equal justice under law. LCCRUL works with communities across the nation to combat and remediate discriminatory housing practices, in particular where doing so helps secure justice for racial and ethnic minorities.

AARP is the nation's largest nonprofit, nonpartisan organization dedicated to empowering Americans 50 and older to choose how they live as they age. In this pursuit, AARP works to ensure the availability of affordable, accessible, and appropriate housing and the elimination of discrimination in housing.

National Consumer Law Center ("NCLC") is a national non-profit research and advocacy organization focusing on justice in consumer financial transactions, especially for low-income and elderly consumers. NCLC also provides legal and technical consulting and assistance on consumer law issues, and regularly provides comprehensive comments to federal agencies, including HUD, on the regulations under consumer laws that affect low-income consumers.

The Poverty & Race Research Action Council ("PRRAC") is a civil rights policy organization committed to bringing the insights of social

science research to the fields of civil rights and poverty law. PRRAC's housing work focuses on the government's role in creating and perpetuating patterns of racial and economic segregation, the long-term consequences of segregation for low-income families of color in the areas of health, education, employment, and economic mobility, and the government policies that are necessary to remedy these disparities.

The National Low Income Housing Coalition ("NLIHC") is dedicated to achieving racially and socially equitable public policy that ensures people with the lowest incomes have quality homes in communities of their choice. Its members include state and local housing coalitions, residents of public and assisted housing, nonprofit housing providers, homeless service providers, fair housing organizations, public housing agencies, private developers and property owners, local and state agencies, faith-based organizations, researchers, and concerned citizens.

The National Housing Law Project ("NHLP") is a nonprofit organization that advances housing justice for poor people and communities, predominantly through technical assistance and training to legal aid attorneys and through co-counseling on important litigation. NHLP works with organizers and other advocacy and service

organizations to strengthen and enforce the rights of tenants and low-income homeowners and increase housing opportunities for underserved communities.

The NAACP Legal Defense & Educational Fund, Inc. ("LDF") is the nation's first and foremost civil rights law organization. Through litigation, advocacy, public education, and outreach, LDF strives to secure equal justice under the law for all people in the United States and to break down barriers that prevent Black people from actualizing their basic civil and human rights.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the Supreme Court has made clear, a plaintiff can succeed on a Fair Housing Act ("FHA") claim using evidence of the unjustified discriminatory effects of a facially neutral housing policy or practice. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015) ("*Inclusive Communities*"). Appellant National Association of Mutual Insurance Companies (hereinafter, "NAMIC" or "Appellant") remains unwilling to accept this reality, at least with respect to the business of homeowner's insurance.

This appeal concerns the U.S. Department of Housing and Urban Development's 2023 rule ("HUD Rule") regarding disparate impact liability under the FHA. The HUD Rule reinstates a 2013 rule that codified a three-part burden-shifting framework for assessing disparate impact claims. Under that framework, to establish disparate impact liability, a plaintiff (or complainant in an administrative proceeding) must first show that "a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R § 100.500(c)(1). If that burden is satisfied, the defendant (or respondent in an administrative proceeding) must prove that "the challenged practice is necessary to achieve one or

5

more substantial, legitimate, nondiscriminatory interests." *Id.* at §
100.500(c)(2). And if the defendant bears its burden, the plaintiff can still
prevail if it shows that the defendant's interests "could be served by
another practice that has a less discriminatory effect." *Id.* at §
100.500(c)(3).

For over a decade, NAMIC has waged war on various versions of
HUD's disparate impact rule. It now challenges the HUD Rule as
inconsistent with the Supreme Court's decision in *Inclusive
Communities*, D. Ct. Dkt. 146 at 150-151, even though that decision
confirmed the availability of disparate impact liability under the FHA
and took no issue with HUD's proposed burden-shifting framework.
Contrary to NAMIC's assertion that the FHA is designed solely to ensure
race-blindness in housing, *see* Appell. Br. 32-33, the purpose of the FHA
is to ensure equal opportunities for housing. This legislation was and
remains necessary to counteract pervasive discrimination and
impermissible disparities in housing. The district court rightly rejected
NAMIC's argument. *See* D. Ct. Dkt. 155 ("Op.").

On appeal, NAMIC insists once again that the HUD Rule cannot be
reconciled with *Inclusive Communities*. *Amici* agree with the arguments

6

presented by Appellee in support of the HUD Rule, *see* HUD Br., Document No. 2063070, but write separately to emphasize three reasons that *Inclusive Communities* does not preclude the application of the HUD Rule to homeowner's insurance.

*First*, contrary to Appellant's characterization, insurance underwriting and ratemaking are not solely the result of objective, scientific risk-grouping and risk-rating practices; these processes weigh many factors that have nothing to do with risk and can cause unjustified disparities by race or other protected characteristics. While Appellant insists that insurers should enjoy a blanket exemption from FHA disparate impact liability because of their purportedly distinct focus on risk assessment, courts have soundly rejected this argument.

*Second*, monitoring related to and compliance with the HUD Rule do not somehow force insurers to engage in discrimination prohibited by the Constitution or *Inclusive Communities*. Instead, consistent with *Inclusive Communities*, the HUD Rule requires the elimination of unjustified practices that cause racial disparities. Despite Appellant's misleading arguments to the contrary, *Inclusive Communities* contains safeguards that are designed to ensure that disparate impact liability

7

does not create constitutional issues. As the district court found, the HUD Rule incorporates these safeguards. Op. at 22-23. To comply with the HUD Rule, insurers need not adopt racial quotas or charge different rates to insureds of different races. They need only change any unjustified policies that cause racial disparities. Following the HUD Rule may cause insurers to take race-neutral actions aimed at reducing unjustified racial disparities, but those actions raise no constitutional issues.

*Third*, Appellant and several of its *amici* conjure up supposed tensions between the HUD Rule and the limiting principles on disparate impact liability set forth in *Inclusive Communities*. But as the district court correctly observed, the HUD Rule does not induce greater consideration of race and other protected characteristics than the FHA, as interpreted in *Inclusive Communities*, already did. Read together, the HUD Rule, the FHA, and *Inclusive Communities* appropriately distinguish between unnecessary, discriminatory barriers to housing and valid policies and practices that advance legitimate business interests.

## ARGUMENT

## I.  APPELLANT MISCHARACTERIZES THE NATURE OF HOMEOWNER'S INSURANCE UNDERWRITING AND RATEMAKING, AS WELL AS THE APPLICATION OF THE FHA TO THE INSURANCE INDUSTRY.

Appellant argues that the HUD Rule—and by extension, FHA disparate impact liability—cannot apply to the underwriting and ratemaking of homeowner's insurance because those processes are influenced solely by objective, scientific, risk-based calculations. Appell. Br. 32 ("the rate-making and underwriting decisions of insurers are based solely on considerations of actuarially sound risk factors"). Appellant's argument is inconsistent with the realities of the insurance industry, in which considerations unrelated to risk have become part of the actuarial process. The insurance industry has and can continue to remedy disparate effects caused by these unjustified practices without affecting any of the fair risk assessment criteria it may use in ratemaking and underwriting.

As in any other industry, human judgment and business strategy are crucial parts of the insurance business. Insurers establish pricing strategies by weighing both risk-based and non-risk-based factors, such as profitability levels, competitor prices, rating territory boundaries, and

9

trending assumptions. As such, the homeowner's insurance business is not influenced solely by objective scientific calculations and is not categorically unique by any salient measure for purposes of the FHA.

A.    Insurance Underwriting and Ratemaking are not the Products of Purely Objective Risk-Sorting.

Appellant claims that the HUD Rule would force the insurance industry to consider protected characteristics in ratemaking and underwriting, an outcome that would supposedly "effect a sweeping transformation of the insurance process." Appell. Br. 28. This ignores crucial facts about underwriting and ratemaking, namely that insurers do not, and never did, make decisions dictated only by objective actuarial considerations. As such, preventing unjustified disparate impacts, consistent with the requirements of FHA under *Inclusive Communities* and the HUD Rule discussed *infra* in Section III, will not meaningfully disrupt the homeowner's insurance industry's business model.

First, insurance "underwriting guidelines," the rules that determine whether an applicant is eligible to purchase homeowner's insurance, are not categorically scientific or directly tied to risk. *See* D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*,

*in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions 119 (Gregory D. Squires ed., 1997) [hereinafter "Insurance Redlining"]. "Underwriting guidelines are […] often based on hunches and subjective stereotypes about classes of consumers and types and geographic location of property." *Id.* at 137. "Historically, underwriters have relied on experience, market knowledge, intuition and oral history more than statistical insights when evaluating risk." Gail McGiffin, *Are Underwriters Smarter Than Predictive Models?* 3 (Ernst & Young LLP, 2013)[1]; *see also Prop. Cas. Insurers Ass'n of Am. v. Todman*, No. 13 C 8564, 2024 WL 1283581 (N.D. Ill. Mar. 26, 2024) (hereinafter, "*PCI*") ("[T]he homeowners insurance industry has previously raised risk as a shield for purportedly 'objective' factors (like property location and age) without clearly substantiating that these factors had any meaningful relationship to the cost of providing insurance.") (citing 88 Fed. Reg. 19,468, nn. 156-57); Brian J. Glenn, *The Shifting Rhetoric of Insurance Denial*, 34 Law & Soc'y Rev. 779, 779

---

[1]https://web.archive.org/web/20140122203125/http://www.ey.com/Publication/vwLUAssets/EY_-_Insurance_underwriters_vs_predictive_models/$File/EY-Insurance-underwriters-vs-predictive-models.pdf.

(2000) ("The most powerful tool used to exclude unwanted groups from the insurance pool lies in the subjective underwriting guidelines companies utilize").

Moreover, as insurance companies have increased their reliance on algorithmic decision-making tools to tailor prices more finely to match a policyholder's risk profile, there is mounting evidence that the use of such artificial intelligence ("AI") tools in the insurance industry has unjustified discriminatory impacts. *See, e.g., Huskey v. State Farm Fire & Cas. Co.*, No. 22 C 7014, 2023 WL 5848164, at \*2 (N.D. Ill. Sept. 11, 2023). "Machine-learning algorithms 'learn' from the inputted data […] Even when users do not input data about race, […] algorithms can learn to combine other inputs correlated with race to produce discriminatory effects." *Id.* "The iterative, unsupervised analysis used by AI to price insurance policies may [therefore] undermine the limited state and federal protections that exist to protect vulnerable groups and suspect classes from higher prices." Rick Swedloff, *The New Regulatory Imperative for Insurance*, 61 B.C.L. Rev. 2031, 2058 (2020).

Second, during the underwriting process, insurers allow human judgments to modify actuarial calculations. As a starting point, an

underwriting score may be calculated based on actuarial criteria. *See* Donald Light, *Transforming Underwriting: From Risk Selection to Portfolio Management* 6-7, 12, (Celent, March 2004).[2] The score is then reviewed to determine whether the application is accepted, rejected, or in need of additional review. *See id.* at 7. There is significant variation among insurers in how this process is implemented and varying levels of quality control. *See id.* Even after the calculation of underwriting scores, "half or more of the underwriting decisions may be ultimately made […] by human underwriters." *Id.* at 7; *see also* McGiffin at 7 ("Few, if any, underwriting decisions are truly binary. That's why insurers still need teams of people who know how to balance the nuances of risk quality, emerging exposures, market contexts and competitive strategies as they make critical underwriting decisions.").

While actuarial calculations may be the starting point for insurance rates, those calculations may also be modified or ignored for reasons unrelated to risk. This is because state law generally permits insurance companies to modify their rates based on business judgment and

---

[2]https://web.archive.org/web/20071012145429/http://www.edmblog .com/weblog/files/insurance_transformingunderwriting_celent_wp.pdf.

competition. Indeed, the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking—which Appellant itself cites, Appell. Br. 25-26—acknowledges that although the actuary's role is to derive an estimation of future costs resulting from the transfer of risk, "[o]ther business considerations are also a part of ratemaking." *See* Board of Directors of the Casualty Actuarial Society, Statement of Principles Regarding Property and Casualty Insurance Ratemaking 5 (May 2021)[3]; *see also* Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Reg. 21, 24-27 (2006) (discussing aspects of the ratemaking function that allow for subjective and non-actuarial judgments).

For example, despite what a company's actuaries may determine is a fair and reasonable rate for an insurance product based on expected loss costs, company executives may reject that determination for competitive reasons—for instance, in order to beat a competitor's price, to penetrate or withdraw from a specific market, or in order to respond

---

[3]https://www.casact.org/sites/default/files/2021-05/Statement-Of-Principles-Ratemaking.pdf.

to agent input or customer response. *See, e.g.*, Meryl Golden & Mike Miller, *Introduction to Price Optimization* 7, 10 (Earnix, 2014)[4] (listing certain competitive adjustments that are often made to indicated loss costs during the rate setting process).

In recent years, insurers have begun to engage in ever more sophisticated forms of "price optimization," in which they engage in "data mining […] of personal consumer information [, …] advanced statistical modeling or both to select prices that differ from indicated rates." Casualty Actuarial and Statistical Task Force of the National Association of Insurance Commissioners, Price Optimization White Paper 1 (Nov. 19, 2015)[5]; *see also* HUD Br. 28. These techniques allow insurers to "'optimize' prices to charge the greatest price without causing the consumer to switch to another insurer." *Id.* at 2.

Price optimization strategies may produce illegal disparate impacts. To assume otherwise would be to simply take insurance

---

[4]https://web.archive.org/web/20150405191544/https://www.naic.org/documents/committees_c_catf_related_price_optimization_docs_reffered_in_memo_to_castf.pdf.

[5]https://content.naic.org/sites/default/files/inline-files/committees_c_catf_related_price_optimization_white_paper.pdf.

companies at their word that all of the considerations made in setting customer rates, including those that are not directly tied to risk and that have disparate effects on protected classes under the FHA, are justified and have no less discriminatory alternatives. The scope of the problem has led at least 19 states to issue bulletins stating that price optimization constitutes unfair discrimination under state law. *See, e.g.*, District of Columbia Department of Insurance, Securities and Banking, Price Optimization Ban, Bulletin 15-IB-06-8/15 (Aug. 25, 2015) ("[C]harging different premiums to like risks or risk classes due wholly or in part to characteristics that bear no relationship to the risk of loss and estimated expenses is unfairly discriminatory").

Appellant's description of the underwriting and ratemaking process omits any mention of these various non-risk-related factors, creating the impression that disparate impact liability will force insurers to deviate from the unadulterated risk-based pricing in which they previously engaged. However, insurers regularly adjust their rates to account for a variety of human judgments and business-related factors.

B.    <u>There is No Legal Basis for Insulating the Insurance Industry from Disparate Impact Liability under the FHA.</u>

As explained above, insurance companies make pricing and underwriting decisions for non-risk-related reasons, leading to racial disparities that cannot be explained by risk of loss. *See e.g.*, Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance Markets*, in Insurance Redlining at 72-73 (concluding that the "relationship between race and the availability of insurance persists, even imperfectly controlling for the risk of loss.").

"To ward off [fair housing] liability," insurers have been arguing for "decades" that imposing disparate impact liability on their risk-based industry would result in a "parade of horribles." *PCI*, 2024 WL 1283581, at *22. But the overwhelming consensus among courts is that insurers

17

are subject to both disparate treatment[6] and disparate impact liability[7]

under the FHA. Indeed, the core claim advanced by Appellant here (*i.e.*,

that insurers cannot be held liable for their policies' disparate impacts on

protected classes) has been rejected by courts as overly "sweeping," *Nat'l*

*Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F.Supp.2d 46, 60

(D.D.C. 2002) ("*Prudential*"), and "fanciful," *DeHoyos*, 345 F.3d at 297

n.5.

---

[6]*See, e.g., Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir.
2010) (holding that the FHA applies to the provision of homeowner's
insurance); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1359-60
(6th Cir. 1995) (same); *United Farm Bureau Mut. Ins. Co., Inc. v. Metro.*
*Hum. Rel. Comm'n*, 24 F.3d 1008, 1015-16 (7th Cir. 1994) (same); *NAACP*
*v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 300-01 (7th Cir. 1992) (same);
*see also Sullivan v. Liberty Mut. Ins. Co.*, 606 F.Supp.3d 796 (N.D. Ill.
2022) (denying insurer defendant's motion to dismiss with respect to
FHA claims); *Burrell v. State Farm & Cas. Co.*, 226 F.Supp.2d 427, 441-
42 (S.D.N.Y. 2002) (applying the FHA to claim of discriminatory handling
of home insurance claims); *Wai v. Allstate Ins. Co.*, 75 F.Supp.2d 1, 5-8
(D.D.C. 1999) (applying the FHA to claims of discrimination in home
insurance).

[7]*See, e.g., DeHoyos v. Allstate Corp.*, 345 F.3d 290, 297 n.5 (5th Cir.
2003); *see also PCI*, 2024 WL 1283581, at *19-22; *Huskey*, 2023 WL
5848164, at *9; *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113
F.Supp.3d 555, 572 (D. Conn. 2015) (noting that "there is no sound reason
why insurers should be immunized from [disparate impact] claims of
discrimination").

This consensus is sound. There is simply nothing "in the FHA itself that would justify […] carving out an exception [to disparate impact liability] for a particular type of organization," such as an insurance company. *Prudential*, 208 F.Supp.2d at 60. And there is no reason to fear that federal courts will act as unsuitable "super actuar[ies]," as the insurance industry has both "ominous[ly]" and "colorful[ly]" argued. *DeHoyos*, 345 F.3d at 297 n.5. Courts are often called upon to evaluate whether a practice with a disparate impact is nevertheless justified by a business necessity, and the "attempt to distinguish the business of insurance from other businesses [in this regard] is unpersuasive." *Id.*

Appellant's own *amicus* recognizes the similarity between the insurance industry and other putative disparate impact defendants whose business involves risk assessment. *See Amicus Curiae* Br. of Chamb. of Comm. 15-16 ("[T]he lending industry, like the insurance industry, engages in 'risk-based' pricing"). Since the FHA indisputably applies to a risk-based industry like lending, "it is difficult to see risk classification as a principled ground to exclude insurers" from disparate impact analysis. *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 299 (7th Cir. 1992); *see also* Dana L. Kaersvang, *The Fair Housing Act and*

19

*Disparate Impact in Homeowners Insurance*, 104 Mich. L. Rev. 1993, 2010-11 (2006) (empirical evidence undermines the argument that risk assessment by insurers differs from risk assessment by lenders and others).

And, of course, the careful phrasing of Appellant's brief—which asks this Court to find the HUD Rule unlawful only as applied to "ratemaking and underwriting decisions of homeowner's insurers," Appell. Br. 22, concedes that there is no reason that disparate impact liability ought not apply to the numerous other practices in which insurers engage. Many routine business practices—marketing and advertising campaigns, sales techniques, agent office placements, insurance product design and benefits, and processes for settling claims and renewing policies—are no different for insurers than for other businesses subject to the FHA. Yet such business practices may have significantly different impacts on different populations, with no business justification to save them from liability. *See, e.g.*, Klein, at 47-48 (identifying several non-risk related barriers that can influence the availability and affordability of homeowners insurance, including agent

bias, prejudicial views of decision-making personnel, adverse selection, and agent commission structures).

Given these non-risk-based practices, there is no reason to distinguish underwriting and ratemaking from other insurance practices for purposes of the FHA. Thus, consistent with the weight of extensive precedent, FHA disparate impact liability undoubtedly applies to the insurance industry. This Court should reject Appellant's tired attempt to argue otherwise.

## II.   ELIMINATING PRIVATE BUSINESS PRACTICES THAT CAUSE UNJUSTIFIED RACIAL DISPARITIES DOES NOT RAISE CONSTITUTIONAL QUESTIONS OR RUN AFOUL OF *INCLUSIVE COMMUNITIES.*

The HUD Rule prohibits homeowner's insurance policies and practices that have an unjustified disparate impact on members of protected classes. Appellant argues that this possibility of liability raises constitutional difficulties because it "inject[s] pervasive consideration of race and similar characteristics" into the ratemaking and underwriting process. Appell. Br. 27.

This argument is misguided for two key reasons. First, HUD's disparate impact rule does not "inexorabl[y]" result in the systematic collection of racial or similar data, let alone "inject[] racial and similar considerations at every stage" of the insurance process. Appell. Br. 28. Second, even if insurers do decide to collect and analyze data on the protected characteristics of their applicants, this practice, on its own, raises no constitutional concern. Because the HUD Rule does not cause constitutionally problematic consideration of protected characteristics, this Court should affirm the district court's ruling.

A.     <u>Imposing Disparate Impact Liability on the Home Insurance Industry Will Not "Inject" Racial and Other Considerations "At Every Stage" of the Insurance Process.</u>

Appellant first contends that the HUD Rule would have the "foreseeable, indeed almost inexorable, result" of forcing insurers to collect, analyze, and use protected characteristic data in individual rate-setting and underwriting decisions. Appell. Br. 28-29.

The HUD Rule does no such thing. First, as the District Court rightly observed, "Nowhere does the Disparate-Impact Rule require those engaging in housing practices to collect […] data on […] protected characteristics" from their customers. Op. at 22 (citation omitted). Appellant has not shown that other entities susceptible to FHA disparate impact liability, such as landlords and local governments, uniformly collect and analyze race data unless they are required to by other laws. That is because it is the *plaintiff*, not the defendant, who bears the initial burden of proving disparate impact. Op. at 22. When civil rights plaintiffs pursue disparate impact claims, they typically collect or assemble their *own* data to prove discriminatory effect. *See, e.g., Huskey*, 2023 WL 5848164, at *2 (describing plaintiffs' survey of individuals with State Farm homeowner's insurance to make out disparate impact claim); *see*

*also United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1186 (8th Cir. 1974); *Greater New Orleans Fair Hous. Action v. St. Bernard Parish*, 641 F.Supp.2d 563, 567-68 (E.D. La. 2009) (using non-proprietary demographic and housing data to assess plaintiffs' disparate impact claims).[8]

Indeed, defendant-specific data are not necessarily "relevant for a disparate impact analysis" at all. *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F.Supp.3d 145, 170 (E.D.N.Y. 2019) (deeming expert's disparate impact report reliable where expert used publicly available data and did "not address data specific" to defendant's housing complex). To the extent that insurers wish to assess whether there may be a racially disparate impact in the operation of their desired business practices, they can use non-proprietary data and statistical modeling just like disparate impact plaintiffs often do.

---

[8]Notably, as discussed *infra*, a defendant will not be liable on the basis of a disparity alone, both because a *prima facie* case of disparate impact under the FHA requires a disparity, a policy or practice, and a causal connection, and because a disparity is not unlawful if there is a legitimate business justification. Op. at 6-7 (citing *Inclusive Communities*, 576 U.S. at 542-46).

Second, even if insurers collect data on individuals' protected characteristics, the HUD Rule will not cause insurers to "use" this data in problematic ways. The Rule does not—indeed, cannot—require insurers to consider protected characteristics in making *individualized* rate-setting and underwriting decisions. *See, e.g., United States v. Starett City Assocs.*, 840 F.2d 1096, 1103 (2d Cir. 1988) (barring use of "rigid racial quotas of indefinite duration to maintain a fixed level of integration").

As to Appellant's specious concern that "[r]eweighing certain risk factors to avoid a disparate impact on one group would inevitably increase the weight attached to other risk factors, negatively affecting those disproportionately affected by those other factors," Appell. Br. 29, this argument is vague, speculative, and made without citation to any data or authority. Moreover, this argument fundamentally misunderstands (or willfully ignores) HUD's burden-shifting framework. Under the second and third prongs of the HUD Rule, as long as an insurer can justify a challenged practice as "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests," a plaintiff can only prevail on its disparate impact claim if it provides that such interests

25

"could be served by another practice that has a *less* discriminatory effect." 24 C.F.R. § 100.500(c)(2)-(3) (emphasis added). In other words, if a proposed change to an insurance policy or practice would result in *more* discrimination against protected classes, the Rule does not mandate that change.

In short, insurers are fully capable of adhering to the HUD Rule without systematically collecting race and other similar data from their customers or using that data in individualized decision-making. This Court should reject Appellant's fearmongering that the HUD Rule will "inexorab[ly]" inject race and similar considerations into ratemaking and underwriting decisions. Appell. Br. 28.

In arguing to the contrary, Appellant relies heavily on language from *Inclusive Communities* noting that, without safeguards at the *prima facie* stage, "disparate-impact liability might cause race to be used and considered in a pervasive way and 'would almost inexorably lead' governmental or private entities to use 'numerical quotas,' and serious constitutional questions then could arise." 576 U.S. at 542 (citation omitted). But as discussed *infra*, the HUD Rule incorporates the same

26

safeguards as *Inclusive Communities* and therefore prevents race from being used in a "pervasive way."

Moreover, *Inclusive Communities* expressly recognized that "race may be considered in certain circumstances and in a proper fashion." *Id.* The decision made clear that it is entirely appropriate "to foster diversity and combat racial isolation with race-neutral tools," *id.* at 545; in fact, the *Inclusive Communities* court encouraged lower courts to craft "race-neutral" remedies where they find liability under a disparate impact theory, *id.* at 544-45. In short, *Inclusive Communities* reaffirmed what the Supreme Court has long made clear: that "mere awareness of race in attempting to solve the problems [associated with historical discrimination] does not doom that endeavor at the outset." *Id.* at 545.

B.    The HUD Rule May Cause Insurers to Take Race-Neutral Actions Aimed at Reducing Unjustified Racial Disparities, but Those Actions Raise No Constitutional Issues.

In order to comply with the HUD Rule, providers of homeowner's insurance may indeed need to change or eliminate certain underwriting and ratemaking policies—but only those policies that disproportionately impact members of protected groups and are simultaneously not justified by actuarial considerations, or for which the actuarial need could be met

27

in a less discriminatory fashion. Even in instances where such changes are necessary, though, that process would not result in an individual insured or applicant for insurance being treated differently from any other on the basis of race. Accordingly, these actions are race-neutral and consistent with *Inclusive Communities* and the antidiscrimination jurisprudence described above.

In fact, insurers already know how to implement race-neutral policy changes in response to disparate impact claims. They have eliminated underwriting criteria that do not correlate with actuarial risk, benefitting homeowners of all races who would have been screened out or charged a higher premium under the old underwriting standards.[9] They have made all types of insurance policies widely available across census

---

[9]*See, e.g.*, Conciliation Agmt. at ¶ 8(A)-(C), *HUD v. Allstate Ins. Co.*, No. 03-94-0529-8 (Feb. 1997) (attached as Attachment 1) (eliminating maximum-age-of-property and minimum-value-of-property requirements, limiting use of credit scoring, and agreeing to adopt objective property-inspection criteria); Conciliation Agmt. at ¶ 11(a)-(f), *HUD v. State Farm Fire & Cas. Co.*, Nos. 05-94-1351-8, 05-94-1352-8 (July 1996) (attached as Attachment 2) (modifying underwriting criteria to, *inter alia*, eliminate maximum-age and minimum-value requirements, limit use of credit reports, and reduce subjective criteria, and agreeing not to decline coverage solely because another insurer did so).

tracts, a facially race-neutral move that increases access for all

consumers to desirable forms of insurance.[10] And they have increased the

accessibility and availability of insurance in targeted urban areas, moves

that improve the vitality and stability of neighborhoods.[11] Each of these

---

[10]*See, e.g.*, Consent Decree at §§ II.c.3, III, *United States v. Am. Family Mut. Ins. Co.* and *NAACP v. Am. Family Mut. Ins. Co.* (E.D. Wis. July 13, 1995), available at https://www.justice.gov/crt/housing-and-civil-enforcement-cases-documents-469# (increasing access to policies by, *inter alia*, eliminating requirement that home must have a market value of 80% or more of the estimated replacement cost); Conciliation Agmt. at ¶ 11(h), *State Farm Fire & Cas. Co.* (agreeing to encourage customers to insure to full replacement cost).

[11]*See, e.g.*, Conciliation Agmt. at ¶ 13(h), *State Farm Fire & Cas. Co.* (adding sales and service centers in targeted urban neighborhoods with a substantial minority population and agreeing to make $1 million in loans available for mortgage financing in neighborhoods with substantial African American populations); Consent Decree at § III.A.3-III.A.4, *United States v. Nationwide Mut. Ins. Co. et al.*, No. C2-97-291 (S.D. Ohio Mar. 10, 1997), available at https://www.justice.gov/crt/housing-and-civil-enforcement-cases-documents-367 (agreeing to affirmative efforts to increase company's presence in predominantly minority neighborhoods); Consent Decree at § VI, *Am. Family Mut. Ins. Co.* (providing $9.5 million in community-based programs including interest rate subsidies for home mortgage and repair loans to encourage the purchase and rehabilitation of homes in predominantly African American communities). *See also* HUD Br. 33 (discussing Travelers' decision to discontinue underwriting criteria that preclude issuing insurance to landlords with Section 8 tenants).

policy changes ameliorates a disparate impact, but none results in any individual being treated differently based on a racial classification.

These changes, like others that might be required by the HUD Rule, are enacted based on a consideration of the racial impact of the policies in question. But again, the fact that an insurer assesses demographic data to evaluate the racial impact of a policy or makes race-neutral changes to avoid a racially-disparate effect does not change that policy's facial neutrality or render it a racial classification triggering constitutional scrutiny.

As Appellant notes, equal protection requires that people be treated as individuals, not "as simply components of a racial, religious, sexual or national class." Appell. Br. 34. But Appellant fails to demonstrate that the HUD Rule would require or even encourage any action tantamount to such an "individual racial classification" through which "burdens or benefits" are distributed. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). Instead, in light of the HUD Rule, insurers may examine their policies for unjustified racial disparities and make facially neutral policy changes to remedy any such disparities. No constitutional issues arise as a result.

### III. THE DISTRICT COURT CORRECTLY HELD THAT THE HUD RULE DOES NOT "INDUCE" GREATER CONSIDERATION OF RACE BEYOND WHAT THE FHA AND *INCLUSIVE COMMUNITIES* ALREADY REQUIRE.

Aside from rehashing the confused constitutional arguments it made at the district court level, NAMIC revives an additional set of arguments centered on the notion that the HUD Rule ventures far beyond what the FHA requires. According to the district court, however, NAMIC never adequately explained "how the provisions of the Disparate-Impact Rule induce that sort of 'self-examination' beyond what the FHA, as interpreted in *Inclusive Communities*, already induces." Op. at 22-23. On appeal, NAMIC again tries to create daylight between the HUD Rule and the FHA, but its arguments are equally unpersuasive.

As an initial matter, Appellant argues that the HUD Rule diverges from the FHA, as interpreted through *Inclusive Communities*, because unlike the HUD Rule, "[n]either the FHA nor *Inclusive Communities* says anything about the business of insurance in general or ratemaking and underwriting practices in particular." Appell. Br. 38. As explained *supra* in Section I.B, "[t]here is a large body of case law holding that insurers…can be held liable under the FHA, and *Inclusive Communities*

31

does not call those cases into question." *Nat'l Fair Hous. All. v. Travelers Indemn. Co.*, 261 F.Supp.3d 20, 29 (D.D.C. 2017). Despite that insurers apparently "felt no need" to assess the racial impacts of their policies before the promulgation of the HUD Rule, Appell. Br. 38, they have no sound basis to assert categorical immunity from FHA or disparate impact liability. "Insurers have [in fact] 'been subject to discriminatory effects liability since well before [HUD's] 2013 Rule.'" *PCI*, 2024 WL 1283581, at *21 (citation omitted).

Next, echoed by *amici curiae*, Appellant insists that the HUD Rule omits "safeguards" articulated in *Inclusive Communities* that would help avoid the "injection of pervasive consideration of protected characteristics." Appell. Br. 35-36, 39; *see also Amicus Curiae* Br. of Chamb. of Comm. at 7-11. These include (1) a requirement that plaintiffs prove that a challenged policy is "artificial, arbitrary, and unnecessary"; and (2) a requirement that liability cannot be imposed "based solely on a showing of a statistical disparity." Appell. Br. 35, 39.

As the district court rightly observed, "NAMIC's argument reads too much into *Inclusive Communities* and not enough into the Disparate-Impact Rule." Op. at 27. *Inclusive Communities* unequivocally held that

32

disparate impact claims are permissible under the FHA as long as they are "properly limited" by allowing defendants to "explain the valid interests served by their policies" and requiring plaintiffs to demonstrate that the "defendant's policy…caus[es] [the] disparity." *Inclusive Communities*, 576 U.S. at 540–43. The HUD burden-shifting framework incorporates these limits.

For instance, if a defendant can prove that a "challenged practice is necessary to achieve" a "substantial, legitimate, nondiscriminatory interest," 24 C.F.R. § 100.500(c)(2), the burden shifts to the plaintiff to prove that the "substantial, legitimate, nondiscriminatory" interest supporting the challenged practice could be served by another practice that has a less discriminatory effect. *Id.* at § 100.500(c)(3). If the plaintiff is unable to carry this burden, then the challenged practice is not "artificial, arbitrary, and unnecessary," and a disparate impact claim will not lie. Similarly, if a plaintiff must show that a "challenged practice caused or predictably will cause a discriminatory effect" at the *prima facie* stage, *id.* at § 100.500(c)(1), then rigorous "proof of causation is exactly what" both the HUD Rule and *Inclusive Communities* require. Op. at 25-27 (noting that "[the] 'robust causality requirement' actually

33

works in favor of NAMIC's members if sued, making NAMIC's argument both counterintuitive and ultimately unconvincing").

In other words, as the district court rightly concluded, "the Disparate-Impact Rule's legal standard can be, and is in fact, consistent with *Inclusive Communities* even if the Rule does not include the same depth of explanation as the judicial opinion." *Id.*; *cf. Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 n.4 (4th Cir. 2018) (HUD regulation is "similar to the framework the Supreme Court ultimately adopted" in *Inclusive Communities*); *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016) ("The Supreme Court implicitly adopted HUD's approach" in *Inclusive Communities*.").

At the same time, the HUD Rule does not make disparate impact liability broader than the requirements set forth in *Inclusive Communities*. Nowhere does *Inclusive Communities* mandate that a plaintiff's proposed alternative to a challenged practice be "equally effective" to the challenged practice in terms of achieving the defendant's

34

business interest,[12] or that it be "cost-efficient."[13] Appell. Br. 35. Nor does *Inclusive Communities* undercut the HUD Rule's requirement that a challenged practice be "necessary to achieve" a defendant's substantial, nondiscriminatory interest, as *amicus curiae* Chamber of Commerce of the United States contends. *Amicus Curiae* Br. of Chamb. of Comm. at 11 (citing 24 C.F.R. § 100.500(c)(2)). To the contrary, the *Inclusive Communities* court explained in no uncertain terms that "housing authorities and private developers [must] be allowed to maintain a policy

---

[12]*Inclusive Communities* only requires "'an available alternative…practice that has less disparate impact and serves the [entity's] legitimate needs.'" 576 U.S. at 534 (citation omitted).

[13]To support its argument here, Appellant cites to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659-660 (1989), but *Wards Cove* is not an FHA case, does not mention the FHA, and no subsequent decision of the Supreme Court has applied the *Wards Cove* standard to the FHA. Further, Congress expressly abrogated the element of the *Wards Cove* framework requiring Title VII plaintiffs to demonstrate that their proposed alternatives were equally effective in the 1991 Amendments to Title VII.

As the district court correctly noted, "[w]hatever effect *Wards Cove* [was once thought to have] on the FHA," it "can hardly be considered the definitive word on…disparate impact liability under the FHA after *Inclusive Communities*," Op. at 26, especially when the *Inclusive Communities* court weighed an almost identical HUD Rule and never so much as implied that the agency's burden-shifting framework was inconsistent with Supreme Court precedent.

if they can prove it is *necessary* to achieve a valid interest." 576 U.S. at 541 (emphasis added); *see also id.* at 521 (analogizing this defense to the "Title VII business *necessity* standard") (emphasis added).

In sum, the district court correctly concluded that the HUD Rule will not necessitate more self-examination than the FHA, as construed by *Inclusive Communities*, already does. Neither the FHA nor *Inclusive Communities* suggest that insurers are categorically immune from FHA or disparate impact liability. And far from being at odds, the HUD Rule and *Inclusive Communities* work together to set out a burden-shifting framework that "distinguish[es] the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests." *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Hum. Rels. Comm'n,* 508 F.3d 366, 374-5 (6th Cir. 2007).

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's decision and grant summary judgment to HUD.

Respectfully submitted,

*/s/ Brian Corman*
Brian Corman
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Ave., N.W., Suite 500
Washington, DC  20005
Tel: (202) 408-4600
bcorman@cohenmilstein.com

Thomas Silverstein
Brook Hill
**LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**
1500 K St. NW #900
Washington, DC 20005
Tel: (202) 662-8600
tsilverstein@lawyerscommittee.org
bhill@lawyerscommittee.org

Morgan Williams
**NATIONAL FAIR HOUSING ALLIANCE**
1331 Pennsylvania Ave. NW #650
Washington, DC 20004
Tel: (202) 898-1661
mwilliams@nationalfairhousing.org

Attorneys for *Amici Curiae*

Dated:     July 10, 2024

37

## **Certificate of Compliance**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 6,442 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1). I further certify that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the motion was prepared in 14-point Century Schoolbook font using Microsoft Word.

/s/ *Brian Corman*
Brian Corman
*Counsel for Amici Curiae*

## Certificate of Service

I hereby certify that on July 10, 2024, I electronically filed this brief with the Clerk of the Court using the appellate CM/ECF system, which effected service to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

/s/ *Brian Corman*
Brian Corman
*Counsel for Amici Curiae*