ORAL ARGUMENT NOT YET SCHEDULED

No. 23-5275

# In the United States Court of Appeals for the District of Columbia Circuit

—————————————

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,
PLAINTIFF-APPELLANT

*v.*

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
AND ADRIANNE TODMAN, IN HER OFFICIAL CAPACITY
AS ACTING SECRETARY OF HOUSING AND URBAN DEVELOPMENT,
DEFENDANTS-APPELLEES

—————————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (CIV. NO. 13-966)
(THE HONORABLE RICHARD J. LEON, J.)*

—————————————

**PAGE-PROOF REPLY BRIEF OF APPELLANT**

—————————————

KANNON K. SHANMUGAM
WILLIAM T. MARKS
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

I.  The disparate-impact rule is unlawful as applied to the ratemaking and underwriting decisions of homeowner's insurers because it will cause the pervasive consideration of protected characteristics ................................................................2

    A.  Ratemaking and underwriting are based on actuarial principles designed to allow insurers to identify, analyze, and group risks ........................................................3

    B.  The disparate-impact rule will cause the pervasive consideration of protected characteristics in ratemaking and underwriting ..................................................6

II. The disparate-impact rule is unlawful as applied to the ratemaking and underwriting decisions of homeowner's insurers because state law limits insurers' discretion over those decisions ........20

    A.  State insurance laws severely limit insurers' discretion to consider protected characteristics in ratemaking and underwriting ........................................................21

    B.  State insurance law breaks the causal connection between ratemaking and underwriting decisions and any disparity in the provision of homeowner's insurance ....................................23

# TABLE OF AUTHORITIES

## CASES

*Association of Private Sector Colleges & Universities* v. *Duncan*,
    681 F.3d 427 (D.C. Cir. 2012)................................................12

*Avenue 6E Investments, LLC* v. *City of Yuma*,
    818 F.3d 493 (9th Cir. 2016)................................................25

*Burrage* v. *United States*, 571 U.S. 204 (2014) ................................................16

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ................................................7, 8, 25

Page

Cases—continued:

*DeHoyos* v. *Allstate Corporation*, 345 F.3d 290 (5th Cir. 2003)......................27

*Greater New Orleans Fair Housing Action Center* v. *HUD*,
   639 F.3d 1078 (D.C. Cir. 2011)................................................................7

*Humana Inc.* v. *Forsyth*, 525 U.S. 299 (1999)....................................26

*Hunt* v. *Cromartie*, 526 U.S. 541 (1999)......................................13

*Inclusive Communities Project, Inc.* v. *Lincoln Property Company*,
   920 F.3d 890 (5th Cir. 2019)................................................................25

*Jones* v. *Travelers Casualty Insurance Company of America*,
   Civ. No. 13-02390, 2015 WL 5091908 (N.D. Cal. May 7, 2015) ....................27

*Kisor* v. *Wilkie*, 588 U.S. 558 (2019) ....................................24

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ......................8

*Mackey* v. *Nationwide Insurance Cos.*, 724 F.2d 419 (4th Cir. 1984)...........4, 8

*Massachusetts Fair Housing Center* v. *HUD*,
   496 F. Supp. 3d 600 (D. Mass. 2020)................................................15

*Mhany Management, Inc.* v. *County of Nassau*,
   819 F.3d 581 (2d Cir. 2016) ................................................................25

*Mountain States Legal Foundation* v. *Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996)................................................................13

*NAACP* v. *American Family Mutual Insurance Co.*,
   978 F.2d 287 (7th Cir. 1992)................................................................4, 7, 22

*National Fair Housing Alliance* v. *Travelers Indemnity Co.*,
   261 F. Supp. 3d 20 (D.D.C. 2017) ....................................................27

*Nationwide Mutual Insurance Co.* v. *Cisneros*,
   52 F.3d 1351 (6th Cir. 1995)................................................................7, 8

ii

Page

Cases—continued:

*Ojo* v. *Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010) ............................7, 8

*Property Casualty Insurers Association of America* v. *Donovan*,
66 F. Supp. 3d 1018 (N.D. Ill. 2014)....................................................14

*Property Casualty Insurers Association of America*
v. *Todman*, Civ. No. 13-8564,
2024 WL 1283581 (N.D. Ill. Mar. 26, 2024).........................................15, 21, 27

*Reyes* v. *Waples Mobile Home Park Limited Partnership*,
903 F.3d 415 (4th Cir. 2018)....................................................................25

*Ricci* v. *DeStefano*, 557 U.S. 557 (2009) ............................................................17

*Students for Fair Admissions, Inc.* v. *President & Fellows*
*of Harvard College*, 600 U.S. 181 (2023) ...........................................17

*Texas Department of Housing & Community Affairs*
v. *Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015)............................................ 1, 3, 6, 9, 10-14, 16-18, 20, 22-27

*Viens* v. *America Empire Surplus Lines Insurance Co.*,
113 F. Supp. 3d 555 (D. Conn. 2015).................................................27

*Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642 (1989)....................................19

**STATUTES AND REGULATION**

Fair Housing Act, 42 U.S.C. §§ 3601-3619...................... 1, 6-9, 14, 17, 21-22, 26

McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015.......................................26, 27

24 C.F.R. § 100.500(c)(2) ....................................................................................18

24 C.F.R. § 100.500(c)(3) ....................................................................................11

# MISCELLANEOUS

Page

85 Fed. Reg. 60,288 (Sept. 24, 2020) .......................................................15

88 Fed. Reg. 19,450 (Mar. 31, 2023)....................................................18-19, 21, 23

# GLOSSARY OF ABBREVIATIONS

**FHA**:    Fair Housing Act

**HUD**:    United States Department of Housing and Urban Development

HUD's disparate-impact rule transgresses the safeguards on disparate-impact liability under the Fair Housing Act imposed by the Supreme Court in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015). The rule injects the pervasive consideration of protected characteristics into insurers' risk-based ratemaking and underwriting processes. It also fails to require a showing of "robust causality," because it would allow disparate-impact claims to proceed against insurers even though the laws of every State substantially limit insurer discretion in setting rates and considering protected characteristics.

The government fails to come to grips with those problems, merely regurgitating the flawed reasoning on which it relied in the rulemaking process. With respect to the pervasive consideration of protected characteristics: the government is incorrect that any problem results from the FHA itself rather than the disparate-impact rule. The rule goes well beyond the text of the FHA in its creation of a particular burden-shifting framework, its rejection of several critical proposed safeguards, and its express application of disparate-impact liability to homeowner's insurers. Nor is it correct to say that the disparate-impact rule cannot cause the pervasive consideration of protected characteristics because it does not explicitly mandate such consideration. *Inclusive Communities* is clear that disparate-impact liability must be limited in order

(1)

to ensure that it does not *cause* the pervasive consideration of protected characteristics.

With respect to the effect of state insurance regulation: the government does not dispute that the laws of every State heavily regulate the business of insurance and substantially curtail insurer discretion. And the government fails to identify a single state insurance law that clearly permits disparate-impact liability against homeowner's insurers, much less imposes such liability using HUD's standards. The government thus fails to rebut the Association's showing that state law breaks the causal chain between the risk-based rate-making and underwriting practices of homeowner's insurers and any disparity in the provision of homeowner's insurance. The district court's decision upholding the disparate-impact rule was erroneous, and its judgment should be reversed.

## I.   THE DISPARATE-IMPACT RULE IS UNLAWFUL AS APPLIED TO THE RATEMAKING AND UNDERWRITING DECISIONS OF HOMEOWNER'S INSURERS BECAUSE IT WILL CAUSE THE PERVASIVE CONSIDERATION OF PROTECTED CHARACTERISTICS

The disparate-impact rule fundamentally alters the structure and practice of insurance ratemaking and underwriting by injecting the pervasive consideration of protected characteristics into a process that otherwise depends on risk-based analysis. The only way a homeowner's insurer could be sure that its risk-based decisions are not causing a disparate impact is to collect and

analyze data concerning the protected characteristics of its insureds and applicants—characteristics that, it is undisputed, currently play no role in insurers' ratemaking and underwriting processes. *See* Br. of Appellant 27-29. By causing insurers to focus on protected characteristics, the disparate-impact rule raises serious constitutional questions and directly contravenes *Inclusive Communities*.

In response, the government argues (Br. 26-38) that the actuarial nature of insurance is not significant; that any collection and analysis of data on protected characteristics is not legally traceable to the disparate-impact rule; and that such collection and analysis does not constitute the pervasive consideration of protected characteristics. Those arguments lack merit.

A.    **Ratemaking And Underwriting Are Based On Actuarial Principles Designed To Allow Insurers To Identify, Analyze, and Group Risks**

As the Association has explained (Br. 22-27), the business of insurance is based on the economically rational allocation of risk. When setting rates and making underwriting decisions, homeowner's insurers collect and analyze extensive data about the risk of loss to property in order to group insureds in a manner that pools similar risks. Insurers then set rates that reflect each

group's risk profile. Insurers do not consider protected characteristics during those processes.

The government concedes that "practices such as ratemaking" are "largely actuarially based," and it "acknowledge[s] the importance of risk allocation to insurers' decision-making." Br. 28, 29 (internal quotation marks and citation omitted). But the government argues that other housing-related businesses, such as mortgage lenders and landlords, also "engage in risk-based decision-making." Br. 27.

That is comparing apples to oranges. Put simply, the "insurance industry has traditionally classified risks" in a way that other housing-related businesses do not. *Mackey* v. *Nationwide Insurance Cos.*, 724 F.2d 419, 423 (4th Cir. 1984). Lenders and landlords may assess risk in terms of analyzing whether a particular applicant has the wherewithal to pay for a loan or lease. And that analysis may be important for avoiding foreclosures and evictions. But that analysis does not inhere in the very nature of the product being offered. By contrast, the entire business of insurance is based on the use of actuarial principles to classify, group, and rate risks. *See* Br. of Appellant 23-27. Indeed, only through the collection of data and accurate assessment of risks can insurance even be offered. *See id.* at 24-25; *NAACP* v. *American Family Mutual Insurance Co.*, 978 F.2d 287, 290-291, 298 (7th Cir. 1992). For insurers, therefore, risk-based decisionmaking is not merely a part of what they do;

4

it is their entire business. Injecting considerations of protected characteristics into the process thus interferes with the very core of the insurance business.

The government also argues that some insurance practices may contain "an element of non-actuarially-based subjective judgment or discretion." Br. 28 (citation omitted). In particular, the government notes that non-actuarial factors such as "discounts for bundling homeowners and automobile insurance and price optimization practices" can affect the ultimate price an insured pays. *Id.* Rates naturally must provide for the cost of doing business, including the costs associated with the transfer of risk, and must not be excessive, inadequate, or unfairly discriminatory. *See* Br. of Appellant 25-26. The risk-based rates insurers file with their state regulators take into account those factors, including associated discounts such as bundling (which increases the predictability of risk-based loss while reducing administrative costs). But that does not alter the incompatibility of disparate-impact liability with the very core of homeowner's insurance, which involves the use of actuarially significant risk factors to assess the risk of loss. *That* is the basis of the Association's challenge; the Association is not challenging the rule as applied to every decision that could conceivably be made by an insurance company.

**B.    The Disparate-Impact Rule Will Cause The Pervasive Consideration Of Protected Characteristics In Ratemaking And Underwriting**

By threatening to impose liability for risk-based processes that are deliberately neutral toward protected characteristics, the disparate-impact rule would inject the pervasive consideration of protected characteristics into the business of insurance. *See* Br. of Appellant 27-36. The government does not dispute that risk factors are unevenly distributed among demographic groups and that, as a result, risk-based ratemaking and underwriting will inevitably produce some disparate effects. *See id.* at 27-28. And the only sure way for an insurer to prevent impermissible effects under the disparate-impact rule is to collect, analyze, and revise their neutral policies in light of data concerning the protected characteristics of insureds and applicants. *See id.* at 28-29. Application of the disparate-impact rule to risk-based ratemaking and underwriting practices would thus necessarily inject the pervasive consideration of protected characteristics into an otherwise neutral process. That runs afoul of *Inclusive Communities*, and the government's contrary arguments are unpersuasive.

1.    The government argues that the disparate-impact rule cannot cause the pervasive consideration of protected characteristics because the rule "imposed no new liability beyond what was already established under the FHA itself." Br. 27. The government adds that "homeowners insurers would have

6

been subject to the same or a similar burden-shifting framework depending on the Circuit in which they were sued." *Id.*

The government is incorrect on both scores. Before promulgation of the rule, only the Ninth Circuit had squarely held that the FHA permitted disparate-impact claims against homeowner's insurers. *See Ojo* v. *Farmers Group, Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010). By contrast, the Sixth Circuit explained that insurers were "not under any present legal obligation to base their insurance underwriting practices on factors other than neutral risk considerations," because whether and how disparate-impact analysis would apply to insurers was "not clear." *Nationwide Mutual Insurance Co.* v. *Cisneros*, 52 F.3d 1351, 1363 (6th Cir. 1995). Similarly, while the Seventh Circuit held (applying deference under *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)) that claims for *intentional* discrimination under the FHA could be brought against insurers, it specifically reserved judgment with respect to disparate-impact claims. *See American Family Mutual Insurance*, 978 F.2d at 290-291. As for this Court, it had never even held that disparate-impact claims were viable under the FHA. *See Greater New Orleans Fair Housing Action Center* v. *HUD*, 639 F.3d 1078, 1085 (D.C. Cir. 2011).

That uncertainty is unsurprising, because the text of the FHA does not plainly cover the provision of homeowner's insurance. Although several courts

of appeals have held that the FHA can reasonably be interpreted to apply to homeowner's insurance, they have all done so in the context of deferring under *Chevron* to a 1989 HUD regulation.  *See Ojo*, 600 F.3d at 1208; *Cisneros*, 52 F.3d at 1360; *American Family Mutual Insurance*, 978 F.2d at 300-301.  Of course, those decisions are no longer persuasive in light of the Supreme Court's recent decision in *Loper Bright Enterprises* v. *Raimondo*, 144 S. Ct. 2244 (2024), and the only court of appeals to have analyzed the issue without applying *Chevron* deference concluded that the FHA does not apply to homeowner's insurance.  *See Mackey*, 724 F.2d at 423.  In any event, the implication of the decisions that applied *Chevron* deference to HUD's 1989 regulation is that application of the FHA to homeowner's insurance is a result of administrative regulation, not congressional decision.  The disparate-impact rule thus imposes unique harm to the insurance industry by purporting to resolve the question of whether homeowner's insurers are subject to disparate-impact liability under the FHA.

In addition, no court of appeals has ever decided whether the burden-shifting approach adopted by HUD can be lawfully applied to the business of insurance.  Indeed, the government admits (Br. 5 n.3) that the courts of appeals had not previously adopted a uniform approach to disparate-impact liability under the FHA.  The rule articulates a specific burden-shifting

8

framework that exceeds the bounds established by *Inclusive Communities*, and the rule is subject to challenge on that basis. *See* Br. of Appellant 35.

The government responds that, because "[i]n the FHA[] Congress expressly provided for statutory exemptions from discriminatory-effects liability" for several industries other than insurance, the FHA must implicitly extend disparate-impact liability to the ratemaking and underwriting practices of homeowner's insurers. Br. 33-34. That argument is flawed for three principal reasons. *First*, as explained above, the text of the FHA does not obviously apply to the business of homeowner's insurance. The absence of an express statutory exemption for insurers from liability is therefore unremarkable. *Second*, the Supreme Court held in *Inclusive Communities* that *all* disparate-impact liability under the FHA must be limited in several crucial respects in order to avoid serious constitutional concerns. *See* 576 U.S. at 540-544. *Third*, the Association is challenging the disparate-impact rule, not the statute. The question here is thus not whether the FHA applies to the provision of homeowner's insurance (although that question itself is unclear, *see* p. 6-8, *supra*), but whether the application of the rule to risk-based ratemaking and underwriting is permissible.

2.     The government also argues that vacating the disparate-impact rule as applied to ratemaking and underwriting would be "overbroad," because doing so would "foreclose claims where the plaintiff could prove the existence

9

of a less discriminatory alternative, such as an alternative risk-based practice."
Br. 28. But the only way an insurer could identify and adopt a "less discrimi-
natory alternative" is to collect and analyze data concerning protected charac-
teristics and then adjust its actuarial policies based on that data. And vacatur
of the disparate-impact rule as applied to actuarial ratemaking and underwrit-
ing would have no effect on a plaintiff's ability to bring claims based on genu-
inely arbitrary practices not based on an assessment of risk.

The government additionally argues that the rule is appropriate even as
applied to actuarial decisionmaking because "the actuarial relevance of a given
factor can vary by context and over time." Br. 29 (citations omitted). That
argument only highlights the flaw in the government's position. According to
the government, not only would the disparate-impact rule necessitate that in-
surers collect, analyze, and potentially revise their actuarially driven policies
based on racial and similar data, but it would also necessitate that they do so
*continuously* in order to ensure that any disparities remain justified over time.
That "second-guess[ing]" of an insurer's "reasonable approach[]" based on ac-
tuarial science is precisely what the Supreme Court warned against in *Inclu-*
*sive Communities*. *See* 576 U.S. at 541.

The government further argues that the disparate-impact rule's burden-
shifting framework does not cause the pervasive consideration of protected
characteristics because insurers have "the opportunity to show at step two

10

that the practice was justified because it was actuarially sound and purely risk-based." Br. 30. But nothing in the rule provides that practices are automatically "justified" simply by virtue of a decision being actuarially sound and risk-based. Indeed, as discussed above, the government is expressing concern about *foreclosing* claims against actuarial practices where "the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice," at the third step of the burden-shifting framework. Br. 28; *see* 24 C.F.R. § 100.500(c)(3). Under that step, liability will attach even if the alternative actuarial practice identified would not serve the relevant interest as effectively or efficiently. *See* Br. of Appellant 35.

The disparate-impact rule could thus force homeowner's insurers to modify even the most predictive factors in their actuarial models if some alternative, but less predictive, factor created less of a disparate impact. As applied to risk-based ratemaking and ratemaking practices, therefore, the rule operates to "displace valid . . . private priorities, rather than solely removing artificial, arbitrary, and unnecessary barriers." *Inclusive Communities*, 576 U.S. at 544 (internal quotation marks, brackets, and ellipsis omitted). To avoid liability under the rule, insurers will thus have no choice but to collect and analyze data on protected characteristics in order to determine whether their actuarially sound, risk-based practices do not create greater disparate impacts than less efficient, costlier alternatives.

11

3.    The government next contends that the disparate-impact rule does not violate *Inclusive Communities* because the rule does not explicitly mandate that insurers "collect or use data regarding protected characteristics." Br. 31 (internal quotation marks and citations omitted). That contention rests on a misreading of *Inclusive Communities*. In cautioning that disparate-impact liability must incorporate "adequate safeguards," the Supreme Court was not primarily concerned with formal requirements to consider protected characteristics, but rather with the imposition of liability that "might *cause* race" and other protected characteristics to "be used and considered in a pervasive way." 576 U.S. at 542 (emphasis added).

Nor can insurers' inevitable consideration of protected characteristics be dismissed as "[v]oluntary self-analysis." Br. 37. A party's attempt to comply with the law is not voluntary merely because the party has the option to roll the dice and hope for the best. *See Association of Private Sector Colleges & Universities* v. *Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012). And although the disparate-impact rule might not lead insurers to implement "racial quotas," Br. 38 (citation omitted), it does inject the pervasive consideration of protected characteristics into an otherwise neutral process.

The government attempts to cast doubt (Br. 31-32) on the causal connection between the disparate-impact rule and insurers' inevitable use of protected characteristics. In particular, the government argues that the nearly

dozen uncontested declarations from insurer executives should not be credited because they "speculate about data collection and use that are not required by the [rule]." *Id.* at 31. Of course, the mere fact that a declaration attests to potential future harm does not alone make it speculative. *See*, *e.g.*, *Mountain States Legal Foundation* v. *Glickman*, 92 F.3d 1228, 1234-1235 (D.C. Cir. 1996). And the government never explains why it is speculative for executives to attest that their businesses will do what is necessary to avoid violating legal rules and incurring liability. That is not speculation; it is simple common sense.

The government suggests in passing that insurers may have "other ways" of determining whether their practices create a disparate impact, such as by relying on "publicly available datasets or studies related to their practices." Br. 32 n.9 (citation omitted). But the government has not identified a single source that would allow insurers to assess the disparate impacts of their risk-based practices. Even if such datasets or studies exist, moreover, they would not obviate the need for insurers to collect their own specific and current data, particularly in light of the government's own insistence that "the actuarial relevance of a given factor can vary by context and over time." Br. 29 (internal quotation marks and citation omitted). In any event, even reliance on general datasets to ensure certain racial outcomes would still be "motivated by a racial purpose or object," *Hunt* v. *Cromartie*, 526 U.S. 541, 546 (1999)

(internal quotation marks omitted), and thus raise "serious constitutional questions," *Inclusive Communities*, 576 U.S. at 542.

The government additionally argues that the Court should disregard the Association's uncontested declarations because none "indicates that any insurers had started collecting and using data regarding protected traits when they were filed in 2016, three years after issuance of the 2013 Rule." Br. 32. But that argument entirely ignores the litigation history surrounding the rule. In 2014, a district judge in parallel litigation in the Northern District of Illinois remanded the disparate-impact rule to HUD on the ground that HUD had failed to provide sufficient justification for application of the rule to homeowner's insurers. *See Property Casualty Insurers Association of America* v. *Donovan*, 66 F. Supp. 3d 1018, 1049 (N.D. Ill. 2014). The district court here then vacated the rule on the ground that disparate-impact claims are not cognizable under the FHA. The following year, the Supreme Court decided *Inclusive Communities*. The parties in both actions amended their complaints to account for the Supreme Court's decision. *See* D. Ct. Dkt. 57; Dkt. 131, *Property Casualty Insurers Association*, Civ. No. 13-8564 (N.D. Ill.).

After the 2016 presidential election, proceedings in the cases were stayed for years while the Trump Administration reconsidered the disparate-impact rule and ultimately replaced it in 2020 with a rule that incorporated many of the safeguards the insurance industry requested. *See* D. Ct. Dkt. 72-

119; *see generally* 85 Fed. Reg. 60,288 (Sept. 24, 2020). That rule was then enjoined before going into effect, *see Massachusetts Fair Housing Center* v. *HUD*, 496 F. Supp. 3d 600, 611-612 (D. Mass. 2020), and after the 2020 election, the litigation was again stayed as the Biden Administration moved to reinstate the original disparate-impact rule. *See* D. Ct. Dkt. 120-124. The district court here did not issue its decision on the Association's claims until September 2023, and the district court in the parallel action did not issue its decision until March 2024. *See* D. Ct. Dkt. 155; *Property Casualty Insurers Association of America*, Civ. No. 13-8564, 2024 WL 1283581 (Mar. 26, 2024). Both cases are currently pending on appeal. *See Property Casualty Insurers Association of America* v. *Todman*, No. 24-1947 (7th Cir.).

Over the course of this litigation, the enforceability and continued existence of the disparate-impact rule has been highly uncertain. And notably, the government has never attempted to enforce the rule against a homeowner's insurer. Accordingly, although the rule may have been technically in place since 2013, the absence of any negative effects says nothing about the effects the rule will produce once the legal challenges are resolved. The handful of district-court decisions applying disparate-impact analysis to homeowner's insurance in private litigation (Br. of Appellees 33) do not change the analysis; it is unsurprising that insurers have not transformed the fundamental

structure of their business in response to nonprecedential decisions during this litigation.

4.     The government falls back on the argument that "awareness of protected traits and the examination of the impact of race-neutral policies is distinguishable from making decisions based upon consideration of such traits." Br. 35.  That argument lacks merit.  As a matter of plain English, if an insurer's "awareness" and "examination" of data about protected characteristics leads it to modify its risk-based ratemaking and underwriting processes in order to avoid disparate-impact liability, the insurer has made a decision "based upon consideration" of protected characteristics.  *See Burrage* v. *United States*, 571 U.S. 204, 213 (2014).  The crucial distinction that *Inclusive Communities* drew was not between "awareness" or "examination" of protected characteristics, on the one hand, and "consideration" of protected characteristics, on the other; it was between "pervasive" consideration of those characteristics and more limited consideration.  576 U.S. at 542.  For the reasons already explained, the disparate-impact rule as applied to risk-based ratemaking and underwriting practices would cause pervasive, not episodic or insubstantial, consideration of protected characteristics.  *See* Br. of Appellant 27-29.

In defense of its flawed distinction, the government contends that "the Supreme Court in *Inclusive Communities* rejected" the argument that it

16

"should interpret the statute differently to avoid" the constitutional question "whether allowing disparate-impact claims would violate equal-protection principles." Br. 36. That is exactly wrong. The Supreme Court made clear that disparate-impact liability under the FHA was "limited in key respects that avoid the serious constitutional questions" that would arise if the statute caused the pervasive consideration of protected characteristics. *Inclusive Communities*, 576 U.S. at 540. And the Supreme Court expressly directed lower courts to "avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." *Id.* at 543. The Court rejected only the argument that constitutional avoidance required dispensing with disparate-impact liability *altogether*.

In a footnote, the government criticizes the Association's reliance on *Students for Fair Admissions, Inc.* v. *President & Fellows of Harvard College*, 600 U.S. 181 (2023), and similar cases, on the ground that "those cases involved disparate treatment." Br. 37 n.10. The government ignores that the implementation of disparate-impact liability can lead to disparate treatment. *See Ricci* v. *DeStefano*, 557 U.S. 557, 579-580 (2009). The problem with the disparate-impact rule is that it lacks the safeguards necessary to reconcile the availability of disparate-impact liability under the FHA with the constitutional and statutory prohibitions on disparate treatment. *See* Br. of Appellant 31-32.

17

5.     Finally, the government insists that its rejection of several proce-
dural safeguards requested by commenters was "fully consistent with" *Inclu-
sive Communities*.  Br. 45.  That argument is also unpersuasive.

As the Association has explained (Br. 35), HUD rejected proposals to
require plaintiffs adequately to plead, and then to demonstrate at the prima
facie stage, that a challenged policy is "artificial, arbitrary, and unnecessary."
D. Ct. Dkt. 153-1, at 15-16.  The government argues (Br. 46-47) that the rule
serves that requirement by having the *defendant* prove, at the second step of
the burden-shifting framework, that the challenged practice is "necessary to
achieve one or more substantial, legitimate, nondiscriminatory interests."  24
C.F.R. § 100.500(c)(2).  But that argument is belied by the Supreme Court's
admonition that, "[w]ithout adequate safeguards *at the prima facie stage*"—
that is, where the *plaintiff* bears the burden—"disparate-impact liability
might cause race to be used and considered in a pervasive way."  *Inclusive
Communities*, 576 U.S. at 542-543 (emphasis added).

HUD also rejected a proposed requirement for plaintiffs to bear the ul-
timate burden of establishing that their proposed alternative policies were
"equally effective" and cost-efficient.  88 Fed. Reg. 19,490 (Mar. 31, 2023).  The
government argues that such a requirement "did not appear in *Inclusive Com-
munities*." Br. 47 (citation omitted).  But the government does not dispute that
the Supreme Court has long understood that requirement to be a crucial part

18

of disparate-impact analysis. *See Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 661 (1989); Chamber Br. 12-14; ABA Br. 6-12. Nor is the problem solved by the government's statement that "an unreasonable alternative practice that creates an undue burden on [a] defendant would not satisfy [a] plaintiff's three-step burden." Br. 47 (citation omitted). But an "undue burden" standard is an entirely different legal test—one that, as HUD acknowledged during the rulemaking process, would still require defendants to assume "increased cost" to avoid disparate impacts, despite having adopted neutral policies. 88 Fed. Reg. 19,491.

More fundamentally, the government fails to come to grips with the fact that the absence of the proposed safeguards is part of what will cause the pervasive consideration of protected characteristics in risk-based ratemaking and underwriting processes. *See* Br. of Appellant 35. The inclusion of those safeguards would have ensured that insurers would face costly disparate-impact litigation only in cases of genuinely unjustifiable and arbitrary practices unconnected with insurers' use of actuarial science. If disparate-impact liability were so limited, the risk of the rule injecting race and other protected characteristics into actuarial analysis would be far lower.

In sum, the disparate-impact rule would fundamentally alter the structure and practice of risk-based ratemaking and underwriting by injecting into those intentionally neutral processes the pervasive consideration of protected

characteristics.  The rule thus raises serious constitutional questions and con-travenes the Supreme Court's instructions in *Inclusive Communities*.

## II.  THE DISPARATE-IMPACT RULE IS UNLAWFUL AS APPLIED TO THE RATEMAKING AND UNDERWRITING DECISIONS OF HOMEOWNER'S INSURERS BECAUSE STATE LAW LIMITS INSURERS' DISCRETION OVER THOSE DECISIONS

Application of the disparate-impact rule to the risk-based ratemaking and underwriting practices of insurers also violates the "robust causality" re-quirement announced in *Inclusive Communities*.  *See* Br. of Appellant 40-52. The insurance laws of every State severely circumscribe the ability of insurers to consider protected characteristics when making rating and underwriting decisions.  As a result, any disparate-impact claim based on actuarial under-writing and rating practices necessarily fails.  By authorizing disparate-impact lawsuits based on those practices, the disparate-impact rule is contrary to law.

The government "does not dispute that state laws regulate insurance and may limit homeowners insurers' discretion in certain respects."  Br. 39. But the government insists that the disparate-impact rule can be validly ap-plied to risk-based underwriting and ratemaking processes, because existing state law is insufficient to break the causal relationship between insurer dis-cretion and any disparate impacts.  *See id.*  The government is again incorrect.

A. **State Insurance Laws Severely Limit Insurers' Discretion To Consider Protected Characteristics In Ratemaking And Underwriting**

As the Association has explained (Br. 41-45), the laws of every State substantially limit the discretion of insurers to consider protected characteristics in the provision of homeowner's insurance. The government responds that the Association "fails to account" for the fact that "some states specifically provide for discriminatory effects liability against insurers under state laws." Br. 39 (quoting 88 Fed. Reg. 19,467). But the government does not identify any binding authority from any State that actually provides for such liability. Instead, HUD identified only three trial-court decisions that contain little to no analysis of the question whether disparate-impact liability interferes with the actuarial processes of homeowner's insurers. *See* 88 Fed. Reg. 19,467 n.153.

The Northern District of Illinois's decision in *Property Casualty Insurers Association*, *supra*, does not move the needle either. There, the court merely noted the filing of an amicus brief by several state attorneys general indicating that, while their States "allow or permit risk-based decision-making under their insurance laws," they "are willing to coordinate these laws with federal-court enforcement of the FHA and accept the policy results." 2024 WL 1283581, at *16. That says nothing about specific state laws permitting disparate-impact claims.

21

Nor does the brief filed by the amici States fill the gap. The brief notes that several States permit disparate-impact claims under general anti-discrimination laws not specific to the business of insurance. Br. 21-25. But the brief identifies no precedent applying those laws to homeowner's insurers. *See id.* at 23 nn.3-4. Nor does it cite any authority holding that States' insurance-discrimination laws permit disparate-impact liability. Amici are thus left to argue that many insurance-discrimination laws are "best read to permit disparate-impact claims," even though they do not expressly provide for it. *Id.* at 25 (emphasis omitted). But contrary to amici's assertion (*id.* at 25-26), the state statutes they cite do not refer to the *consequences* of an insurer's actions to an insured or applicant, as does the phrase "otherwise make unavailable" in the FHA, *see Inclusive Communities*, 576 U.S. at 533; instead, they merely refer to conduct by the insurer. And because "insurers seek to differentiate risk classes with many variables" and "efforts to differentiate more fully among risks may produce classifications that could be generated by discrimination," *American Family Mutual Insurance*, 978 F.2d at 290, courts should be particularly cautious about inferring disparate-impact liability in state insurance codes absent a clear indication that such liability was intended.

Contrary to the government's contention, the Association did not "overlook[] that there may be multiple ways of complying with a state law requirement." Br. 40. The Association acknowledged that "state insurance law does

not directly require homeowner's insurers to set rates in any particular way." Br. 51. But as the Association explained, *Inclusive Communities* does not require "compulsion of a precise result before a law would break the causal chain between the disparity and the challenged practice." *Id.* As both the language and logic of *Inclusive Communities* make clear, even a law that "substantially limits [a defendant's] discretion" is sufficient to sever the required causal connection. 576 U.S. at 543. In light of pervasive state regulation of ratemaking practices, it is thus immaterial that insurers may retain a limited zone of discretion regarding how best to implement and weigh particular actuarial factors. And as already discussed, *see* p. 19, a decision in favor of the Association would not necessarily preclude disparate-impact claims where insurers "override actuarial calculations." Br. of Appellees 40 (citation omitted).

## B. State Insurance Law Breaks The Causal Connection Between Ratemaking and Underwriting Decisions And Any Disparity In The Provision Of Homeowner's Insurance

In promulgating the disparate-impact rule, the government steadfastly maintained that the Supreme Court in *Inclusive Communities* "did not announce a heightened causality requirement for disparate impact liability." 88 Fed. Reg. 19,461. The government wisely does not reprise that argument before this Court. But the government now treats the "robust causality" requirement as effectively meaningless. That effort fares no better.

The government first argues that the disparate-impact rule "already contain[s]" a robust causality requirement in that "the plaintiff must establish at the first step of the burden-shifting framework that the defendant's practice or policy caused the discriminatory effect." Br. 42. Nothing on the face of the rule's standard is "robust." The plain text requires only ordinary causation, and the government cannot interpret its way out of that problem. *See Kisor* v. *Wilkie*, 588 U.S. 558, 574-575 (2019).

The government next argues that the disparate-impact rule is consistent with the robust causality requirement because "three courts of appeals" have since "applied a burden-shifting approach consistent with" the rule, or suggested that the Supreme Court "implicitly adopted or endorsed the rule" in *Inclusive Communities*. Br. 42. As an initial matter, it is a reach to say that the Supreme Court "adopted or endorsed" the disparate-impact rule. The Court cited the rule twice in explaining its reasoning: once in explaining that a "step of the analysis" is "analogous to the business necessity standard under Title VII," 576 U.S. at 541, and again in explaining that "disparate-impact liability 'does not mandate that affordable housing be located in neighborhoods with any particular characteristic,'" *id*. at 542 (quoting 78 Fed. Reg. 11,476). That is hardly a wholesale endorsement of every aspect of the rule.

In addition, none of the appellate decisions cited by the government approved of the rule's causation requirement, much less applied the rule to the

24

risk-based ratemaking and underwriting processes of homeowner's insurers. In *Mhany Management, Inc.* v. *County of Nassau*, 819 F.3d 581 (2016), the Second Circuit held only that, under the rule, the plaintiff bears the burden of establishing the existence of a less discriminatory alternative to the defendant's challenged practice (and applied *Chevron* deference in doing so). *Id.* at 618-619.  In *Avenue 6E Investments, LLC* v. *City of Yuma*, 818 F.3d 493 (2016), the Ninth Circuit cited the rule only in passing when explaining that disparate-impact liability does not impose a duty on municipalities to "approve all zoning applications in a particular price range." *Id.* at 512-513.  And in *Reyes* v. *Waples Mobile Home Park Limited Partnership*, 903 F.3d 415 (2018), the Fourth Circuit rejected a causation argument that would effectively have required a showing of "*intent* to disparately impact a protected class," "thereby collapsing the disparate-impact analysis into the disparate-treatment analysis." *Id.* at 430.  In rejecting that approach, the Fourth Circuit emphasized that *Inclusive Communities*' "robust causality" requirement was controlling "[t]o the extent" it conflicts with the rule. *Id.* at 432 n.10; *see id.* at 424 n.4.

The government has no choice but to acknowledge (Br. 42-43) the Fifth Circuit's decision holding that the rule does not comport with the "robust causality" standard.  *See Inclusive Communities Project, Inc.* v. *Lincoln Property Co.*, 920 F.3d 890, 902-903 (2019).  The government attacks that decision

25

by arguing that the Supreme Court "affirmed the Fifth Circuit's earlier judgment in that case applying the 2013 Rule's burden-shifting framework."  Br. 43.  But as just explained, the Supreme Court did not endorse the rule's causation standard, and that standard does not require robust causality. *See* p. 24, *supra*.

The government also does not dispute that three courts of appeals have "concluded that an FHA disparate impact claim was precluded by the McCarran-Ferguson Act."  Br. 43.  Instead, the government demurs by arguing that the McCarran-Ferguson Act is "not at issue here."  Br. 43-44.  Yes and no.  Yes, the Association is not challenging the rule under the McCarran-Ferguson Act.  But no, that does not mean decisions applying that statute are irrelevant to the question of whether state law severs the robust causal connection required in *Inclusive Communities*.  The McCarran-Ferguson Act reverse-preempts federal law where application of federal law to an insurer would "directly conflict with state regulation," "frustrate any declared state policy," or "interfere with a State's administrative regime." *Humana Inc.* v. *Forsyth*, 525 U.S. 299, 310 (1999).  Under *Inclusive Communities*, a disparate-impact claim will fail if state law "substantially limits" the defendant's discretion.  576 U.S. at 543.  If the application of disparate-impact liability *conflicts* with state insurance law (for purposes of the McCarran-Ferguson Act), then the same

state insurance law assuredly limits an insurer's discretion (for purposes of *Inclusive Communities*).

To be sure, in *DeHoyos* v. *Allstate Corporation*, 345 F.3d 290 (2003), the Fifth Circuit "[did] not agree" that "disparate-impact claims are particularly likely to impair state law" for purposes of the McCarran-Ferguson Act. *Id.* at 299 n.7; *see* Br. of Appellees 44. But the court did so only in a footnote and did not explain why it reached that conclusion. The decision thus carries little weight. The same is true of the district-court decisions cited in *Property Casualty Insurers Association*, 2024 WL 1283581, at *13: none of the cases grapples with the inconsistency of disparate-impact liability with state laws. *See National Fair Housing Alliance* v. *Travelers Indemnity Co.*, 261 F. Supp. 3d 20, 34 n.4 (D.D.C. 2017); *Viens* v. *America Empire Surplus Lines Insurance Co.*, 113 F. Supp. 3d 555, 572-573 (D. Conn. 2015); *Jones* v. *Travelers Casualty Insurance Co. of America*, Civ. No. 13-02390, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015).

The government thus has no persuasive response to the fact that state insurance law substantially limits insurer discretion in risk-based underwriting and ratemaking, thereby breaking any causal connection between an insurer's actuarial practices and a disparity in the provision of insurance. HUD's disparate-impact rule cannot properly be applied to those practices, and the district court erred by holding otherwise.

\*      \*      \*      \*      \*

The judgment of the district court should be reversed.

Respectfully submitted,

/s/ KANNON K. SHANMUGAM
KANNON K. SHANMUGAM
WILLIAM T. MARKS
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

AUGUST 23, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellant National Association of Mutual Insurance Companies and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g), that the foregoing Reply Brief of Appellant is proportionately spaced, has a typeface of 14 points or more, and contains 5,958 words.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

AUGUST 23, 2024