No. 23-5275

# In the United States Court of Appeals for the District of Columbia Circuit

———————————

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,
PLAINTIFF-APPELLANT

*v.*

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
AND ADRIANNE TODMAN, IN HER OFFICIAL CAPACITY
AS ACTING SECRETARY OF HOUSING AND URBAN DEVELOPMENT,
DEFENDANTS-APPELLEES

———————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (CIV. NO. 13-966)
(THE HONORABLE RICHARD J. LEON, J.)*

———————————

**JOINT APPENDIX**

———————————

<div style="display:flex">

SARAH E. HARRINGTON
MICHAEL S. RAAB
STEPHANIE R. MARCUS
CIVIL DIVISION
U.S. DEPARTMENT OF JUSTICE
  *950 Pennsylvania Avenue, N.W.*
  *Washington, D.C. 20530*
  *stephanie.marcus@usdoj.gov*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

</div>

# TABLE OF CONTENTS

Page

District court docket entries.................................................................1

Affidavit of David R. Benseler,
    D. Ct. Dkt. 60-3.................................................................32

Affidavit of Kevin J. Christy,
    D. Ct. Dkt. 60-4.................................................................34

Affidavit of Andrew P. Forstenzer,
    D. Ct. Dkt. 60-5.................................................................36

Affidavit of Greg Hayward,
    D. Ct. Dkt. 60-6.................................................................38

Affidavit of William G. Hirschfeld,
    D. Ct. Dkt. 60-7.................................................................42

Affidavit of Salvatore T. LaDuca,
    D. Ct. Dkt. 60-8.................................................................47

Affidavit of Stephanie Lloyd,
    D. Ct. Dkt. 60-9.................................................................50

Affidavit of Nikki L. Meek,
    D. Ct. Dkt. 60-10.................................................................53

Affidavit of North Dakota Association of
    Farm Mutual Insurance Companies,
    D. Ct. Dkt. 60-11.................................................................59

Affidavit of Dianne L. Priest,
    D. Ct. Dkt. 60-12.................................................................64

Affidavit of Larry M. Shaw,
    D. Ct. Dkt. 60-13.................................................................68

Affidavit of Scott St. Angel,
    D. Ct. Dkt. 60-14.................................................................70

(i)

Page

Table of contents—continued:

Affidavit of Geneau M. Thames,
  D. Ct. Dkt. 60-15.................................................................72

Affidavit of Dalith Wells,
  D. Ct. Dkt. 60-16.................................................................76

Declaration of Ronald Joseph Zaleski, Sr.,
  D. Ct. Dkt. 60-17.................................................................80

Second amended complaint,
  D. Ct. Dkt. 146 (Mar. 28, 2023).................................................85

Comment letter of the National Association of
  Mutual Insurance Companies (Aug. 23, 2021),
  A.R. 052411-052420.............................................................108

Memorandum opinion,
  D. Ct. Dkt. 155 (Sept. 19, 2023)..............................................118

Summary judgment order,
  D. Ct. Dkt. 156 (Sept. 19, 2023)..............................................149

Notice of appeal,
  D. Ct. Dkt. 157 (Nov. 17, 2023)...............................................150

APPEAL,CLOSED,STAYED,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:13-cv-00966-RJL

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES v. UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al
Assigned to: Judge Richard J. Leon
Case in other court:  USCA, 14-05321
USCA, 23-05275
Cause: 05:702 Administrative Procedure Act

Date Filed: 06/26/2013
Date Terminated: 09/20/2023
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**AMERICAN INSURANCE ASSOCIATION**
*TERMINATED: 03/26/2019*

represented by **Kannon K. Shanmugam**
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
Fax: (202) 223-7420
Email: kshanmugam@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William T. Marks**
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7314
Fax: (202) 223-7420
Email: wmarks@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Joshua Podoll**
WILLIAMS & CONNOLLY
680 Maine Avenue Southwest
Washington, DC 20024
202-434-5092
Email: apodoll@wc.com
*TERMINATED: 03/15/2019*

**Allison Jones Rushing**
WILLIAMS & CONNOLLY LLP
725 12th St. NW
Washington, DC 20005

J.A.1

(202) 434-5478
Fax: (202) 434-5029
Email: ajones@wc.com
*TERMINATED: 03/11/2019*

**Plaintiff**

**NATIONAL ASSOCIATION OF**
**MUTUAL INSURANCE COMPANIES**

represented by **Kannon K. Shanmugam**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William T. Marks**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Joshua Podoll**
(See above for address)
*TERMINATED: 03/15/2019*

**Allison Jones Rushing**
(See above for address)
*TERMINATED: 03/11/2019*

V.

**Defendant**

**UNITED STATES DEPARTMENT OF**
**HOUSING AND URBAN**
**DEVELOPMENT**

represented by **Brian C. Rosen-Shaud**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch
1100 L Street
Rm. 12022
Washington, DC 20530
202-305-7667
Email: brian.c.rosen-shaud@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James D. Todd , Jr.**
U.S DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O Box 883
Ben Franklin Station
Washington, DC 20044
(202) 514-3378
Fax: (202) 616-8470
Email: james.todd@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Junis Lee Ross Baldon**
U.S. DEPARTMENT OF JUSTICE
Civil Rights Division

950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-1806
Fax: (202) 514-1116
Email: junis.baldon@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian G. Kennedy**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 514-3357
Fax: (202) 616-8470
Email: brian.kennedy@usdoj.gov
*TERMINATED: 05/31/2017*

**Daniel Paul Mosteller**
NC DEPARTMENT OF JUSTICE
PO Box 629
Raleigh, NC 27602
919-716-6026
Email: dmosteller@ncdoj.gov
*TERMINATED: 01/06/2017*

**Emily Sue Newton**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-8356
Fax: (202) 616-8460
Email: emily.s.newton@usdoj.gov
*TERMINATED: 01/03/2022*

**Kyle Renee Freeny**
GREENBERG TRAURIG, LLP
2101 L Street N.W.
Washington, DC 20037
(202) 331-3100
Fax: (202) 331-3101
Email: freenyk@gtlaw.com
*TERMINATED: 01/20/2016*

**Defendant**
**SHAUN DONOVAN**
*in his official capacity as Secretary of*
*Housing and Urban Development*
*TERMINATED: 04/14/2016*

represented by **James D. Todd , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Junis Lee Ross Baldon**
(See above for address)
*LEAD ATTORNEY*

**J.A.3**

*ATTORNEY TO BE NOTICED*

**Brian G. Kennedy**
(See above for address)
*TERMINATED: 05/31/2017*

**Daniel Paul Mosteller**
(See above for address)
*TERMINATED: 01/06/2017*

**Emily Sue Newton**
(See above for address)
*TERMINATED: 01/03/2022*

**Kyle Renee Freeny**
(See above for address)
*TERMINATED: 01/20/2016*

**Defendant**

**JULIAN CASTRO**
*in his official capacity as Secretary of
Housing and Urban Development
TERMINATED: 02/03/2019*

represented by  **James D. Todd , Jr.**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Junis Lee Ross Baldon**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Brian G. Kennedy**
(See above for address)
*TERMINATED: 05/31/2017*

**Daniel Paul Mosteller**
(See above for address)
*TERMINATED: 01/06/2017*

**Emily Sue Newton**
(See above for address)
*TERMINATED: 01/03/2022*

**Defendant**

**BENJAMIN S. CARSON, SR.**
*in his official capacity as Secretary of
Housing and Urban Development
TERMINATED: 03/28/2023*

represented by  **James D. Todd , Jr.**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Junis Lee Ross Baldon**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Emily Sue Newton**

**J.A.4**

(See above for address)
*TERMINATED: 01/03/2022*

**Defendant**

**MARIA L. FUDGE**                          represented by   **Brian C. Rosen-Shaud**
*in her official capacity as Secretary of*                  (See above for address)
*Housing and Urban Development*                             *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **James D. Todd , Jr.**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**JUDICIAL WATCH, INC.**                    represented by   **Chris Fedeli**
                                                            FEDERAL COMMUNICATIONS
                                                            COMMISSION
                                                            45 L Street, NE
                                                            Washington, DC 20554
                                                            202-418-1514
                                                            Email: christopher.fedeli@fcc.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**ALLIED EDUCATIONAL**                      represented by   **Chris Fedeli**
**FOUNDATION**                                              (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL FAIR HOUSING**                   represented by   **Glenn Schlactus**
**ALLIANCE**                                                RELMAN COLFAX PLLC
                                                            1225 19th Street NW
                                                            Suite 600
                                                            Washington, DC 20036
                                                            (202) 728-1888
                                                            Fax: (202) 728-0848
                                                            Email: gschlactus@relmanlaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Stephen M. Dane**
                                                            DANE LAW LLC
                                                            P.O. Box 1011
                                                            Perrysburg, OH 43552
                                                            419-944-8611
                                                            Email: sdane@fairhousinglaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**  represented by  **Glenn Schlactus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Dane**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Silverstein**
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
1500 K Street NW
Suite 900
Washington
Washington, DC 20005
202-662-8316
Email: tsilverstein@lawyerscommittee.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**
**NATIONAL LOW INCOME HOUSING COALITION**  represented by  **Glenn Schlactus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**
**POVERTY & RACE RESEARCH ACTION COUNCIL**  represented by  **Glenn Schlactus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Dane**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**
**NATIONAL HOUSING LAW PROJECT**  represented by  **Glenn Schlactus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Dane**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**
**LATINOJUSTICE PRLDEF**  represented by  **Glenn Schlactus**
(See above for address)

**J.A.6**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Dane**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NAACP LEGAL DEFENSE AND**          represented by   **Ryan P. Haygood**
**EDUCATIONAL FUND, INC.**                            NAACP LEGAL DEFENSE &
                                                      EDUCATIONAL FUND, INC.
                                                      99 Hudson Street
                                                      Suite 1600
                                                      New York, NY 10013
                                                      (212) 965-2200
                                                      Fax: (212) 226-7592
                                                      Email: rhaygood@naacpldf.org
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**AMERICAN CIVIL LIBERTIES UNION**   represented by   **Ryan P. Haygood**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Stephen M. Dane**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NATIONAL CONSUMER LAW**            represented by   **Ryan P. Haygood**
**CENTER**                                            (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Stephen M. Dane**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NATIONAL COMMUNITY**               represented by   **Ryan P. Haygood**
**REINVESTMENT COALITION**                            (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Stephen M. Dane**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**CHAMBER OF COMMERCE OF THE**
**UNITED STATES OF AMERICA**

represented by **Carter G. Phillips**
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8270
Fax: (202) 736-8711
Email: cphillips@sidley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian P. Morrissey , Jr.**
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8798
Email: bmorrissey@sidley.com
*TERMINATED: 03/16/2017*

**Amicus**

**AMERICAN FINANCIAL SERVICES**
**ASSOCIATION**

represented by **John Longstreth**
K & L GATES LLP
1601 K Street, NW
Washington, DC 20006
(202) 661-6271
Fax: (202) 778-9100
Email: john.longstreth@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul F. Hancock**
K&L GATES LLP
200 South Biscayne Boulevard
Suite 3900
Miami, FL 33131
305-539-3300
Fax: 305-358-7095
Email: paul.hancock@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CONSUMER MORTGAGE**
**COALITION**

represented by **John Longstreth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul F. Hancock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**J.A.8**

**INDEPENDENT COMMUNITY**
**BANKERS OF AMERICA**

represented by **John Longstreth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul F. Hancock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MORTGAGE BANKERS**
**ASSOCIATION**

represented by **John Longstreth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul F. Hancock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL ASSOCIATION OF HOME**
**BUILDERS OF THE UNITED STATES,**
**INC.**

represented by **Felicia Kirsten Watson**
NATIONAL ASSOCIATION OF HOME
BUILDERS
1201 15th Street, NW
Washington, DC 20005
(202) 266-8229
Fax: (202) 266-8161
Email: fwatson@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN BANKERS ASSN.**

represented by **John Longstreth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CONSUMER BANKERS**
**ASSOCIATION**

represented by **John Longstreth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**FINANCIAL SERVICES**
**ROUNDTABLE**

represented by **John Longstreth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**J.A.9**

represented by **Stephen M. Dane**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/26/2013 | 1 | COMPLAINT against SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ( Filing fee $ 400 receipt number 0090-3376984) filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 2 | Corporate Disclosure Statement by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 3 | NOTICE of Appearance by Allison B. Jones on behalf of AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Jones, Allison) (Entered: 06/26/2013) |
| 06/26/2013 | | Case Assigned to Judge Richard J. Leon. (kb) (Entered: 06/26/2013) |
| 06/26/2013 | | SUMMONS Not Issued as to SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (kb) (Entered: 06/26/2013) |
| 06/26/2013 | 4 | NOTICE *(Corrected Summons)* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 5 | NOTICE *(Corrected Summons)* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 6 | NOTICE *(Corrected Summons)* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/26/2013 | 7 | NOTICE *(Corrected Summons)* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/26/2013) |
| 06/27/2013 | 8 | ELECTRONIC SUMMONS (4) ssued as to SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Consent to Magistrate)(znmw, ) (Entered: 06/27/2013) |
| 07/10/2013 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SHAUN DONOVAN served on 7/1/2013; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT served on 7/1/2013, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 07/01/13., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 7/1/2013. ( Answer due for ALL FEDERAL DEFENDANTS by 8/30/2013.) (Jones, Allison) (Entered: 07/10/2013) |

**J.A.10**

| 08/07/2013 | 10 | NOTICE of Appearance by Kyle Renee Freeny on behalf of All Defendants (Freeny, Kyle) (Entered: 08/07/2013) |
|---|---|---|
| 08/07/2013 | 11 | NOTICE of Appearance by Daniel Paul Mosteller on behalf of All Defendants (Mosteller, Daniel) (Entered: 08/07/2013) |
| 08/15/2013 | 12 | Unopposed MOTION to Stay *Proceedings* by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 08/15/2013) |
| 08/29/2013 | | MINUTE ORDER granting 12 Motion to Stay. It is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that the proceedings in the above-captioned case are stayed until further order, pending the conclusion of proceedings before the Supreme Court in Township of Mount Holly v. Mount Holly Gardens Citizens in Action, Inc., No. 11-1507. It is further ORDERED that, within 30 days after the Supreme Court's disposition of Mount Holly, the parties to this action shall submit a status report to the Court addressing the need for any further proceedings in this action. Signed by Judge Richard J. Leon on 8/29/13. (lcrjl2) (Entered: 08/29/2013) |
| 12/16/2013 | 13 | JOINT STATUS REPORT by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (jf, ) (Entered: 12/17/2013) |
| 12/16/2013 | 14 | JOINT MOTION to Lift Stay by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(jf, ) (Entered: 12/17/2013) |
| 12/20/2013 | 15 | ORDER: Upon consideration of the Parties' 14 Motion to Lift Stay and Status Report; it is hereby ordered that the motion is GRANTED. Signed by Judge Richard J. Leon on 12/20/13. SEE ORDER FOR FULL DETAILS. (tb, ) (Entered: 12/20/2013) |
| 12/20/2013 | 16 | MOTION for Summary Judgment by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Text of Proposed Order)(Shanmugam, Kannon) (Entered: 12/20/2013) |
| 01/11/2014 | 17 | NOTICE of Appearance by Adam Joshua Podoll on behalf of AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Podoll, Adam) (Entered: 01/11/2014) |
| 01/28/2014 | 18 | NOTICE *of Consent to Amicus Briefs* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 01/28/2014) |
| 01/30/2014 | 19 | MOTION for Leave to File *Amicus Brief* by JUDICIAL WATCH, INC., ALLIED EDUCATIONAL FOUNDATION. (Attachments: # 1 Exhibit Amicus Brief in Support of Plaintiffs)(Fedeli, Christopher) Modified to add filer on 1/31/2014 (znmw, ). (Entered: 01/30/2014) |
| 02/03/2014 | | MINUTE ORDER granting 19 Motion for Leave to File an Amicus Curiae Brief and Corporate Disclosure Certification. It is hereby ORDERED that the motion is GRANTED and Judicial Watch and AEF may each file an amicus curiae brief in this case. Signed by Judge Richard J. Leon on 2/3/14. (lcrjl2, ) (Entered: 02/03/2014) |
| 02/03/2014 | 20 | MOTION to Dismiss *or, in the Alternative, for Summary Judgment* by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Exhibit A, # 2 Administrative Record - Certified List of Contents, # 3 Text of Proposed Order)(Freeny, Kyle). Added MOTION for Summary Judgment on 2/4/2014 (znmw, ). (Entered: 02/03/2014) |

**J.A.11**

| 02/03/2014 | 21 | Memorandum in opposition to re 16 MOTION for Summary Judgment filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Exhibit A)(Freeny, Kyle) (Entered: 02/03/2014) |
| 02/03/2014 | 22 | AMICUS BRIEF by ALLIED EDUCATIONAL FOUNDATION, JUDICIAL WATCH, INC.. (znmw, ) (Entered: 02/04/2014) |
| 02/10/2014 | 23 | Unopposed MOTION for Leave to File *a Brief Amicus Curiae* by NATIONAL FAIR HOUSING ALLIANCE, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL LOW INCOME HOUSING COALITION, POVERTY & RACE RESEARCH ACTION COUNCIL, NATIONAL HOUSING LAW PROJECT, LATINOJUSTICE PRLDEF (Attachments: # 1 Brief of Amici Curiae, # 2 Exhibit A, # 3 Exhibit B)(Schlactus, Glenn) (Entered: 02/10/2014) |
| 02/11/2014 | | MINUTE ORDER granting 23 Motion for Leave to File a Brief Amicus Curiae. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 2/11/14. (lcrjl2, ) (Entered: 02/11/2014) |
| 02/12/2014 | 24 | AMICUS BRIEF by LATINOJUSTICE PRLDEF, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL FAIR HOUSING ALLIANCE, NATIONAL HOUSING LAW PROJECT, NATIONAL LOW INCOME HOUSING COALITION, POVERTY & RACE RESEARCH ACTION COUNCIL. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(znmw, ) (Entered: 02/12/2014) |
| 02/20/2014 | 25 | MOTION for Leave to File *a Brief Amicus Curiae* by NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., AMERICAN CIVIL LIBERTIES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL COMMUNITY REINVESTMENT COALITION (Attachments: # 1 Brief of Amici Curiae)(Haygood, Ryan) (Entered: 02/20/2014) |
| 02/24/2014 | | MINUTE ORDER granting 25 Motion for Leave to File a Brief Amicus Curiae. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 2/24/14. (lcrjl2, ) (Entered: 02/24/2014) |
| 02/24/2014 | 26 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Attachments: # 1 Amicus Brief)(Morrissey, Brian) (Entered: 02/24/2014) |
| 02/24/2014 | 27 | Memorandum in opposition to re 20 MOTION to Dismiss *or, in the Alternative, for Summary Judgment* MOTION for Summary Judgment *and Reply in Support of 16 Motion for Summary Judgment* filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Declaration 1, # 2 Affidavit 2, # 3 Affidavit 3, # 4 Affidavit 4, # 5 Affidavit 5, # 6 Affidavit 6)(Shanmugam, Kannon) (Entered: 02/24/2014) |
| 02/24/2014 | 28 | REPLY to opposition to motion re 16 MOTION for Summary Judgment filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (See Docket Entry 27 to view document). (znmw, ) (Entered: 02/25/2014) |
| 02/24/2014 | 29 | AMICUS BRIEF by AMERICAN CIVIL LIBERTIES UNION, NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., NATIONAL COMMUNITY REINVESTMENT COALITION, NATIONAL CONSUMER LAW CENTER. (znmw, ) (Entered: 02/25/2014) |
| 03/03/2014 | | MINUTE ORDER granting 26 Motion for Leave to File Amicus Curiae Brief. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 3/3/14. (lcrjl2, ) (Entered: 03/03/2014) |

| 03/03/2014 | [30](#) | AMICUS BRIEF by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (znmw, ) (Entered: 03/04/2014) |
|---|---|---|
| 03/18/2014 | [31](#) | REPLY to opposition to motion re [20](#) MOTION to Dismiss *or, in the Alternative, for Summary Judgment* MOTION for Summary Judgment filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Freeny, Kyle) (Entered: 03/18/2014) |
| 03/18/2014 | [32](#) | MOTION for Leave to File *amici curiae brief* by AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER MORTGAGE COALITION, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MORTGAGE BANKERS ASSOCIATION (Attachments: # [1](#) Exhibit Amici curiae brief of AFSA et al)(Longstreth, John) (Entered: 03/18/2014) |
| 03/19/2014 | [33](#) | NOTICE of Appearance by Paul F. Hancock on behalf of AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER MORTGAGE COALITION, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MORTGAGE BANKERS ASSOCIATION (Hancock, Paul) (Entered: 03/19/2014) |
| 03/25/2014 | | MINUTE ORDER granting [32](#) Motion for Leave to File Amici Curiae Brief in Support of Plaintiffs' Motion fur Summary Judgement. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 3/25/14. (lcrjl2, ) (Entered: 03/25/2014) |
| 03/25/2014 | [34](#) | AMICUS BRIEF by AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER MORTGAGE COALITION, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MORTGAGE BANKERS ASSOCIATION. (znmw, ) (Entered: 03/26/2014) |
| 03/27/2014 | [35](#) | NOTICE OF SUPPLEMENTAL AUTHORITY by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # [1](#) Supplemental Authority)(Freeny, Kyle) (Entered: 03/27/2014) |
| 04/01/2014 | [36](#) | NOTICE *of Joint Appendix of Administrative Record Materials* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES re [16](#) MOTION for Summary Judgment (Shanmugam, Kannon) (Entered: 04/01/2014) |
| 06/13/2014 | | NOTICE of Hearing on Motions: [20](#) MOTION to Dismiss *or, in the Alternative, for Summary Judgment* MOTION for Summary Judgment; and [16](#) MOTION for Summary Judgment Motion Hearing set for 7/10/2014 @ 3:00 PM in Courtroom 18 before Judge Richard J. Leon. (tj ) (Entered: 06/13/2014) |
| 06/17/2014 | [37](#) | Unopposed MOTION for Order *Rescheduling Hearing* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/17/2014) |
| 06/17/2014 | | MINUTE ORDER granting [37](#) Unopposed Motion to Reschedule Hearing. It is hereby ORDERED that the motion is GRANTED and oral argument will be held on 7/16/2014 at 3:00 pm. Signed by Judge Richard J. Leon on 7/16/14. (lcrjl2, ) (Entered: 06/17/2014) |
| 06/18/2014 | | Set/Reset Hearings: Motions Hearing reset for 7/16/2014 at 3:00 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 06/18/2014) |
| 07/11/2014 | | Set/Reset Hearings: The Motions Hearing that is presently scheduled for Wednesday, July 16, 2014, at 3:00 PM is rescheduled to Tuesday, July 22, 2014, at 3:00 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 07/11/2014) |
| 07/22/2014 | | Minute Entry: Motions Hearing held on 7/22/2014 before Judge Richard J. Leon re [20](#) MOTION to Dismiss or, in the Alternative, for Summary Judgment filed by SHAUN |

| | | |
|---|---|---|
| | | DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and 16 MOTION for Summary Judgment filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES, AMERICAN INSURANCE ASSOCIATION; Motions heard and taken under advisement. Parties may file supplemental briefs by not later than 8/5/2014. (Court Reporter Scott Wallace) (tb, ) (Entered: 07/23/2014) |
| 08/05/2014 | 38 | SUPPLEMENTAL MEMORANDUM to re 16 MOTION for Summary Judgment filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 08/05/2014) |
| 08/05/2014 | 39 | SUPPLEMENTAL MEMORANDUM to re 20 MOTION to Dismiss *or, in the Alternative, for Summary Judgment* MOTION for Summary Judgment filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Freeny, Kyle) (Entered: 08/05/2014) |
| 08/08/2014 | 40 | ADMINISTRATIVE RECORD by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Pages 1-209, # 2 Pages 210-378, # 3 Pages 379-516, # 4 Pages 517-645, # 5 Pages 646-804, # 6 Pages 805-881, # 7 Pages 882-1032, # 8 Pages 1033-1132, # 9 Pages 1133-1206, # 10 Pages 1207-1360, # 11 Pages 1361-1593, # 12 Pages 1594-1812)(Mosteller, Daniel) (Entered: 08/08/2014) |
| 10/14/2014 | 41 | NOTICE OF SUPPLEMENTAL AUTHORITY by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Exhibit A)(Freeny, Kyle) (Entered: 10/14/2014) |
| 10/16/2014 | 42 | RESPONSE re 41 NOTICE OF SUPPLEMENTAL AUTHORITY filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 10/16/2014) |
| 10/22/2014 | 43 | MOTION to Stay *Proceedings* by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 10/22/2014) |
| 10/24/2014 | 44 | RESPONSE re 43 MOTION to Stay *Proceedings* filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 10/24/2014) |
| 10/24/2014 | | MINUTE ORDER denying 43 Motion to Stay. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 10/24/14. (lcrjl2, ) (Entered: 10/24/2014) |
| 11/03/2014 | 45 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 11/03/14. (tb, ) (Entered: 11/03/2014) |
| 11/03/2014 | 46 | ORDER: For reasons set forth in the Memorandum Opinion accompanying this Order; it is hereby ordered that plaintiff's 16 Motion for Summary Judgment is GRANTED and defendant's 20 Motion to Dismiss is DENIED, and it is further ordered that the Department of Housing and Urban Development's Disparate Impact Rule, promulgated in 78 Fed. Reg. 11,460-11,482, and codified at 24 C.F.R. Section 100.500, is hereby VACATED. Signed by Judge Richard J. Leon on 11/03/14. (tb, ) (Entered: 11/03/2014) |
| 11/07/2014 | 47 | AMENDED MEMORANDUM OPINION. This Amended Memorandum Opinion replaces the Memorandum Opinion dated 11/3/2014 (Dkt. #45). Signed by Judge Richard J. Leon on 11/07/2014. (jth) (Entered: 11/07/2014) |
| 12/18/2014 | 48 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 46 Order on Motion for Summary Judgment, Order on Motion to Dismiss,, 45 Memorandum & Opinion, 47 Memorandum & Opinion by UNITED STATES DEPARTMENT OF HOUSING AND URBAN |

| | | |
|---|---|---|
| | | DEVELOPMENT, SHAUN DONOVAN. Fee Status: No Fee Paid. Parties have been notified. (Freeny, Kyle) (Entered: 12/18/2014) |
| 12/19/2014 | 49 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the fee was an Appeal by the Government re 48 Notice of Appeal to DC Circuit Court. (znmw, ) (Entered: 12/19/2014) |
| 12/23/2014 | | USCA Case Number 14-5321 for 48 Notice of Appeal to DC Circuit Court, filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (rd) (Entered: 12/24/2014) |
| 11/17/2015 | 50 | NOTICE *of Plaintiffs' Intent to Move for Leave to Amend the Complaint* by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 11/17/2015) |
| 11/17/2015 | 51 | MANDATE of USCA (certified copy) ORDERED that the district court order granting summary judgment in favor of American Insurance Association, Inc., filed November 3, 2014, be vacated and FURTHER ORDERED that the case be remanded to the district court for consideration in light of Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015) as to 48 Notice of Appeal to DC Circuit Court, filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. USCA Case Number 14-5321. (zvt) (Entered: 11/20/2015) |
| 12/08/2015 | 52 | MOTION to Amend/Correct 1 Complaint, by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Attachments: # 1 Exhibit Amended Complaint, # 2 Text of Proposed Order)(Shanmugam, Kannon) (Entered: 12/08/2015) |
| 12/10/2015 | 53 | Unopposed MOTION for Extension of Time to File Response/Reply as to 52 MOTION to Amend/Correct 1 Complaint, by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 12/10/2015) |
| 12/11/2015 | | MINUTE ORDER granting 53 Unopposed Motion for Extension of Time to File Response/Reply re 52 MOTION to Amend/Correct 1 Complaint. It is hereby ORDERED that the motion is GRANTED. It is further ORDERED that defendants shall have up to and including January 11, 2016 to respond to plaintiffs' Motion for Leave to Amend the Complaint. Signed by Judge Richard J. Leon on 12/11/2015.(lcrjl2, ) (Entered: 12/11/2015) |
| 12/15/2015 | | Set/Reset Deadlines: Response due by 1/11/2016. (tb) (Entered: 12/15/2015) |
| 01/11/2016 | 54 | Memorandum in opposition to re 52 MOTION to Amend/Correct 1 Complaint, filed by SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 01/11/2016) |
| 01/19/2016 | 55 | REPLY to opposition to motion re 52 MOTION to Amend/Correct 1 Complaint, filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Podoll, Adam) (Entered: 01/19/2016) |
| 01/20/2016 | 56 | NOTICE OF SUBSTITUTION OF COUNSEL by Brian G. Kennedy on behalf of All Defendants Substituting for attorney Kyle R. Freeny (Kennedy, Brian) (Entered: 01/20/2016) |
| 04/14/2016 | | MINUTE ORDER granting 52 Motion to Amend/Correct. It is hereby ORDERED that plaintiffs' Motion for Leave to Amend the Complaint is GRANTED. It is further |

| | | |
|---|---|---|
| | | ORDERED that the Amended Complaint is deemed filed as of the date of this Order. Signed by Judge Richard J. Leon on 4/14/2016. (lcrjl2, ) (Entered: 04/14/2016) |
| 04/14/2016 | 57 | AMENDED COMPLAINT against UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, JULIAN CASTRO filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES, AMERICAN INSURANCE ASSOCIATION.(znmw) (Entered: 04/14/2016) |
| 04/25/2016 | 58 | Joint MOTION for Order *To Set Briefing Schedule* by JULIAN CASTRO, SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Kennedy, Brian) (Entered: 04/25/2016) |
| 04/27/2016 | | MINUTE ORDER granting 58 Joint Motion to Set Briefing Schedule. It is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the following schedule shall govern the above-captioned case: (1) plaintiffs will file an opening motion for summary judgment on or before June 30, 2016; (2) defendants will file their combined cross-dispositive motion for summary judgment and opposition to plaintiffs' motion on or before August 30, 2016; (3) plaintiffs will file their combined opposition to defendants' motion and a reply in support of their own motion on or before September 30, 2016; and (4) defendants will file a reply in support of their cross motion on or before October 28, 2016. It is further ORDERED that defendants' obligation to answer or otherwise respond to the Amended Complaint shall be deferred pending a ruling on the parties' dispositive motions. Signed by Judge Richard J. Leon on 4/27/2016. (lcrjl2, ) (Entered: 04/27/2016) |
| 04/28/2016 | | Set/Reset Deadlines: Cross Motions due by 8/30/2016. Response to Cross Motions due by 9/30/2016. Reply to Cross Motions due by 10/28/2016. Summary Judgment motion due by 6/30/2016. Response to Motion for Summary Judgment due by 8/30/2016. Reply to Motion for Summary Judgment due by 9/30/2016. (tb) (Entered: 04/28/2016) |
| 06/28/2016 | 59 | Unopposed MOTION for Leave to File *Amicus Brief* by NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, INC. (Attachments: # 1 Appendix Amicus Brief)(Watson, Felicia) (Entered: 06/28/2016) |
| 06/30/2016 | | MINUTE ORDER granting 59 Unopposed Motion for Leave to File an Amicus Curiae Brief by National Association of Home Builders of the United States. It is hereby ORDERED that the Motion is GRANTED. Signed by Judge Richard J. Leon on 6/30/2016. (lcrjl2, ) (Entered: 06/30/2016) |
| 06/30/2016 | 60 | MOTION for Summary Judgment by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Exhibits A-C, # 3 Affidavit David R. Benseler, # 4 Affidavit Kevin J. Christy, # 5 Affidavit Andrew P. Forstenzer, # 6 Affidavit Greg Hayward, # 7 Declaration William G. Hirschfeld, # 8 Affidavit Salvatore T. Laduca, # 9 Affidavit Stephanie Lloyd, # 10 Affidavit Nikki L. Meek, # 11 Affidavit N.D. Assoc. of Farm Mutual Insurance Cos., # 12 Affidavit Dianne L. Priest, # 13 Affidavit Larry M. Shaw, # 14 Affidavit Scott St. Angel, # 15 Affidavit Geneau M. Thames, # 16 Affidavit Dalith Wells, # 17 Declaration Ronald Joseph Zaleski, Sr.)(Shanmugam, Kannon) (Entered: 06/30/2016) |
| 07/01/2016 | 61 | AMICUS BRIEF by NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, INC.. (znmw) (Entered: 07/01/2016) |
| 07/15/2016 | 62 | Consent MOTION for Leave to File *amici curiae brief in support of Plaintiffs' motion for summary judgment* by AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER MORTGAGE COALITION, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MORTGAGE BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, CONSUMER BANKERS ASSOCIATION, FINANCIAL SERVICES |

**J.A.16**

| | | |
|---|---|---|
| | | ROUNDTABLE (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Lodged brief of amici curiae)(Longstreth, John) (Entered: 07/15/2016) |
| 07/21/2016 | | MINUTE ORDER granting 62 Consent Motion for Leave to File an Amici Curiae Brief by American Bankers Association, American Financial Services Association, Consumer Bankers Association, Consumer Mortgage Coalition, Financial Services Roundtable, Independent Community Bankers of America, and Mortgage Bankers Association. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 7/21/2016. (lcrjl2, ) (Entered: 07/21/2016) |
| 07/21/2016 | 63 | AMICUS BRIEF by AMERICAN BANKERS ASSOCIATION, AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER BANKERS ASSOCIATION, CONSUMER MORTGAGE COALITION, FINANCIAL SERVICES ROUNDTABLE, INDEPENDENT COMMUNITY BANKERS OF AMERICA, MORTGAGE BANKERS ASSOCIATION. (znmw) (Entered: 07/22/2016) |
| 08/30/2016 | 64 | MOTION for Summary Judgment by JULIAN CASTRO, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Mosteller, Daniel) (Entered: 08/30/2016) |
| 08/30/2016 | 65 | Memorandum in opposition to re 60 MOTION for Summary Judgment filed by JULIAN CASTRO, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Mosteller, Daniel) (Entered: 08/30/2016) |
| 09/13/2016 | 66 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by AMERICAN CIVIL LIBERTIES UNION, LATINOJUSTICE PRLDEF, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL COMMUNITY REINVESTMENT COALITION, NATIONAL CONSUMER LAW CENTER, NATIONAL FAIR HOUSING ALLIANCE, NATIONAL HOUSING LAW PROJECT, POVERTY & RACE RESEARCH ACTION COUNCIL, AARP (Attachments: # 1 Text of Proposed Order, # 2 Brief of Amici Curiae)(Dane, Stephen) (Entered: 09/13/2016) |
| 09/15/2016 | | MINUTE ORDER granting 66 Unopposed Motion of the American Civil Liberties Union, the National Fair Housing Alliance, the Lawyers' Committee for Civil Rights Under Law, the Poverty & Race Research Action Council, the National Consumer Law Center, the National Community Reinvestment Coalition, the National Housing Law Project, LatinoJustice PRLDEF and AARP for Leave to File a Brief Amici Curiae. It is hereby ORDERED that the Motion is GRANTED. Signed by Judge Richard J. Leon on 9/15/2016. (lcrjl2, ) (Entered: 09/15/2016) |
| 09/15/2016 | 67 | AMICUS BRIEF by AARP, AMERICAN CIVIL LIBERTIES UNION, LATINOJUSTICE PRLDEF, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL COMMUNITY REINVESTMENT COALITION, NATIONAL CONSUMER LAW CENTER, NATIONAL FAIR HOUSING ALLIANCE, NATIONAL HOUSING LAW PROJECT, POVERTY & RACE RESEARCH ACTION COUNCIL. (znmw) (Entered: 09/16/2016) |
| 09/30/2016 | 68 | Memorandum in opposition to re 64 MOTION for Summary Judgment filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 09/30/2016) |
| 09/30/2016 | 69 | REPLY to opposition to motion re 60 MOTION for Summary Judgment filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 09/30/2016) |
| 10/28/2016 | 70 | REPLY to opposition to motion re 64 MOTION for Summary Judgment filed by JULIAN CASTRO, SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Kennedy, Brian) (Entered: 10/28/2016) |

| | | |
|---|---|---|
| 01/06/2017 | 71 | NOTICE OF SUBSTITUTION OF COUNSEL by Junis Lee Ross Baldon on behalf of All Defendants Substituting for attorney Daniel P. Mosteller (Baldon, Junis) (Entered: 01/06/2017) |
| 01/26/2017 | | MINUTE SCHEDULING ORDER: It is hereby ORDERED that oral argument on the parties' cross-motions for summary judgment [Dkts. #60 #64] shall be held before the undersigned on February 13, 2017 at 2:30 PM in Courtroom 18. Signed by Judge Richard J. Leon on January 26, 2017. (lcrjl2) (Entered: 01/26/2017) |
| 02/06/2017 | 72 | MOTION to Continue re Scheduling Order, *for Continuance of Hearing on Cross-Motions for Summary Judgment* by JULIAN CASTRO, SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Kennedy, Brian) Modified event title on 2/7/2017 (znmw). (Entered: 02/06/2017) |
| 02/08/2017 | | MINUTE ORDER granting in part and denying in part 72 Defendants' Motion for Forty-Five Day Continuance of Oral Argument. It is hereby ORDERED that the hearing set for February 13, 2017 at 2:30 PM in Courtroom 18 is converted into a status conference. It is further ORDERED that oral argument is continued until a date to be determined by the Court. Signed by Judge Richard J. Leon on February 8, 2017. (lcrjl2) (Entered: 02/08/2017) |
| 02/09/2017 | | Set/Reset Hearings: Status Conference set for 2/13/2017 at 2:30 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 02/09/2017) |
| 02/13/2017 | | Minute Entry for proceedings held before Judge Richard J. Leon: Status Conference held on 2/13/2017. Another Status Conference is set for 5/16/2017 at 12:00 PM in Courtroom 18 before Judge Richard J. Leon. (Court Reporter: William Zaremba) (jth) (Entered: 02/13/2017) |
| 02/15/2017 | | MINUTE ORDER: It is hereby ORDERED that the above captioned case is STAYED pending the status conference set for 05/16/2017 at 12:00 PM in Courtroom 18 before Judge Richard J. Leon. Signed by Judge Richard J. Leon on 02/15/2017. (lcrjl2) (Entered: 02/15/2017) |
| 03/07/2017 | 73 | TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS before Judge Richard J. Leon held on February 13, 2017; Page Numbers: 1-11. Date of Issuance: March 7, 2017. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/28/2017. Redacted Transcript Deadline set for 4/7/2017. Release of Transcript Restriction set for 6/5/2017.(wz) (Entered: 03/07/2017) |
| 03/16/2017 | 74 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. Attorney Brian P. Morrissey, Jr terminated. |

| 05/15/2017 | 75 | STATUS REPORT by JULIAN CASTRO, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Kennedy, Brian) (Entered: 05/15/2017) |
| --- | --- | --- |
| 05/16/2017 | | Minute Entry: Status Conference held on 5/16/2017 before Judge Richard J. Leon: Status Conference continued to 7/17/2017 at 03:00 AM in Courtroom 18 before Judge Richard J. Leon. (Court Reporter William Zaremba) (tb) (Entered: 05/18/2017) |
| 05/31/2017 | 76 | NOTICE OF WITHDRAWAL OF APPEARANCE as to JULIAN CASTRO, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. Attorney Brian G. Kennedy terminated. (Kennedy, Brian) (Entered: 05/31/2017) |
| 06/08/2017 | 77 | NOTICE OF SUBSTITUTION OF COUNSEL by Emily Sue Newton on behalf of All Defendants Substituting for attorney Brian G. Kennedy (Newton, Emily) (Entered: 06/08/2017) |
| 07/03/2017 | 78 | TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS before Judge Richard J. Leon held on May 16, 2017; Page Numbers: 1-17. Date of Issuance: July 3, 2017. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the co urt reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/24/2017. Redacted Transcript Deadline set for 8/3/2017. Release of Transcript Restriction set for 10/1/2017.(wz) (Entered: 07/03/2017) |
| 07/12/2017 | 79 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Newton, Emily) (Entered: 07/12/2017) |
| 07/14/2017 | | MINUTE ORDER: Upon review the Joint Status Report 79 submitted by the parties, it is hereby ORDERED that the status conference set for 07/17/2017 at 03:00 PM is continued to 08/14/2017 at 03:00 PM in Courtroom 18 before Judge Richard J. Leon. Signed by Judge Richard J. Leon on 07/14/2017. (lcrjl2) (Entered: 07/14/2017) |
| 08/09/2017 | 80 | Joint STATUS REPORT *and request to continue the currently scheduled status hearing* by JULIAN CASTRO, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Newton, Emily) (Entered: 08/09/2017) |
| 08/09/2017 | | MINUTE ORDER: Upon review the Joint Status Report 80 submitted by the parties, it is hereby ORDERED that the status conference set for 08/14/2017 at 03:00 PM is continued to 09/15/2017 at 02:30 PM in Courtroom 18 before Judge Richard J. Leon. Signed by Judge Richard J. Leon on 08/09/2017. (lcrjl2) (Entered: 08/09/2017) |
| 09/13/2017 | 81 | MOTION to Continue *Status Conference* by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order) (Newton, Emily) (Entered: 09/13/2017) |

**J.A.19**

| | | |
|---|---|---|
| 09/14/2017 | 82 | Memorandum in opposition to re 81 MOTION to Continue *Status Conference* filed by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 09/14/2017) |
| 09/14/2017 | | MINUTE ORDER granting 81 Defendants' Motion to Continue Status Conference. It is hereby ORDERED that the Motion is GRANTED. The status conference set for 09/15/2017 is continued to 10/31/2017 at 03:00 PM in Courtroom 18 before Judge Richard J. Leon. Signed by Judge Richard J. Leon on 9/14/17. (lcrjl2) (Entered: 09/14/2017) |
| 10/26/2017 | 83 | MOTION to Continue *Currently Scheduled Status Hearing* by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 10/26/2017) |
| 10/26/2017 | 84 | STATUS REPORT by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 10/26/2017) |
| 10/30/2017 | | MINUTE ORDER granting 83 Defendants' Motion to Continue Status Conference. It is hereby ORDERED that the Motion is GRANTED. The status conference set for 10/31/2017 at 03:00 PM is continued to 12/15/2017 at 03:00 PM in Courtroom 18 before Judge Richard J. Leon. Signed by Judge Richard J. Leon on 10/30/2017. (lcrjl2) (Entered: 10/30/2017) |
| 11/07/2017 | 85 | Joint MOTION to Continue *Change the Date of the Currently Scheduled Status Hearing* re Order on Motion to Continue,, Set/Reset Deadlines/Hearings, by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Newton, Emily) Modified event title on 11/8/2017 (znmw). (Entered: 11/07/2017) |
| 11/13/2017 | | MINUTE ORDER granting 85 Joint Motion to Change Date of Status Hearing. It is hereby ORDERED that the Joint Motion is GRANTED. The status conference set for 12/15/2017 at 03:00 PM is continued to 12/21/2017 at 02:30 PM in Courtroom 18 before Judge Richard J. Leon. Signed by Judge Richard J. Leon on 11/13/2017. (lcrjl2) (Entered: 11/13/2017) |
| 12/14/2017 | 86 | Unopposed MOTION to Continue *Status Conference* by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 12/14/2017) |
| 12/20/2017 | | MINUTE ORDER granting 86 Motion to Continue. The status conference presently scheduled in this case for 12/21/17 is cancelled and rescheduled for a date and time to be determined. Signed by Judge Richard J. Leon on 12/20/17. (lcrjl3) (Entered: 12/20/2017) |
| 12/21/2017 | 87 | NOTICE by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Newton, Emily) (Entered: 12/21/2017) |
| 02/01/2018 | | Minute Order. Status Conference set for 2/8/2018 at 4:00 PM in Courtroom 18 before Judge Richard J. Leon. Signed by Judge Richard J. Leon on 2/1/18. (lcrjl3) (Entered: 02/01/2018) |
| 02/07/2018 | 88 | Joint MOTION to Continue *Status Hearing* by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Text of Proposed Order) (Newton, Emily) (Entered: 02/07/2018) |
| 02/07/2018 | | MINUTE ORDER granting 88 Joint Motion to Continue the status conference currently scheduled for 2/8/18. While the Court is willing to grant the joint motion at this time, the parties are on notice that this is the last time the Court will grant a continuance. A status |

| | | |
|---|---|---|
| | | conference in this case is scheduled for 4/10/18 at 3:00 PM in Courtroom 18 before Judge Richard J. Leon. At that status conference, the parties should be prepared to discuss their plans for moving forward in this case. So Ordered. Signed by Judge Richard J. Leon on 2/7/18. (lcrjl3) (Entered: 02/07/2018) |
| 02/07/2018 | | Set/Reset Hearing: A status conference is set for 4/10/2018 at 3:00 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 02/08/2018) |
| 03/30/2018 | | MINUTE ORDER. The status conference presently set for 4/10/2018 at 3:00 PM in Courtroom 18 before Judge Richard J. Leon is rescheduled for 4/10/2018 at 5:00 PM in Courtroom 18 before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 3/30/18. (lcrjl3) (Entered: 03/30/2018) |
| 04/01/2018 | | Set/Reset Hearings: The status conference is rescheduled for 4/10/2018 at 5:00 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 04/01/2018) |
| 04/03/2018 | 89 | Joint MOTION to Continue by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Attachments: # 1 Text of Proposed Order) (Shanmugam, Kannon) (Entered: 04/03/2018) |
| 04/03/2018 | 90 | STATUS REPORT by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (See Docket Entry 89 to view document). (znmw) (Entered: 04/04/2018) |
| 04/06/2018 | | MINUTE ORDER granting 89 Joint MOTION to Continue filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES, AMERICAN INSURANCE ASSOCIATION. The Court reluctantly grants the motion but does so with the expectation that the discussions referenced in the Joint Motion will be fruitful. It is hereby ORDERED that the status conference scheduled for 4/10/2018 at 12:00PM is rescheduled to 5/10/2018 at 5:00PM in Courtroom 18 before Judge Richard J. Leon. Signed by Judge Richard J. Leon on 4/6/2018. (lcrjl3) (Entered: 04/06/2018) |
| 04/10/2018 | | Set/Reset Hearings: The Status Conference is rescheduled to 5/10/2018 at 5:00 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 04/10/2018) |
| 04/10/2018 | | Set/Reset Hearings: The Status Conference in this case presently set for 5/10/2018 at 5:00 PM is reset for 5/10/2018 at 4:00 PM in Courtroom 18 before Judge Richard J. Leon. (jth) (Entered: 04/10/2018) |
| 05/10/2018 | 91 | NOTICE of Appearance by William T. Marks on behalf of All Plaintiffs (Marks, William) (Entered: 05/10/2018) |
| 05/10/2018 | 92 | NOTICE by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Attachment A - Text of Press Release) (Newton, Emily) (Entered: 05/10/2018) |
| 05/10/2018 | | Minute Entry for proceedings held before Judge Richard J. Leon: Status Conference held on 5/10/2018. A Joint Status Report from the parties is due by 6/25/2018. (Court Reporter: William P. Zaremba) (jth) (Entered: 05/10/2018) |
| 05/16/2018 | 93 | TRANSCRIPT OF STATUS CONFERENCE HEARING PROCEEDINGS before Judge Richard J. Leon held on May 10, 2018; Page Numbers: 1-18. Date of Issuance: May 16, 2018. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased fro m the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter. |

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/6/2018. Redacted Transcript Deadline set for 6/16/2018. Release of Transcript Restriction set for 8/14/2018.(wz) (Entered: 05/16/2018)

| | | |
|---|---|---|
| 06/25/2018 | 94 | Joint STATUS REPORT by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Text of Proposed Order Exhibit A - Proposed Order of Plaintiffs, # 2 Text of Proposed Order Exhibit B - Proposed Order of Defendants)(Shanmugam, Kannon) (Entered: 06/25/2018) |
| 07/16/2018 | | MINUTE ORDER. Upon consideration of 94 Joint Status Report, it is hereby ORDERED that the stay in this case is continued until October 19, 2018 to allow the U.S. Department of Housing and Urban Development (HUD) to consider public comment in response to the Advance Notice of Proposed Rulemaking issued June 20, 2018. It is further ORDERED that the parties shall file a joint status report on or before October 19, 2018, updating the Court on the status of HUDs consideration and proposing any next steps in this litigation. SO ORDERED. By Judge Richard J. Leon on 7/16/2018. (jth) (Entered: 07/16/2018) |
| 10/19/2018 | 95 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 10/19/2018) |
| 10/24/2018 | 96 | NOTICE of Appearance by Thomas Silverstein on behalf of LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Silverstein, Thomas) (Entered: 10/24/2018) |
| 10/26/2018 | | MINUTE ORDER. Upon consideration of 95 Joint Status Report, it is hereby ORDERED that the stay in this case is continued until December 18, 2018 to allow the U.S. Department of Housing and Urban Development (HUD) to issue a Notice of Proposed Rulemaking in response to public comments. It is further ORDERED that the parties shall file a joint status report on or before December 18, 2018, updating the Court on the status of HUD's issuance of the rule and proposing any next steps in this litigation. SO ORDERED. Signed by Judge Richard J. Leon on 10/26/18. (lcrjl3) (Entered: 10/26/2018) |
| 10/29/2018 | | Set/Reset Deadlines: The parties shall file a Joint Status Report by 12/18/2018, updating the Court on the status of HUD's issuance of the rule and proposing any next steps in this litigation. (jth) (Entered: 10/29/2018) |
| 12/18/2018 | 97 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 12/18/2018) |
| 12/21/2018 | | MINUTE ORDER. Upon consideration of 97 Joint Status Report, it is hereby ORDERED that the stay entered in this case is continued until February 1, 2019 to allow the U.S. Department of Housing and Urban Development (HUD) to issue a Notice of Proposed Rulemaking in response to public comments. It is further ORDERED that the parties shall file a joint status report on or before February 1, 2019, updating the Court on the status of HUD's issuance of the rule and proposing any next steps in this litigation. SO ORDERED. By Judge Richard J. Leon on 12/21/2018. (jth) (Entered: 12/21/2018) |
| 01/23/2019 | 98 | WITHDRAWN PURSUANT TO NOTICE FILED 01/28/19.....MOTION to Stay *all proceedings* by UNITED STATES DEPARTMENT OF HOUSING AND URBAN |

| | | |
|---|---|---|
| | | DEVELOPMENT (Attachments: # 1 Text of Proposed Order)(Newton, Emily) Modified on 1/30/2019 (jth). (Entered: 01/23/2019) |
| 01/28/2019 | 99 | NOTICE *of Restoration of Appropriations* by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Newton, Emily) (Entered: 01/28/2019) |
| 02/01/2019 | 100 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 02/01/2019) |
| 02/06/2019 | | MINUTE ORDER. Upon consideration of 100 Joint Status Report, it is hereby ORDERED that the stay entered in this case is continued until March 15, 2019 to allow the Office of Management and Budget time to review the U.S. Department of Housing and Urban Development's Notice of Proposed Rulemaking. It is further ORDERED that the parties shall file a joint status report on or before March 15, 2019, updating the Court on the status of HUD's issuance of the rule and proposing any next steps in this litigation. SO ORDERED. By Judge Richard J. Leon on 2/6/19.(lcrjl3) (Entered: 02/06/2019) |
| 02/07/2019 | | Set/Reset Deadlines: The parties shall file a Joint Status Report by 3/15/2019, updating the Court on the status of HUD's issuance of the rule and proposing any next steps in this litigation. (jth) (Entered: 02/07/2019) |
| 03/11/2019 | 101 | NOTICE OF WITHDRAWAL OF APPEARANCE as to AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. Attorney Allison Jones Rushing terminated. (Rushing, Allison) (Entered: 03/11/2019) |
| 03/13/2019 | 102 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Amanda Weingarten, :Firm- Paul, Weiss, Rifkind, Wharton & Garrison LLP, :Address- 1285 Avenue of the Americas, New York, NY 10019. Phone No. - 212-373-3276. Fax No. - 212-757-3990 Filing fee $ 100, receipt number 0090-5999455. Fee Status: Fee Paid. by AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Attachments: # 1 Declaration of Amanda Weingarten, # 2 Text of Proposed Order)(Shanmugam, Kannon) (Entered: 03/13/2019) |
| 03/14/2019 | 103 | Joint STATUS REPORT by BENJAMIN CARSON, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 03/14/2019) |
| 03/14/2019 | | MINUTE ORDER. Upon consideration of 103 Joint Status Report, it is hereby ORDERED that the stay entered in this case is continued until May 13, 2019 to allow the Office of Management and Budget time to review the U.S. Department of Housing and Urban Development's Notice of Proposed Rulemaking. It is further ORDERED that the parties shall file a joint status report on or before May 13, 2019, updating the Court on the status of HUD's issuance of the rule and proposing any next steps in this litigation. SO ORDERED. Signed by Judge Richard J. Leon on 3/14/19. (lcrjl3) (Entered: 03/14/2019) |
| 03/15/2019 | 104 | Unopposed MOTION to Dismiss *Without Prejudice* by AMERICAN INSURANCE ASSOCIATION (Attachments: # 1 Text of Proposed Order)(Shanmugam, Kannon) (Entered: 03/15/2019) |
| 03/15/2019 | 105 | NOTICE OF WITHDRAWAL OF APPEARANCE as to AMERICAN INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. Attorney Adam Joshua Podoll terminated. (Podoll, Adam) (Entered: 03/15/2019) |
| 03/26/2019 | 106 | ORDER. Plaintiff American Insurance Association (AIA's) 104 Unopposed Motion to Dismiss Without Prejudice is GRANTED. SO ORDERED. (see order for complete |

| | | details). Signed by Judge Richard J. Leon on 3/25/2019. (jth) (Entered: 03/26/2019) |
|---|---|---|
| 05/13/2019 | 107 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 05/13/2019) |
| 06/12/2019 | 108 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 06/12/2019) |
| 07/11/2019 | 109 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 07/11/2019) |
| 08/12/2019 | 110 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 08/12/2019) |
| 09/11/2019 | 111 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 09/11/2019) |
| 11/18/2019 | 112 | Joint STATUS REPORT by BENJAMIN CARSON, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 11/18/2019) |
| 01/17/2020 | 113 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 01/17/2020) |
| 01/21/2020 | | MINUTE ORDER. Upon review of 113 the parties' Joint Status Report, and for good cause shown therein, it is hereby ORDERED that the stay in this case is continued until March 17, 2020, on which date the parties shall file a joint status report, updating the Court on the expected timing of any further action by HUD and proposing any next steps in this case. Signed by Judge Richard J. Leon on 1/21/2020. (lcrjl2) (Entered: 01/21/2020) |
| 03/17/2020 | 114 | Joint STATUS REPORT by BENJAMIN CARSON, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 03/17/2020) |
| 03/18/2020 | | MINUTE ORDER. Upon consideration of 114 the parties' Joint Status Report, it is hereby ORDERED that this case remains stayed. It is further ORDERED that the parties shall file a joint status report apprising the Court of the expected timing of any further action by HUD and proposing any next steps in this case on or before May 18, 2020. SO ORDERED. Signed by Judge Richard J. Leon on 3/18/2020. (lcrjl2) (Entered: 03/18/2020) |
| 05/18/2020 | 115 | Joint STATUS REPORT by BENJAMIN S. CARSON, SR, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 05/18/2020) |
| 05/23/2020 | | MINUTE ORDER. Upon consideration of 115 the parties' Joint Status Report, it is hereby ORDERED that this case remains stayed. It is further ORDERED that the parties shall file a joint status report on or before July 17, 2020, updating the Court on the expected timing of any further government action and proposing any next steps in this case. SO ORDERED. Signed by Judge Richard J. Leon on 5/23/2020. (lcrjl2) (Entered: 05/23/2020) |

| 07/17/2020 | 116 | Joint STATUS REPORT by BENJAMIN S. CARSON, SR, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 07/17/2020) |
|---|---|---|
| 07/21/2020 | | MINUTE ORDER. Upon consideration of 116 the parties' Joint Status Report, it is hereby ORDERED that this case remains stayed. It is further ORDERED that the parties shall file a joint status report on or before August 17, 2020, updating the Court on the expected timing of any further government action and proposing any next steps in this case. SO ORDERED. Signed by Judge Richard J. Leon on 7/21/2020. (lcrjl2) (Entered: 07/21/2020) |
| 08/17/2020 | 117 | Joint STATUS REPORT by BENJAMIN S. CARSON, SR, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 08/17/2020) |
| 08/18/2020 | | MINUTE ORDER. Upon consideration of 117 the parties' Joint Status Report, it is hereby ORDERED that this case remains stayed. It is further ORDERED that the parties shall file a joint status report on or before September 14, 2020, updating the Court on the expected timing of any further government action and proposing any next steps in this case. SO ORDERED. Signed by Judge Richard J. Leon on 8/18/2020. (lcrjl2) (Entered: 08/18/2020) |
| 09/14/2020 | 118 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 09/14/2020) |
| 09/14/2020 | | MINUTE ORDER. Upon consideration of 118 the parties' Joint Status Report, it is hereby ORDERED that this case remains stayed. It is further ORDERED that the parties shall file a joint status report on or before December 14, 2020, updating the Court on the expected timing of any further government action and proposing any next steps in this case. SO ORDERED. Signed by Judge Richard J. Leon on 9/14/2020. (lcrjl2) (Entered: 09/14/2020) |
| 12/14/2020 | 119 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 12/14/2020) |
| 12/18/2020 | | MINUTE ORDER. Upon consideration of 119 the parties' joint status report, it is hereby ORDERED that this case remains stayed. It is further ORDERED that the parties shall file a joint status report on or before February 12, 2021, updating the Court on the expected timing of any further government action and proposing any next steps in this case. SO ORDERED. Signed by Judge Richard J. Leon on 12/18/2020. (lcrjl2) (Entered: 12/18/2020) |
| 02/12/2021 | 120 | Joint STATUS REPORT by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Text of Proposed Order of Plaintiff, # 2 Text of Proposed Order of Defendant)(Shanmugam, Kannon) (Entered: 02/12/2021) |
| 04/15/2021 | 121 | Joint STATUS REPORT by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Newton, Emily) (Entered: 04/15/2021) |
| 04/19/2021 | | MINUTE ORDER. Upon consideration of 121 the parties' Joint Status Report, it is hereby ORDERED that this case remains stayed. It is further ORDERED that the parties shall file a joint status report no later than July 14, 2021, updating the Court on the expected timing of any further government action and proposing any next steps in this case. SO ORDERED. Signed by Judge Richard J. Leon on 4/19/2021. (lcrjl2) (Entered: 04/19/2021) |

| 04/19/2021 | | Set/Reset Deadlines: Joint Status Report due by 7/14/2021. (zjd) (Entered: 04/19/2021) |
|---|---|---|
| 04/29/2021 | 122 | NOTICE *of Status Update* by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 04/29/2021) |
| 06/25/2021 | 123 | NOTICE *of Status Update* by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 06/25/2021) |
| 06/29/2021 | 124 | RESPONSE re 123 NOTICE of Status Update filed by UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Newton, Emily) Modified on 6/30/2021 to add docket link (zjf). (Entered: 06/29/2021) |
| 07/01/2021 | | MINUTE ORDER. Upon consideration of plaintiff's 123 Notice of Status Update and the recent notice of proposed rulemaking issued by defendant United States Department of Housing and Urban Development, 86 Fed. Reg. 33,590, it is hereby ORDERED that a hearing on the parties' currently pending cross-motions for summary judgment shall be set for July 19, 2021 at 3:00 PM in Courtroom 18 before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 7/1/2021. (hmc) (Entered: 07/01/2021) |
| 07/12/2021 | 125 | NOTICE of Appearance by James D. Todd, Jr on behalf of All Defendants (Todd, James) (Entered: 07/12/2021) |
| 07/19/2021 | | Minute Entry for Proceedings held before Judge Richard J. Leon: Motions Hearing held on 7/19/2021 re: Plaintiff's 60 MOTION for Summary Judgment, and 64 Defendants MOTION for Summary Judgment. The 60 64 Motions were Heard and Taken Under Advisement. The Court will allow supplemental submissions, not to exceed 20 pages, within two (2) weeks of the parties receipt of the transcript, limited to points raised during argument. (Court Reporter: Nancy Meyer) (jth) (Entered: 07/19/2021) |
| 08/02/2021 | 126 | TRANSCRIPT OF PROCEEDINGS before Judge Richard J. Leon held on 07/19/2021. Page Numbers: 1-41. Date of Issuance: 07/29/2021. Stenographic Court Reporter: Nancy J. Meyer. Telephone Number: 202-354-3118. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced a bove. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have 21 days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/23/2021. Redacted Transcript Deadline set for 9/2/2021. Release of Transcript Restriction set for 10/31/2021.(Meyer, Nancy) (Entered: 08/02/2021) |
| 08/02/2021 | | MINUTE ORDER. It is hereby ORDERED that the parties may, no later than August 16, 2021, file supplemental briefs, not to exceed 20 pages, regarding points raised during oral argument on 7/19/2021. SO ORDERED. Signed by Judge Richard J. Leon on 8/2/2021. (zjd) (Entered: 08/02/2021) |

| 08/09/2021 | 127 | Unopposed MOTION for Extension of Time to *File Supplement Brief* by BENJAMIN S. CARSON, SR, JULIAN CASTRO, SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 08/09/2021) |
| --- | --- | --- |
| 08/10/2021 | | MINUTE ORDER. Upon consideration of defendants' 127 Motion for Extension of Time to File Supplemental Brief, it is hereby ORDERED that the motion is GRANTED. Each party may, no later than September 1, 2021, file a supplemental brief, not to exceed 20 pages, regarding points raised during oral argument on 7/19/2021. SO ORDERED. Signed by Judge Richard J. Leon on 8/10/2021. (lcrjl2) (Entered: 08/10/2021) |
| 09/01/2021 | 128 | SUPPLEMENTAL MEMORANDUM to re 64 MOTION for Summary Judgment filed by BENJAMIN S. CARSON, SR, JULIAN CASTRO, SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Todd, James) (Entered: 09/01/2021) |
| 09/01/2021 | 129 | SUPPLEMENTAL MEMORANDUM to re 60 MOTION for Summary Judgment filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 09/01/2021) |
| 01/03/2022 | 130 | NOTICE OF WITHDRAWAL OF APPEARANCE as to UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. Attorney Emily Sue Newton terminated. (Newton, Emily) (Entered: 01/03/2022) |
| 08/03/2022 | 131 | NOTICE OF SUPPLEMENTAL AUTHORITY by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 08/03/2022) |
| 08/19/2022 | 132 | RESPONSE re 131 NOTICE OF SUPPLEMENTAL AUTHORITY filed by BENJAMIN S. CARSON, SR, JULIAN CASTRO, SHAUN DONOVAN, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Todd, James) (Entered: 08/19/2022) |
| 09/14/2022 | 133 | NOTICE *of Status Update* by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 09/14/2022) |
| 10/12/2022 | | MINUTE ORDER. Upon consideration of plaintiff's 133 Notice of Status Update, it is hereby ORDERED that a status conference is scheduled for Friday, October 21, 2022 at 3:30 PM in Courtroom 18 before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 10/12/2022. (lcrjl2) (Entered: 10/12/2022) |
| 10/12/2022 | | Set/Reset Hearings: Status Conference set for 10/21/2022 at 3:30 PM in Courtroom 18- In Person before Judge Richard J. Leon. (zgdf) (Entered: 10/12/2022) |
| 10/17/2022 | 134 | Consent MOTION to Reschedule Status Conference by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Text of Proposed Order) (Shanmugam, Kannon) (Entered: 10/17/2022) |
| 10/17/2022 | | MINUTE ORDER. Upon consideration of plaintiff's 134 Consent Motion to Reschedule Status Conference, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the status conference currently scheduled for Friday, October 21, 2022 at 3:30 PM is hereby vacated and continued until Friday, October 28, 2022 at 4:00 PM in Courtroom 18 before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 10/17/2022. (lcrjl2) (Entered: 10/17/2022) |
| 10/17/2022 | | Set/Reset Hearings: Status Conference set for 10/28/2022 at 4:00 PM in Courtroom 18 (In-Person) before Judge Richard J. Leon. (smc) (Entered: 10/18/2022) |
| 10/28/2022 | | Minute Entry for Status Conference held on 10/28/2022 before Judge Richard J. Leon: A further Status Conference set for 11/30/2022 at 3:30 PM in Courtroom 18 (In-Person) |

| | | |
|---|---|---|
| | | before Judge Richard J. Leon. Someone from the General Counsel's office is to be present at the next hearing. Court Reporter: Jeff Hook. (smc) (Entered: 10/28/2022) |
| 11/23/2022 | 135 | MOTION Cancel November 30, 2022, Status Conference re Status Conference,, Set Hearings, *and Status Report* by BENJAMIN S. CARSON, SR, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 11/23/2022) |
| 11/28/2022 | | MINUTE ORDER. Upon consideration of defendants' 135 Status Report and Motion to Cancel the November 30, 2022, Status Conference, it is hereby ORDERED that the motion is GRANTED IN PART AND DENIED IN PART. It is further ORDERED that the status conference currently scheduled for November 30, 2022, is hereby vacated and continued until December 13, 2022, at 4:00 PM in Courtroom 18 before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 11/28/2022. (lcrjl2) (Entered: 11/28/2022) |
| 11/28/2022 | | Set/Reset Hearings: Status Conference set for 12/13/2022 at 4:00 PM in Courtroom 18 (In-Person) before Judge Richard J. Leon. (smc) (Entered: 11/29/2022) |
| 12/06/2022 | 136 | Consent MOTION to Reschedule Status Conference by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Text of Proposed Order) (Shanmugam, Kannon) (Entered: 12/06/2022) |
| 12/08/2022 | 137 | MOTION to Cancel the December 13, 2022 Status Conf. re Set/Reset Hearings *and Status Report* by BENJAMIN S. CARSON, SR, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order) (Todd, James) Modified on 12/12/2022 (ztth). (Entered: 12/08/2022) |
| 12/08/2022 | | MINUTE ORDER. Upon consideration of plaintiff's 136 Consent Motion to Reschedule Status Conference and defendants' 137 Status Report and Motion to Cancel the December 13, 2022, Status Conference, it is hereby ORDERED that plaintiff's Motion is GRANTED and defendants' Motion is DENIED. It is further ORDERED that the status conference currently scheduled for December 13, 2022, is hereby vacated and continued until December 19, 2022, at 3:30 PM in Courtroom 18 before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 12/8/2022. (lcrjl2) (Entered: 12/08/2022) |
| 12/08/2022 | | Set/Reset Hearings: Status Conference set for 12/19/2022 at 3:30 PM in Courtroom 18- In Person before Judge Richard J. Leon. (zjch, ) (Entered: 12/09/2022) |
| 12/19/2022 | | Minute Entry for Status Conference held on 12/19/2022 before Judge Richard J. Leon. Status Conference set for 1/13/2023 at 4:00 PM in Courtroom 18- In Person before Judge Richard J. Leon. Court Reporter: Lorraine Herman. (zjch) Modified to correct year on 12/20/2022 (smc). (Entered: 12/19/2022) |
| 01/03/2023 | 138 | NOTICE *of Status Update* by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 01/03/2023) |
| 01/05/2023 | | MINUTE ORDER. Upon consideration of plaintiffs' 138 Notice of Status Update, it is hereby ORDERED that defendants shall be prepared to advise the Court at the January 13 status conference whether they have a good-faith belief that the final rule will differ meaningfully from the 2013 Rule and, if so, the basis for that belief. SO ORDERED. Signed by Judge Richard J. Leon on 1/5/2023. (lcrjl2) (Entered: 01/05/2023) |
| 01/12/2023 | 139 | STATUS REPORT by BENJAMIN S. CARSON, SR, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Todd, James) (Entered: 01/12/2023) |

| | | |
|---|---|---|
| 01/13/2023 | | Minute Entry for proceedings held before Judge Richard J. Leon: Status Conference held on 1/13/2023. Court Reporter Lisa Grimminger. (zjch, ) (Entered: 01/13/2023) |
| 01/27/2023 | 140 | NOTICE *of Government Filing in Related Case* by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 01/27/2023) |
| 01/31/2023 | 141 | RESPONSE re 140 Notice (Other) filed by BENJAMIN S. CARSON, SR, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Todd, James) (Entered: 01/31/2023) |
| 03/09/2023 | 142 | MOTION for a Status Conference by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) Modified event on 3/10/2023 (znmw). (Entered: 03/09/2023) |
| 03/17/2023 | 143 | RESPONSE re 142 MOTION for Status Conference *and Status Report* filed by BENJAMIN S. CARSON, SR, JULIAN CASTRO, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Todd, James) (Entered: 03/17/2023) |
| 03/22/2023 | 144 | REPLY to opposition to motion re 142 MOTION for Status Conference filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 03/22/2023) |
| 03/27/2023 | 145 | Consent MOTION for Leave to File *Second Amended Complaint* by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Attachments: # 1 Second Amended Complaint for Declaratory and Injunctive Relief)(Shanmugam, Kannon) (Entered: 03/27/2023) |
| 03/28/2023 | | MINUTE ORDER. Upon consideration of plaintiff's 145 Consent Motion for Leave to File Second Amended Complaint, it is hereby ORDERED that the motion is GRANTED. The Clerk is directed to file plaintiff's [145-1] Second Amended Complaint for Declaratory and Injunctive Relief. SO ORDERED. Signed by Judge Richard J. Leon on 3/28/2023. (lcrjl2) (Entered: 03/28/2023) |
| 03/28/2023 | 146 | SECOND AMENDED COMPLAINT against UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, MARIA L. FUDGE filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES.(znmw) (Entered: 03/29/2023) |
| 04/05/2023 | 147 | Joint MOTION for Briefing Schedule by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 04/05/2023) |
| 04/10/2023 | 148 | Consent MOTION to Stay re 146 Amended Complaint *Defendants' Deadline to Respond* by MARIA L. FUDGE, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 04/10/2023) |
| 04/11/2023 | | MINUTE ORDER. Upon consideration of the parties' 147 Joint Motion for Briefing Schedule, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that defendants shall serve the administrative record supplement on plaintiff by April 17, 2023; defendants shall file any supplemental brief by May 5, 2023; plaintiff shall file any supplemental response by May 19, 2023; and the parties shall file joint excerpts of record by May 31, 2023. It is further ORDERED that plaintiff's 142 Motion for Hearing is DENIED AS MOOT. SO ORDERED. Signed by Judge Richard J. Leon on 4/11/2023. (lcrjl2) (Entered: 04/11/2023) |
| 04/11/2023 | | Set/Reset Deadlines: Administrative Record Supplement due by 4/17/2023. Supplemental Brief due by 5/5/2023. Supplemental Response due by 5/19/2023. Joint Excerpts of Record due by 5/31/2023. (smc) (Entered: 04/11/2023) |

| 04/14/2023 | | MINUTE ORDER. Upon consideration of defendants' 148 Consent Motion to Stay Deadline to Respond to Second Amended Complaint, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that defendants' deadline to respond to 146 Second Amended Complaint is hereby STAYED. In the event this Court denies both parties' respective motions for summary judgment, defendants shall respond to 146 Second Amended Complaint within 14 days after any such order. SO ORDERED. Signed by Judge Richard J. Leon on 4/14/2023. (lcrjl2) (Entered: 04/14/2023) |
|---|---|---|
| 05/05/2023 | 149 | NOTICE of Appearance by Brian C. Rosen-Shaud on behalf of All Defendants (Rosen-Shaud, Brian) (Entered: 05/05/2023) |
| 05/05/2023 | 150 | SUPPLEMENTAL MEMORANDUM to re 64 MOTION for Summary Judgment filed by MARIA L. FUDGE, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. (Todd, James) (Entered: 05/05/2023) |
| 05/19/2023 | 151 | SUPPLEMENTAL MEMORANDUM to 60 *MOTION for Summary Judgment* filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (Shanmugam, Kannon) (Entered: 05/19/2023) |
| 05/30/2023 | 152 | NOTICE *of Filing Joint Excerpts of Certified Administrative Record* by MARIA L. FUDGE, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT re 150 Supplemental Memorandum, 151 Supplemental Memorandum (Attachments: # 1 Index of Jt. Excerpts of Record, # 2 Jt. Excerpts of Record Part 1, # 3 Jt. Excerpts of Record Part 2, # 4 Jt. Excerpts of Record Part 3, # 5 Jt. Excerpts of Record Part 4, # 6 Jt. Excerpts of Record Part 5)(Todd, James) (Entered: 05/30/2023) |
| 05/30/2023 | 153 | NOTICE *of Filing Joint Excerpts of the Administrative Record - Part II* by MARIA L. FUDGE, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (Attachments: # 1 Jt. Excerpts Part 6, # 2 Jt. Excerpts Part 7, # 3 Jt. Excerpts Part 8, # 4 Jt. Excerpts Part 9, # 5 Jt. Excerpts Part 10, # 6 Jt. Excerpts Part 11) (Todd, James) (Entered: 05/30/2023) |
| 07/20/2023 | 154 | NOTICE *of Related Litigation* by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES (Shanmugam, Kannon) (Entered: 07/20/2023) |
| 09/19/2023 | 155 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 9/19/2023. (lcrjl2) (Entered: 09/19/2023) |
| 09/19/2023 | 156 | ORDER. Signed by Judge Richard J. Leon on 9/19/2023. (lcrjl2) (Entered: 09/19/2023) |
| 11/17/2023 | 157 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 156 Order on Motion for Summary Judgment, by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. Filing fee $ 505, receipt number ADCDC-10503812. Fee Status: Fee Paid. Parties have been notified. (Shanmugam, Kannon) (Entered: 11/17/2023) |
| 11/20/2023 | 158 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 157 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 11/20/2023) |
| 11/27/2023 | | USCA Case Number 23-5275 for 157 Notice of Appeal to DC Circuit Court, filed by NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES. (znmw) (Entered: 11/27/2023) |

**PACER Service Center**

**Transaction Receipt**

08/28/2024 12:51:16

| PACER Login: | pw0001MAO | Client Code: | 022538-00001-08560 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 1:13-cv-00966-RJL |
| Billable Pages: | 27 | Cost: | 2.70 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN INSURANCE ASSOCIATION and
NATIONAL ASSOCIATION OF MUTUAL
INSURANCE COMPANIES,

      Plaintiffs,

                                         Civil Action No. 13-cv-966 (RJL)

        v.

UNITED STATES DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT
and JULIAN CASTRO, in his official capacity as
Secretary of Housing and Urban Development,

      Defendants.

**AFFIDAVIT OF DAVID R. BENSELER IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

I, David R. Benseler, declare as follows:

1. I am over eighteen years of age and am not suffering under any legal or physical disability.

2. I am the Vice President of the Actuarial Division at Motorists Mutual Insurance Company ("Motorists"). I am a member of Academy of Actuaries and a Fellow of the Casualty Actuarial Society. My duties include overseeing my company's actuarial function, including but not limited to, all rate making operations.

3. Motorists is a member of Plaintiff National Association of Mutual Insurance Companies, and insures policyholders in Ohio, Kentucky, Indiana, Pennsylvania, Michigan and West Virginia.

4. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. I am testifying to the statements below based on my personal knowledge.

5. At no time has Motorists collected data regarding the race, color, religion, national origin, handicap or other protected classes of its policyholders.

6. Motorists only collects information about its policyholders that has been deemed permissible for underwriting purposes.

**J.A.32**

7. Due to the overwhelming cost, need to add resources i.e. consultants, need to develop new policies and procedures, rewrite underwriting guidelines, reprogram existing policy management systems, expand data warehousing capabilities, increased man hours from Information Systems staffing taking that staff away from their regular duties all at excessive costs and expense in order to accomplish this task, Motorists has no intention of collecting that data from current policyholders and house it on our systems.

8. Collection of that data from prospective policyholders would also require Motorists to devote significant resources and impose a substantial financial burden on our company to the detriment of our ongoing business.

9. But for the implementation of the Department of Housing and Urban Development Disparate Impact Rule Motorists would not be forced to incur these burdensome costs and tasks to the detriment of its current and future policyholders to obtain this information which it has no interest in collecting or using.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 27, 2016.

David R. Benseler

Sworn and subscribed before me this

27th day of June, 2016

Notary Public

Charles R. Gaskill II, Attorney At Law
Notary Public - State of Ohio
My Commission has no expiration date
Section 147.03 R.C.

**J.A.33**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

    Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and JULIAN CASTRO, in his official
capacity as Secretary of Housing and Urban
Development,

    Defendants.

Civil Action No. 13-cv-966 (RJL)

**AFFIDAVIT OF KEVIN J. CHRISTY IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

I, Kevin J. Christy, declare as follows:

1.    I am over eighteen years of age and am not suffering under any legal or physical disability.

2.    I submit this declaration in support of Plaintiffs' motion for summary judgment. I am testifying to the statements below based on my personal knowledge.

3.    I am Vice President and Chief Actuary at Western National Mutual Insurance Company (Western National). My duties include heading up the actuarial area, business intelligence, product development area, and those responsible for implementation of our rates and rating algorithms.

4.    Before the Department of Housing and Urban Development enacted the Disparate-Impact Rule, Western National did not collect data regarding the race, color, religion, national origin, sex, familial status, or handicap of its insureds.

1

**J.A.34**

5.     Because of the enactment of the Disparate-Impact Rule and in response to that rule,

       Western National will need to assess how to collect, organize, and analyze such data,

       both from existing and prospective policyholders.

6.     I estimate my staff and I will need to spend 40 hours determining what data Western Na-

       tional will need to ensure compliance with the Disparate Impact Rule.

7.     My staff and I will also spend an estimated 60 hours determining how to collect the data

       needed to ensure compliance with the Disparate Impact Rule.

8.     My staff and I will need to spend an estimated 300 hours executing our plan to collect the

       data needed to ensure compliance with the Disparate Impact Rule.

9.     In total, I estimate it will cost Western National $10,000, and approximately 400 hours in

       employee time, to plan, organize, and procure the data necessary to comply with the Dis-

       parate-Impact Rule.

10.    That cost is ongoing because Western National will need to continuously monitor the da-

       ta it collects.  Western National will spend an estimated $5,000 per month collecting new

       data on race, color, religion, national origin, sex, familial status, and handicap; and ana-

       lyzing that data as it is available to ensure that Western National is complying with the

       Disparate Impact Rule.

11.    But for the Disparate Impact Rule, Western National would not incur these costs.


       I declare under penalty of perjury that the foregoing is true and correct.

       Executed on June 15, 2016


                                          _____
                                          Kevin J. Christy

                                ii

**J.A.35**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and JULIAN CASTRO, in his official
capacity as Secretary of Housing and Urban
Development,

      Defendants.

Civil Action No. 13-cv-966 (RJL)

**AFFIDAVIT OF ANDREW P. FORSTENZER**

**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Andrew P. Forstenzer, declare as follows:

1. I am over eighteen years of age and am not suffering under any legal or physical disability.
2. As General Counsel at Preferred Mutual Insurance Company ("Preferred Mutual") my duties include overseeing government affairs and Preferred Mutual's compliance with state and federal law.
3. Preferred Mutual is a member of Plaintiff National Association of Mutual Insurance Companies, and insures policyholders in New York, New Jersey, Massachusetts and New Hampshire.
4. I submit this declaration in support of Plaintiff National Association of Mutual Insurance Companies' Motion for Summary Judgment. I am testifying to the statements below based upon my personal knowledge.
5. Preferred Mutual does not currently collect or use information regarding the race, color, religion, national original, sex, familial status or handicap of its policyholders.

**J.A.36**

6.  In the past, in response to the enactment of the Disparate Impact Rule, Preferred Mutual has undertaken to consider how to collect, organize and analyze such data, both from existing and prospective policyholders.

7.  In doing so, Preferred Mutual has determined that collection of such data from current policyholders would require Preferred Mutual to devote significant resources at considerable additional cost and be a financial burden to the company.  Costs would include, among others, survey campaigns, expenses associated with the expansion of ongoing customer management system development and upgrades, consultant fees related to the expansion of our data warehouse and considerable man/hours by our systems development personnel.

8.  Collection of such data from prospective policyholders would also require Preferred Mutual to devote significant resources and impose a financial burden on our company. Among the costs to be incurred would be those related to development of a new user interface to collect the data and house it on an expanded data warehouse, including retention of outside consultants, the purchase of additional data sources and the expenditure of considerable man/hours by our internal systems development personnel.

9.  Compliance with this rule will, in addition, require Preferred Mutual to rebuild its rate engine through the additional expenditure of man/hours by internal systems development personnel.

10. Once data has been collected, the company will face additional costs to build and scrub the modelling set necessary to develop applicable rating models, to retain consultants to assist us in data analysis and compliance with the rule and in adding additional full time employees to monitor compliance.

11. But for the Disparate Impact Rule, Preferred Mutual would not incur the costs described above.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 24, 2016.

Andrew P. Forstenzer

Sworn and subscribed before me this

24th day of June, 2016

Lora Rowe, Notary Public

LORA A. ROWE #4767854
Notary Public, State of New York
Qualified in Chenango County
Commission Expires 9/30_18_

**J.A.37**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN INSURANCE ASSOCIATION
And NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

                                          Civil Action No. 13-cv-966 (RJL)

        Plaintiffs,

                v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
And JULIAN CASTRO, in his official
Capacity as Secretary of Housing and Urban
Development,

        Defendants.

**AFFIDAVIT OF GREG HAYWARD
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BEFORE ME, the undersigned authority, personally appeared who, being by me duly sworn, deposed and stated as follows:

1. My name is Greg Hayward. I am an Assistant Vice President and Actuary in the Property and Casualty Actuarial Department and have served in that capacity for at least 12 years. During my career I have had several roles in the Property and Casualty Actuarial Department including actuarial analyst, senior actuarial analyst, pricing manager, and pricing director. I am currently overseeing five researcher managers and one actuarial analyst, and in addition to the management responsibilities my job duties include using my extensive experience and actuarial expertise to establish vision and strategies, conduct research, and lead broad and complex enterprise initiatives. All of this work is in support of State Farm Mutual Automobile Insurance Company, its subsidiaries and affiliates, including those selling property insurance in the United States (hereafter for those companies underwriting property insurance, "State Farm"). State Farm provides homeowner's insurance in all 50 States and in the District of Columbia.

2. I am making this affidavit in connection with the above-referenced lawsuit styled Civil Action No. 1:13-cv-00966 (RJL), *American Insurance Association et al. v. United States Department of Housing and Urban Development et al.,* in the United States District Court for the District of Columbia. State Farm is a member of Plaintiff National Association of Mutual Insurance Companies. I have the authority and have been authorized to make this affidavit on behalf of State Farm. I am over 18 years of age, capable of making this affidavit, and have personal knowledge of the facts stated herein and they are true and correct.

3. I understand that the United States Department of Housing and Urban Development

1

**J.A.38**

("HUD") has issued a final rule (the "Disparate Impact Rule") purporting to interpret the Fair Housing Act to prohibit practices, including the provision and pricing of homeowner's insurance, that result in a disparate impact on groups identified by certain protected characteristics, including race, color, and national origin (hereinafter referred to as "protected class").

4.  As part of my job duties, I am familiar with State Farm's underwriting guidelines for the provision of homeowner's insurance and have researched and developed rates for State Farm's homeowner's insurance.

5.  State Farm does not collect or use information about membership in protected classes for the purposes of rating or underwriting of residential property insurance.

6.  State Farm does not collect, retain, or use data regarding the race, color, religion, national origin, sex, familial status, or handicap of its policyholders for its rating or underwriting of residential property insurance.

7.  Because some States prohibit insurance companies from collecting or using data on the race, color, religion, national origin, sex, familial status, or handicap of its policyholders, State Farm does not collect such data for rating or underwriting of residential property insurance in any State.

8.  The U.S. insurance industry is highly regulated, primarily through state law.  An insurer's failure to comply with state law can lead to drastic consequences, including loss of the right to do business in that State.

9.  The personal lines underwriting and rating functions at State Farm identify risk factors related to particular residential properties.  After identifying those risks as being eligible to insure from an underwriting perspective, State Farm uses data wholly unrelated to the protected class status to establish rates for similarly situated risks.  The fairness of State Farm's rates—and the viability of its products—depends on accurate and impartial evaluation and differentiation of risk, and the matching of price to risk.

10. The race, color, religion, national origin, sex, familial status, or handicap of the policyholders plays no part in State Farm's assessment of and differentiation among risks of residential property insurance.

11. Even if State Farm had access to records of its residential property insurance policyholders' race, color, religion, national origin, sex, familial status, or handicap, the existing State Farm systems for residential property insurance underwriting and rating do not have the existing capabilities to store or utilize individual records of the protected class status of its policyholders for rating or underwriting of residential property insurance.  Accordingly, State Farm cannot determine whether there is a disparate impact on a protected class by a particular rating or underwriting practice or, if so, whether there is a less discriminatory alternative that either effectively differentiates risks or matches price to risk, or that does not result in unfairly discriminatory rates prohibited by the insurance laws of the states.

2

**J.A.39**

12. Collecting  protected class data from existing residential property insurance policyholders and housing it in a way to be utilized by the systems for residential property insurance underwriting and rating to be able to determine whether a practice has a disparate impact on a protected group or, if so, to determine whether such a less discriminatory alternative was available, would be expensive and would expressly interject those prohibited factors into consideration by State Farm underwriting and rating processes.  The costs would include survey campaigns, new hardware and software, and expanded data-storage facilities.  In addition, collecting data on the protected characteristics listed in the Disparate Impact Rule would require State Farm to expend substantial human resources, including time spent planning for collecting and housing the new data, and continued maintenance of new data.

13. Applicants for residential property insurance and residential property insurance policyholders may be unwilling to provide data about race, color, religion, national origin, sex, familial status, or handicap status, making it impossible to collect and to have an accurate way to determine disparate impact and less discriminatory alternatives if necessary.

14. Collecting data about race, color, religion, national origin, sex, familial status, or handicap status may expose State Farm to adverse publicity from persons who may disapprove of the company collecting this data, and thus damaging its reputation among existing and potential customers.

15. If State Farm were to include such protected classes as factors in its rating or underwriting of residential property insurance to be able to accurately determine disparate impacts of underwriting or rating practices and less discriminatory alternatives, State Farm may render its rating and underwriting models to be less predictive of insurance risk.  To counteract any disparate impact on one protected class may transfer the impact to another protected class which may result in allegations of intentional discrimination under the Fair Housing Act or state law.  Inaccurate models used in underwriting and rating may result in allegations that State Farm is violating state insurance laws which prohibit unfair discrimination.

16. State Farm may not take race or other similar protected characteristics into account in its ratemaking or underwriting decisions for residential property insurance under state insurance laws.

17. State Farm cannot accurately determine whether it's underwriting or rating practices for residential property insurance create a disparate impact or any less discriminatory alternative, without taking steps that undermine its current business practices, and its obligations to comply with state insurance laws that prohibit consideration of the factors defining the protected classes in underwriting or rating residential property insurance.

18. Under the HUD Disparate Impact Rule, HUD could mandate an alleged remedy for disparate-impact issues by forcing consideration of the race, color, religion, national origin, sex, familial status, or handicap of its policyholders into the underwriting and ratemaking process for residential property insurance.  That, in turn, may result in violations of the state insurance laws prohibiting consideration of such factors in residential property insurance or unfair

3

**J.A.40**

discrimination.  In addition, remedying disparate impact on one protected class by transferring the impact to another protected class may result in allegations of intentional discrimination under the Fair Housing Act or state laws.

19. State Farm makes its underwriting and rating decisions based primarily on insurance risk, and does not consider the race, color, religion, national origin, sex, familial status, or handicap of applicants for residential property insurance.  Forced compliance with the Disparate-Impact Rule by HUD will call State Farm to account for its policyholders' race, color, religion, national origin, sex, familial status, or handicap, in violation of state law.

20. I reside and work primarily in the State of Illinois. This affidavit and all affidavits and drafts I have prepared were prepared with the assistance of counsel.

FURTHER, Affiant sayeth not.

Greg Hayward

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this _29_ day of  June, 2016, by Greg Hayward , who is personally known to me to be the person whose name is subscribed to this document.

Notary Public

OFFICIAL SEAL
TIFFANY L SCOTT
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/05/18

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN INSURANCE ASSOCIATION and NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES, | : : : : : | Civil Action No.: 13-cv-966 (RJL) |
| Plaintiffs, | : : | |
| v. | : : | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and JULIAN CASTRO, in his official capacity as Secretary of Housing and Urban Development, | : : : : : | **DECLARATION OF WILLIAM G. HIRSCHFELD IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | : : : | |

I, William G. Hirschfeld, being duly sworn, do hereby state as follows:

1.      I am over the age of eighteen and competent to provide testimony in the above matter. I am currently employed as the Vice President of Underwriting for the Franklin Mutual Insurance Group ("Franklin Mutual" or "the Company"). Franklin Mutual is a property and casualty insurance company authorized to issue insurance policies in New Jersey only, and as such, is one of the top ten largest, homeowners insurers in the State. In my capacity as the Vice President of Underwriting, I am knowledgeable about the policies and practices of Franklin Mutual regarding the collection of data from policyholders and applicants for insurance, as well as the data that is currently used by the Company in the underwriting process and the cost and burdens associated with the collection of additional data, as described below.

2.      I make this declaration in support of the motion for summary judgment filed by the plaintiffs, the American Insurance Association and the National Association of Mutual

**J.A.42**

Insurance Companies, in the above matter, and to address the impact on Franklin Mutual of the Department of Housing and Urban Development's ("HUD") Disparate-Impact Rule.

### Current Practices at the Company

3.      Prior to the promulgation by HUD of the Disparate-Impact Rule, Franklin Mutual did not, and the Company currently does not, collect, retain or use data regarding the race, color, religion, national origin, sex, familial status or handicaps of its policyholders or applicants for insurance.

4.      To the contrary, I am advised that New Jersey law prohibits the Company, in setting rates, from unfairly discriminating against any person or group of persons based upon race, color, religion, national origin, sex, familial status or handicaps.  Accordingly, the Company does not currently collect, maintain or use such data in connection with underwriting or rate making.

5.      The insurance industry in New Jersey is heavily regulated by the New Jersey Department of Banking and Insurance.  All homeowners rates must receive prior approval from the Department, and therefore, any change in rates, rules and/or forms must receive Department approval before they may be used.  A failure by Franklin Mutual to comply with state law would have drastic consequences for the Company, including the loss of its ability to do business in New Jersey, the only state in which it operates.

6.      The Company's underwriting process identifies risk factors related to particular properties in a way that allows the Company to establish rates.  In order to do so fairly, the Company needs an accurate and impartial evaluation and differentiation of risks.  As indicated above, the race, color, religion, national origin, sex, familial status or handicap of the Company's policyholders are not used in the assessment and differentiation of those risks.

{R0351169.2}                                      2

**J.A.43**

## Effect of Compliance With Disparate-Impact Rule

7.    To determine whether it complies with by the Disparate-Impact Rule, Franklin Mutual would need to start collecting data regarding its policyholders' protected characteristics, as the Company currently does not collect that information for its purposes.

8.    Collecting that data would entail significant additional costs, as it would require survey campaigns, changes to existing software, and potentially additional or different hardware and expanded data-storage capability.

9.    In addition, collecting data on the protected characteristics identified in the Disparate-Impact Rule would require the Company to expend substantial additional human resources, likely including the retention of outside consultants in order to assist in the planning and implementation of the collection of the additional data and the subsequent inclusion of that data into the risk evaluation process.

10.    After collecting the necessary data, Franklin Mutual would need to use the data to determine if it complies with the Disparate-Impact Rule, assuming that it could do so without violating existing New Jersey law.  This process would require the Company to evaluate, at potentially significant expense, the legality under applicable law of the collection, maintenance and use of this data in connection with its business practices.

11.    In the event that Franklin Mutual could reach the conclusion that it would be able to collect, maintain and utilize such data without violating state law and jeopardizing its ability to do business in New Jersey, the Company would then need to build new rating models that considered the race, color, religion, national origin, sex, familial status and/or handicap of its policyholders.

**J.A.44**

12.     Without taking all of these steps, Franklin Mutual could not determine whether its practices create a disparate impact upon its policyholders and also could not implement a remedy to address any potential disparate-impact issue.

13.     In addition, to ensure compliance with the Disparate-Impact Rule, the Company would need to cross reference the newly-collected data against prior underwriting and rating determinations based on other, actuarially relevant factors and adjust its underwriting, rating and pricing decisions accordingly.   Franklin Mutual is unsure whether or how it could do so consistent with its obligations under New Jersey law.

14.     In the absence of the implementation of the Disparate-Impact Rule in this area, Franklin Mutual would continue its current practice of **not** collecting information regarding the protected characteristics of its policyholders, which would result in a substantial saving of time, expenses, and costs.

## Conclusion

15.     But for the Disparate-Impact Rule, Franklin Mutual would continue its current practice, which specifically avoids collection, retention or use of data about the race, color, religion, national origin, sex, familial status or handicap of its policyholders.   Changing those practices would cause the Company to incur substantial additional costs.

16.     The effect of the Disparate-Impact Rule on the Company is significant in that it appears to require the Company to collect, maintain and use data in violation of both New Jersey law and settled actuarial principles, and yet failure to collect, maintain and use such data would render the Company unable to determine whether its practices create a disparate-impact issue and to implement a remedy to address any such issue.

{R0351169.2}                                          4

**J.A.45**

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of

the United States of America that the foregoing is true and correct.

Dated:  June $\underset{\underline{\quad\quad}}{23}$, 2016

William G. Hirschfeld

**J.A.46**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION<br><br>and<br><br>NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and JULIAN CASTRO, in his official capacity as Secretary of Housing and Urban Development,<br><br>Defendants. | Civil Action No. 13-cv-966 (RJL) |

## AFFIDAVIT OF SALVATORE T. LADUCA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Salvatore T. LaDuca, declare as follows:

1.  I am over eighteen years of age and am not suffering under any legal or physical disability.

2.  Plaintiffs have filed an action to enjoin the enforcement of the Department of Housing Development's "Disparate-Impact Rule".

3.  I submit this declaration in support of Plaintiffs' motion for summary judgment. I am testifying to the statements below based on my personal knowledge.

i

1255401.2 6/24/2016

4.   I am Vice President of Product Management & Actuarial at Merchants Mutual
     Insurance Company, Merchants Preferred Insurance Company and Merchants
     National Insurance Company (collectively "Merchants").  I am responsible for
     managing the Actuarial and Product Management functions, which include the
     development of Merchants' rating and underwriting systems that comply with state
     insurance laws and regulations.  Failure to comply with these laws can lead to
     severe penalties including the loss of the right to do business in that state.

5.   Merchants is licensed to sell Homeowners insurance in 11 states and is a member
     of the National Association of Mutual Insurance Companies, which is a plaintiff in
     the action.

6.   Merchants' Homeowners products offering are underwritten and rated using
     standard risk factors based on data specific to an insured property.  Examples of
     such factors include age of home and type of construction but also include broader
     factors such as weather and catastrophe history of the geographic area.

7.   These risk factors are filed with State insurance regulators as part of the approval
     process for Merchants' rates, which govern what Merchants may charge
     homeowners for premiums.

8.   State laws and regulations are clear and consistent in their permission of such risk
     based pricing and underwriting.  They are equally clear in the prohibition of
     collecting or using data on the race, color, religion, national origin, sex, familial
     status, or handicap of its policyholders or prospective policyholders.

ii

1255401.2 6/24/2016

**J.A.48**

9.      Merchants does not currently collect, retain, or use data regarding the race, color,

religion, national origin, sex, familial status, or handicap of its policyholders or

prospective policyholders.

10.     Because of the Disparate-Impact Rule, Merchants will need to assess whether and

how it can collect, organize, and analyze such data from existing and prospective

policyholders in a manner consistent with state insurance laws.  We see this effort

as being in direct conflict with the state insurance laws preventing discrimination

described above.  We estimate that costs associated with the assessment and

execution of the plan to collect, organize, and analyze such data would be

significant.

11.     After collecting such data, Merchants would need to evaluate what steps it could

take to comply with the Disparate-Impact Rule without violating state and federal

discrimination laws.  That analysis will consume further time and resources with

additional significant costs.

12.     Should Merchants need to revise its Homeowners insurance rates to ensure

compliance with the Disparate-Impact Rule, the revised rates would likely be in

conflict with current state insurance laws that require pricing based on risk

characteristics, and could adversely impact our ability to continue to do business

as a Homeowners' insurer.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 27, 2016.

Salvatore T. LaDuca

1255401.2 6/24/2016

iii

**J.A.49**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


---

AMERICAN INSURANCE ASSOCIATION et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, et al.,

Defendants.

---

Civil Action No. 13-cv-966 (RJL)


**AFFIDAVIT OF STEHPANIE LLOYD IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The affiant being duly sworn testifies as follows:

1.      I, Stephanie Lloyd, am an employee of Farmers Group, Inc. and hold the position of Chief Underwriting Officer, Personal Lines.  Farmers Group, Inc. is a wholly owned subsidiary of Zurich Insurance Group, Ltd. and is a member of the American Insurance Association.  Farmers Group Inc. is not an insurance carrier, but does provide certain insurance-related administrative services. In my position, I am familiar with the underwriting practices of the insurance companies which comprise the Farmers Insurance Group of Companies. I make this affidavit in support of Plaintiffs' motion for summary judgment.  I have personal knowledge of the facts set forth herein and, if called as a witness, I would competently testify as follows.

**J.A.50**

2.      The companies which comprise the Farmers Insurance Group of Companies (hereinafter "Farmers Insurance") sell personal and commercial lines property and casualty insurance throughout the United States.

3.      Farmers Insurance does not use a policyholder's race or ethnicity as a factor in its insurance underwriting.  Farmers Insurance does not use race or ethnicity in determining which risks to insure or in determining the price or premium rate charged to insure risks.

4.      Farmers Insurance does not collect and maintain data on the race or ethnicity of policyholders for purposes of making underwriting or rating decisions.

5.      Like other insurance companies, Farmers Insurance is subject to regulation by each State in which it does business.

6.      In virtually every state in which Farmers Insurance does business, State insurance laws and/or regulations prohibit race or ethnicity being used as a factor in underwriting and pricing.

7.      Because Farmers Insurance does not collect, maintain or use data on race or ethnicity for underwriting or pricing, Farmers Insurance has no present ability to determine from its own data if its underwriting and pricing does, or does not, have an "adverse impact" on racial or ethnic minorities.  Likewise, Farmers Insurance has no ability to evaluate possible alternative underwriting and/or pricing that may, or may not, have a lesser "adverse impact" on these groups.

8.      To evaluate and avoid potential liability under the "disparate impact rule" promulgated by the Department of Housing and Urban Development, Farmers Insurance would have to collect and maintain data on the race and ethnicity of all policyholders, and would have

to take into consideration race and ethnicity in its underwriting and pricing decisions.  Such a

practice would contravene the insurance laws and/or regulations of numerous States in which

Farmers Insurance does business.

June 30, 2016                               _____
                                                Stephanie Lloyd

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

     Plaintiffs,

         v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and JULIAN CASTRO, in his official
capacity as Secretary of Housing and Urban
Development,

     Defendants.

Civil Action No. 13-cv-966 (RJL)

**AFFIDAVIT OF NIKKI L. MEEK IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

I, Nikki L. Meek, declare as follows:

1.     I am over eighteen years of age and am not suffering any legal or physical disability.

2.     I submit this affidavit in support of Plaintiffs' Motion for Summary Judgment.  I am testi-

fying to the statements below based on my personal knowledge.

3.     I am Assistant Vice President – Business Compliance, Personal Lines at The Hartford

Financial Services Group, Inc. ("Hartford").  Hartford is a member of Plaintiff American

Insurance Association.  My duties at Hartford include managing and optimizing the on-

going work to ensure that Hartford's writing companies are in compliance with State and

federal law in the provision of homeowners' insurance.

4.     The American insurance industry is highly regulated, primarily through the regulatory

arm of each State.  An insurer's compliance with insurance rules and regulations in a ju-

risdiction is generally a prerequisite to doing business there.  The consequences of laps-

ing out of compliance with a State's regulatory strictures can be catastrophic, including

the loss of the right to conduct business as an insurer in that State.

5.      The Hartford writing companies insure over a million homeowners in the 50 States and

the District of Columbia against the risk of loss to their homes and belongings. Through

its compliance and government affairs functions, Hartford maintains ongoing monitoring

and outreach efforts to ensure it is operating in full accord with the regulatory strictures

of each of the States.

6.      Hartford designs and sells its homeowners' insurance products based on long-standing

principles of risk assessment and differentiation.  In short, in the underwriting process

Hartford identifies risk factors based on data pertinent to a given property.  Those may

include dwelling-specific factors such as property age, type of construction, and broader

factors such as the catastrophe history of the region.  From there, Hartford can pool risks,

thereby creating a basis for predictability that allows the company to establish rates.  The

accurate ongoing evaluation and differentiation of risk drives the underwriting and rating

models.

7.      Hartford provides the consumer with the characteristics that we use to rate their policy.

Hartford does so as well to State regulators, in the form of rate filings that are submitted

as a precondition of doing business there, which govern the price Hartford can charge for

insurance premiums in that State.

8.      The regulations that govern Hartford and its peers in the business of insurance are fully

consistent with the idea that risk assessment and differentiation should be the primary en-

gine in underwriting, rating and pricing homeowners' insurance.  For example, regula-

tions in Alaska, Colorado, West Virginia and Wisconsin affirmatively permit risk differ-

entiation to account for probable impacts on losses or expenses.  Similarly, Maine's stat-

ute enumerates permissible factors for risk classification, so long as the classifications

apply equally to all insureds with the same circumstances or conditions.

9.      State regulations also make clear that certain factors extraneous to risk assessment and

differentiation should not be considered in insurers' actuarial and rating work.  By way of

example, Alaska, Illinois and Tennessee each forbid risk differentiation in insurance

based on race, color, religion, or national origin.  Maryland law forbids even the collec-

tion of data regarding those characteristics of insureds.  In that spirit, Hartford does not

collect or take any account of these criteria in underwriting and rating homeowners' in-

surance, and these factors have no relevance to actuarial risk assessment and differentia-

tion in the process of insuring homeowners.

10.     The adoption by the Department of Housing and Urban Development (HUD) of a rule

which, on its face, extends that entity's reach into the field of homeowners' insurance has

provided much cause for concern and internal discussion at Hartford about what steps, if

any, Hartford can take in response without creating other, greater problems.  The thresh-

old problem is that Hartford cannot determine its current compliance or ability to comply

with the HUD rule without taking new steps that would undermine its current business

practices discussed above and its ongoing obligations to comply with State rules and reg-

ulations.

11.     The HUD rule creates immediate tension with respect to State regulatory obligations, as

they essentially forbid consideration of protected characteristics that the HUD rule would

newly require us to value in the underwriting and rating process.  I am aware of no cur-

202981907_1 LAW

rent efforts by State regulators to give insurers relief from the existing State regulatory regimes to facilitate compliance with the HUD rule.

12.    Hartford would have to undertake three steps to assure effective compliance with the HUD rule, and each of those steps would mark departures from Hartford's current business practices.  The three-step process would comprise: (1) collecting data on characteristics of Hartford's insureds of interest to HUD (including race, religion, gender and national origin); (2) cross-referencing this newly-collected data against the pricing determined by the current risk assessment and differentiation model described above; and (3) making corrective underwriting, rating and pricing adjustments to recalibrate away from risk and towards parity of "impact."  Each of these steps would create fundamental conflicts with Hartford's existing State regulatory obligations.

13.    First, Hartford does not currently collect or use data regarding race, religion, or nationality in issuing homeowners' insurance policies.  This data in no way informs the process Hartford employs to assess risk or to rate and price insurance.  Given the State regulations that affirmatively forbid the use of such data by insurers, it would be a compliance risk under the existing State regulatory regime even to possess such data.  Hartford would need some State regulators' approval to modify its processes to collect this data, and the inconsistency of this modification with most existing State regulatory obligations (starting with Maryland's, which prohibits the collection of such data) would certainly create friction, or even active conflict, with State regulators.

14.    Second, using the currently-uncollected data as a benchmark against our current underwriting and rating structure is foreign to Hartford's current actuarial process and would require the incorporation of additional analytics that, for obvious reasons, do not exist in

the current system.  Again, the actuarial use of this data itself would likely be regarded as violative of existing State norms that prohibit attempts to differentiate amongst insureds by means of these characteristics.

15.    Third, taking the analysis to its logical conclusion, in order to ensure compliance with the HUD rule, Hartford would have to use the newly-acquired data to adjust outcomes for individual insureds based solely on this data – *i.e.* adjusting (upward or downward) the premium charged to achieve parity of "impact."  Again, this would require additional analytical effort and diversion of resources, all in the cause of a process that would run directly afoul of most State regulatory regimes, and operate inconsistently with others. That practice would risk Hartford's ability to do business as an insurer in those States under current regulations.  It would also subvert Hartford's risk differentiation model that has governed its business practices, and the operation of the American insurance business more generally, for decades.

\\\

\\\

\\\

202981907_1 LAW

16.     Hartford's compliance organization prides itself on being proactive and maintaining

adaptability to change.  We keep close watch on proposed State rules and regulations and

foster strong working relationships with State regulators to ensure that Hartford remains

on the leading edge of the compliance curve.  Good-faith efforts to assure compliance

with the HUD rule would force Hartford out of compliance with many States, thereby

jeopardizing its ongoing ability to do business.


        I declare under penalty of perjury that the foregoing is true and correct.  Executed on

June 29, 2016 in San Diego, CA.

_____

Nikki L. Meek

J.A.58

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

    Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and JULIAN CASTRO, in his official
capacity as Secretary of Housing and Urban
Development,

    Defendants.

Civil Action No. 13-cv-966 (RJL)

**AFFIDAVIT OF NORTH DAKOTA ASSOCIATION OF FARM MUTUAL
INSURANCE COMPANIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**We, Dundee Mutual Insurance Company, Cass County Mutual Insurance Company,
Family Mutual Insurance Company, Flaxton Mutual Fire Ins. Company, Griggs
Nelson Mutual Insurance Company, Home Mutual Insurance Company, McLean
McHenry Mutual Insurance Company, Southwest Mutual Insurance Company,
Walsh County Mutual Insurance Company and West McLean County Farm Mutual
Insurance Company are all County Mutual property insurance companies in the
State of North Dakota, declare as follows:**

1. **We the undersigned are managers of the companies listed above, all over eighteen
   years of age and not suffering from legal or physical disability.**

2. **We all are members of the North Dakota Association of Farm Mutual Insurance
   Companies.**

3. **We are all members of Plaintiff National Association of Mutual Insurance
   Companies.**

4. We have the authority to make this affidavit on behalf of each of the respective companies listed and the North Dakota Association of Farm Mutual Insurance Companies.

5. We are all small property insurance companies with annual premiums of between $750,000 and $3,000,000, with an employment base of between one and six employees as authorized we do business in specific counties in North Dakota, only.

6. The Companies listed above do not collect or retain hard copy or electronic records of policyholder's age, race, religion, color, national origin, family status or disability on existing or new policyholder accounts, nor does any company have existing capability to collect, store, analyze or utilize that information.

7. The age, race, religion, color, national origin, family status or disability of the above name company's policyholder plays no part in the assessment of and differentiation among risks.

8. The Companies listed above are highly regulated by the North Dakota State Insurance Department and are subject to strict compliance of State Statute NDCC 26. 1-04-03 (7) and NDCC 26.1-39-17which prohibit discrimination and or the use of the criteria suggested by HUD's Disparate-Impact Rule to price, accept or reject or renew insurance customers.

9. An insurer's failure to comply with state law can lead to drastic consequences, including revocation of the certificate to do business.

10. Compliance with the Disparate-Impact Rule would require each company to collect data regarding its policyholder's characteristics, including policyholder's age, race, religion, color, national origin, family status or disability of which the rule is insensitive to size of the company's financial and human resource necessary to get to and stay in compliance with the Rule.

11. Subsequent to collecting the requisite data, the Companies would be required to evaluate what steps would be needed to comply with the Rule, all without violating the letter and/or spirit of State and Federal non-discrimination laws, further escalating cost and requisite use of human resources.

12. But for the rule, the Companies listed above would not incur the costs described or expend human resources inherently already short given the size of our group of companies.

13. The onerous cost of compliance may very well have the unintended consequence of forcing smaller companies out of business while at the same time the effect and value of the rule does not appear measurably clear given each state's dedication and strict regulatory attention to achieve and maintain a non-discriminatory insurance environment.

I declare under penalty of perjury that the foregoing is to the best of my knowledge true and correct.

Executed on June 17, 2016 in Bismarck ND

**Dundee Mutual Insurance Company**

**Eugene Bossert, Manager**

> LEANNE VIGEN
> Notary Public
> State of North Dakota
> My Commission Expires Aug. 31, 2018

Leanne Vigen  6-23-2016

**Family Mutual Ins. Co**

**Rod Warner, General Manager**

> PHOEBE DEKREY
> Notary Public
> State of North Dakota
> My Commission Expires February 9, 2018

Phoebe DeKrey 6-17-16

**Flaxton Farmers Mutual Fire Ins. Co**

**James Anderson, Secretary**

> JAMIE A WILLIAMS
> Notary Public
> State of North Dakota
> My Commission Expires December 16, 2019

Jamie A. Williams 6-20-2016

**Home Mutual Ins. Company**

**Dorothy Dockter, Secretary**

> PHOEBE DEKREY
> Notary Public
> State of North Dakota
> My Commission Expires February 9, 2018

Phoebe DeKrey 6-17-16

**Cass County Mutual Ins. Co**

**Tracey Sherman Secy. Manager**

> LINDSEY D. JOHNSON
> Notary Public
> State of North Dakota
> My Commission Expires Jan. 2, 2020

6-22-2016

**Southwest Mutual Ins. Co**

**Brenda Doll, Secretary**

> JAMIE A WILLIAMS
> Notary Public
> State of North Dakota
> My Commission Expires December 16, 2019

Jamie A. Williams 6-20-2016

**Griggs Nelson Mutual Ins. Co**

**Audrey Reinhardt Secy. Manager**

> NATALIE NELSON
> Notary Public
> State of North Dakota
> My Commission Expires May 13, 2022

Natalie Nelson May 13, 2022
6-23-16

**McLean McHenry Mutual Ins. Co**

**Linda Huelsman, Secretary**

> DENISE BELISLE
> Notary Public
> State of North Dakota
> My Commission Expires August 30, 2016

Denise Belisle 6-20-16

**Walsh County Mutual Ins. Co.**

**Brad Schanilec, Secretary**

THOMAS M. SCHUSTER
Notary Public
State of North Dakota
My Commission Expires Jan. 4, 2019

**West McLean County Farmers Mutual Insurance Company**

**Debbie Keller, Secretary**

JAMIE A WILLIAMS
Notary Public
State of North Dakota
My Commission Expires December 16, 2019

• **Attached please find full names of the Companies, addresses and telephone numbers**

# North Dakota County Mutual Insurance Companies

**3**   **Dundee Mutual Insurance Company** .............................**Eugene Bossert, Secy.-Mgr.** ........**701-284-7139**
     Box 50, Park River, ND 58270-0050                           FAX: 701-284-7267

**5**   **Cass County Mutual Insurance Company** ....................**Tracey Sherman, Secy.-Mgr.**........**701-347-4309**
     830 Front St., Box 608, Casselton, ND 58012                 FAX: 701-347-5957

**10**   **Steele-Traill County Farmers Mutual Ins. Company** ....**Amy Johnson, Secy.-Mgr.**............**701-524-1524**
     300 Central Ave., Suite 107, Finley, ND 58230            FAX: 701-524-1525
     **Portland, ND Office** ...................................................................................................**701-786-3777**
                                                      FAX: 701-786-3743

**11**   **Family Mutual Insurance Company**.............................**Curt Jacobson, Secy.** .................**701-968-3651**
     Box 668, Cando, ND 58324           **Rodney Warner, Mgr.**      FAX: 701-968-3099
     **Bismarck, ND Office** ..................................................................................................**701-667-6050**
                                                       FAX: 701-667-6055

**15**   **Flaxton Farmers Mutual Fire Ins. Company** ...............**James B. Anderson, Secy.** ..........**701-377-2942**
     PO Box 99, Bowbells, ND 58721                       FAX: 701-377-2943

**17**   **Griggs Nelson Mutual Insurance Company** .................**Audrey Reinhart, Secy.-Mgr.** ......**701-322-5118**
     112 Main, Box 424, McVille, ND 58254                FAX: 701-322-4918
     **Cooperstown, ND Office**.............................................................................................**701-797-2692**

**19**   **Home Mutual Insurance Company**...............................**Dorothy Dockter, Secy.** .............**701-642-4101**
     502 Second Avenue North, Wahpeton, ND 58075-4418      FAX: 701-642-1755

**23**   **McLean McHenry Mutual Insurance Company**..............**Linda Huelsman, Secy.**................**701-448-2255**
     112 Main St., Box 575, Turtle Lake, ND 58575           FAX: 701-448-2322

**24**   **Southwest Mutual Insurance Company** ........................**Brenda L. Doll, Secy.** .................**701-843-7640**
     108 North 4th Street, Box 69, New Salem, ND 58563       FAX: 701-843-8106

**31**   **Walsh County Mutual Insurance Company** ..................**Brad Schanilec, Secy.**..................**701-248-3231**
     429 2nd Street, Box 375, Minto, ND 58261             FAX: 701-248-3709

**32**   **West McLean County Farmers**
     **Mutual Insurance Company** ....................................**Debbie Keller, Secy.** ...................**701-837-8179**
     1809 S. Broadway "Suite W", Minot, ND 58702         FAX: 701-858-1702

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES,

　　　　　Plaintiffs,

　　　　v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
and JULIAN CASTRO, in his official
capacity as Secretary of Housing and Urban
Development,

　　　　　Defendants.

Civil Action No. 13-cv-966 (RJL)

### AFFIDAVIT OF DIANNE L. PRIEST
### IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

BEFORE ME, the undersigned authority, personally appeared Dianne L. Priest who, being by me duly sworn, deposed and stated as follows:

1.　　My name is Dianne Priest.　I am the Executive Vice President of Cameron Mutual Insurance Company ("Cameron Mutual"). In that capacity, I am responsible for the Underwriting and Research and Development functions of the company.

2.　　I am making this affidavit in connection with the above-referenced lawsuit styled Civil Action No. 13-cv-966 (RJL), *American Insurance Association et al. v. United States Department of Housing and Urban Development et al.,* in the United States District Court for the District of Columbia. Cameron Mutual Insurance Company is a member of Plaintiff National Association of Mutual Insurance Companies.　I have the authority and have been authorized by

Cameron Mutual to make this affidavit. I am more than 18 years old, am capable of making this affidavit, and have personal knowledge of the facts set forth herein.

3.      As part of my duties as Executive Vice President, I am familiar with and have knowledge of the computer systems and data repositories used to support Cameron Mutual's underwriting of homeowners business. I am familiar with the application forms used to collect underwriting information from persons applying for homeowners insurance with Cameron Mutual. I am also familiar with the underwriting rules and procedures which apply to homeowners business and the factors used in the ratemaking process for the homeowners line of business.

4.      Cameron Mutual does not request, collect or store information or records relating to race, color, religion, national origin, or handicap as part of the application process for homeowners insurance.

5.      Cameron Mutual does not use race, color, religion, national origin, sex, or handicap as factors in underwriting its homeowners business. The underwriting process employed by the company focuses upon the particular and unique risk factors presented by the real property we are requested to insure.

6.      Cameron Mutual does not use race, color, religion, national origin, sex, or handicap as factors when developing underwriting rules or rates for homeowners business.

7.      Cameron Mutual does not collect or store information relating to race, color, religion, national origin, sex, or handicap in its homeowners data repositories. These data repositories are not designed or structured to capture this information. Although data on an applicant or insured's sex or marital status may be present in an underwriting file, this information is not aggregated or stored in any homeowners data repository in a format or

structure which would make it able to be used as a rating factor in the homeowners ratemaking process.

8.      To determine if Cameron Mutual is in compliance with the Disparate Impact Rule, it would need to start collecting and storing information on its applicants' and insureds' race, color, religion, national origin, sex, and handicap.

9.      In order to collect information on the race, color, religion, national origin, sex, or handicap of current insureds, Cameron Mutual would be required to mail surveys to each person presently insured under a policy issued by Cameron Mutual. Mailing and postage costs would amount to thousands of dollars.  Additionally, personnel expenses associated with manually inputting survey information would be incurred.

10.     In order to collect the race, color, religion, national origin, sex, or handicap of applicants for insurance, Cameron Mutual's user interfaces and data repositories would need to be modified to allow this information to be requested, collected and stored.  This would entail substantial expenditures on in-house personnel and outside consultants to program the changes to system interfaces and also to the database architecture.

11.     Cameron Mutual would have no way to compel its insureds to comply with any request for data on their protected characteristics.  As a result, the data collected likely would be incomplete and would provide an inaccurate basis for disparate impact analysis.

12.     Because of the Disparate-Impact Rule, Cameron Mutual will need to assess whether and how it can collect, organize, and analyze data regarding the race, color, religion, national origin, sex, or handicap of its policyholders, consistent with the state law in each state in which it operates.

13.    To determine whether it complies with the Disparate Impact Rule, Cameron Mutual would need to use the collected data regarding policyholders' protected characteristics, including race, color, religion, national origin, and handicap, if such use could be permitted under state law.

14.    But for the Disparate Impact Rule, Cameron Mutual would not collect, retain, or use data about the race, color, religion, national origin, or handicap of its homeowners policyholders.

15.    But for the Disparate Impact Rule, Cameron Mutual would not incur the costs of storing or analyzing data on the race, color, religion, national origin, or handicap of its policyholders, or of determining whether and how the data could be used consistent with state law.

FURTHER, affiant sayeth naught.

Dianne L. Priest, Affiant

**J.A.67**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
AND NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES

       Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
AND JULIAN CASTRO, in his official
Capacity as Secretary of Housing and Urban
Development,

       Defendants.


AFFIDAVIT OF LARRY M. SHAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

I, Larry M. Shaw, declare as follows:

1.  I am over 18 years of age and do not suffer from any legal or physical disabilities.

2.  I am the President and CEO of MMG Insurance Company, A Property and Casualty Insurer domicile in Presque Isle, Maine. MMG Insurance Company is licensed to conduct business in Maine, New Hampshire, Vermont, New York, Pennsylvania and Virginia.

3.  MMG Insurance Company is a member of Plaintiff National Association of Mutual Insurance Companies.

4.  I am submitting this declaration in support of Plaintiffs Motion for Summary Judgement. I am testifying to the statements below based upon my personal knowledge.

5.  Before the Department of Housing and Urban Development enacted the Disparate Impact Rule, MMG Insurance Company did not collect homeowner's insurance applicant information on protected classes such as race, ethnicity, or religion, and has no intention of doing so in the future.  Protected class data is not used in the rating, pricing, or risk selection process.

6.  Since the enactment of the Disparate Impact Rule and to comply with the regulation, MMG Insurance Company is evaluating our responsibility and would be required to begin collecting protected class information.

7.  Collection of this data would require MMG Insurance Company to establish a process to obtain it, build it into our information systems, establish tight user security on user access to this data, and establish a process to manage its ongoing accuracy.  This would be costly,

disruptive to current business practices, and create adverse consumer reaction to its collection.

8. MMG Insurance Company would need to make the following changes in order to comply with the rule: Our current policy applications used by our Independent Agents to write business with MMG Insurance Company would need to be withdrawn and changed to add the required items addressed in the rule. We would need extensive modification to our processing system to allow for storage of protected class data. Our agency portal would need to be restructured and our existing computer system would need to be redesigned to accommodate the data required to be collected. Assuming this data would be sensitive in nature, we would need to mask our internal systems to only allow access to a limited audience. This would require countless hours by our internal Information systems staff and would take them away from current projects necessary to serve our existing policyholders and provide for future enhancements and growth.

9. The soft costs associated with this rule requirement would create the following issues for MMG Insurance Company: It would require our staff be trained on what is to be collected and how it would need to be safeguarded. We would need to educate our agency force on the collection of the data. We expect that there would also be an adverse customer response to the need to collect this data.

10. The requirement to collect this data as outlined in the Disparate Impact Rule would result in a significant cost to our company which in turn would result in a pass through to our policyholders.

11. But for the Disparate Impact Rule, MMG Insurance Company would not incur these costs or be subject to the changes described above.

12. Currently, MMG Insurance Company has no interest nor desire in the collection of this data unless required to do so through the Disparate Impact Rule.

I declare under penalty of perjury that the forgoing is true and correct. Executed on

June 14, 2016.

_____
Larry M. Shaw

Sworn and subscribed before me this

__20th__ day of __June__, 2016

_Patricia M. Browning_
Patricia Browning, Notary Public

Patricia M. Browning
Notary Public, State of Maine
My Commission Expires: 2/10/2018

**J.A.69**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION and NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and JULIAN CASTRO, in his official capacity as Secretary of Housing and Urban Development,<br><br>Defendants. | Civil Action No. 13-cv-966 (RJL) |

## AFFIDAVIT OF <u>SCOTT ST. ANGEL</u>
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Scott St. Angel, declare as follows:

1. I am over eighteen years of age and not suffering under any legal or physical disability.

2. I submit this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss.

3. I am testifying to the statements below based on my personal knowledge.

4. As President & CEO of Farmers Insurance Company of Flemington I am responsible for the oversight of all company operations including underwriting and rating.

5. Farmers Insurance Company of Flemington sells homeowners insurance exclusively in New Jersey, and is a member of the National Association of Mutual Insurance Companies (NAMIC).

6. As a Mutual insurance company, Farmers Insurance Company of Flemington has no stockholders.   We are organized solely for the benefit of our Policyholders, each of whom is a member of the Company.

7. The insurance industry in New Jersey is highly regulated under the oversight of the Department of Banking and Insurance.  Compliance with jurisdictional rules and regulations is essential to doing business in the state and failure to comply with regulatory mandates can be catastrophic; including financial penalties and even the loss of the right to do business in the state.

**J.A.70**

8. Farmers Insurance Company of Flemington utilizes a risk based underwriting process that uses objective data about a given risk to establish eligibility and pricing.  This data includes elements such as type of construction, property age & condition, hurricane exposure, proximity to a fire department or fire hydrant, occupancy, and roof type, for example.

9. Farmers Insurance Company of Flemington does not collect or retain records of the race, color, religion, national origin, sexual orientation, gender, familial status, or handicap of its policyholders, nor does it have existing capabilities to store or utilize that information.

10. Collecting that data from existing policyholders and housing it in Farmers Insurance Company of Flemington's system would be extremely expensive and disruptive to our operations.  The costs would include survey campaigns, new hardware and software, expanded data-storage facilities, and substantial human resources, which we do not have available on staff.   This will place a huge financial burden on us and, therefore, our Policyholders.

11. Further, we expect many of our Policyholders will simply refuse to provide us with this type of information.  Many of our Policyholders will likely consider this type of information to be private, sensitive, and irrelevant to their insurance transaction so it may be impossible for us to collect it from them.  Additionally, we would anticipate a large volume of calls, complaints and inquiries from Policyholders in response to any request for such information, which will place a significant burden on our customer service resources and reduce our ability to operate our business and properly service our Policyholders' insurance needs.

12. Without collecting data on the race, color, religion, national origin, sexual orientation, gender, familial status, or handicap of its Policyholders, Farmers Insurance Company of Flemington will not be able to assess whether any of its practices violate the Disparate-Impact Rule.

13. In order to comply, Farmers Insurance Company of Flemington would need to adjust its underwriting, rating, and pricing decisions to take race, color, religion, national origin, sexual orientation, gender, familial status, or handicap into account.  It is unclear whether or how we could do so in a manner consistent with our obligations under state law and without a total overhaul of the objective risk-based underwriting process that has served our policyholders well for over 160 years.

14. But for the Disparate-Impact Rule, Farmers Insurance Company of Flemington would not collect, retain, or use data about the race, color, religion, national origin, sexual orientation, gender, familial status, or handicap of its policyholders.

Under penalty of perjury, I declare that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 29, 2016 in Flemington, New Jersey.

Scott St. Angel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN INSURANCE ASSOCIATION
and NATIONAL ASSOCIATION OF MUTUAL
INSURANCE COMPANIES,

      Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT and
JULIAN CASTRO,
in his official capacity as Secretary of Housing and
Urban Development,

      Defendants.

Civil Action No.: 13-cv-966 (RJL)

## AFFIDAVIT OF GENEAU M. THAMES
## IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BEFORE ME, the undersigned authority, personally appeared Geneau M. Thames, Esq.

who, being by me duly sworn, deposed and stated as follows:

    1.     I am over eighteen years of age and am not suffering under any legal or physical

disability.

    2.     This Affidavit is submitted on behalf of Plaintiff's Motion for Summary

Judgment.  The statements made below are based on my personal knowledge on behalf Harford

Mutual Insurance Company, referred to herein as "Harford Mutual."

    3.     I am the General Counsel and Director of Compliance for Harford Mutual.

Harford Mutual is a member of Plaintiff National Association of Mutual Insurance Companies.

My duties at Harford Mutual include ensuring that Harford Mutual is in compliance with state

and federal regulatory laws in its underwriting and issuance of the commercial lines products it

sells.

1

**J.A.72**

4.      Harford Mutual's principal office is domiciled in the State of Maryland but it sells its insurance products in the entire Mid-Atlantic Region and also some southern Atlantic states.

5.      Although Harford Mutual writes commercial line products, approximately forty percent (40%) of its book insures habitational risks.  By way of example, habitational risks insurance policies are designed for residential properties such as apartment buildings, homeowners associations, rented houses and condominiums.

6.      The insurance industry is highly regulated through each State in which an insurer performs its business.  An insurer is required to comply with the insurance rules and regulations of a particular state and the consequences of failing to comply can be cataclysmic.  An insurer can face significant fines and even the loss of the right to conduct business as an insurer in the State.

7.      It is understood that the United States Department of Housing and Urban Development ("HUD") has issued a final rule purporting to interpret the Fair Housing Act to prohibit practices including the provisions and pricing of insurance that results in a disparate impact on groups of protected individuals including race, color, and national origin for individuals attempting to gain access to fair housing opportunities.

7.      This rule also has an effect on the commercial market especially as it relates to the habitational book.  Similar to homeowner's insurance carriers, insurers of habitational risks sell its products based on principles of risk assessment.  Like many carriers, Harford Mutual identifies risk factors based on specified data for a given property such as, age of property, construction type, catastrophe history of the region, mitigation of risks taken by the property owner for the property, etc.  This necessarily includes the type of "housing" that HUD's final ruling on the Disparate Impact Rule purports to protect.

**J.A.73**

8.      Harford Mutual does not currently collect data regarding the race, color, religion, national origin, sex, familial status, or handicap of its policyholders or their tenants.

9.      Due to the enactment of the Disparate-Impact Rule, Harford Mutual will need to assess whether it will be required to comply with the Disparate Impact Rule based on its substantial habitational book.  This includes an assessment of how, under state law it would collect, organize and analyze such data from existing and prospective policyholders.

10.     It should be noted that as a Maryland domiciled insurer wherein approximately 33% of Harford Mutual's business is written; Maryland law forbids even the collection of data regarding certain characteristics of its insureds, including that related to race, color, religion, national origin, sex, familial status, or handicap.

11.     Furthermore, collecting such data from existing policyholders and housing it in the Company's system would be expensive.  The costs would include new hardware, software and expanded data-storage facilities.  In addition, it would require the Company expend significant human resources and man hours than it would not otherwise be required to exhaust.

12.     After collecting data on the race, color, religion, national origin, sex, familial status or handicap of its policyholders, Harford Mutual would need to evaluate what steps it could take to comply with the Rule without violating state and federal discrimination laws.  This analysis will consume additional time and resources.

13.     But for the Disparate-Impact Rule, Harford Mutual would not collect, retain, or use data about race, color, religion, national origin, sex, familial status, or handicap of its policyholders.

**J.A.74**

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

_14TH_, day of June, 2016 in Harford County, Maryland.


_____
GENEAU M. THAMES, ESQ.
General Counsel & Director of Compliance
Harford Mutual Insurance Company, Inc.

STATE OF MARYLAND
COUNTY OF HARFORD

I, the undersigned Notary Public, do hereby affirm that _Geneau M. Thames_ personally appeared before me on this __6/14/16__ and signed the above Affidavit as her free and voluntary act and deed.

__3/6/19__                                   _Christina A. Dickerson_
My Commission Expires                        Christina A. Dickerson
                                             Notary Public

4

**J.A.75**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION and NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,<br><br>        Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and JULIAN CASTRO, in his official capacity as Secretary of Housing and Urban Development,<br><br>        Defendants. | Civil Action No. 13-cv-966 (RJL) |

AFFIDAVIT OF DALITH WELLS
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1.      My name is Dalith Wells.  I am Personal Lines Underwriting Manager for

Employers Mutual Casualty Company (hereinafter "EMC").  I am over the age of eighteen years

and have personal knowledge of the facts set forth in this Affidavit.  I understand that this

affidavit will be submitted in support of Plaintiffs' Motion for Summary Judgment pursuant to

Federal Rule of Civil Procedure 56(c)(1)(A).

2.      EMC is a mutual insurance company organized under the laws of the State of

Iowa and is licensed to do business in all fifty states plus the District of Columbia.

3.      EMC is a member of the Plaintiff National Association of Mutual Insurance

Companies.

4.      In approximately twenty-two (22) states, EMC, and its affiliates, provide

homeowners insurance to private individuals as contemplated by the Department of Housing and

1

**J.A.76**

Urban Development's "Implementation of Fair Housing Act's Discriminatory Effects Standard,"

24 C.F.R. §§ 100.5 *et seq.* (hereinafter the "Disparate-Impact Rule).

5.     Currently, EMC makes its underwriting and rating decisions for homeowners

insurance based solely upon risk.  EMC does not consider any of the following factors of

homeowners insurance applicants when underwriting homeowners insurance:  race, color,

religion, national origin, sex, familial status, or handicap.

6.     Because EMC does not consider these factors, EMC does not collect this

information from homeowners insurance applicants.

7.     Further, because EMC does not collect this information from homeowners

insurance applicants, EMC does not know the effect of using this information to underwrite

and/or rate homeowners insurance.

8.     To ensure our compliance with the Disparate-Impact Rule, EMC will be forced to

begin collecting information from homeowners insurance applicants regarding their race, color,

religion, sex, handicap, familial status, and national origin.

9.     Without collecting data on the race, color, religion, national origin, sex, familial

status, or handicap of our policyholders, EMC will not be able to assess whether any of our

practices violate the Disparate-Impact Rule.

10.    Because many state insurance laws prohibit EMC from collecting or using data on

the race, color, religion, national origin, sex, familial status, or handicap of its policyholders,

EMC does not collect or use such data in any state.  Collecting this information would cause

EMC to be in violation of numerous state insurance laws.  We are unaware of how to collect this

information without violating the state laws which forbid it.

**J.A.77**

11.     Because EMC does not collect this information, we do not have developed loss histories for the race, color, religion, national origin, sex, familial status, or handicap of our policyholders. This causes the risk rating for each factor to be more unpredictable.

12.     EMC uses local independent insurance agents to market and sell homeowners insurance to insureds across the country. In the states where collection of this information is illegal, compliance with the Disparate Impact Rule would force us to ask our insurance agents to break the law. This would necessarily harm our relationships with those agents and interfere with our agency agreements.

13.     Because EMC endeavored to comply with these numerous state insurance laws, we do not have the technological capability to collect this information from any of our current insureds or potential new insureds without deviating from our standard homeowners insurance processes.

14.     Ultimately, in order to comply with the Disparate-Impact Rule, our technological capabilities and processes will need to be changed, at an unknown but significant cost of time and money to reprogram systems, to send requests for information to agents and insureds, and to staff the entry of the data in our new system.

15.     Additionally, incorporating information regarding race, color, religion, national origin, sex, familial status, or handicap of our insureds into our risk rating models for homeowners insurance will be costly, time-consuming, burdensome, and potentially disruptive to our current risk models.

16.     But for the Disparate-Impact Rule, EMC would not incur these costs and harm to our business practices.

3

**J.A.78**

Pursuant to Iowa Code 622.1, I certify under penalty of perjury and pursuant to the laws

of the state of Iowa that the preceding is true and correct.

Executed: June 29, 2016

Dalith Wells, Personal Lines Underwriting Manager for
Employers Mutual Casualty Company

4

**J.A.79**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN INSURANCE ASSOCIATION, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.* )<br><br>Defendants. ) | Case No.: 1:13-cv-966 (RJL) |

### DECLARATION OF RONALD JOSEPH ZALESKI, SR.
### IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Ronald Joseph Zaleski, Sr., declare as follows:

1. I am over eighteen years of age and am not suffering under any legal or physical disability.

2. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. I am testifying to the statements below based on my personal knowledge.

3. I am Executive Vice President and Chief Actuary of Selective Insurance Company of America ("Selective"). I have held the Chief Actuary position since 1999, when I joined Selective. I first started working as an actuary in the insurance industry in 1976 and have previously served as a Chief Actuary at both TIG Insurance Company and Zurich Personal Insurance. I am a Fellow of the Casualty Actuarial Society and a Member of the American Academy of Actuaries.

**J.A.80**

4.      Selective is an insurance company organized and existing under the laws of the state of New Jersey and is a member of the American Insurance Association.

5.      Selective is licensed to write property casualty insurance, including homeowners insurance, in thirty-seven jurisdictions across the United States, including in Arkansas, the District of Columbia, Illinois, Indiana, Iowa, Maryland, Minnesota, Missouri, Nebraska, North Dakota, South Dakota and Wisconsin.

6.      As the Chief Actuary at Selective, I am responsible for developing Selective's rating and pricing plans for all risks, including homeowners.  As part of my job, I assess the statistical data used in Selective's risk-based modeling and ensure that Selective's rating plans meet the various state legal and regulatory requirements and are approved by the appropriate state regulators.

7.      Like many insurance companies, Selective calculates its rates in part based on historic data and loss information compiled by Insurance Services Offices ("ISO").  ISO is recognized by the industry as a leading source for information about property casualty risks and the factors relevant to the rating and pricing of insurance coverage.

8.      Pursuant to a limited antitrust exemption for insurance under the McCarran-Ferguson Act, Selective and other insurers are able to confidentially and anonymously coordinate data collection and share information relevant to pricing trends and policy development through ISO.  ISO, in turn, shares aggregated data and actuarial conclusions about risks in each of the various states and smaller geographic areas with insurers, including Selective, that subscribe to ISO's services.

9.      I understand that on February 15, 2013 the Department of Housing and Urban Development issued its final rule interpreting the Fair Housing Act to prohibit insurance

- 2 -

**J.A.81**

practices, including the pricing of homeowners insurance, that result in a disparate impact on certain groups or individuals with protected characteristics (the "Disparate-Impact Rule").

10.     The Disparate-Impact Rule, if applied to the business of insurance, would require Selective to compile and track personal data of every applicant and insured including information concerning the individual's race, color, religion, national origin, sex, familial status, and/or disability.

11.     With regard to homeowners insurance, Selective (i) does not collect and compile data concerning the race, color, religion, national origin, or disability of an applicant or insured, and (ii) does not consider such data to be risk-related factors relevant to coverage or rates.

12.     In some states, like Maryland, insurers are specifically prohibited from soliciting information concerning the race, creed, color or national origin of any insured: "[A]n insurer or insurance producer may not make an inquiry about race, creed, color, or national origin in an insurance form, questionnaire, or other manner of requesting general information that relates to an application of insurance." MD Ins. Code § 27-501 (c) (1).

13.     In calculating rates for homeowners insurance, Selective uses the underlying risk considerations identified both internally and by ISO, and performs a multivariate analysis of factors including the applicant's actual loss experience, amount of coverage, location of the premises, construction and age of the dwelling, whether fire and burglar alarms are installed in the dwelling, and the dwelling's proximity to fire hydrants and fire stations.

14.     Selective does not specifically analyze the demographics of a geographic area before calculating the risk and the appropriate rate on a property in that particular area.

15.     In the vast majority of the jurisdictions where Selective is licensed to write property casualty insurance, the laws specifically provide that insurance rates may not be

- 3 -

excessive or unfairly discriminatory and further require that insurers file proposed rates with the state regulators for review and approval.

16.     In most cases, Selective's rates are approved by state insurance regulators before Selective sells any policies to customers using these calculated rates.

17.     As part of the rate submission process, Selective's actuaries certify that, to the best of their knowledge, Selective's rates comply with the applicable laws and regulations of the specific jurisdiction.  An insurance regulator's approval confirms that Selective's rates are not excessive or unfairly discriminatory against any one group or individual with specific characteristics.

18.     To perform any analysis under the Disparate Impact Rule, Selective must obtain personal data on every applicant and insured.  The cost of soliciting and collecting this exercise would be enormous.  Moreover, request for sensitive data represents an unwelcomed imposition on an applicant and insured.

19.     Even if the requested personal information would be voluntarily disclosed and the volume of data amassed, at a minimum, it would be very difficult for actuaries to isolate every factor considered in a multivariate analysis to evaluate whether use of a particular risk factor has a disparate impact on the rates for a particular group or individual with a defined characteristic.

20.     Even if we could determine whether use of particular factors had a disparate impact, eliminating those factors in a risk and rate assessment would compromise the actuarial soundness of the risk-based rating plans that are generally accepted as the industry standard and that are used by Selective.

21.     Selective has no evidence that its rates have a disparate impact on any particular group of applicants or insureds, or in any specific area or demographic.

- 4 -

**J.A.83**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of June, 2016.

Ronald Joseph Zaleski, Sr.

**J.A.84**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF MUTUAL
INSURANCE COMPANIES,
   122 C Street, N.W., Suite 450,
   Washington, DC 20001,

     Plaintiff,

       v.

Civil Action No. 13-cv-966 (RJL)

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
   451 Seventh Street, S.W.,
   Washington, DC 20410,

and

**SECOND AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

MARIA L. FUDGE, in her official capacity as
Secretary of Housing and Urban Development,
   Office of the Secretary,
   451 Seventh Street, S.W.,
   Washington, DC 20410,

     Defendants.

## INTRODUCTION

1.     Plaintiff National Association of Mutual Insurance Companies seek declaratory and

injunctive relief against Defendants Department of Housing and Urban Development ("HUD")

and Marcia L. Fudge, in her official capacity as Secretary of Housing and Urban Development

("Secretary"), for violations of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA"),

and the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA").

2.      On February 15, 2013, HUD promulgated a final rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard," 78 Fed. Reg. 11,460 (the "2013 Disparate-Impact Rule").  The 2013 Disparate-Impact Rule purported to interpret the FHA to prohibit housing-related activities that, although not motivated by intent to discriminate, result in a disparate impact on certain protected groups.  The 2013 Disparate-Impact Rule created a three-part burden-shifting framework for assigning liability in private lawsuits and HUD enforcement actions premised on the existence of a disparate impact.

3.      In the preamble to the 2013 Disparate-Impact Rule, HUD formally extended disparate-impact liability to the provision and pricing of homeowner's insurance for the first time. 78 Fed. Reg. 11,460, 11,475.

4.      On June 25, 2015, the Supreme Court issued its decision in *Texas Department of Housing and Community Affairs* v. *The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015).  The Court held that disparate-impact claims are cognizable under the FHA but cautioned that disparate-impact liability under the FHA is "limited in key respects."  *Id.* at 2522.  For example, "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers."  *Id.* at 2524 (internal quotation marks omitted).  "The FHA is not an instrument to force [housing-related entities] to reorder their priorities" or to "displace valid governmental and private priorities."  *Id.* at 2522, 2524.  "[A] disparate-impact claim that relies on a statistical disparity," moreover, "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  *Id.* at 2523.  The causal connection is severed where "federal law substantially limits the [defendant's] discretion." *Id.* at 2524.  In addition, the disparate-impact requirement must not be applied in a manner that would "cause race to be used and considered in a pervasive way."  *Id.* at 2523.

5.    In light of *Inclusive Communities*, applying disparate-impact liability to the provision and pricing of homeowner's insurance is contrary to law.  In order to satisfy the disparate-impact requirement, insurers would be required pervasively to use and consider race and ethnicity in their insurance decisions and to discount or disregard legitimate risk-related factors. The disparate-impact theory also runs headlong into state insurance law, which substantially limits insurers' discretion in the underwriting and ratemaking processes.

6.    The 2013 Disparate-Impact Rule also runs afoul of other limits announced in *Inclusive Communities*.  For example, the Rule contemplates that a plaintiff may state a prima facie claim based on a statistical disparity alone, without showing that a policy or practice of the defendant actually caused the alleged disparity.  *See*, *e.g.*, 78 Fed. Reg. 11,460, 11,469.  The Rule also purports to allow a disparate-impact plaintiff to prevail by showing simply that the defendant's stated interest in the policy or practice at issue could be served by another practice that has a less discriminatory effect, even if the policy or practice is valid and does not present an artificial, arbitrary, and unnecessary barrier.  *See id.* at 11,482 (24 C.F.R. § 100.500(c)(3) (2014)).

7.    During the rulemaking process, Plaintiff pointed out the problems with extending disparate-impact liability to the provision of homeowner's insurance, but HUD promulgated the 2013 Disparate-Impact Rule in spite of them.

8.    On April 14, 2016, Plaintiff filed an Amended Complaint challenging the Disparate-Impact Rule as reaching beyond HUD's statutory authority under the Fair Housing Act, as interpreted by the Supreme Court in *Inclusive Communities*.

9.    Between June 2016 and August 2016, the parties filed and briefed cross motions for summary judgment.  Beginning in February 2017, however, this action was stayed for several years in light of an anticipated new rule that would amend the 2013 Disparate-Impact Rule.

**J.A.87**

10.    On September 24, 2020, HUD published a final rule, entitled "HUD's Implementation of the Fair Housing Act's Disparate Impact Standard," 85 Fed. Reg. 60,288 (Sept. 24, 2020) ("the 2020 Rule"), amending the 2013 Disparate-Impact Rule.

11.    Before the 2020 Rule could enter into effect, however, a district court enjoined its implementation.  *See Mass. Fair Hous. Ctr.* v. *U.S. Dep't of Hous. & Urban Dev.*, No. 3:20-cv-11765, 2020 WL 6390143 (D. Mass. October 24, 2020), *appeal dismissed*, No. 21-1003 (1st Cir. Feb. 9, 2021).  The 2013 Disparate-Impact Rule thus remained in effect.

12.    On June 25, 2021, HUD published a notice of proposed rulemaking stating that it was reconsidering its 2020 Rule and proposing to recodify the 2013 Disparate-Impact Rule. *See Reinstatement of HUD's Discriminatory Effects Standard*, 86 Fed. Reg. 33,590 (June 25, 2021).

13.    In September 2021, the parties filed supplemental briefing to their 2016 cross-motions for summary judgment in light of the subsequent developments.

14.    On March 17, 2023, HUD published the text of the final rule reinstating the 2013 Disparate-Impact Rule (the "2023 Disparate-Impact Rule") on its website and transmitted the 2023 Disparate-Impact Rule to the Federal Register for publication.

15.    The 2023 Disparate-Impact Rule will take effect 30 days after publication in the Federal Register.

16.    For purposes of this Complaint, the 2023 Disparate-Impact Rule is substantively identical to the 2013 Disparate-Impact Rule.

17.    For the reasons set forth below, this Court should declare that both the 2013 Disparate-Impact Rule and the substantively identical 2023 Disparate-Impact Rule (jointly, the "Disparate-Impact Rule") are unlawful.

**J.A.88**

## PARTIES

18.     The National Association of Mutual Insurance Companies ("NAMIC") is a nonprofit trade organization with its headquarters in Indianapolis, Indiana.  NAMIC's members sell homeowner's insurance, subject to state insurance regulations, in every State and territory of the United States.  The Disparate-Impact Rule purports to regulate NAMIC's members.  In bringing this lawsuit, NAMIC seeks to vindicate the interests of its members.

19.     Defendant HUD is an executive agency of the federal government, 5 U.S.C. §§ 101, 105, and is subject to the APA, 5 U.S.C. § 551(1).  HUD was established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. §§ 3531 *et seq*.  HUD is headquartered in Washington, D.C.

20.     Defendant Marcia L. Fudge is the Secretary of Housing and Urban Development.  Her official address is in Washington, D.C.  She is being sued in her official capacity.  In that capacity, Secretary Fudge has responsibility for the operation and management of HUD.  As such, Secretary Fudge is responsible for HUD's promulgation of the challenged regulation.

## JURISDICTION, VENUE, AND TIMELINESS

21.     This action arises under the APA and the FHA.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and is authorized to review the final rule and grant relief pursuant to 5 U.S.C. §§ 702, 704, and 706.

22.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (e)(1) because Defendant HUD resides in this judicial district; Defendant Fudge performs her official duties in this judicial district; and a substantial part of the events giving rise to this action occurred in this judicial district.

23.     This Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201 and 2202.

**J.A.89**

24.     This Complaint is timely under 28 U.S.C. § 2401(a).

**BACKGROUND**

**A.      The Business of Insurance**

25.     Plaintiff's members insure property, including private homes, against the risk of damage or loss.  They sell their homeowner's insurance to private individuals.

26.     When providing insurance coverage, insurers make underwriting and rating decisions.  They calculate the probability of a potential loss by considering aggregated loss data related to the characteristics of the insured property and the risk being assumed.  They are required to consider costs associated with the transfer of risk in developing their rating plans.   For homeowner's coverage, relevant characteristics may include, for example, construction type, location of the property (such as in a region with a heightened risk of natural catastrophes), and the presence of smoke detectors.

27.     By properly classifying the risk associated with insured properties, insurers can then pool similar risks together to reduce the amount of variance in the insurer's expected losses. That process turns many individually risky transactions into a set that produces predictable outcomes.  Insurers then establish rates, taking into account the expected loss, the magnitude of loss, overhead costs, and a reasonable profit.

28.     Insurance markets function efficiently and fairly when insurers underwrite according to actuarially significant risk factors and set rates that accurately reflect the likelihood of the risk of loss and expenses.  If insurers are not able to do so, the system cannot operate efficiently.  Some consumers would overpay, others would underpay, and insurers would be unable to set premiums that accurately reflect the risks they assume.

29.     Differentiation among risks, then, is one of the foundational elements of insurance. A regime that does not allow an insurer to make risk-based distinctions would be antithetical to basic insurance practice.  Accurate risk allocation and pooling benefits insured and insurer alike.

30.     To promote accurate risk allocation, every State has enacted laws that regulate the business of insurance.  Those regulatory schemes typically cover virtually all aspects of the business of insurance, including the licensing and operation of insurers in the State, and they are overseen by insurance administrators responsible for consistent, fair enforcement.

31.     Among other things, state laws dictate that insurers' risk-classification standards may be based upon the "differences among risks that can be demonstrated to have a probable effect upon losses or expenses."  W. Va. Code § 33-20-3; *see also* Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(c); Wis. Stat. Ann. § 626.12(2).

32.     So, for example, risk classification may be "based upon size, expense, management, individual experience, purpose of insurance, location or dispersion of hazard, or any other reasonable considerations, provided such classifications and modifications apply to all risks under the same or substantially similar circumstances or conditions."  Me. Rev. Stat. tit. 24-A, § 2303(2).

33.     The differentiation among risks that present different probabilities of loss is permissible and appropriate under state laws.  *See*, *e.g.*, Va. Code Ann. § 38.2-1904(A)(3) (providing that "[n]o rate shall be unfairly discriminatory if a different rate is charged for the same coverage and the rate differential (i) is based on sound actuarial principles or (ii) is related to actual or reasonably anticipated experience").  In some instances, such differentiation is required by the State.

**J.A.91**

34.     By contrast, treating similar risks differently for reasons unrelated to actuarial justification is impermissible.  Under state insurance codes, that principle is typically referred to as a prohibition against "unfair discrimination."

35.     For example, insurers may not differentiate among "individuals or risks of the same class or of essentially the same hazard and expense element because of the race, color, religion, or national origin of such insurance risks or applicants."  215 Ill. Comp. Stat. 5/424(3); *see also* Alaska Stat. § 21.36.090; Tenn. Code Ann. § 56-5-303(a)(2)(d).  Nor may risk classifications "be based upon race, creed, national origin or the religion of the insured."  Me. Rev. Stat. tit. 24-A, § 2303(1)(G).

36.     Because state law prohibits considering characteristics such as the race and national origin of the insured in the risk-classification process, property insurers do not collect data regarding those characteristics.

37.     In order to preserve the primacy of the States in regulating the business of insurance and protect these comprehensive and detailed state regulatory schemes from federal intrusion, Congress enacted the McCarran-Ferguson Act in 1945. *See* 15 U.S.C. §§ 1011-1015.

38.     The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b). A state law is "impaired" under the McCarran-Ferguson Act if application of the federal law in question would frustrate declared state policy or interfere with a State's administrative regime.  *See Humana, Inc.* v. *Forsyth*, 525 U.S. 299 (1999).

39.     The McCarran-Ferguson Act secured the supremacy of state law in the realm of insurance regulation, absent specific legislation from Congress to the contrary.

8

**J.A.92**

### B.   HUD's Disparate-Impact Rule

40.     On November 7, 2011, the Supreme Court granted certiorari in *Magner* v.

*Gallagher*, No. 10-1032, to decide whether disparate-impact claims are cognizable under the FHA

and, if so, what approach courts should use to resolve them.

41.     As of that time, HUD had not proposed any rule concerning disparate-impact

liability under the FHA.  Nine days after the Supreme Court granted certiorari in *Magner*, HUD

proposed a regulation creating disparate-impact liability under the FHA. 76 Fed. Reg. 70,921

(Nov. 16, 2011).  That proposed regulation became the final rule at issue in this case.

42.     HUD did not formally consult with state insurance commissioners or the Federal

Insurance Office before launching the rulemaking process.

43.     The City of St. Paul, Minnesota, which was the petitioner in *Magner*, voluntarily

dismissed its case before the Supreme Court on February 14, 2012.  The Department of Justice's

role in that dismissal was the subject of an ensuing congressional investigation.  *See* Staff of H.

Comm. on Oversight and Government Reform et al., 113th Cong., *DOJ's* Quid Pro Quo *with St.*

*Paul: How Assistant Attorney General Thomas Perez Manipulated Justice and Ignored the Rule*

*of Law* (Comm. Rep. 2013).

44.     On February 15, 2013, after notice-and-comment rulemaking, HUD promulgated

this final rule interpreting the FHA to prohibit practices that, although devoid of discriminatory

intent, result in a disparate impact. 78 Fed. Reg. 11,460.

45.     The Disparate-Impact Rule, codified at 24 C.F.R. §§ 100.5 (2014) *et seq.*, provides

as follows: "Liability may be established under the Fair Housing Act based on a practice's

discriminatory effect . . . even if the practice was not motivated by a discriminatory intent." *Id.*

§ 100.500 (2014).  "A practice has a discriminatory effect where it actually or predictably results

in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates

segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." *Id.* § 100.500(a) (2014).

46.     Under the Disparate-Impact Rule, a practice that results in a discriminatory effect is permissible only if it is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests . . . [and] [t]hose interests could not be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(b)(1) (2014).

47.     The Disparate-Impact Rule creates a burden-shifting framework for assessing disparate-impact liability under the FHA.  It provides that the plaintiff or charging party has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1) (2014).  If the plaintiff or charging party meets that burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2) (2014). If the defendant or respondent meets its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3) (2014).

48.     In the preamble to the Disparate-Impact Rule, HUD formally extended Disparate-Impact liability to the provision and pricing of homeowner's insurance for the first time.  78 Fed. Reg. 11,460, 11,475.

### C.     The Supreme Court's Decision In *Inclusive Communities Project*

49.     In 2008, the Inclusive Communities Project, a non-profit organization, filed suit against the Texas Department of Housing and Community Affairs and its officers, alleging that the Department's criteria for allocating tax credits associated with low-income housing

**J.A.94**

developments violated the FHA.  That was so, the Inclusive Communities Project said, because the criteria had a disparate impact—namely, by virtue of granting "too many credits for housing in predominantly black inner-city areas and too few in predominantly white suburban neighborhoods." *Inclusive Communities*, 135 S. Ct. at 2514.

50.     The district court ruled in the Inclusive Communities Project's favor.  135 S. Ct. at 2514. While the Department's appeal was pending, HUD promulgated the Disparate-Impact Rule. *Id.*  The Fifth Circuit held, based on circuit precedent, that the Inclusive Communities Project's disparate-impact claim was cognizable under the FHA.  The Fifth Circuit reversed on the merits, however, because the district court applied a burden-shifting test that was inconsistent with the Disparate-Impact Rule.  *Id.* at 2515.

51.     The Supreme Court granted review to decide whether the FHA permits Disparate-Impact claims.  The Court answered in the affirmative. 135 S. Ct. at 2516-2522.

52.     At the same time, however, the Court cautioned that disparate-impact liability under the FHA is "limited in key respects."  135 S. Ct. at 2522.  It "is not an instrument to force [institutions] . . . to reorder their priorities," or a license "to inject racial considerations into every housing decision." *Id.* at 2522, 2524.  As the Court explained, "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers."  *Id*. at 2524 (internal quotation marks omitted).

53.     The Court insisted on a "robust causality requirement" to "protect[] defendants from being held liable for racial disparities they did not create."  135 S. Ct. at 2523.  Applying that consideration, the Court noted that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  *Id.* Likewise, legal obligations that "substantially limit[]" a defendant's discretion break the causal

J.A.95

chain between a policy and its effect, with the result that a disparate-impact claim cannot lie. *Id.* at 2524.

54.     The Court emphasized that "disparate-impact liability under the FHA" should not be construed in such a way as to "cause[] race to be used and considered" in a pervasive manner. 135 S. Ct. at 2524.  The Court cautioned that, without "adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas," giving rise to "serious constitutional questions." *Id.* at 2523.

### D.     The Disparate-Impact Rule Is Contrary To Law

55.     The Disparate-Impact Rule is not authorized under the FHA to the extent that it imposes a disparate-impact requirement on insurers' underwriting and rating practices.

56.     Plaintiff's members make race-blind underwriting and rating decisions for property insurance.  Those decisions are risk-based, often relying on statistics and probabilities.  Indeed, Plaintiff's members do not even collect data regarding the race and ethnicity of their insureds for underwriting or rating purposes.

57.     Under the Disparate-Impact Rule, however, Plaintiff's members could not maintain their current race-neutral practices.  In order to ensure that their policies and practices did not cause or perpetuate a disparate impact, insurers would be compelled to collect data on protected characteristics such as race, consider that data, and make classification and rating decisions that take into account membership in protected groups.

58.     Imposing a disparate-impact requirement on insurers will thus necessarily "cause race to be used and considered in a pervasive way." *Inclusive Communities*, 135 S. Ct. at 2523.

**J.A.96**

59.     In addition, Plaintiff's members are heavily regulated under state law.   State insurance codes substantially limit insurers' discretion to make underwriting and ratemaking decisions, dictating what criteria insurers may use to classify risks, *see*, *e.g.*, W. Va. Code § 33-20-3; Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(c); Wis. Stat. Ann. § 626.12(2); Me. Rev. Stat. tit. 24-A, § 2303(2), and defining what constitutes prohibited "unfair discrimination," *see*, *e.g.*, 215 Ill. Comp. Stat. 5/424(3); Alaska Stat. § 21.36.090; Tenn. Code Ann. § 56-5303(a)(2)(d); Me. Rev. Stat. tit. 24-A, § 2303(1)(G).

60.     Because state law "substantially limits [Plaintiff's members'] discretion," disparate-impact claims against insurers based on underwriting and rating decisions cannot lie under the FHA. *Inclusive Communities*, 135 S. Ct. at 2524.

61.     The McCarran-Ferguson Act buttresses that conclusion.   The FHA does not specifically indicate an intention to override the States' authority to regulate the business of insurance within the meaning of the McCarran-Ferguson Act.   Congress therefore did not intend that the FHA be construed in a way that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance."   15 U.S.C. § 1012(b).

62.     Imposing a disparate-impact requirement on insurers' ratemaking and underwriting decisions, however, would have precisely that effect.

63.     Among other things, the Disparate-Impact Rule would impair state laws that prohibit discrimination between risks of the same class or of essentially the same hazard.

64.     The Disparate-Impact Rule would also impair state laws that prohibit consideration of race in the underwriting or rating process.   It would do so by giving rise to disparate treatment among risks of the same class or of essentially the same hazard in order to avoid a disparate impact on protected groups, and by imposing on insurers a need to collect data about characteristics such

13

**J.A.97**

as the race or national origin of the insured in order to avoid unintentionally perpetuating a disparate effect.

65.     In addition, the Disparate-Impact Rule is not authorized under the FHA to the extent that it is inconsistent with the limitations on disparate-impact liability that the Supreme Court identified in *Inclusive Communities*.

66.     *Inclusive Communities* made clear that a plaintiff cannot make a prima facie disparate-impact claim solely by identifying a statistical disparity, without also identifying a particular policy or set of policies that actually caused the disparate effect. *Inclusive Communities*, 135 S. Ct. at 2523. Indeed, "if such liability were imposed based solely on statistical disparity," "serious constitutional questions . . . might arise." *Id.* at 2522.

*67.*     Under the Disparate-Impact Rule, however, "analysis of . . . data" alone may suffice to state a prima facie claim. 78 Fed. Reg. 11,460, 11,478; *see also id.* at 11,469. HUD expressly declined to impose a requirement that plaintiffs identify "a specific practice and show that the alleged discriminatory effect is caused by that specific practice." *Id.* at 11,469. HUD also expressly declined to limit disparate-impact liability to practices and policies that create disparate effects, as opposed to merely continuing pre-existing patterns of segregation. *Id.*

68.     In *Inclusive Communities*, the Supreme Court also explained that disparate-impact liability under the FHA should not be used to "second-guess which of two reasonable approaches" an entity should follow. *Inclusive Communities*, 135 S. Ct. at 2522. Nor is it "an instrument to force . . . [defendants] to reorder their priorities." *Id.* Instead, disparate-impact liability is properly used only to "remov[e] artificial, arbitrary, and unnecessary barriers." *Id.* at 2524 (internal quotation marks omitted).

14

**J.A.98**

69.     The Disparate-Impact Rule, however, requires defendants to prove that the challenged practice or policy is necessary to achieve a substantial, legitimate, nondiscriminatory interest.  24 C.F.R. § 100.500(c)(2) (2014).  Even if the defendant makes that showing, the plaintiff may prevail by demonstrating that the defendant's stated interest could be served by some other practice or policy that has a less discriminatory effect.  *Id.* § 100.500(c)(3) (2014).  Moreover, HUD specifically rejected a requirement that the plaintiff's alternative be "equally effective" or "at least as effective" as the challenged policy in advancing the defendant's proffered interest.  78 Fed. Reg. 11,473.

### E.     Plaintiff's Members Are Harmed By The Disparate-Impact Rule

70.     Although the text of the Disparate-Impact Rule does not specifically address insurance, HUD's proposed rule cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act."  76 Fed. Reg. 70,921, 70,924.

71.     In response to the proposed rule, Plaintiff filed comments that identified a variety of problems with the proposed rule.  Regarding insurers, Plaintiff argued, among other things, that:

A.     Disparate-impact liability for insurance practices is inappropriate because insurance is risk-based and insurers rely on numerous legitimate factors when providing coverage;

B.     Insurers would be forced to violate state laws that require insurance rates to accurately estimate risk and not be excessive, inadequate, or unfairly discriminatory under state law; and

C.     Insurers would face special hardship on burden-of-proof issues because they do not collect race and ethnicity data.  Indeed, considering race or ethnicity data in the course

15

**J.A.99**

of searching for a less discriminatory alternative would be a violation of state laws prohibiting the consideration of those factors.

72.     Instead of directly addressing those arguments, HUD dodged them at every turn.

A.     HUD responded to concerns about risk-based ratemaking and compliance with state law by suggesting that an insurer could always "defend the business justifications for its policies" if it showed that the premiums it charged were supported by "a legally sufficient justification." 78 Fed. Reg. 11,460, 11,475.  It did not address the fact that the Disparate-Impact Rule would force insurers, in many cases, to violate state law; bear the costs and risks of proving the necessity of well-established ratemaking practices; and still face the prospect of liability if there were a less accurate alternative to risk-based rating practices that would allegedly result in less of a disparate impact.

B.     HUD essentially ignored the burden-of-proof argument, merely stating that the burden of proof would be no more of an issue for insurers than it would be for plaintiffs.  HUD did not address the burden that the Disparate-Impact Rule would impose on insurers, which would have to create new data-collection processes specifically for the purpose of considering factors such as race, when they previously had not done so, in order to defend against disparate-impact claims.  Worse still, HUD completely ignored the fact that, at least in ratemaking, insurers would have to violate state laws prohibiting the consideration of race or ethnicity or other protected characteristics in order to determine whether a less discriminatory alternative practice is available.

73.     After giving those plainly inadequate responses that left Plaintiff's concerns unaddressed, HUD promulgated the Disparate-Impact Rule.

74.     As a result, Plaintiff and its members have expended money and resources analyzing the applicability of the Disparate-Impact Rule to the business of insurance.

16

**J.A.100**

75.    Plaintiff has spent money and resources explaining the Disparate-Impact Rule to their members.

76.    Plaintiff has spent money and resources evaluating the effect of the Disparate-Impact Rule on their members and helping to ensure that their members are in a position to comply with the Disparate-Impact Rule.

77.    In addition, the Disparate-Impact Rule will create, and has already created, significant burdens on Plaintiff's members.

78.    In order to comply with the Disparate-Impact Rule, Plaintiff's members have spent and will continue to have to spend money on, and have devoted and will continue to have to devote resources to, re-examining and, if necessary, modifying their existing practices.  Plaintiff's members are and will be harmed by the Disparate-Impact Rule.

79.    The Disparate-Impact Rule will inevitably have an ongoing effect on Plaintiff' and its members.

80.    The Disparate-Impact Rule subjects Plaintiff's members to different and conflicting obligations under state and federal law.

81.    Plaintiff's members also face a significant threat of continuous and recurring litigation and agency-enforcement actions under the Disparate-Impact Rule.

82.    The Disparate-Impact Rule injures insurers, including Plaintiff's members, by imposing significant costs related to identifying and altering or removing the risk distinctions that were acceptable until the rule was issued.  A court decision invalidating the Disparate-Impact Rule would redress that injury.

83.    Ultimately, the Disparate-Impact Rule harms the public, as consumers of insurance, because increased costs to the insurance industry will result in increased costs to insurance

**J.A.101**

policyholders; because consideration of potential disparate impacts will make rating less efficient, causing some policyholders to overpay; and because the Rule, for the first time, makes the policyholder's protected personal characteristics such as race relevant to the insurance decision.

## CLAIMS FOR RELIEF

### COUNT I
**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law To The Extent It Applies To Insurers' Ratemaking And Underwriting Decisions**

84.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

85.    Congress delegated to the Secretary of HUD the authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA.  42 U.S.C. § 3614a.

86.    The Disparate-Impact Rule constitutes final agency action.

87.    The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA.

88.    The Rule imposes a disparate-impact requirement on insurers regarding ratemaking and underwriting practices.  The FHA does not authorize that expansion of disparate-impact liability because it will inevitably "cause race to be used and considered in a pervasive way," contrary to the purpose of the FHA.  *Inclusive Communities*, 135 S. Ct. at 2523.

89.    Accordingly, Defendants did not have authority under the FHA to promulgate the Disparate-Impact Rule, and the Disparate-Impact Rule is not in accordance with the FHA.

90.    By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT II
**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law To The Extent It Applies To Insurers' Ratemaking And Underwriting Decisions**

91.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

92.     Congress delegated to the Secretary of HUD the authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA.  42 U.S.C. § 3614a.

93.     The Disparate-Impact Rule constitutes final agency action.

94.     The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA.

95.     The Rule allows disparate-impact claims against insurers based on ratemaking and underwriting practices.  State regulation, however, "substantially limits" insurers' discretion and breaks the causal connection between underwriting and rating decisions and any disparate impact. *Inclusive Communities*, 135 S. Ct. at 2524.  Disparate-impact claims based on insurers' underwriting and rating are thus contrary to the FHA.  *See id.*

96.     Accordingly, Defendants did not have authority under the FHA to promulgate the Disparate-Impact Rule, and the Disparate-Impact Rule is not in accordance with the FHA.

97.     By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT III
**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law To The Extent It Applies To Insurers' Ratemaking And Underwriting Decisions**

98.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

19

**J.A.103**

99.     Congress delegated to the Secretary of HUD the authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA.  42 U.S.C. § 3614a.

100.    The Disparate-Impact Rule constitutes final agency action.

101.    The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA.

102.    HUD has indicated that, under the Rule, a plaintiff may make a prima facie showing of disparate-impact liability based on statistics alone, need not identify a specific practice causing the disparity, and may rest on the mere continuation of pre-existing patterns. 78 Fed. Reg. 11,460, 11,469, 11,478.

103.    But a disparate-impact claim under the FHA based on a statistical disparity cannot lie "if the plaintiff cannot point to a defendant's policy or policies causing that disparity," and defendants may not be "held liable for racial disparities they did not create."  *Inclusive Communities*, 135 S. Ct. at 2523.

104.    Disparate-impact claims based on statistics alone are particularly disruptive to the business of insurance and harmful to insurers.  Insurance ratemaking, in particular, relies on statistics and probabilities, and disparate-impact liability based on statistical disparities alone would impose liability based on disparities that insurers did not create.

105.    Because the Rule does not require a plaintiff to identify a specific policy that caused the alleged disparate impact, the Rule is not in accordance with the FHA.

106.    By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

<u>COUNT IV</u>

**The Disparate-Impact Rule Is In Excess Of Defendants' Statutory Jurisdiction, Authority, Or Limitations Or Is Otherwise Not In Accordance With Law To The Extent It Applies To Insurers' Ratemaking And Underwriting Decisions**

107.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

108.    Congress delegated to the Secretary of HUD the authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out" the FHA.  42 U.S.C. § 3614a.

109.    The Disparate-Impact Rule constitutes final agency action.

110.    The Disparate-Impact Rule does not "carry out" the FHA and is not authorized under the FHA.

111.    Under HUD's burden-shifting framework, a plaintiff may prevail on a Disparate-Impact claim—even after a defendant proves that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest—by showing that the defendant's stated interest "could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(2), (3) (2014).  HUD specifically rejected an interpretation of the Rule requiring that the plaintiff's alternative be "equally effective" or "at least as effective" as the challenged policy in advancing the defendant's proffered interest.  78 Fed. Reg. 11,473.

112.    But the disparate-impact requirement of the FHA only "mandates the removal of artificial, arbitrary, and unnecessary barriers, not the displacement of valid . . . policies." *Inclusive Communities*, 135 S. Ct. at 2522 (internal quotation marks omitted).  It "is not an instrument to force . . . [entities] to reorder their priorities." *Id.*

113.    Because the Rule allows plaintiffs to "second guess which of two reasonable approaches a [defendant] should follow," without requiring a showing that the defendant has

21

**J.A.105**

imposed an "artificial, arbitrary, *and* unnecessary barrier[]," 135 S. Ct. at 2522 (internal quotation marks omitted) (emphasis added), the Rule is not in accordance with the FHA.

114.    The Rule would particularly harm Plaintiff's members, because insurers' ratemaking and underwriting decisions are dictated by valid policies and priorities, including state law and actuarial standards.

115.    By promulgating the Disparate-Impact Rule, Defendants acted in excess of their statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C), and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

1.    Declare that Defendants have violated the APA;

2.    Declare that the  Disparate-Impact Rule (as codified in both 2013 and 2023) is not in accordance with the FHA and is beyond Defendant's authority under the FHA to the extent it applies to insurers' ratemaking and underwriting decisions;

3.    Grant an order and judgment vacating the Disparate-Impact Rule (as codified in both 2013 and 2023) as unlawful to the extent it applies to insurers' ratemaking and underwriting decisions;

4.    Grant an order and judgment enjoining HUD and its officers from carrying out any of the powers delegated to them by the Disparate-Impact Rule (as codified in both 2013 and 2023) to the extent it applies to insurers' ratemaking and underwriting decisions;

5.    Award Plaintiff its costs and reasonable attorneys' fees as appropriate; and

6.    Grant any such other relief that this Court deems just and appropriate.

Respectfully submitted,

/s/ Kannon K. Shanmugam
Kannon K. Shanmugam (#474304)
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
kshanmugam@paulweiss.com

*Counsel for Plaintiff*
*National Association*
*of Mutual Insurance Companies*

Dated: March _, 2023

**J.A.107**



317.875.5250 | [F] 317.879.8408
3601 Vincennes Road, Indianapolis, Indiana 46268

202.628.1558 | [F] 202.628.1601
20 F Street N.W., Suite 510 | Washington, D.C. 20001

August 23, 2021

Kathleen M. Pennington
Acting Associate General Counsel for Fair Housing
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW
Washington, DC        20410–0500


**Re: Department of Housing and Urban Development, 24 CFR Part 100 [Docket No. FR–6251–P–01] RIN 2529–AB02, Reinstatement of HUD's Discriminatory Effects Standard Proposed Rule ("Proposed Rule")**

Acting Associate General Counsel Pennington:

The National Association of Mutual Insurance Companies (NAMIC) is respectfully submitting comments on the Proposed Rule. NAMIC is the largest property/casualty insurance trade group with a diverse membership of more than 1,400 local, regional, and national member companies, including seven of the top 10 property/casualty insurers in the United States. NAMIC members lead the personal lines sector representing 66 percent of the homeowner's insurance market and 53 percent of the auto market.

NAMIC and NAMIC's members are adamantly opposed to discrimination based on protected classes and unfair discrimination in general, and we support legislative and regulatory policies to prevent these practices.  The elimination of racism improves every aspect of our relationships, institutions, and business communities.

**There Remains No Need for The Proposed Rule to Apply to Insurance**

There is no evidence that there were actionable disparate impact cases involving the pricing or provision of housing insurance prior to 2013, and with insurers being subject to the 2013 rule for the last eight years, there have similarly been no allegations or findings of homeowner insurer disparate impact have been made or adjudicated since 2013. As NAMIC has repeatedly made clear to HUD in

comments and in court proceeding challenging this rule, every state has effective and strong civil and criminal insurance anti-discrimination laws, regulations, and enforcement divisions, and there has been not a single allegation that these civil and criminal insurance anti-discrimination laws, regulations and enforcement division have in any way been insufficient.  In fact, the rule undermines or impairs the existing application of the McCarran-Ferguson Act that established the states as the regulators over insurance and in particular the source for the definition of unfair discrimination, linking the definition to equal treatment and cost-based pricing.

A.  **The Proposed Rule Disrupts the Business of Insurance**

As NAMIC commented on the original proposed rule in 2012, State insurance laws prohibit insurance rates from being "excessive, inadequate, unreasonable or unfairly discriminatory." Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance.  "Unfair discrimination," on the other hand, has specific meaning in the insurance context. The concept of unfairly discriminatory insurance rates has historically been a cost-based concept.  Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."

Also, in comments to HUD on the proposed rule in 2012 and subsequently, NAMIC has continuously tried to help HUD understand that the foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly.  NAMIC has informed HUD that race or other protected class characteristics are not part of the risk assessment process.  HUD understands that state insurance laws proscribe the use of prohibited factors in rating and underwriting practices of insurers, and states prohibit unfair discrimination in insurance.  In the context of insurance, unfair discrimination includes treating similar risks in a dissimilar manner. Insurance regulation focuses on facially neutral underwriting or rating factors that reflect insurance risk.  Accordingly, state insurance laws largely reflect the principles underpinning property/casualty insurance pricing.

To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the

very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material (s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system among many other facially neutral factors.

Under this Reinstated Discriminatory Effects Standard, these and other common underwriting factors could be jeopardized, even though they do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected.  To achieve a condition in which no statistical disparities would exist that could "actually or predictably results in a disparate impact" in the average rate paid by different demographic groups, many if not most risk- based variables would have to be eliminated from the underwriting process.  In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. But this would be patently unfair since it will result in those receiving more in claim payments paying less while those receiving less in claim payments would pay more.  This will be the case within a protectected class as well as between protected classes since the likelihood of loss is not monolithic by race or ethnicity.  This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

**B.  Insurer Compliance with the Reinstated Rule Will be Unworkable**

In the Reinstatement, HUD blithely states "this proposed rule…. will have no impact on regulated entities …. Therefore, HUD does not believe that deeper analysis is needed on the impact of this rule."  NAMIC respectfully and vigorously disagrees.

§ 100.500 (a) of the proposed reinstated rule provides that "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." To ensure that an insurer does not employ any practice that "actually or predictably results" in disparate impact "because of race, color, religion, sex, handicap, familial status, or national origin", an insurer would <u>by definition</u> need to know and consider the race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant, as well as the undefined "segregated housing patterns."

The primary impediment to any practical compliance by insurers is the fact that insurance companies that price and provide homeowner insurance do not have any data on the race, color, religion, handicap, or national origin of policyholders or applicants. These companies are precluded by at least one state law for asking for such data. To avoid being blindsided and to defend against allegations against insurer practices that may "actually or predictably results in a disparate impact" an insurer would need to somehow obtain, validate, record, and apply data on the race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant. Insurers would be required to ask each existing policyholder and each policy applicant for their self-identified race, color, religion, sex (gender identity?), handicap, familial status, or national origin. Short of denying coverage to all policyholders and applicants who refuse to provide and validate such data, insurers would have no way to ensure that their protected class data sets were accurate and complete. As the proposed disparate impact standard does not consider intent, but rather resulting impact, an incomplete or erroneous data set would likely result in inaccurate evaluations and potential discrimination liability for insurers that employed even the most vigorous compliance efforts.

This need for this perfect data set will also require that an insurer trying to comply must validate and update the data set when a policyholder later self identifies as a different race, color, religion, sex, handicap, familial status, or national origin.

But there's more. The reinstated rule would also subject insurers to liability for insurance practices that – inadvertently and without intent – "actually or predictably" create, increase, reinforce, or perpetuate segregated housing patterns. This would require a compliance oriented insurer to have the same unrealistic protected class data sets defined above, AND to then to understand the undefined "segregated housing patterns" sufficiently to guarantee that the an insurance policy renewed or provided to a policyholder or applicant of a defined race, color, religion, handicap, familial status, or national origin of every policyholder and applicant could not actually or predictably create, increase, reinforce, or perpetuate segregated housing patterns related to race, color, religion, handicap, familial status, or national origin of every policyholder and applicant.

If an insurer can achieve and maintain a perfect data set of policyholder race, color, religion, sex, handicap, familial status, or national origin of every policyholder and applicant, and understand segregated housing patterns, these dual goals of the reinstated regulation may operate in conflict. Under the proposed rule, an insurer could be liable for discrimination if they have a practice of considering the pricing or provision or a homeowner policy based on race, color, religion, sex,

handicap, familial status, or national origin of every policyholder and applicant. Under the same rule, an insurer would be liable if they perpetuate segregated housing patterns.

Assuming Insurer X has an application for a homeowner policy from a Protected Group A, it would be discrimination for Insurer X to consider national origin intentionally or operate in any way that resulted in a disparate manner. But at the same time under disparate impact liability under the 2013 Rule, Insurer X could be liable if the home in question was in an area that was perpetuating Protected Group A housing patterns. By requiring the insurer to avoid practices that "actually or predictably creates, increases, reinforces, or perpetuates segregated housing patterns", HUD would require the insurer to make an intentional or disparate practice based upon a prohibited factor.

Insurers would also have great compliance difficulty in continually defining and addressing the requisite statistical discrepancy that would be the basis of possible disparate impact claims under the proposed rule. While there are varying accepted standards of applicable statistical discrepancy that may be permissible and impermissible – i.e. X% variance from statistics is allowed, but X+1% is discriminatory - but the completely undefined factor is the geographic statistical base upon which the insurer's practice must comply. Is the insurer required to track and comply with government, academic or independent protected class statistics of Ward 8, south Baltimore, Baltimore city, metropolitan Baltimore, Maryland, the greater Baltimore Washington Metropolitan area, the Mid-Atlantic states or nationally? Or is the statistical focus on the business of the area in which the insurer operates, or on the business line the insurer offers, or some combination of geographic regions and the insurer's business.

Without some definition of the geographic, business or some other definitive statistical base upon which an insurer could being to establish a compliance program, even the most perfectly accurate and evolving protected class data base and comprehensive analysis of segregated housing by an insurer would not enable compliance with the proposed rule.

These are just some of impractical results of applying the proposed regulation to the pricing and provision of homeowners insurance.  Others not detailed here would include the vast expense required of insurers to collect and maintain the protected class data, the liability of insurers for any breach of the confidentiality of that data potential impact of insurers leaving the market as unworkable, too expense and too risky.

Case 1:13-cv-00966-RJL    Document 153-1    Filed 05/30/23    Page 15 of 19
USCA Case #23-5275    Document #2072580    Filed: 08/30/2024    Page 116 of 153
www.namic.org

**C.  The 2013 Rule Does Not Included the 2015 Disparate Impact Requirements Set by the U.S. Supreme Court**

HUD's self-congratulatory reinstatement and approval of its own work is a combination of revisionist history and selective memory. HUD proposed the rule in 2012 to try to impose its views on burdens of proof requirements to federal courts that chose to apply the burdens of proof that each court determined most appropriate.  There was not a "judicial consensus" as HUD claims in the Reinstatement, which is clear from HUD's 2011 proposed rule statement that "This inconsistency threatens to create uncertainty as to how parties' conduct will be evaluated."

In the Reinstatement, "HUD believes the 2013 Rule is more consistent with judicial precedent construing the Fair Housing Act, including *Inclusive Communities*", which amazingly purports HUD's clairvoyance in proposing a rule in 2011 that would include judicial precedent set out by the Supreme Court in 2015. This continues in the Reinstatement - "As HUD has stated, the 2013 Rule was consistent with Inclusive Communities."  HUD also claims that the Supreme Court "cited HUD's 2013 Rule multiple times with approval". While provisions of the Rule were cited in one paragraph by the Court, there is nothing in the reference that can reasonably be interpreted as approval. In fact, HUD's Reinstatement later acknowledges that the "Court had no occasion or opportunity to consider the proper pleading standards."

What the Supreme Court did do in Inclusive Communities is define a number of specific limitation and restrictions that are not included in the 2013 Rule or its Reinstatement. HUD is fully aware that NAMIC has been challenging these deficiencies in the 2013 Rule in federal court since 2015; a case in which HUD has requested and been granted dozens of stays for HUD to examine and reexamine the 2013 rule which has remained in effect and which "HUD does not believe that deeper analysis is needed on the impact of this rule."

The 2013 Rule does not and has not included protections and limitations set down by the U.S. Supreme Court in Inclusive Communities.  But disparate-impact liability has always been properly limited in key respects to avoid serious constitutional questions that might arise under the FHA, e.g., if such liability were imposed based solely on a showing of a statistical disparity.

A disparate-impact claim relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement is important in ensuring that defendants do not resort to the use of racial quotas.

Case 1:13-cv-00966-RJL    Document 153-1    Filed 05/30/23    Page 16 of 19
USCA Case #23-5275    Document #2072580    Filed: 08/30/2024    Page 117 of 153
www.namic.org

Policies, whether governmental or private, are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." Griggs, 401 U. S., at 431. Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and "would almost inexorably lead" governmental or private entities to use "numerical quotas," and serious constitutional questions then could arise. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice, and courts should strive to design race-neutral remedies. Remedial orders that impose racial targets or quotas might raise difficult constitutional questions.
A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.
The limitations on disparate-impact liability discussed here are also necessary to protect potential defendants against abusive disparate-impact claims.

Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities, rather than solely "remov[ing] . . . artificial, arbitrary, and unnecessary barriers." Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that "arbitrar[ily] . . . operate[s] invidiously to discriminate on the basis of rac[e]." Ibid. If additional measures are adopted, courts should strive to design them to eliminate racial disparities through race-neutral means.

D.  **The Proposed Rule Burdens of Proof are Inequitably Tilted to the Charging Party**

As noted, the U.S, Court has made clear that disparate impact requires adequate safeguards at the prima facie stage.  The 2013 Rule that purports to address burdens of proof do not include these safeguards and create an unlevel playing field in favor of the charging party.

Section 2(c) of the proposed § 100.500 provides that the charging party has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect. That section does not set any standards for the level of proof or what can or cannot be used. This contrasts with the requirement that the respondent or defendant then has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant, which requires a legally sufficient justification, which must be supported by evidence and may not be hypothetical or speculative.

**J.A.114**

By inference, the plaintiff proof need not be supported by evidence and may be hypothetical or speculative. This means that a plaintiff may allege that the defendant's practice will "result in a disparate impact" without evidence, but the defendant may not provide a justification to a proposed result that includes speculation but must provide evidence that the result cannot occur. This is clearly in conflict with the Supreme Court ruling that "A plaintiff who fails to allege <u>facts</u> at the pleading stage or produce statistical <u>evidence</u> demonstrating a causal connection cannot make out a prima facie case of disparate impact."

If the respondent or defendant satisfies that burden of proof, the charging party or plaintiff may still prevail upon proving – without evidence and using hypotheticals or speculation - that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect. Note that this standard does not require that the other practice be equally practical or productive or have any economic limitations. There is no requirement that the other practice be reasonable, simply that it has "less discriminatory effect." It also removes the Supreme Court's requirement that the charging party not resort to reverse discrimination.

### E. The Proposed Rule Remedies are Concurrently Overbroad and Inadequate

Therein is another unfair burden imposed upon the defendant. As written, the rule does not exonerate the defendant upon adopting this other practice.  As written, the defendant is still found liable for discrimination for an inadvertent practice and then ordered to adopt a less discriminatory practice. And a less discriminatory practice is still a discriminatory practice that subjects the defendant to further liability.

The purpose of such a section is properly to implement the Supreme Courts direction that "Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice". The other practice should not merely reduce the level of the disparate impact – leaving the defendant prejudged for the next allegation – but should be a replacement practice only if it actually or judicially predictably results in the elimination of the discriminatory effect.

In the instance of an insurer, if the insurer has by non-speculative evidence proven that the practice is necessary to achieve one or more of their substantial, legitimate, nondiscriminatory interests – and is therefore not artificial, arbitrary, and unnecessary, then the insurer should be found not liable for disparate impact discrimination if the insurer replaces the practice with a operational and economically reasonable replacement practice that the court judicially determines to actually or

Case 1:13-cv-00966-RJL   Document 153-1   Filed 05/30/23   Page 18 of 19
USCA Case #23-5275      Document #2072580        Filed: 08/30/2024      Page 119 of 153
www.namic.org

predictably result in the elimination of the proposed discriminatory effect.

**Conclusion**

Insurer liability for any civil or criminal liability is an extremely serious matter, and for the mutual insurance company members of NAMIC, such liability can threaten the ability of the mutual insurance company to continue to provide the requisite protection of its collective policyholders. Discrimination liability includes a particular toxicity in these present times and even an unsupported allegation of such heinous conduct will do permanent and last damage to a mutual insurance company. Mutual insurance companies are often small market companies operating in a single county, with many specializing in niche markets such as churches, pharmacists, jewelers, and lumber dealers. Improperly drafted regulations that encourage baseless allegations of discrimination or that deny a innocent mutual insurance company the ability to comply or defend result in a taint that may immeasurably harm the company and policyholders.

As NAMIC has described above and in its many prior submissions to HUD, the 2013 Rule and the Proposed Rule are not necessary and operate to disrupt the fundamentals of the insurance business. Existing federal, state and local laws and regulations have proven to prevent insurer discrimination and no examples of any deficiencies in these many provisions has been offered by HUD or other proponents of the 2013 Rule. Causing insurers to obtain and use protected class factors that are unrelated to the principles of risk-based pricing is contrary to the business of insurance.  While perhaps well intentioned, the Reinstated Rule will be unworkable for insurers and compliance with the convoluted and conflicting provisions will be complex, expensive, intrusive on policyholder's privacy and unreasonable. It conflicts with impairs and supersedes the congressional authorization of the states to regulate the business of insurance under the McCarran-Ferguson Act and the mandate to the states to define unfair discrimination.

The Reinstated Rule purports to include the protections and limitation set down by the U.S. Supreme Court but it does not. The burdens of proof are tilted to favor the allegations and hamstring any defense. The proposed remedies provide unreasonable latitude to revise the business of insurers without any consideration of practicality or economics, and as written,  and allow remedies that mitigate discrimination, rather than eliminate discrimination as directed by the Supreme Court.  In fact, the proposed remedies enable reverse discrimination by overturning the state statutory prohibition of unfair discrimination as that standard requires insurers to base treatment on expected losses and costs.

I would be most happy to address any questions you may have by contacting me at tkarol@namic.org. Thank you for your time and consideration.

Thomas J. Karol
General Counsel Federal

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Case No. 13-966 (RJL) |
| | ) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | ) ) ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**
(September 19, 2023) [Dkt. ## 60, 64]

The U.S. Department of Housing and Urban Development has promulgated a Rule that creates a legal framework for establishing disparate-impact claims under the Fair Housing Act.  That Disparate-Impact Rule first came to be in 2013, after which two associations whose members sell homeowner's insurance challenged it as exceeding HUD's authority.  As originally conceived, this action posed the question whether disparate-impact claims are permissible at all under the Fair Housing Act.  In 2014, I answered that question in the negative, *Am. Ins. Ass'n v. HUD*, 74 F. Supp. 3d 30, 32 (D.D.C. 2014), but the Supreme Court in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.* (*Inclusive Communities*), 576 U.S. 519 (2015), several months later answered the same question in the affirmative.  Consequently, this action moved in a different direction after it went on appeal to our Circuit Court. Undaunted, the associations still argued that the Disparate-Impact Rule is unlawful, but

they advanced a new theory that the Rule expands the Supreme Court's judicially approved disparate-impact liability concept beyond certain parameters laid out in *Inclusive Communities*.

Amazingly that theory has remained untested for seven years, in what is sure to be a case study in government by rulemaking!   In that time—a period covering three Presidential administrations—the Disparate-Impact Rule was substantially overhauled, then stayed, then revived to its original form.   Along the way, one of the two associations dropped out of the action, leaving the National Association of Mutual Insurance Companies ("NAMIC") as the only plaintiff.   The good news for NAMIC is that its challenge is, at long last, ripe for decision.   The bad news for NAMIC is that its post–*Inclusive Communities* arguments for invalidating the Disparate-Impact Rule, creative as they might be, are unconvincing.   Indeed, because I have concluded that the Rule does not conflict with the Fair Housing Act as applied to insurers' underwriting and rating practices, I must DENY NAMIC's motion for summary judgment and GRANT HUD's cross-motion for summary judgment.

## BACKGROUND

### I.     The Fair Housing Act and the 2013 Rule

Enacted in 1968, Title VIII of the Civil Rights Act of 1968—commonly known as the Fair Housing Act ("FHA")—furthers the congressional policy "to provide, within constitutional limitations, for fair housing throughout the United States."   Civil Rights Act of 1968, Pub. L. No. 90-284, § 801, 82 Stat. 73, 81 (codified at 42 U.S.C. § 3601).   The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to

2

refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of" certain protected characteristics. 42 U.S.C. § 3604(a). It also makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" the same characteristics. *Id.* § 3604(b).[1]

Absent from the FHA, however, is explicit language specifying the types of discrimination claims created by those provisions. While it was undisputed that the FHA prohibits housing policies and practices that intentionally discriminate on the basis of a protected characteristic, *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 682 (D.C. Cir. 2006); *see Inclusive Cmtys.*, 576 U.S. at 558 (Alito, J., dissenting) ("Everyone agrees that the FHA punishes intentional discrimination."), it was much less clear (at least until 2015) whether the FHA also recognizes so-called disparate-impact liability—that is, a housing policy or practice "that [is] not intended to discriminate but in fact ha[s] a disproportionately adverse effect on" individuals with a protected characteristic, *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009); *see Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1085 (D.C. Cir. 2011) ("We have not decided whether [the FHA] permits disparate impact claims."). In 2011, the Supreme Court granted

---

[1] The characteristics protected by the FHA, as originally enacted, were race, color, religion, and national origin.  Civil Rights Act of 1968 § 804(a)–(b), 82 Stat. at 83.  In 1974 amendments, Congress expanded the list of protected characteristics to include sex, Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 808(b)(1), 88 Stat. 633, 729, and in 1988 amendments, familial status and handicap were added, Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6(a), (b)(2), 102 Stat. 1619, 1620–22 (codified as amended at 42 U.S.C. § 3604(a)–(b), (f)).

certiorari in *Magner v. Gallagher*, 565 U.S. 1013 (2011), to address that very question. *See* Petition for Writ of Certiorari at i, *Magner*, No. 10-1032 (U.S. Feb. 14, 2011).

Just nine days later, HUD, supposedly having "long interpreted" the FHA to allow disparate-impact liability, proposed a rule that would "establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921, 70,921 (proposed Nov. 16, 2011) (to be codified at 24 C.F.R. pt. 100).[2] The parties in *Magner* settled their case, however, before the Supreme Court could address its merits. 565 U.S. 1187 (2012). The rulemaking nevertheless continued. HUD published its final Rule in February 2013 (the "2013 Rule"), "formaliz[ing] its long-held recognition of discriminatory effects liability under the Act" and creating a three-step "burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act." Implementation of the Fair Housing Act's Discriminatory Effects Standard ("2013 Rule"), 78 Fed. Reg. 11,460, 11,460 (Feb. 15, 2013) (to be codified at 24 C.F.R. pt. 100).

Under the first step of the framework, a plaintiff had the burden of proving "that a challenged practice caused or predictably will cause a discriminatory effect," 24 C.F.R. § 100.500(c)(1) (2013), that is, when the practice "actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates

---

[2] The 1988 amendments to the FHA vested the Secretary of HUD with authority to make rules, after notice and comment, to carry out the goals of the FHA. Fair Housing Amendments Act of 1988 § 8, 102 Stat. at 1635 (codified as amended at 42 U.S.C. § 3614a).

segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin," *id.* § 100.500(a). If that burden was met, the defendant bore the burden at the second step of proving that the practice was "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). If that burden was also met, the burden returned at the third step to the plaintiff to prove that "the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). At the last two steps, the burden could *not* be met with hypotheticals or speculation; hard evidence was required. *Id.* § 100.500(b)(2).

The 2013 Rule expressly applied to providers of homeowner's insurance, such as the members of the two original plaintiffs in this action, NAMIC and the American Insurance Association ("AIA"). 2013 Rule, 78 Fed. Reg. at 11,474–75; Compl. [Dkt. #1] ¶¶ 7–8.[3] Indeed, they commenced this action against HUD and its Secretary (hereinafter referred to collectively and in the singular, "HUD") after the 2013 Rule was issued, claiming violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the FHA. Compl. ¶ 1. Their position then was that the FHA prohibited only intentional discrimination and so HUD's promulgation of a Rule recognizing disparate-impact liability exceeded its statutory jurisdiction, authority, and limitations, or was otherwise not in

---

[3] In 2019, AIA merged with a separate organization called the Property Casualty Insurers Association of America, who was pursuing its own challenge to the 2013 Rule in the U.S. District Court for the Northern District of Illinois. The merged organization, called the American Property Casualty Insurance Association, continued pressing its claims in Illinois, and so AIA sought and obtained a dismissal of its claims here pursuant to Federal Rule of Civil Procedure 41(a)(2). Unopposed Mot. to Dismiss [Dkt. #104]; Order (Mar. 25, 2019) [Dkt. #106].

accordance with law. *Id.* ¶¶ 43–50, 66–73; *see* 5 U.S.C. § 706(2)(A), (C). I agreed,

granting the associations' motion for summary judgment and vacating the 2013 Rule. *Am.*

*Ins. Ass'n*, 74 F. Supp. 3d at 32.[4]

As I forecasted, however, my decision would not be the final say on disparate-

impact liability under the FHA, *id.* at 47, for the Supreme Court had just recently granted

certiorari in *Inclusive Communities*, 573 U.S. 991 (2014), its third attempt to resolve

whether disparate-impact claims are cognizable under the FHA. *See* Petition for Writ of

Certiorari at i, *Inclusive Cmtys.*, 576 U.S. 519 (No. 13-1371). With four Justices in dissent,

it answered that question in the affirmative. *Inclusive Cmtys.*, 576 U.S. at 545–46. It did,

however, impose certain limitations on disparate-impact liability under the FHA, cautious

not to allow "disparate-impact liability [to] displace valid governmental and private

priorities." *Id.* at 544. For one, at the prima facie stage of the analysis, "a disparate-impact

claim that relies on a statistical disparity must fail if the plaintiff cannot point to a

defendant's policy or policies *causing* that disparity." *Id.* at 542 (emphasis added). This

"causality requirement" is "robust": a mere statistical correlation is insufficient, and

external factors that might limit a defendant's discretion can sever the causal connection

between a housing practice and any disparate impact. *Id.* at 542–43. If a prima facie case

is met, it is a defense to a disparate-impact claim if a housing practice or policy is proven

---

[4] Summary judgment briefing, oral argument, and my decision all occurred after a stay that was ordered when the Supreme Court granted certiorari in *Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.*, 570 U.S. 904 (2013), to resolve the statutory question first presented in *Magner*. *See* Petition for Writ of Certiorari at i, *Township of Mount Holly*, No. 11-1507 (U.S. June 11, 2012). Unfortunately, the parties in *Township of Mount Holly*, like those in *Magner*, once again settled before the Supreme Court could issue a decision on the merits. 571 U.S. 1020 (2013).

**J.A.123**

to be "necessary to achieve a valid interest." *Id.* at 541. In the final calculus, housing

practices or policies "are not contrary to the disparate-impact requirement unless they are

'artificial, arbitrary, and unnecessary barriers.'" *Id.* at 543 (quoting *Griggs v. Duke Power*

*Co.*, 401 U.S. 424, 431 (1971)).

     While it goes without saying that *Inclusive Communities* overruled much of this

Court's first opinion, our Circuit Court vacated my order granting summary judgment and

predictably remanded the case for further consideration in light of *Inclusive Communities*.

Order, *Am. Ins. Ass'n v. HUD*, No. 14-5321 (D.C. Cir. Sept. 23, 2015). On remand, the

associations requested and obtained leave to file an amended complaint. Not surprisingly,

they still alleged violations of the APA and the FHA but focused on more specific ways in

which the 2013 Rule ran afoul of the limitations to disparate-impact liability imposed by

the Supreme Court in *Inclusive Communities*. Am. Compl. [Dkt. #57] ¶¶ 1–8, 47–61, 76–

107. New summary judgment briefing followed shortly thereafter. Pls.' Mot. for Summ.

J. ("NAMIC Mot.") [Dkt. #60]; Defs.' Mot. for Summ. J. ("HUD Mot.") [Dkt. #64]; Defs.'

Opp'n [Dkt. #65]; Pls.' Opp'n [Dkt. #68]; Pls.' Reply [Dkt. #69]; Defs.' Reply [Dkt. #70].

     Oral argument was scheduled to occur in February 2017, but the recent change of

Presidential administrations had the unfortunate effect of creating an extended delay in this

litigation. For example, the case had to be stayed for over a year to allow for individuals

in certain leadership positions at HUD and the Department of Justice to be nominated,

confirmed, and brought up to speed on this litigation. Min. Order (Feb. 15, 2017); Joint

Status Report (July 12, 2017) [Dkt. #79]; Joint Mot. to Continue Status Conference (Feb.

7, 2018) [Dkt. #88]. Once the dust settled by mid-2018, however, the stay continued

because HUD apparently had second thoughts about maintaining and defending the 2013

Rule.  Indeed, the agency issued an Advance Notice of Proposed Rulemaking seeking

public comment on possible amendments to the Rule following *Inclusive Communities*.

Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact

Standard, 83 Fed. Reg. 28,560 (proposed June 20, 2018) (to be codified at 24 C.F.R. pt.

100); *see also* Joint Status Report (June 25, 2018) [Dkt. #94].  And that fall, it shared its

plans to issue a Notice of Proposed Rulemaking, Joint Status Report (Oct. 19, 2018) [Dkt.

#95], which it finally published in August 2019.  HUD's Implementation of the Fair

Housing Act's Disparate Impact Standard, 84 Fed. Reg. 42,854 (proposed Aug. 19, 2019)

(to be codified at 24 C.F.R. pt. 100).

## II.    The 2020 Rule

Ultimately, it took another year for HUD to publish its new final Rule (the "2020

Rule") replacing the 2013 Rule, after which the case remained stayed.  HUD's

Implementation of the Fair Housing Act's Disparate Impact Standard ("2020 Rule"), 85

Fed. Reg. 60,288 (Sept. 24, 2020) (to be codified at 24 C.F.R. pt. 100); *see* Joint Status

Report (Dec. 14, 2020) [Dkt. #119].  But the new Rule, not surprisingly, invited new

litigation elsewhere.  Relative to the 2013 Rule, the 2020 Rule made it more difficult for

plaintiffs to advance disparate-impact claims and easier for defendants to justify housing

practices and policies so as to avoid liability.  2020 Rule, 85 Fed. Reg. at 60,292–97.

Unhappy with that development, fair housing organizations challenged the 2020 Rule

under the APA, and they were able to obtain a preliminary injunction in a Massachusetts

District Court postponing its effective date. *Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 607, 611–12 (D. Mass. 2020).

That ruling was in late 2020, just before yet another change of Presidential administrations. That new administration unsurprisingly quickly announced its opposition to the 2020 Rule, Memorandum on Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies, 2021 Daily Comp. Pres. Doc. 90 (Jan. 26, 2021), and by June 2021, HUD issued a Notice of Proposed Rulemaking with plans "to recodify its previously promulgated rule," the 2013 Rule. Reinstatement of HUD's Discriminatory Effects Standard, 86 Fed. Reg. 33,590, 33,590 (proposed June 25, 2021) (to be codified at 24 C.F.R. pt. 100). According to HUD, the 2013 Rule "better states Fair Housing Act jurisprudence and is more consistent with the Fair Housing Act's remedial purposes." *Id.* With such strong indications of a reversion back to the 2013 Rule, I finally held oral argument on the parties' cross-motions for summary judgment in July 2021—nearly four and a half years after originally scheduled. Tr. of Oral Arg. (July 19, 2021) [Dkt. #126]. The parties also submitted supplemental briefs after argument. Suppl. Br. in Supp. of Defs.' Mot. for Summ. J. [Dkt. #128]; Suppl. Br. of Pl. [Dkt. #129]. Still, the case remained stayed thereafter and through the publication of HUD's new Rule in March 2023 (the "2023 Rule").

## III.   The 2023 Rule

The 2023 Rule comes as advertised, reinstating *verbatim* the disparate-impact standard from the 2013 Rule. Reinstatement of HUD's Discriminatory Effects Standard ("2023 Rule"), 88 Fed. Reg. 19,450, 19,454–55 (Mar. 31, 2023) (to be codified at 24 C.F.R.

pt. 100).[5]  To establish a claim for disparate-impact liability under the FHA, a plaintiff

bears the initial burden of proving "that a challenged practice caused or predictably will

cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1) (2023).[6]  A practice has such an

effect "where it actually or predictably results in a disparate impact on a group of persons

or creates, increases, reinforces, or perpetuates segregated housing patterns because of race,

color, religion, sex, handicap, familial status, or national origin." *Id.* § 100.500(a).  If the

plaintiff meets that initial burden, the defendant must then prove "that the challenged

practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory

interests" of the defendant.  *Id.* § 100.500(c)(2); *see also id.* § 100.500(b)(1)(i).  If the

defendant meets that burden, the plaintiff may still prevail if it proves "that the substantial,

legitimate, nondiscriminatory interests supporting the challenged practice could be served

by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3); *see also id.*

§ 100.500(b)(1)(ii).  As with the 2013 Rule, the final two burdens in the analysis "must be

supported by evidence and may not be hypothetical or speculative." *Id.* § 100.500(b)(2).

---

[5] The only part of the 2020 Rule that the 2023 Rule retains is one example of an activity that would violate the prohibition on "engag[ing] in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons," "because of" a protected characteristic.  24 C.F.R. § 100.70(b) (2023).  The example is as follows: "Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin." *Id.* § 100.70(d)(5); *see* 2023 Rule, 88 Fed. Reg. at 19,455, 19,500.

[6] This opinion cites to the Code of Federal Regulations for the language codified therein and hereafter refers to that language as the "Disparate-Impact Rule."  It cites to the Federal Register for the preambles of the 2013 Rule and the 2023 Rule.

**J.A.127**

After the 2023 Rule was published, NAMIC[7] obtained leave to amend the complaint again, with minimal changes given that the 2023 Rule simply reinstated the 2013 Rule.  *See* Second Am. Compl. [Dkt. #146] ¶¶ 14–17; *id.* at 22.  The parties then submitted yet another round of supplemental briefs.  Suppl. Br. in Supp. of Defs.' Mot. for Summ. J. ("HUD Second Suppl. Br.") [Dkt. #150]; Suppl. Br. of Pl. [Dkt. #151].  At last their motions are now ripe for review.

## LEGAL STANDARD

On a motion for summary judgment in an action challenging an agency action, the typical standard under Federal Rule 56(a) does not apply.  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001).  Rather, "as an appellate tribunal," *id.*, the district court "must decide as a matter of law 'whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'"  *Cayuga Nation v. United States*, 594 F. Supp. 3d 64, 71 (D.D.C. 2022) (Lamberth, J.) (quoting *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013) (Contreras, J.)).  Under the APA, a reviewing court shall set aside a final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or one found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  A court reviews "an agency's construction of the statute which it administers" under the two-step framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  At step

---

[7] *See supra* note 3 and accompanying text.

one, the court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, "the statutory provision in question is 'silent or ambiguous with respect to the specific issue,'" the court moves to step two and must defer to the agency's interpretation so long as it "is based on a permissible construction of the statute." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 552 (D.C. Cir. 2020) (quoting *Chevron*, 467 U.S. at 843).

With respect to standing and ripeness, "district courts are not limited to the administrative record." *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 187 (D.D.C. 2022) (Moss, J.). As the party invoking federal jurisdiction, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" supporting standing, "which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)). "Similarly, a defendant may move for summary judgment on standing, seeking to demonstrate 'that there is no genuine dispute as to any material fact' and that [a] plaintiff[] cannot establish the required elements of Article III standing based on the record evidence." *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 187 (citations omitted) (quoting Fed. R. Civ. P. 56(c)). Those same standards apply to the question of whether a claim is ripe for adjudication, on constitutional grounds or for prudential reasons. *Garcia v. Acosta*, 393 F. Supp. 3d 93, 103 (D.D.C. 2019) (Moss, J.).

## DISCUSSION

### I.   Constitutional Standing and Ripeness

For similar reasons as in 2014, *see Am. Ins. Ass'n*, 74 F. Supp. 3d at 36–39, NAMIC

has standing to challenge the Disparate-Impact Rule.   As an association, NAMIC has

standing only if (1) at least one of its members has standing to sue in its own right, (2) the

interests that NAMIC seeks to protect by suing are germane to its purpose, and (3) neither

the asserted claim nor the relief requested requires individual members to participate in the

litigation.   *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022).   The latter

two requirements are easily met.   The interests being protected by NAMIC here are its

*raison d'être*, *see* Second Am. Compl. ¶ 18, and the Court "see[s] no reason—nor has any

been identified—that an individual member's participation is required." *Ctr. for Biological

Diversity*, 56 F.4th at 67.

As to the first requirement, no doubt at least one of NAMIC's members has standing

to sue on its own—in fact, every single member likely has standing.   A member would

have standing upon a showing of an "injury in fact that was caused by the conduct of the

defendants and that can be redressed by judicial relief." *Pub. Citizen, Inc. v. Nat'l Highway

Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).   The 2023 Rule, by its own

terms, applies to the insurance practices engaged in by NAMIC's members.   *See* 2023 Rule,

88 Fed. Reg. at 19,463–80 (explaining in detail HUD's decision not to exempt insurance

industry, as requested by commenters in notice-and-comment).   And it sets a legal standard

under which insurance companies may become liable for violating the FHA.   *See id.* at

19,500.   That legal exposure is an injury in fact caused by HUD's rulemaking, and the

liability would be eliminated by a decision in NAMIC's favor. *See Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 43 (D.C. Cir. 2015) ("[R]egulated entities' standing to challenge the rules that govern them is normally not an issue, because regulatory constraints typically qualify as injury in fact." (cleaned up)).

Not so fast, says HUD.  It takes the position that the 2023 Rule "essentially duplicates pre-existing legal duties" imposed by the FHA and therefore does not cause any injury to NAMIC's members that can be redressed with a favorable ruling.  HUD Second Suppl. Br. at 12–15.  It points to cases in which a plaintiff lacks standing because two independent government actions produce the same harm but only one is challenged.  *See, e.g.*, *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015) (per curiam) (no standing to challenge EPA standards when unchallenged NHTSA standards independently caused same harm); *see also Texas v. EPA*, 726 F.3d 180, 198 (D.C. Cir. 2013) (no standing to challenge rule that actually *mitigated* the injury from a self-executing statute).  The same is true here, says HUD: even if the 2023 Rule is vacated, the FHA's disparate-impact liability, as interpreted in *Inclusive Communities* and other opinions, still applies to NAMIC's members.  HUD Second Suppl. Br. at 13–15.  I disagree.

HUD curiously undersells the Disparate-Impact Rule, which does not simply restate preexisting legal duties.  In "providing consistency nationwide," 2013 Rule, 78 Fed. Reg. at 11,460, the Rule "confirmed preexisting legal standards in some circuits, [but] it went beyond established law in others."  *Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1043 (N.D. Ill. 2014); *see 2013 Rule, 78 Fed. Reg. at 11,462 (discussing divergent standards adopted by various U.S. courts of appeals).  It did even more in our

Circuit, where no judicially crafted standard has ever existed. *See Greater New Orleans Fair Hous. Action Ctr.*, 639 F.3d at 1085. And that calculus has not changed since *Inclusive Communities*. In holding that the FHA allows for disparate-impact claims, the Supreme Court recognized some outer boundaries on disparate-impact liability, 576 U.S. at 540–45, but it did not purport to establish a uniform legal standard or framework for deciding such claims. *Id.* at 586 (Alito, J., dissenting) (observing that majority opinion left unanswered specific questions about proving a disparate-impact claim). The Disparate-Impact Rule may well be "[c]onsistent with [HUD's] own past practice and that of many federal courts." 2013 Rule, 78 Fed. Reg. at 11,463. But the Rule can hardly be said to have zero practical effect in light of preexisting legal duties. If it did, why promulgate it in the first place?

HUD also argues that NAMIC's evidentiary submissions fall short of showing an "actual or imminent" injury. HUD Second Suppl. Br. at 10–12; *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). When NAMIC moved for summary judgment in 2016, it submitted affidavits from fifteen employees at certain of its member companies, and they all explained that they would need to start collecting data about applicants' and insureds' protected characteristics (which they otherwise do not do) in order to ensure compliance with the Disparate-Impact Rule. *E.g.*, Christy Aff. [Dkt. #60-4] ¶¶ 4–10; Hayward Aff. [Dkt. #60-6] ¶¶ 5–7, 12–14. According to HUD, those data-collection burdens are too hypothetical and speculative to count as an injury for purposes of Article III standing. HUD Second Suppl. Br. at 10–11. And, from HUD's perspective, the proof is in the pudding: "In the seven years since summary judgment briefing,

[NAMIC] still has not come forward with any evidence substantiating its claims of present or imminent injury to its members." *Id.* at 11.

But NAMIC's standing is "self-evident," and so it need not rely on evidence outside the administrative record to establish its standing. *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002). When a plaintiff challenges an administrative action and is "an object of th[at] action," usually "no evidence outside the administrative record is necessary for the court to be sure of" the plaintiff's standing. *Id.* Nothing further is required because "'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Defs. of Wildlife*, 504 U.S. at 561–62). And there is little question here. As noted above, the 2023 Rule expressly applies to the insurance practices engaged in by NAMIC's members, and it exposes those insurers to disparate-impact liability beyond what they otherwise would. 2023 Rule, 88 Fed. Reg. at 19,463–80, 19,500. NAMIC therefore has established its standing even without the data-collection burdens its members would purportedly bear under the 2023 Rule.

For much the same reasons, this action is constitutionally ripe for review. *See POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) ("Constitutional ripeness is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is imminent or certainly impending." (internal quotation marks omitted) (quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012))). While I acknowledge this action is a so-called "pre-enforcement suit," in which a regulated

entity is challenging the validity of a law before violating that law, *State Nat'l Bank*, 795 F.3d at 53–54, that sort of posture does *not* make a case premature. Federal courts "'normally do not require plaintiffs to bet the farm' by violating the law in order to challenge" an administrative action. *Id.* at 54 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010)). And HUD does not offer any reason to force NAMIC's members to bet their farm before their association can challenge the 2023 Rule here. *See* HUD Second Suppl. Br. at 17. This case is therefore constitutionally ripe.

## II.  Prudential Ripeness

"Even if a case is 'constitutionally ripe,' though, there may also be 'prudential reasons for refusing to exercise jurisdiction.'" *Am. Petroleum Inst.*, 683 F.3d at 386 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). Not so, however, here! The aim of prudential ripeness, in a nutshell, is to have "Article III courts make decisions only when they have to, and then, only once." *Id.* at 387. In the administrative context, the doctrine seeks to prevent courts "from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *In re Aiken County*, 645 F.3d 428, 433 (D.C. Cir. 2011) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). It also "protect[s] the expenditure of judicial resources [and] comports with [the courts'] theoretical role as the governmental branch of last resort." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). Courts are thus tasked with evaluating "two factors in deciding whether to stay their hand: the 'fitness of the issues for

17
**J.A.134**

judicial decision' and 'the extent to which withholding a decision will cause hardship to the parties.'" *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 408 (D.C. Cir. 2013) (quoting *Am. Petroleum Inst.*, 683 F.3d at 387).

As to the "fitness" factor, NAMIC's claims are "presumptively suitable for judicial review" because they "raise purely legal questions." *Kaufman v. Nielsen*, 896 F.3d 475, 483 (D.C. Cir. 2018) (quoting *Venetian Casino Resort, L.L.C. v. EEOC*, 409 F.3d 359, 364 (D.C. Cir. 2005)).  NAMIC's position is that the Disparate-Impact Rule runs contrary to the FHA in all applications to insurers' underwriting and rating practices.[8]   Second Am. Compl. at 18–22.  Although, as detailed below, that position places a heavy burden on NAMIC, it nonetheless presents pure legal questions that NAMIC can raise now, before one of its members gets sued for practices that allegedly have a disparate impact.  *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464–65 (D.C. Cir. 2006) (facial challenge to regulation governing discharge permits as exceeding statutory authority was ripe, even though each permitting decision will rest on case-specific findings).  In other words, case-specific factual development would not, as HUD thinks, "significantly advance [the Court's] ability to deal with the legal issues presented nor aid [it] in their resolution." *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 82 (1978); HUD Second Suppl. Br. at 18–19.

---

[8] Underwriting refers to the decisions of whether to accept or decline an application for insurance and how to group an insurance policy with other policies that have similar risk profiles.  1 Steven Plitt et al., Couch on Insurance § 1:2 (3d ed. 2023); Daniel Schwarcz, *Towards a Civil Rights Approach to Insurance Anti-discrimination Law*, 69 DePaul L. Rev. 657, 664 (2020).  Rating refers to the setting of the premium to be paid by a group of policyholders, based on the risk insured. Plitt et al., *supra*, § 1:3; *see also* Schwarcz, *supra*, at 664 ("In practice, the line between rating and underwriting has become increasingly blurred in recent decades.").

**J.A.135**

And because the Disparate-Impact Rule marks the end of the administrative road, there is no concern that the Court's review would "disrupt" an ongoing "administrative process." *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 674 (D.C. Cir. 1978). With the Disparate-Impact Rule, HUD has "crystalized its position" on the scope of disparate-impact liability under the FHA, *Sprint Corp. v. FCC*, 331 F.3d 952, 957 (D.C. Cir. 2003), and private parties who believe they have been wronged may seek to establish such liability without any further decision-making from HUD. 24 C.F.R. § 100.500 (2023). The Rule is therefore unlike the agency actions challenged in some cases on which HUD relies, which contemplate further agency decisions. HUD Second Suppl. Br. at 18–19. For example, in *Diamond Shamrock*, the challenged regulation governed the measurement of wastewater discharge to be used by regional EPA administrators when issuing permits in the future. 580 F.2d at 672. And in *Office of Communication of United Church of Christ v. FCC*, the challenged policy statement outlined a framework that the FCC might apply in deciding whether to postpone review of a future license-transfer application. 826 F.2d 101, 103 (D.C. Cir. 1987). In those cases, "judicial intervention would inappropriately interfere with further administrative action." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Not so with the Disparate-Impact Rule.

The "hardship" factor weighs heavily in favor of reviewing the claims now. HUD's contention that NAMIC's challenge to the Disparate-Impact Rule would be ripe only after a specific underwriting or rating practice has been challenged as causing a disparate impact under the Rule is practically unworkable. HUD Second Suppl. Br. at 18–19. Indeed, it's no surprise that courts typically do not require parties to flout regulations and risk the

imposition of civil liability, just to obtain judicial review of a regulation.  *Bellion Spirits,*

*LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021).  Speaking out of the other side

of its mouth, HUD also claims that NAMIC has not suffered hardship because none of its

members have faced a claim under the Disparate-Impact Rule since it was first promulgated

in 2013.  HUD Second Suppl. Br. at 20–21.  Regardless of why that might be, it is enough

to say that the Disparate-Impact Rule is "a substantive rule which as a practical matter

requires [NAMIC's members] to adjust [their] conduct immediately."  *Nat'l Park Hosp.*

*Ass'n*, 538 U.S. at 808 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

And perhaps they have done just that in order to avoid a lawsuit.  The pressure to comply

with the Disparate-Impact Rule or else get sued is a hardship "felt immediately by those

subject to it in conducting their day-to-day affairs," *Toilet Goods Ass'n v. Gardner*, 387

U.S. 158, 164 (1967), not some "speculative or hypothetical future harm," *Nat. Res. Def.*

*Council, Inc. v. EPA*, 859 F.2d 156, 166 (D.C. Cir. 1988) (per curiam); *see also id.* ("The

paradigmatic hardship situation is where a petitioner is put to the choice between incurring

substantial costs to comply with allegedly unlawful agency regulations and risking serious

penalties for non-compliance.").  For all those reasons, NAMIC's claims are ripe for

review, and the Court can proceed to the merits.

## III.   Merits

In a case that was initiated on the theory that the FHA does not encompass disparate-

impact liability, NAMIC has been forced to change its strategy after the Supreme Court

reached the opposite conclusion in *Inclusive Communities*.  Under its new strategy,

NAMIC still argues that the Disparate-Impact Rule conflicts with the FHA, but in more

nuanced ways.  As explained above, the Supreme Court in *Inclusive Communities* placed certain limitations on disparate-impact liability under the FHA so as to avoid potential constitutional issues and to prevent the Act from forcing housing authorities to reorder their legitimate priorities.  576 U.S. at 540.  NAMIC's theory is that the Disparate-Impact Rule goes beyond those limitations for four reasons.  Unfortunately for NAMIC, all four are unconvincing.  How so?[9]

### A.     Pervasive Consideration of Protected Characteristics

NAMIC first argues that the Disparate-Impact Rule is inconsistent with the FHA because it will cause protected characteristics to be used and considered by insurers in a pervasive way.  NAMIC Mot. at 15–21.  Without the Rule, the argument goes, insurers make underwriting and rating decisions without considering protected characteristics; those decisions are informed only by factors relevant to the risk of future loss, such as a home's age, its location, and repair costs.  *Id.* at 15–16.  Under the Rule, however, insurers must collect, store, and analyze data on insureds' and applicants' protected characteristics to determine if their practices result in or perpetuate a disparate impact.  *Id.* at 16–17.  They

---

[9] Before explaining why, I would simply note that, "[w]ith respect to the first step of the *Chevron* analysis, the FHA is silent regarding how the FHA or a private plaintiff should prove a housing discrimination claim." *Prop. Cas. Insurers*, 66 F. Supp. 3d at 1052–53.  I therefore reach *Chevron*'s second step and must uphold the Disparate-Impact Rule if it amounts to a permissible construction of the FHA. 467 U.S. at 843.

As to NAMIC's four reasons why the Disparate-Impact Rule is unlawful "to the extent it applies to insurers' ratemaking and underwriting decisions," Second Am. Compl. at 18–22 (capitalization altered); *see also* Tr. of Oral Arg. at 35:22–24, I will model my approach on the one taken in *Hodge v. Talkin*: examine the validity of the Disparate-Impact Rule's application to specific housing practices (insurers' underwriting and rating decisions), but ask whether the Rule is invalid in *all* such underwriting and rating decisions, not a particular decision that someone alleges resulted in a disparate impact.  *See* 799 F.3d 1145, 1156–57 (D.C. Cir. 2015); *see also Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012) (same principles apply to challenges to both statutes and regulations).

**J.A.138**

would then have to rewrite their underwriting and rating models to eliminate any statistical disparities the data revealed. *Id.* at 17. But doing so would mean that insurers are, as prohibited by the FHA, considering protected characteristics in a pervasive way. *Id.* at 17–18.

NAMIC is indeed correct that the Supreme Court in *Inclusive Communities* sought to establish "adequate safeguards at the prima facie stage" so as not to allow disparate-impact liability to "cause race to be used and considered in a pervasive way." 576 U.S. at 542. It is also true that the Supreme Court cautioned against "interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." *Id.* at 543.

But it is hard to see how the Disparate-Impact Rule causes the pervasive consideration of protected characteristics that NAMIC fears is inevitable. Nowhere does the Disparate-Impact Rule require those engaging in housing practices to collect or use data on individuals' protected characteristics. *See* 24 C.F.R. § 100.500 (2023). Rather, as HUD points out, the initial burden is on the *plaintiff* to prove—through data or otherwise—that a housing practice actually or predictably results in a disparate impact. *Id.* § 100.500(a), (c)(1); HUD Mot. at 21. The defendant bears no such burden. 2023 Rule, 88 Fed. Reg. at 19,480 ("Defendants need not present their own statistics in response to this step one evidence . . . ."). And although an insurer "may wish to examine whether a facially neutral policy or practice causes an unjustified discriminatory effect," *id.* at 19,469, NAMIC does not explain how the provisions of the Disparate-Impact Rule induce that sort of "self-examination" beyond what the FHA, as interpreted in *Inclusive Communities*,

already induces. *See id.* at 19,465 ("Any obligation to evaluate practices comes from the language of the Act itself, not this final rule.").

Ultimately, NAMIC's argument here is a complaint about any sort of disparate-impact liability that might apply to insurance practices. *See, e.g.*, NAMIC Mot. at 18 ("In short, disparate-impact claims are in 'inevitable and irreconcilable conflict' with core insurance principles because they require insurers to consider race, not risk, in their rating and underwriting decisions."). Although I found that complaint convincing back in 2014, *Am. Ins. Ass'n*, 74 F. Supp. 3d at 44–45, we are now living in a post–*Inclusive Communities* world. And I do not see how the Disparate-Impact Rule causes pervasive consideration of protected characteristics beyond what the FHA, according to the Supreme Court, causes.[10]

### B. State-Law Limitations on Insurance Practices

NAMIC next argues that the Disparate-Impact Rule is unlawful insofar as it forces insurers to consider the protected characteristics that state laws prohibit from consideration. NAMIC Mot. at 21–24. As NAMIC correctly points out, many states have enacted statutes that generally prohibit "unfairly discriminatory" insurance rates. Ronen Avraham, Kyle D. Logue & Daniel Schwarcz, *Understanding Insurance Antidiscrimination Laws*, 87 S. Cal. L. Rev. 195, 232 nn.124–25 (2014). And many states more specifically prohibit the consideration of certain characteristics in insurers' underwriting and rating decisions. *Id.* at 240, 248, 257, 263, 270–74; *see also id.* at 196 ("[S]tate insurance antidiscrimination

---

[10] The Court reaches that conclusion without according HUD any deference, which NAMIC argues would be inappropriate because HUD's interpretation of the FHA "raise[s] serious constitutional questions." *Miller v. Johnson*, 515 U.S. 900, 923 (1995); NAMIC Mot. at 18–20.

laws vary a great deal: in substance and in the intensity of regulation, across lines of insurance, across policyholder characteristics, and across states."). According to NAMIC, those laws "substantially limit[]" an insurer's "discretion" in its underwriting and rating decisions and thereby eliminate any cognizable disparate-impact claim. NAMIC Mot. at 23–24. And that, says NAMIC, makes the Disparate-Impact Rule unlawful. *Id.* at 24.[11]

NAMIC's argument borrows heavily from a particular passage in *Inclusive Communities*. In its discussion of a "robust causality requirement" necessary to limit the scope of viable disparate-impact claims, the Supreme Court raised some examples of housing practices in which a plaintiff might not be able to establish causation. 576 U.S. at 543. For example, a developer's decision to construct a new building in a particular location is unlikely to be "a policy causing a disparate impact because such a one-time decision may not be a policy at all." *Id.* Similarly, a state agency's policy of distributing tax credits under federal law might not be shown to cause a disparate impact if the "federal law substantially limits the [state agency]'s discretion" in its distribution. *Id.* If a plaintiff cannot show the causal connection between the policy or practice and the disparate impact, the result should be "dismissal of th[e] case." *Id.*

---

[11] NAMIC's theory here is not to be confused with one based on the McCarran-Ferguson Act, which calls for the primacy of state insurance law by prohibiting any federal law from being construed to invalidate, impair, or supersede state insurance law unless the federal law specifically relates to insurance. 15 U.S.C. § 1012(b). In its first opinion in this action, the Court saw the reverse-preemptive effect of the McCarran-Ferguson Act, in conjunction with the state laws discussed above, as a reason to hold that the FHA does not encompass disparate-impact liability. *Am. Ins. Ass'n*, 74 F. Supp. 3d at 43–46. (Again, the Supreme Court saw it differently. *Inclusive Cmtys.*, 576 U.S. at 545–46.) But the inquiry then was whether Congress intended to include disparate-impact liability in the FHA, not, as it is now, whether state law categorically severs the causation requirement in a disparate-impact claim under the FHA.

**J.A.141**

To be clear, that "robust causality requirement" actually works in favor of NAMIC's members if sued, making NAMIC's argument both counterintuitive and ultimately unconvincing. Indeed, the causation element is meant to "protect[] defendants from being held liable for racial disparities they did not create." *Id.* at 542. If an insurer is sued under a disparate-impact theory of liability, it can try to show that a state law prohibits (or requires) certain underwriting or rating decisions in a way that severs the causal connection between the insurer's practices and the disparate impact. *Id.* at 543. If successful, the insurer should be able to get the case dismissed. *Id.* But that does not make the Disparate-Impact Rule unlawful or, somehow, categorically inapplicable to insurers. *See Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 408 (Mass. 2016) (declining to adopt "a per se rule precluding disparate impact liability under the fair housing statutes where a property owner has acted in accord with statute, regulation, and contract"). It is one thing for a law to have a standard that is difficult (or perhaps even impossible) for a plaintiff to meet, and quite another for the law to be invalid. NAMIC does not explain why the latter must follow from the former. NAMIC Mot. at 24. Accordingly, it cannot succeed on its theory that state antidiscrimination laws invalidate the Disparate-Impact Rule by severing the nexus between a housing practice or policy and a disparate impact.

### C.    Claims Based Solely on Statistical Disparities

NAMIC's next argument is that the Disparate-Impact Rule conflicts with the FHA insofar as the Rule allows a claim to be established solely on statistical disparities. NAMIC Mot. at 24–26. As already discussed, the Supreme Court in *Inclusive Communities* outlined certain limitations on disparate-impact claims, like the "robust causality requirement" that

"ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create."  576 U.S. at 542 (alterations in original) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)).[12]  One corollary of that causation requirement is that disparate-impact liability cannot be established "solely on a showing of a statistical disparity."  *Id.* at 540.  Simply put, a statistical correlation does not prove causation.  *See id.* at 542 ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity." (emphasis added)).

NAMIC contrasts that limitation with the Disparate-Impact Rule, which does not include language specifically addressing how statistical evidence may (or may not) be used to establish causation.  NAMIC Mot. at 24–25.  The Rule simply requires a plaintiff, at the prima facie stage at least, to demonstrate "that a challenged practice caused or predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1) (2023); *see also id.* § 100.500(a) ("A practice has a discriminatory effect where it actually or predictably

---

[12] Back when the 2013 Rule was the operative rule being challenged in this action, American Bankers Association and its fellow amici argued that the Disparate-Impact Rule was unlawful because it did not follow *Wards Cove*'s framework for establishing disparate-impact liability, which, although abrogated in the employment context, was apparently "binding" in the housing context while the 2013 Rule was being promulgated.  Amici Curiae Br. of Am. Bankers Ass'n [Dkt. #63] at 9–12.  *See generally Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (explaining effect of 1991 amendment on *Wards Cove* framework for Title VII employment claims).  Whatever effect *Wards Cove* had on the FHA back then, it can hardly be considered the definitive word on the disparate-impact liability under the FHA after *Inclusive Communities*, which issued well before rulemaking commenced for the 2023 Rule, the operative rule now.  *See Inclusive Cmtys.*, 576 U.S. at 533 ("The cases interpreting Title VII and the ADEA provide essential background and instruction in the case now before the Court.").  That is why NAMIC's action focuses, appropriately, on the Disparate-Impact Rule vis-à-vis *Inclusive Communities*, not *Wards Cove*.  Second Am. Compl. at 18–22.

**J.A.143**

results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns . . . ."). That more general language allows "prima facie liability based entirely on a showing of statistical disparity, even if there is no evidence of causation," says NAMIC. NAMIC Mot. at 25. But "[t]he FHA forecloses that approach." *Id.*

From my perspective, NAMIC's argument reads too much into *Inclusive Communities* and not enough into the Disparate-Impact Rule. The Supreme Court's specific mention of statistical disparities was part of a broader discussion on the importance of establishing causation at the prima facie stage. *See Inclusive Cmtys.*, 576 U.S. at 542–43. And, contrary to NAMIC's position, proof of causation is exactly what the Disparate-Impact Rule requires of plaintiffs at the prima facie stage. 24 C.F.R. § 100.500(a), (c)(1) (2023). To be sure, the Supreme Court specifically called out statistical disparities as being insufficient *alone* to establish causation at the prima facie stage, *Inclusive Cmtys.*, 576 U.S. at 542, and the Disparate-Impact Rule does not. But the Disparate-Impact Rule's legal standard can still be, and is in fact, consistent with *Inclusive Communities* even if the Rule does not include the same depth of explanation as does the judicial opinion. As HUD explained when it first promulgated the Disparate-Impact Rule, the purpose of the Rule "is to formalize a long-recognized legal interpretation and establish a uniform legal standard, rather than to describe how data and statistics may be used in the application of the standard." 2013 Rule, 78 Fed. Reg. at 11,468. I therefore disagree with the premise of

NAMIC's argument: that the Disparate-Impact Rule allows a prima facie showing with nothing more than evidence of statistical disparities. Simply put: it does not![13]

### D.    Displacement of Valid Priorities

NAMIC's final argument is that the Disparate-Impact Rule violates the FHA insofar as the Rule allows plaintiffs "to force housing authorities to reorder their priorities." *Inclusive Cmtys.*, 576 U.S. at 540. As the Supreme Court observed, "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." *Id.* (quoting *Griggs*, 401 U.S. at 431). In the housing context, all sorts of valid factors—market dynamics, costs, traffic patterns, and historic architecture, to name a few—might influence where a private developer chooses to build, how zoning officials choose to draw lines, or how a housing authority chooses to allocate tax credits for low-income housing. *Id.* at 541–42. Disparate-impact liability cannot be used to force entities to make different decisions "merely because some other priority might seem preferable." *Id.* at 541. In other words, plaintiffs may not "attempt to second-guess which of two reasonable approaches a housing authority should follow in the sound exercise of its discretion." *Id.*

---

[13] I likewise disagree with NAMIC's reading of HUD's responses to certain comments in notice-and-comment for the 2013 Rule. NAMIC claims that HUD "disagreed" with comments recommending that the Rule require a party to "identify a specific practice and show the alleged discriminatory effect is caused by that specific practice." NAMIC Mot. at 25. But HUD did not quite "disagree[]" with the recommendation. It explained that some cases might allow for easy identification of a specific practice causing an alleged disparate impact, while others might involve multiple acts that, combined, create a disparate impact. 2013 Rule, 78 Fed. Reg. at 11,469. Either way, causation is required. *Id.*

NAMIC also claims that HUD confirmed a commenter's concern that the Rule would allow for lawsuits based only on statistical data. NAMIC Mot. at 25. But that comment was in regard to an entirely different section of the 2013 Rule that is not part of the Disparate-Impact Rule's burden-shifting framework, 24 C.F.R. § 100.120(b)(2) (2013), and is not being challenged by NAMIC in this action. 2013 Rule, 78 Fed. Reg. at 11,478.

According to NAMIC, the final step of the Disparate-Impact Rule's burden-shifting framework allows for such second-guessing. NAMIC Mot. at 27–28. At that final step—after a plaintiff has proven that a practice causes a discriminatory effect, and after a defendant proves that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest—a plaintiff may prevail upon proving that the interest "could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3) (2023). A plaintiff need not, however, prove that the alternative practice achieves the defendant's interest as effectively as the challenged practice, which NAMIC thinks is crucial. NAMIC Mot. at 27. In fact, HUD received comments in notice-and-comment asking it to adopt such an "equally effective" standard at the final step, but it declined to do so. 2023 Rule, 88 Fed. Reg. at 19,490–91.

To the extent that the Disparate-Impact Rule's "could be served" standard could allow for second-guessing of the type prohibited by *Inclusive Communities*, NAMIC's challenge is not the vehicle to decide it. Recall, NAMIC is challenging the Rule in every application to insurers' underwriting and rating decisions. Second Am. Compl. at 18–22. It is therefore not enough to "point to a hypothetical case in which the rule might lead to an arbitrary result." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 667 (D.C. Cir. 2019) (quoting *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991)).

But NAMIC tries just that! It proposes a hypothetical in which a plaintiff can prove that an insurer's interest in setting risk-accurate rates "could be served" by basing rates on a criterion "that has a less discriminatory effect" than the insurer's preferred criterion, even though the plaintiff's alternative reflects actual risk less accurately than the insurer's

preferred criterion and thus is not "equally effective." NAMIC Mot. at 28–29. In NAMIC's hypothetical, the insurer's preferred criterion is the high risk of fire introduced by wood-burning stoves in a particular area populated disproportionately by families who observe a particular religion; the plaintiff's proposed alternative is the risk-lowering fact that the area has several fire stations nearby. The consideration of fire stations could serve the insurer's interest in setting risk-based rates and would have less discriminatory effect (rates would be lower), but it would not be as effective in capturing risk as would consideration of the risky wood-burning stoves.

In the abstract, this over-simplified hypothetical might make sense. But in the final analysis, the Court has no way of knowing whether the consideration of fire-station proximity would actually serve an insurer's interest in setting risk-accurate rates. In fact, it would probably be rather *in*accurate to base rates solely on that criterion. Nor do I know whether consideration of that criterion actually has a less discriminatory effect. In sum, the Court cannot conclude, based on a single hypothetical in which the Disparate-Impact Rule might allow a plaintiff to second-guess an insurer's priorities, that *every* underwriting and rating decision will be second-guessed in violation of the FHA. This is, after all, a summary judgment motion, not a law school classroom discussion! *See Brennan v. Dickson*, 45 F.4th 48, 61 (D.C. Cir. 2022).

**J.A.147**

**CONCLUSION**

For the foregoing reasons, NAMIC's motion for summary judgment will be

DENIED, and HUD's cross-motion for summary judgment will be GRANTED.  An order

consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,** | ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) **Civil Case No. 13-966 (RJL)** ) |
| **UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,** | ) ) ) ) |
| **Defendants.** | ) ) |

**ORDER**

(September 19, 2023) [Dkt. ## 60, 64]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiff National Association of Mutual Insurance Companies'

Motion for Summary Judgment [Dkt. #60] is **DENIED**. It is further

**ORDERED** that defendants United States Department of Housing and Urban

Development and Marcia L. Fudge's Motion for Summary Judgment [Dkt. #64] is

**GRANTED**. It is further

**ORDERED** that the case is **DISMISSED** in its entirety.

**SO ORDERED**.

_____
RICHARD J. LEON
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES, | |
| Plaintiff, | Case No. 1:13-cv-00966 (RJL) |
| v. | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, | |
| Defendants. | |

<u>**NOTICE OF APPEAL**</u>

Plaintiff National Association of Mutual Insurance Companies appeals to the United States Court of Appeals for the District of Columbia Circuit from the order denying summary judgment in favor of plaintiff, granting summary judgment in favor of defendants, and dismissing the case in its entirety, Dkt. 156, entered on September 19, 2023.

/s/ *Kannon K. Shanmugam*
Kannon K. Shanmugam
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com

*Counsel for National Association of Mutual Insurance Companies*

J.A.150