**ORAL ARGUMENT SCHEDULED NOVEMBER 20, 2024**

No. 23-5275

# In the United States Court of Appeals for the District of Columbia Circuit

———————————————

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,
PLAINTIFF-APPELLANT

*v.*

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
AND ADRIANNE TODMAN, IN HER OFFICIAL CAPACITY
AS ACTING SECRETARY OF HOUSING AND URBAN DEVELOPMENT,
DEFENDANTS-APPELLEES

———————————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (CIV. NO. 13-966)
(THE HONORABLE RICHARD J. LEON, J.)*

———————————————

**SUPPLEMENTAL BRIEF OF APPELLANT**

———————————————

KANNON K. SHANMUGAM
WILLIAM T. MARKS
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

Introduction and summary of argument.................................................................1

Background .................................................................................................................2

Argument ....................................................................................................................6

    A.    The Association's standing is 'self-evident' because the disparate-impact rule constrains the scope of the Association's members' lawful conduct ..........................................7

    B.    The disparate-impact rule will require the Association's members to incur compliance costs .................................................11

    C.    The Association's standing is not based on self-inflicted present harm designed to avoid uncertain future harm...............14

# TABLE OF AUTHORITIES

## CASES

*Arizona* v. *EPA*, 77 F.4th 1126 (D.C. Cir. 2023) ...................................................8

*Association of Private Sector Colleges & Universities* v. *Duncan*, 681 F.3d 427 (D.C. Cir. 2012)............................................................12

*Attias* v. *Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) ............................... 16-17

*Bonacci* v. *TSA*, 909 F.3d 1155 (D.C. Cir. 2018)............................................8

*Center for Biological Diversity* v. *EPA*, 56 F.4th 55 (D.C. Cir. 2022) ....................................................................6

*Chlorine Chemistry Council* v. *EPA*, 206 F.3d 1286 (D.C. Cir. 2000).................................................................12, 14

*Clapper* v. *Amnesty International USA*, 568 U.S. 398 (2013)........................................................... 1, 2, 14-16

*Columbia Gulf Transmission* v. *FERC*, 106 F.4th 1220 (D.C. Cir. 2024) ............................................................10, 12

Page

Cases—continued:

*Corbett* v. *TSA*, 19 F.4th 478 (D.C. Cir. 2021)....................................................8, 10

*Estate of Boyland* v. *USDA*, 913 F.3d 117 (D.C. Cir. 2019)..............................10

*Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992)................................ 7, 15-16

*Martinez* v. *City of Clovis*, 307 Cal. Rptr. 3d 64 (Ct. App. 2023) .....................17

*Noel* v. *City of New York*, Civ. No. 15-5236,
    2023 WL 3160261 (S.D.N.Y. Apr. 28, 2023) .....................................................17

*Office of Personnel Management Data Security Breach
    Litigation, In re*, 928 F.3d 42 (D.C. Cir. 2019)........................................12, 13

*Sierra Club* v. *EPA*, 292 F.3d 895 (D.C. Cir. 2002)........................................7, 10

*State National Bank of Big Spring* v. *Lew*,
    795 F.3d 48 (D.C. Cir. 2015)....................................................................................12

*Texas Department of Housing & Community Affairs*
    v. *Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015)............................................................................................. 3-4

*United States* v. *Students Challenging Regulatory Agency
    Procedures*, 412 U.S. 669 (1973)................................................................ 12-13

*Virginia* v. *American Booksellers Association, Inc.*,
    484 U.S. 383 (1988)....................................................................................................11

*Window Covering Manufacturers Association* v. *CPSC*,
    82 F.4th 1273 (D.C. Cir. 2023) ...........................................................................8

## STATUTES AND REGULATIONS

Fair Housing Act, 42 U.S.C. §§ 3601-3619..........................................2-3, 5, 9-11

24 C.F.R. § 100.5(b) ......................................................................................................8

## MISCELLANEOUS

Page

78 Fed. Reg. 11,460.........................................................................................8, 11, 14

88 Fed. Reg. 19,450.................................................................................................4, 8

## GLOSSARY OF ABBREVIATIONS

**FHA**:   Fair Housing Act

**HUD**:   United States Department of Housing and Urban Development

Pursuant to the Court's order of October 25, 2024, appellant National Association of Mutual Insurance Companies (the Association) respectfully submits this supplemental brief regarding Article III standing.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Association challenges the disparate-impact rule on behalf of home-owner's insurers that are directly regulated by it. The rule purports to make unlawful ratemaking and underwriting practices that cause a disparate impact. Those practices would be permissible but for the rule—giving rise to a cognizable injury in fact that is fairly traceable to the rule and redressable by this Court. In such circumstances, this Court has long recognized that a plaintiff's standing is "self-evident" without resort to additional evidence. But here, the Association has also offered undisputed evidence showing that the rule will require its members to incur substantial monetary costs to ensure that their practices comply with the rule's substantive standards. Those compliance costs confirm the Association's standing.

The district court twice concluded that the Association has standing to challenge the disparate-impact rule, and the government expressly declined to challenge those determinations on appeal. In its supplemental-briefing order, this Court cited *Clapper* v. *Amnesty International USA*, 568 U.S. 398, 415 (2013), for the proposition that "a plaintiff cannot manufacture standing by inflicting harm on itself based on fear of uncertain future harm." But unlike

in *Clapper*, the Association's members are directly regulated by the disparate-impact rule, and their standing does not turn on a highly speculative chain of causation stemming from the regulation of third parties. The Association thus has standing to challenge the disparate-impact rule.

## BACKGROUND

The parties have twice addressed the question of whether the Association has Article III standing to challenge the disparate-impact rule. In both instances, the district court correctly held that the Association has standing.

1.     After the Association filed its initial complaint challenging the version of the disparate-impact rule promulgated in 2013, the government moved to dismiss, arguing, *inter alia*, that the Association lacked standing. D. Ct. Dkt. 21. The government claimed that the Association "failed to identify a single member that [was] allegedly injured by the [r]ule," *id.* at 8; that it could not "presume[] that [its] members will inevitably have to modify current underwriting practices" in order to avoid disparate-impact liability because their practices could be "lawful if supported by a legally sufficient justification," *id.* at 10 (citation omitted); and that the members' injuries were not traceable to the rule nor redressable by the relief sought, because "preexisting legal requirements"—out-of-circuit precedent applying disparate-impact liability under the Fair Housing Act—were the real source of injury, *id.* at 12-14; *see* Br. of Appellees 5 n.3 (acknowledging that the D.C. Circuit has not previously

2

applied disparate-impact liability under the FHA). In opposition, the Association explained that its standing was "self-evident" because the rule regulated its members, but it also offered evidence that its members would incur compliance costs as a result of the rule and that at least one member had been the subject of multiple disparate-impact complaints. D. Ct. Dkt. 27, at 2-18.

The district court held that the Association had standing to challenge the disparate-impact rule. D. Ct. Dkt. 45. The court first reasoned that the Association's standing was "self-evident" and that it need not submit any additional evidence to establish standing because the rule was "clearly intended to apply to the provision and pricing of homeowner's insurance," making the Association's members the object of the regulation. *Id.* at 12-14 (internal quotation marks and citation omitted). The district court then explained that the Association's evidence regarding the compliance costs its members would incur as a result of the rule "further cement[ed]" its standing. *Id.* at 14. The court determined that those injuries were fairly traceable to the rule and redressable by the relief sought because the rule "changed the law" by "resolv[ing] whatever uncertainty existed as to the availability of disparate-impact liability." *Id.* at 14-15 & n.14.

2.    Following the Supreme Court's decision in *Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), the Association filed an amended complaint alleging that the

3

disparate-impact rule violated the limitations on disparate-impact liability recognized in *Inclusive Communities*.  D. Ct. Dkt. 57.  The parties filed cross-motions for summary judgment in 2016.  D. Ct. Dkt. 60, 64.  The Association's motion included affidavits from fifteen of its members explaining that the disparate-impact rule would require them to bear the costs of collecting, storing, and analyzing demographic data on its insureds that they would not otherwise collect.  J.A. 32-84.  The government did not contest the Association's standing in its own motion.  *See generally* D. Ct. Dkt. 64.  Before the district court could rule on the motions, the litigation was stayed and remained stayed for the remainder of the Trump Administration.  *See* Br. of Appellant 12-15.

The stay was lifted after the Biden Administration announced its intent to revoke the disparate-impact rule promulgated by the Trump Administration.  J.A. 26.  At a July 2021 hearing, the government unexpectedly revived its standing challenge, arguing that the Association's injuries were not concrete and were not traceable to the disparate-impact rule or redressable by the district court.  D. Ct. Dkt. 126, at 20.  The government reiterated those arguments in supplemental briefing after the hearing, D. Ct. Dkt. 128, at 11-16, and again in supplemental briefing following promulgation of the Biden Administration's 2023 rule, D. Ct. Dkt. 150, at 8-16.  Each time, the government argued that the Association's affidavits did not substantiate its claim of present or imminent injury to its members and that the Association could not

establish traceability and redressability because the rule duplicated preexisting legal duties imposed by the FHA. D. Ct. Dkt. 128, at 11-16; D. Ct. Dkt. 150, at 10-14.

The district court again held that the Association had standing to challenge the disparate-impact rule on behalf of its members. J.A. 130. The court had "no doubt" that the Association has standing because "every single member likely has standing," given that the rule "applies to the insurance practices engaged in by [the Association's] members" and "sets a legal standard under which insurance companies may become liable for violating the FHA." *Id.* The court accordingly reiterated that the Association's standing was "self-evident." J.A. 133. On traceability and redressability, the court reasoned that "HUD curiously undersells the [rule], which does not simply restate preexisting legal duties," but goes "beyond established law," including in this circuit "where no judicially crafted standard has ever existed." J.A. 131-132 (citations omitted).

The court also acknowledged that the Association had "submitted affidavits from fifteen employees at certain of its member companies, and they all explained that they would need to start collecting data about applicants' and insureds' protected characteristics (which they otherwise do not do) in order to ensure compliance" with the rule. J.A. 132. But ultimately, the court held

that the Association "has established its standing even without the data-collection burdens its members would purportedly bear" under the rule.  J.A. 133.

3.      In this appeal, the government affirmatively declined to challenge the district court's holding that the Association has standing.  *See* Br. 16 n.7.

## ARGUMENT

As a trade association bringing suit on behalf of its members, the Association has Article III standing as long as at least one of its members would have standing to sue in its own right; the interest sought to be protected is germane to its organizational mission; and the suit does not require the participation of individual members.  *See*, *e.g.*, *Center for Biological Diversity* v. *EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022).  The second and third requirements have never been in dispute and are plainly satisfied:  as the district court explained, the interest sought to be protected is the Association's "*raison d'être*," and there is no reason why participation by the Association's individual members would be required.  J.A. 130.

The first requirement is readily satisfied here as well.  A member of the Association has standing if it "suffers injury-in-fact fairly traceable to the challenged action that is likely to be redressed by a favorable decision."  *Center for Biological Diversity*, 56 F.4th at 67.  The disparate-impact rule directly regulates the Association's members, providing two straightforward bases for standing.  *First*, the disparate-impact rule directly constrains the members'

lawful range of conduct by imposing liability for standard risk-based processes, making the Association's standing "self-evident." *Sierra Club* v. *EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). *Second*, the disparate-impact rule will cause the Association's members to incur additional compliance costs. Those injuries are concrete and non-speculative, fairly traceable to the rule, and redressable by a favorable judgment. The Association thus has standing to challenge the disparate-impact rule.

## A.   The Association's Standing Is 'Self-Evident' Because The Disparate-Impact Rule Constrains The Scope Of The Association's Members' Lawful Conduct

The Association's standing is self-evident because the disparate-impact rule directly regulates its members and constrains the lawful scope of rate-making and underwriting practices. The Association thus has standing to challenge the rule regardless of any additional evidence it submitted in support of its standing.

1.     When a plaintiff challenging a government regulation is "an object of the action," there is "little question" that the action has "caused him injury, and that a judgment preventing  .  .  .  the action will redress it." *Sierra Club*, 292 F.3d at 900 (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561-562 (1992)). In such cases, "the [plaintiff's] standing to seek review of administrative action is self-evident," and "no evidence outside the administrative record is necessary for the court to be sure of it." *Id*. at 899-900.

This Court has routinely found standing to challenge a regulation to which the plaintiff is directly subject.  For example, a pilot had standing to challenge a screening program because he was "subject to" the agency program.  *Bonacci* v. *TSA*, 909 F.3d 1155, 1160 (D.C. Cir. 2018).  An airline passenger "clearly" had standing to challenge a mask mandate because he was "the target of the [agency's] regulations."  *Corbett* v. *TSA*, 19 F.4th 478, 483 (D.C. Cir. 2021).  And a trade association had standing to challenge an agency's product safety standards because its members manufactured products subject to those standards, making them the "object of the action at issue."  *Window Covering Manufacturers Association* v. *CPSC*, 82 F.4th 1273, 1282 (D.C. Cir. 2023) (citation and alteration omitted).  Those cases reflect the common-sense principle that a regulated party has standing to challenge agency action when the action "constrain[s] what [the party] may lawfully do."  *Arizona* v. *EPA*, 77 F.4th 1126, 1131 (D.C. Cir. 2023).

2.    The Association's standing is similarly obvious here.  On its face, the disparate-impact rule applies to homeowner's insurers' ratemaking and underwriting practices.  The rule applies to "the provision of services in connection" with "the sale or rental of dwellings," 24 C.F.R. § 100.5(b), and HUD expressly extended the rule's governing standards to the provision and pricing of homeowner's insurance by refusing to exempt those practices from its scope.  78 Fed. Reg. 11,475; *see also* 88 Fed. Reg. 19,463.  Eliminating any

doubt, the Association submitted affidavits at summary judgment confirming that the rule directly regulates its members. *See* J.A. 32-84. The government has not disputed any of those points. *See* Br. of Appellee 26-30.

The disparate-impact rule also imposes substantive standards of conduct that constrain the scope of the Association's members' ratemaking and underwriting practices. As the Association has explained, the rule "imposes unique harm to the insurance industry" by purporting to resolve "whether homeowner's insurers are subject to disparate-impact liability under the FHA"—an unsettled question. Reply Br. 8. And the rule's regulation of ratemaking and underwriting practices exceeds the scope of permissible disparate-impact liability under the FHA by requiring the pervasive consideration of protected characteristics in the business of insurance. *See* Br. of Appellant at 22-39. Put another way, the rule requires insurers to abandon facially neutral ratemaking and underwriting practices in order to ensure that their practices do not impose a disparate impact on the basis of any protected characteristic, and the rule makes them liable if their practices do. The rule thus purports to make unlawful race-neutral ratemaking and underwriting practices that would be permissible but for the rule. That is a straightforward, cognizable Article III injury.

To be sure, the government offers a different view of the rule on the merits (Br. 30-35), but it is well settled that, "when considering whether a

9

plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of his or her legal claim." *Estate of Boyland* v. *USDA*, 913 F.3d 117, 123 (D.C. Cir. 2019). Because the Association's position is that the disparate-impact rule constrains the scope of lawful ratemaking and underwriting practices of homeowner's insurers, it is "self-evident" that the rule inflicts a cognizable injury-in-fact on members of the Association that is fairly traceable to the rule and redressable by a favorable judgment. *Sierra Club*, 292 F.3d at 899-900.

3.     In the district court, the government argued that any alleged injury to homeowner's insurers is not fairly traceable to the disparate-impact rule because the regulation "essentially duplicates pre-existing legal duties." D. Ct. Dkt. 150, at 13. For an injury to be fairly traceable to a defendant's conduct, the plaintiff must "demonstrate that the challenged conduct triggered additional . . . harm or additional . . . responsibility." *Columbia Gulf Transmission* v. *FERC*, 106 F.4th 1220, 1228 (D.C. Cir. 2024) (internal quotation marks and citation omitted; alterations in original). When two government actions impose similar obligations, a regulated party has standing to challenge either action as long as there is not a "one-for-one fit" as to the scope of the actions, even if that difference is "slight." *Corbett*, 19 F.4th at 484.

Here, the disparate-impact rule imposes additional harm and additional responsibility on homeowner's insurers beyond both the FHA itself and exist-

ing judicial precedent.  Through the disparate-impact rule, HUD sought to settle the debate over whether disparate-impact liability could apply to the ratemaking and underwriting practices of homeowner's insurers, and the agency endeavored to set "uniform standards" for determining when a housing practice with a discriminatory effect violates the FHA.  78 Fed. Reg. 11,463.  In so doing, the agency "went beyond established law" in this circuit and others.  J.A. 131-132 (citation omitted); *see also* Br. of Appellant 7-8.  Indeed, as the district court noted, if the rule had "zero practical effect," that would raise the obvious question of why the agency would have "promulgate[d] it in the first place."  J.A. 132.  The disparate-impact rule thus imposes a discrete injury redressable by a decision vacating the rule as applied to the ratemaking and underwriting practices of homeowner's insurers.

## B.     The Disparate-Impact Rule Will Require The Association's Members To Incur Compliance Costs

Even if the Association's standing were not self-evident by virtue of the direct regulation of its members, the record demonstrates that the rule will require the Association's members to incur substantial compliance costs, which confirms the Association's standing.

1.     Courts have long recognized that a party has standing to challenge a law that imposes additional compliance costs.  *See, e.g.*, *Virginia* v. *American Booksellers Association, Inc.*, 484 U.S. 383, 392 (1988).  This Court has found standing based on the incurrence of compliance costs in various circumstances,

11

such as where a regulated party would incur additional costs to remedy past conduct, *Chlorine Chemistry Council* v. *EPA*, 206 F.3d 1286, 1290 (2000); to implement new compliance processes, *State National Bank of Big Spring* v. *Lew*, 795 F.3d 48, 53 (2015); *Association of Private Sector Colleges & Universities* v. *Duncan*, 681 F.3d 427, 458 (2012); or to mitigate future, non-speculative risks, *Columbia Gulf Transmission*, 106 F.4th at 1229; *In re Office of Personnel Management Data Security Breach Litigation*, 928 F.3d 42, 59 (2019).

The Association has shown, through undisputed affidavits submitted at summary judgment, that its members will incur a wide range of costs to comply with the disparate-impact rule. *See* J.A. 32-84. The Association's members will need to collect demographic data on existing and new policyholders, develop new user interfaces to collect the data, expand data warehouse capabilities, create new software, build out new rating models, hire additional employees, hire consultants to develop new policies and procedures, and rewrite their underwriting guidelines. *See, e.g.*, J.A. 33, 35, 37, 40, 56-57, 83. The members must do this initially to assess the compliance of their existing practices and continuously to monitor their future practices. *See, e.g.*, J.A. 35, 37. Indeed, incurring those costs is the only way to ensure that the Association's members' ratemaking and underwriting practices do not result in or perpetuate a disparate impact. *See* Br. of Appellant 27. And although compliance costs need not be significant to establish standing, *see, e.g.*, *United States* v. *Students*

12

*Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973), the Association's members explained in their affidavits that such compliance measures would be "extremely expensive," "onerous," and "enormous." J.A. 60, 71, 83.

Nor are those significant compliance costs speculative. As already discussed, *see* pp. 8-10, the Association's members are directly regulated by the disparate-impact rule. Absent relief, the rule is guaranteed to apply to them. And the undisputed evidence shows that the members will need to incur the costs in order to ensure their compliance with the rule. *See*, *e.g.*, J.A. 35, 44-45, 56-57, 60. That evidence indicates that members are certain to incur those costs or, at a minimum, that there is a substantial risk that they will need to incur the costs. That suffices to establish an injury in fact. *See Data Security Breach Litigation*, 928 F.3d at 59. And for the same reasons as already discussed, *see* pp. 10-11, those costs are fairly traceable to the rule and are redressable by a favorable judgment, because the undisputed evidence shows that the Association's members would not incur the costs but for the rule. *See* J.A. 32-33, 34-35, 39, 56, 65.

2.    On appeal, the government argues that the uncontested affidavits submitted by the Association should be disregarded because they do not indicate that "any insurers had started collecting and using data regarding protected traits when they were filed in 2016, three years after the issuance of the

13

2013 Rule." Br. 32. Although the government frames that issue in terms of the merits, it advanced a similar argument with respect to standing in the district court. *See* D. Ct. Dkt. 150, at 10-12. But as the Association has explained (Reply Br. 14-16), the scope and continued existence of the disparate-impact rule have been highly uncertain throughout the long history of this litigation. The absence of past or present negative effects flowing from the rule thus says little about the future effects of the rule once the legal challenges are resolved. That same reasoning applies with equal force to the Association's standing, especially because evidence of past injury is not required to show future injury. *See Chlorine Chemistry Council*, 206 F.3d at 1289. Because of the litigation history surrounding the rule, it makes little sense to look backwards to assess whether homeowner's insurers will incur costs to comply with the rule if it is ultimately upheld.

## C.     The Association's Standing Is Not Based On Self-Inflicted Present Harm Designed To Avoid Uncertain Future Harm

In its supplemental-briefing order, the Court cited *Clapper* v. *Amnesty International USA*, 568 U.S. 398, 415 (2013), for the proposition that "a plaintiff cannot manufacture standing by inflicting harm on itself based on fear of uncertain future harm." C.A. Doc. No. 2082036. *Clapper* is inapposite.

1.     *Clapper* involved a challenge to Section 702 of the Foreign Intelligence Surveillance Act, which allows the government to acquire foreign intelligence information on individuals who are not "United States persons." 568

U.S. at 401.  The challenge was not brought by anyone directly subject to the statute, but instead by United States persons whose communications could have been incidentally intercepted through their work with non-United States persons potentially subject to surveillance.  *Id.* at 406-407.  The Court rejected the plaintiffs' theory of standing based on the alleged increased risk of interception of their own communications, because it depended on a "speculative chain of possibilities" involving the conduct of third parties, and the plaintiffs could not establish even a "substantial risk" of harm.  *Id.* at 414 & n.5.  Because the risk that the plaintiffs' communications would be intercepted was too speculative, the Court also rejected the plaintiffs' claim that they would incur additional costs to avoid surveillance.  *Id.* at 415-416.  The Court reasoned that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm" that is speculative.  *Id.* at 416.

That reasoning has no application here.  In *Clapper*, the plaintiffs challenged a law that regulated third parties—the non-United States persons potentially subject to surveillance.  568 U.S. at 411.  The relevant provision of the statute even "expressly provide[d]" that the plaintiffs, as United States persons, could not "be targeted for surveillance."  *Id.*  Where "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," it is well settled that "much more is needed" to

15

establish standing. *Lujan*, 504 U.S. at 562. But here, the Association's members are the "object of the government action," *id.*, and their conduct is directly constrained by the disparate-impact rule, *see* pp. 8-10, *supra*. Unlike in *Clapper*, therefore, the Association's standing is self-evident.

*Clapper* also does not bar standing based on the Association's evidence of compliance costs. If the disparate-impact rule is upheld, the Association's members will necessarily incur compliance costs as a direct result of being subject to its regulation. *See* pp. 12-13, *supra*. That makes this case a far cry from *Clapper*, where the costs incurred by plaintiffs were not related to compliance with the law itself but were instead an attempt to avoid the speculative possibility of being subject to the surveillance in the first place. 568 U.S. at 415-416. *Clapper* thus has no application here, because the Association's standing follows directly from the disparate-impact rule and does not depend on a speculative chain of possibilities.

2. Although the Association can establish standing based on the fact that the rule directly regulates its members, it has also shown a substantial risk that the disparate-impact rule will be affirmatively enforced against its members in the future. As this Court has explained, a party can establish "substantial risk of harm" where "[n]o long sequence of uncertain contingencies involving multiple independent actors has to occur before the plaintiffs . . . will suffer any harm"—especially where the harm has already occurred.

*Attias* v. *Carefirst, Inc.*, 865 F.3d 620, 629 (2017).  Here, there is no attenuated chain of contingencies between the Association's members and the disparate-impact rule.  The government refused to exclude the ratemaking and under-writing practices of homeowner's insurers from the scope of the disparate-impact rule, and disparate-impact claims relying on the rule have already been brought.  *See*, *e.g.*, D. Ct. Dkt. 27-1, at 1-6; *Noel* v. *City of New York*, Civ. No. 15-5236, 2023 WL 3160261, at *3 & n.7 (S.D.N.Y. Apr. 28, 2023); *Martinez* v. *City of Clovis*, 307 Cal. Rptr. 3d 64, 104 (Ct. App. 2023).  The Association's members thus have faced, and will continue to face, a substantial risk of harm while they remain subject to the disparate-impact rule.  The Association thus has standing to challenge the disparate-impact rule.

Respectfully submitted,

/s/ KANNON K. SHANMUGAM

KANNON K. SHANMUGAM
WILLIAM T. MARKS
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

NOVEMBER 8, 2024

17

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellant National Association of Mutual Insurance Companies and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g) and this Court's order of October 25, 2024, that the foregoing Supplemental Brief of Appellant is proportionately spaced, has a typeface of 14 points or more, and contains 3,874 words.

NOVEMBER 8, 2024                    /s/ KANNON K. SHANMUGAM
                                    KANNON K. SHANMUGAM